**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

ESWARAN SUBRAMANIAN, Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

MICHAEL D. WATFORD,
GARLAND R. SHAW,
C. BRADLEY JOHNSON,
DAVID W. HONEYFIELD and
JERALD J. STRATTON, JR.,

      Defendants.

---

**PLAINTIFF'S CLASS ACTION COMPLAINT FOR VIOLATION**
**OF THE FEDERAL SECURITIES LAWS**

---

Plaintiff Eswaran Subramanian ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against the defendants named herein, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") and bankruptcy filings of Ultra Petroleum Corp. ("Ultra" or the "Company"), the Company's press releases and analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all purchasers of Ultra common stock between April 13, 2017 and August 8, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") against certain of the Company's current and former senior executives.

2.      Ultra is an oil and gas development company with primary assets in the Pinedale and Jonah fields of the Green River Basin of southwest Wyoming.  Over 80% of the Company's revenues have historically been derived from the development and sale of natural gas.  On May 14, 2020, Ultra filed for bankruptcy protection for the second time in four years and, as a result, is not named as a defendant in this action.

3.      At the start of the Class Period, in April 2017, Ultra exited a court-supervised reorganization under Chapter 11 of the U.S. Bankruptcy Code.  At the time, Ultra's management hailed the Company's purportedly streamlined and flexible financial profile, lower debt load, access to credit lines, and production growth capabilities.  Ultra's management also represented that the Company was well positioned to service its remaining $2 billion debt load and not at risk of any further court-ordered reorganizations, even in the event of a sustained declined in the price of natural gas.

4.      Unusually, the bankruptcy afforded equity holders a substantial recovery in the form of newly issued equity in the reorganized Company, leading defendant Michael D. Watford (Ultra's then-Chairman and Chief Executive Officer) to boast to investors: "We didn't haircut anyone at all." On the basis of this purportedly favorable conclusion to the bankruptcy, Ultra executives and other employees received lavish equity awards worth an estimated $300 million at the time.  Defendant

Watford alone received $35 million worth of equity compensation, roughly ten times his prior annual compensation.

5.      Ultra exited the bankruptcy purportedly in "growth mode." Defendants stated that the Company was poised to maximize the value of its substantial oil and gas deposits (which they valued at $4.19 billion, including $1.5 billion of proved undeveloped reserves) through ramped up production in 2017 and 2018. They likewise claimed that Ultra was on track to produce between 290 and 300 billion cubic feet equivalent ("Bcfe") in 2017, with 25% production growth over these figures in 2018. Defendants represented that the Company had the financial and production flexibility to weather even a low-commodity-price environment and was set to ramp up well development with 10 rigs operating by 2018 on the back of an estimated $788 million capital budget. Accretive to this plan was the launch of a horizontal well drilling program, which Ultra executives claimed was set to significantly expand the production capabilities of the Company's existing wells.

6.      These and similar statements to investors were materially false and misleading when made. Throughout the Class Period, defendants, *inter alia*: (i) materially overstated the value of Ultra's oil and gas reserves; (ii) materially misrepresented the Company's ability to ramp up production and its financial flexibility; (iii) failed to disclose the Company's extreme sensitivity to even a modest decline in natural gas prices; and (iv) concealed significant setbacks in the Company's vaunted horizontal well drilling program.

7.      Soon after exiting bankruptcy, cracks in defendants' false and misleading narrative appeared when Ultra provided disappointing financial and operational results for its second quarter of 2017 – the ***same quarter*** in which Ultra had exited the bankruptcy proceedings. However, the full truth about defendants' fraud would not be fully revealed until two years later, after a series of

shocking revelations demonstrated that Ultra could not grow production by any meaningful amount and that its wells were worth a fraction of the values previously represented. By the end of the Class Period, Ultra was forced to completely halt well development, abandon its horizontal well program, and admit that its undeveloped proved reserves – previously valued at $1.5 billion – were in fact worthless.

8.     These adverse developments and the concomitant impact on the price of Ultra stock occurred despite a relatively modest decline in the price of natural gas, as reflected in the following chart:



9.     Ultra stock has now been delisted. In May 2020, the Company was forced to enter bankruptcy proceedings yet again in order to seek a court-ordered reorganization. This time around,

however, the Company claimed its equity is worthless and that shareholders should get nothing. The bankruptcy court approved the Company's reorganization plan on August 21, 2020.  The bankruptcy court approved the Company's reorganization plan on August 21, 2020.

10.     The price of Ultra stock has plummeted 99% from its Class Period high to a low of less than $0.01 per share, causing investors in the Company to suffer tremendous losses.  This lawsuit seeks recompense for those losses, which are the result of defendants' fraud as detailed herein.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

13.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.  Non-party Ultra's headquarters are in this District.

14.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## RELEVANT NON-PARTY

15.     Non-party Ultra is a petrochemical company focused on developing its natural gas reserves located in southwest Wyoming.  The Company moved its headquarters to Englewood,

Colorado in 2018 from Houston, Texas.  Prior to being delisted, Ultra stock traded on NASDAQ under the ticker symbol "UPL."  Ultra shares currently trade over-the-counter under the ticker symbol "UPLCQ."  On May 14, 2020, the Company filed for a court-supervised reorganization under Chapter 11 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court, Southern District of Texas, Case No. 20-bk-32631.

## PARTIES

16.     Plaintiff Eswaran Subramanian purchased Ultra common stock during the Class Period, as detailed in the attached certification incorporated herein, and has been damaged thereby.

17.     Defendant Michael D. Watford ("Watford") was Ultra's Chief Executive Officer ("CEO"), President, and Chairman of the Board of the Directors during the Class Period until his retirement in February 2018.

18.     Defendant Garland R. Shaw ("Shaw") was Ultra's Chief Financial Officer ("CFO") and Senior Vice President during the Class Period until November 2018.

19.     Defendant C. Bradley Johnson ("Johnson") is Ultra's President and CEO and a member of Ultra's Board of Directors.  Defendant Johnson formerly served as Ultra's Senior Vice President of Operations until February 2018 and as interim CEO from March 2018 to March 2019.

20.     Defendant David W. Honeyfield ("Honeyfield") is Ultra's Chief Financial Officer ("CFO") and Senior Vice President, roles he has held since November 2018.

21.     Defendant Jerald J. Stratton, Jr. ("Stratton") is Ultra's Chief Operating Officer ("COO") and Senior Vice President, roles he has held since June 2018.

22.     Defendants Watford, Shaw, Johnson, Honeyfield and Stratton are collectively referred to herein as "defendants."  Defendants made, or caused to be made, false statements that artificially inflated the price of Ultra common stock during the Class Period.

## CONTROL PERSONS

23.     As officers and controlling persons of a publicly held company whose common stock was traded on NASDAQ and is governed by the provisions of the federal securities laws, defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein, were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Ultra, defendants each had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Ultra and its business or adopted by the Company materially false and misleading.

25.     Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company issued during the Class Period. Each defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

26.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Ultra. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Ultra common stock was a success, as it: (i) deceived the investing public regarding Ultra's prospects and business; (ii) artificially inflated the price of Ultra common stock; and (iii) caused plaintiff and other members of the Class (as defined below) to purchase Ultra common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

27.     Ultra is an energy exploration and production company primarily focused on producing natural gas reserves in the Green River Basin of Wyoming, where the Company has two principle exploration sites, the Pinedale Field and the Jonah Field. Ultra's website claims that "Ultra is the top natural gas producer in the State of Wyoming," and that "[p]roduction in Pinedale," alone, "can support the Company in virtually any reasonable commodity price environment."[1] The

---

[1]  *See* Ultra Petroleum Corp., *Operations*, https://www.ultrapetroleum.com/operations/ (last visited Aug. 11, 2020).

Company, at the beginning of the Class Period, also had smaller operations and/or oil and gas leases in Utah, Colorado and Pennsylvania, which it subsequently divested.

28.     Following a period of depressed natural gas prices, on April 29, 2016, Ultra, together with a number of its subsidiaries, filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court, Southern District of Texas, Case No. 16-bk-32202 (the "2016 Bankruptcy").  As defendant Watford explained during the Company's February 22, 2017 earnings call: "2016 was certainly a difficult year for us with low natural gas prices, necessitating lower CapEx, lower production, lower EBITDA and cash flow and the need for a restructuring of the balance sheet."  Trading in Ultra common stock was suspended during its bankruptcy.

29.     Ultra exited the 2016 Bankruptcy less than a year later, in April 2017.  The exit and restructuring plan was unusual because it afforded the Company's equity holders a substantial recovery in the form of new equity in the restructured Company.  In addition, the Company secured approximately $2.98 billion worth of exit refinancing, including: (i) a $400 million revolving credit facility; (ii) $500 million worth of 7.25% senior notes due 2025; (iii) $700 million worth of 6.875% senior notes due 2022; (iv) an $800 million senior second term loan agreement; and (v) the completion of a $580 million equity rights offering for common stock.  The size of the term loan agreement and the revolving credit facility were determined in part by Ultra's "borrowing base," which is set by the purported value of the Company's oil and gas reserves and acts as a type of collateral.  The higher the value of the borrowing base the more a company such as Ultra can borrow against it to fund operations, expand production or use for other corporate purposes.

30.     Ultra employees, including several of the defendants, benefitted handsomely from the reorganization.  Insiders were estimated to share 7.5% of Ultra's new shares in the reorganized

Company, worth approximately $300 million at the time. Defendant Watford alone was estimated to have received $35 million worth of Ultra shares for his role in steering the Company through its reorganization, roughly 10 times his annual compensation. *The Wall Street Journal* covered the surprising payouts in an April 2017 article entitled "Most Lucrative Energy Job?  Some Say It's CEO of a Bankrupt Company."  The article cited one industry insider who observed that, based on Ultra's example, "surprising[ly]," "the most lucrative job in the oil-and-gas industry in the last year is a senior executive at a bankrupt company."

31.      Defendant Watford and other Ultra executives claimed that the payouts were justified because of the purportedly solid financial footing that they had placed the Company on through the reorganization process.  As defendant Watford explained during a June 28, 2017 investor conference:

> *We recently emerged from an in-court restructuring, couldn't get done what we needed to get done out of court, did it in court, very unique result because we were a solvent bankrupt company, which means that we had a lot of equity value at the end of the day, so that we paid everyone off what they were owed, principal, interest, vendors, everyone.  We didn't haircut anyone at all.*  And as a result of that, our old shareholders own slightly less than 50% of the company.  On a go-forward basis, the old 5 members of the board continued with 2 additions and management continues.  So very unique situation where through reorganization, we fixed some things we had to fix.  But solvency, a lot of equity value retained.  But there are some clear benefits with the reorganization, we're going to talk about in just a minute.  We're going to mention our company highlights, asset review, which is really Pinedale, our guidance for 2017 and then wrap up summary.
>
> *Benefits from the ugly times spent in in-court restructuring, as we like to call it, we materially improved our already low-cost structure* . . . .[2]

32.      Although Ultra retained more than $2 billion in debt following the 2016 Bankruptcy, its executives claimed that the Company could easily service this debt while maintaining positive

---

[2]   Emphasis has been added unless otherwise noted.

cash flows, growing production and achieving profitability.  For example, in the Ultra financial representations prepared and provided to investors by defendants Watford, Shaw and Johnson in support of the Company's proposed plan of reorganization and disclosure statement (the "Bankruptcy Representations"), the Company stated capital expenditures would total $408 million during the nine months ended December 31, 2017, an amount projected to rise to $788 million by 2018 and to $800 million by 2019.  In the Bankruptcy Representations, defendants also stated that Ultra would operate four rigs in 2017, before ramping up to ten rigs by 2018.  Ultra was projected to generate net income of $354 million during the nine months ended December 31, 2017, $531 million in 2018, and $617 million in 2019, and adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") of $557 million, $875 million, and $1.012 billion during these respective time frames.  Company filings further stated that Ultra's access to additional credit levers and ability to adjust its capital expenditure program and production profile offered substantial downside protection and would prevent the need to seek a further reorganization even in the event of a prolonged low-gas-price environment.  As defendant Watford claimed during a February 22, 2017 earnings call, Ultra was exiting bankruptcy in "growth mode."

33.     On February 28, 2017, Ultra filed a current report on Form 8-K with the SEC.  The Form 8-K was filed in connection with presentations to prospective lenders in Ultra's bankruptcy exit financing and included an attached exhibit listing Ultra's "Adjusted Oil and Gas Reserves Estimates."  The exhibit included the following table, stating that the adjusted PV10[3] of Ultra's proved, developed and producing ("PDP") reserves was approximately $2.69 billion (based on 2,543

---

[3]   PV10 is a common method for valuing a petrochemical company's oil and gas reserves.  It provides the present value of estimated future oil and gas revenues, net of estimated direct expenses and discounted at an annual rate of 10%.

Bcfe), and the adjusted PV10 of the Company's total proved reserves (including proved undeveloped ("PUD") reserves purportedly worth $1.5 billion) was approximately $4.19 billion (based on 5,806 Bcfe):

| Adjusted PDP Reserves[1] | Crude Oil (in Bbls) | NGLs (in Bbls) | Natural Gas (in Mcf) | Oil + NGLs + Gas (in Bcfe) | Adjusted PV-10[2] | |
|---|---|---|---|---|---|---|
| Pennsylvania | - | - | 118,639 | 118,639 | $ | 123,646 |
| Utah | 5,740 | 105 | 7,680 | 42,750 | | 87,541 |
| Wyoming | 17,060 | - | 2,279,718 | 2,382,078 | | 2,479,051 |
| Total: | 22,800 | 105 | 2,406,038 | 2,543,467 | $ | 2,690,238 |

| Total Adjusted Proved Reserves[3] | Crude Oil (in Bbls) | NGLs (in Bbls) | Natural Gas (in Mcf) | Oil + NGLs + Gas (in Bcfe) | Adjusted PV-10[2] | |
|---|---|---|---|---|---|---|
| Pennsylvania | - | - | 118,639 | 118,639 | $ | 123,646 |
| Utah | 12,767 | 211 | 15,483 | 93,350 | | 118,716 |
| Wyoming | 41,309 | - | 5,345,930 | 5,593,782 | | 3,949,760 |
| Total: | 54,075 | 211 | 5,480,054 | 5,805,771 | $ | 4,192,122 |

34. On March 15, 2017, Ultra issued a press release providing the Company's capital investment program and production timeline. The release stated that Ultra was expected to grow annual production for 2017 to 290 to 300 Bcfe, compared to production of 282 Bcfe for 2016, based on a $500 million capital expenditures budget. The release also provided the Company's projected earnings as follows:

> Based on a $3.25 per MMBtu Henry Hub natural gas price and a $50.00 per Bbl NYMEX crude oil price, the projected earnings before interest, taxes, depreciation, depletion and amortization for full-year 2017 range between $650.0 million and $700.0 million.

35. On April 3, 2017, Ultra announced in a press release that, "based on significant market demand," the Term Loan Facility had "been increased to $800.0 million, from $600.0 million" and the loan's borrowing base, tied to the purported value of Ultra's proved reserves, had "been increased from $1.0 billion to $1.2 billion."

36. On April 12, 2017, Ultra emerged from bankruptcy and filed a registration statement on Form S-8 registering over 15.8 million common shares, which began trading on NASDAQ the next day, April 13, 2017. The registration statement also incorporated documents by reference, including Ultra's Annual Report on Form 10-K for the fiscal year ended December 31, 2016 ("FY16"), filed on February 22, 2017, and current reports filed with the SEC on Form 8-K, including

filings on February 9, 2017 and March 16, 2017 describing and attaching the Company's plan of reorganization (the "Plan"). The FY16 10-K stated that, under the Plan, Ultra had a total enterprise value of $6 billion.

37. The FY16 10-K further stated that Ultra intended to allocate nearly all of its capital budget to development of its purportedly proven reserves in the Pinedale field in Wyoming, stating:

> *2017 Capital Investment Plan*. For 2017, our capital expenditures are expected to be approximately $500.0 million. We expect to fund these capital expenditures through cash flows from operations and cash on hand. We expect to allocate nearly all of the budget to development activities in our Pinedale field.

38. The FY16 10-K also included the following table, which estimated the Company's expected future net cash flows, before income tax, of its proved and develop reserves (not including PUD reserves) at $2.79 billion:

| | December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| | ($ amounts in thousands, except per unit data) | | |
| **Proved Developed Reserves** | | | |
| Natural gas (MMcf) | 2,321,613 | 2,336,280 | 2,243,004 |
| Oil (MBbl) | 21,473 | 22,173 | 28,481 |
| Natural gas liquids (MBbl) | 9,903 | 9,840 | 9,118 |
| **Proved Undeveloped Reserves** | | | |
| Natural gas (MMcf) | — | — | 2,586,190 |
| Oil (MBbl) | — | — | 39,285 |
| Natural gas liquids (MBbl) | — | — | 12,873 |
| **Total Proved Reserves (MMcfe)(1)** | 2,509,881 | 2,528,370 | 5,369,748 |
| Estimated future net cash flows, before income tax | $ 2,791,229 | $ 2,946,982 | $ 14,844,349 |
| Standardized measure of discounted future net cash flows, before income taxes(2) | $ 1,890,946 | $ 1,865,649 | $ 7,097,359 |
| Future income tax | $ — | $ — | $ 1,863,876 |
| Standardized measure of discounted future net cash flows, after income tax | $ 1,890,946 | $ 1,865,649 | $ 5,233,483 |
| Calculated average price(3): | | | |
| Gas ($/Mcf) | $ 2.07 | $ 2.21 | $ 4.32 |
| Oil ($/Bbl) | $ 37.90 | $ 42.36 | $ 80.62 |
| NGLs ($/Bbl) | $ 19.17 | $ 20.61 | $ 46.27 |

(Footnote omitted.)

39. The statements identified in ¶¶27-38 remained uncorrected and alive in the market at the start of the Class Period.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

40. The Class Period begins on April 13, 2017, the day that Ultra common stock began trading on the NASDAQ.

41.     On May 3, 2017, Ultra issued a press release announcing its financial and operational results for the first quarter of 2017 ("1Q17").  For the quarter, Ultra reported revenues of $221 million, a 39% increase from the previous year's first quarter, and production of natural gas and oil of 64 Bcfe.  The release also stated that Ultra had "[s]uccessfully completed [its] in-court restructuring and emerged from chapter 11, preserving significant value for existing equity holders and repaying creditors in full."  In addition, the release claimed that Ultra had "significantly lower[ed] [its] cost structure while retaining quality assets," including an "'extensive inventory of low-risk, repeatable drilling locations.'"  The release stated that the Company was expected to achieve annual production in 2017 of between 290 and 300 Bcfe, with a $500 million drilling and completion capital budget, leading to a projected EBITDA range of $650 million to $700 million for the year.  The release stated production was on track to grow 25% in 2018, leading to projected EBITDA in excess of $800 million at current strip pricing.  The release quoted defendant Watford as stating: "'We were successful in preserving and maximizing value for all stakeholders.'"  He continued in pertinent part:

> "***With a new capital structure, we are back to growing our business***.  We operated an average of two rigs for most of 2016 and have a plan for the remainder of 2017 where we grow to eight operated rigs.  Fourth quarter 2017 production should be 25% greater than first quarter with funding from cash flow . . . ."

42.     Also on May 3, 2017, Ultra reported its 1Q17 results on Form 10-Q, which it filed with the SEC.  The Form 10-Q contained the quarterly operational and financial information provided in the 1Q17 release and was signed by defendants Watford and Shaw, who also provided signed certifications attesting to its accuracy.

43.     The same day, May 3, 2017, Ultra held an earnings call to discuss the Company's 1Q17 financial results with analysts and investors hosted by defendants Watford, Shaw and Johnson.

- 14 -

During the call, these Ultra executives described the purportedly high value of Ultra's assets and favorable financing position and claimed that Ultra had reached an "inflection point" in low-cost production. Defendant Watford stated in his opening remarks in pertinent part as follows:

> Well, we are still Ultra Petroleum Corp. with the same high-quality, low-cost natural gas asset-base with thousands of highly economic, low-risk repeatable and predictable development locations, all identified and engineered by a highly respected third-party reservoir engineering company. We enjoy high realizations on our natural gas prices due to excess pipeline takeaway capacity in the West, where our assets are focused.

> &ast;  &ast;  &ast;

> ***With the end of restructuring, we have reached the inflection point on production and will start to once again grow, 25% volume growth from first quarter 2017 to fourth quarter 2017 and 25% annual growth in 2018***. So in many ways, we are the same, but in other ways we are better. We are glad to be back.

44. Defendant Johnson further stated that Ultra's production could be expanded through the exploration of horizontal wells, stating: "The concept in Pinedale would be, as you know, it's been developed vertically, historically, and the concept we are optimistic about is taking horizontal development on the edges and fringes of the field and expanding the resource."

45. During the question and answer portion of the call, Ultra's executives also represented that Ultra's oil and gas reserves were worth much more than they had been valued at in the Company's FY16 10-K. For example, defendant Johnson noted that the Company had been unable to include the Company's PUD reserves in the annual report because of the bankruptcy, but claimed that the massive PUD reserve valuation provided to lenders (as stated in the February 28, 2017 Form 8-K detailed above) provided a more complete picture of the true value of the Company's untapped oil and gas assets, stating in pertinent part:

> Last quarter, we reported our year-end 2016 reserves of 2.5 Tcfe. It is important to recall that the inclusion of PUD locations – excuse me, PUD locations in our year-

end 2016 reserves was disallowed because the company remained in its in-court restructuring process.  However, as part of the company's disclosures required to obtain exit financing, Ultra included a reserves sensitivity in a SEC Form 8-K.  This sensitivity that we call adjusted proved reserves uses the following assumptions: a forward-looking commodity strip, a 5-year development schedule and the same inventory of opportunities that we would often referred to as technical PUDs.  *This particular sensitivity showed adjusted proved reserves of 5.8 Tcfe of reserves for 2.3x the amount reported at year-end 2016.  More details can be found in the 8-K filing as well as in the updated investor presentation that was posted to our website this morning*.

46.     On June 28, 2017, defendant Watford presented at the JPMorgan Energy Equity Investor Conference.  During his presentation, defendant Watford highlighted Ultra's "high quality" asset base and "predictable" and "low cost" production techniques, which would purportedly allow Ultra to weather even a depressed commodity cycle.  He stated in pertinent part:

> High quality and deep asset base with attractive returns, low-risk repeatable.  We have 2,600 locations drilled in Pinedale and Jonah Field.  Predictable development.  Attractive realized prices, low cost operator, probably some – almost the lowest, if not the lowest cash cost.  Uinta and Marcellus provide additional upside, and we have a very strong balance sheet now and cash flow profile . . . .

> *            *            *

> Because we believe that with a low cost company, *we can make money throughout the commodity cycles – commodity price cycles*.

47.     Later in the presentation, defendant Watford again highlighted the purported value of the Company's reserves and its efforts to dramatically ramp up production, stating in pertinent part:

> [E]nd of December 2016, we did not provide a traditional SEC proved reserve report because we couldn't book PUDs, not knowing what was going to happen.  So we did an adjusted total reserve calculation here, subsequently.  So adjusted PDP reserves for year-end 2016 were 2.5Ts, adjusted proved little less than 6Ts, 5.8Ts and a 3P number of almost 16Ts.

> *You see the PV-10 numbers, and I just want to jump back to Pinedale because that's really where the value is for the company today, where we have adjusted 3P of 13Ts*.

Quick asset overview, starting with Pinedale.  First quarter production almost 660 million day, 95% of the company's reserves, 4,900 remaining locations.  We haven't talked about horizontal opportunities.  If you have a one-on-one with us, we'll talk about that.  These are all vertical wells.  2,600 wellbores already in the field, well understood.  Only if – less than 40% of the field is developed, that's amazing. . . .

We spent most of 2016 with 2 operated rigs, while we were in our restructuring mode.  We added a third and fourth rig in – late in the fourth quarter.  We are up to 7 operated rigs in the field right now with eighth one showing up end of July, early August.  ***We have plans to grow production in fourth quarter of '17 versus fourth quarter of '16 by 20%, 25%.  Similarly, we have plans to grow 2018 production over '17 by 20%, 25%, all while spending within cash flow***.

48.     Defendant Watford directed investors' attention to a slide deck accompanying his presentation, which included the total adjusted proved reserve PV10 valuation of $4.19 billion (which included the $1.5 billion PUD reserves valuation) that Ultra had previously highlighted from its submissions to the Company's lenders.  The relevant slide stated as follows:

## Significant Total Resource Potential

- Unique mix of significant undeveloped opportunity paired with sizable existing production base
- Foreseeable development expected to be funded with cash flow from operations

| Pinedale Wyoming | Marcellus Pennsylvania | Uinta Utah | Adj. Total Reserves |
|---|---|---|---|
| • Reserves: | • Reserves: | • Reserves: | • Reserves: |
| ▪ Adj. PDP: 2,382 Bcfe | ▪ Adj. PDP: 119 Bcfe | ▪ Adj. PDP: 7 Mmboe | ▪ Adj. PDP: 2,543 Bcfe |
| ▪ Adj. Proved: 5,594 Bcfe | ▪ Adj. Proved: 119 Bcfe | ▪ Adj. Proved: 16 Mmboe | ▪ Adj. Proved: 5,806 Bcfe |
| ▪ Adj. 3P: 13,079 Bcfe | ▪ Adj. 3P: 1,758 Bcfe | ▪ Adj. 3P: 145 Mmboe | ▪ Adj. 3P: 15,708 Bcfe |
| • PV-10 | • PV-10 | • PV-10 | • PV-10 |
| ▪ Adj. PDP: $2,479 mm | ▪ Adj. PDP: $123 mm | ▪ Adj. PDP: $88 mm | ▪ Adj. PDP: $2,690 mm |
| ▪ Adj. Proved: $3,950 mm | ▪ Adj. Proved: $123 mm | ▪ Adj. Proved: $119 mm | ▪ Adj. Proved: $4,192 mm |
| ▪ Adj. 3P: $5,733 mm | ▪ Adj. 3P: $278 mm | ▪ Adj. 3P: $447 mm | ▪ Adj. 3P: $6,458 mm |

49.     The statements referenced in ¶¶41-48 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants:

(a)     that Ultra's proved reserves were materially overstated and, therefore, worth hundreds of millions of dollars less than represented;

(b)     that Ultra's proved undeveloped reserves were of *de minimis* value because they contained low quality deposits that lacked a commercially viable path to development;

(c)     that Ultra was unable to meet the production and development estimates provided to investors and such estimates lacked a reasonable basis;

(d)     that Ultra was unable to withstand even a modest downturn in the price of natural gas because, *inter alia*, Ultra's business had less financial and production flexibility than claimed; and

(e)     that Ultra did not have the technical or financial capabilities or available asset base to sustainably grow its oil and natural gas production by any meaningful amount.

50.     On August 9, 2017, Ultra issued a press release announcing its financial and operational results for the second quarter of 2017 ("2Q17") – the same quarter in which Ultra exited the 2016 Bankruptcy.  To the surprise of investors, Ultra reduced its 2017 annual production guidance to a range of 280 to 290 Bcfe and reduced 2018 projected annual growth to 20% from the earlier 25% forecast.  Ultra blamed the reduced production forecast on a "delay in rig deliveries" and "a redirection of some of [its] resources toward resource expansion and a decision to drill fewer development wells."

51.     On this news, the price of Ultra stock declined 13% to $7.76 per share on unusually high volume of more than five million shares traded.  However, because defendants did not reveal the full truth about Ultra's business, operations and prospects, the price of the stock remained artificially inflated.

52.     For example, the 2Q17 release quoted defendant Watford as stating:

> "*For the last 18 months during restructuring, we have not been able to work on resource expansion.  Now we can.  We've added over 9,000 net acres, or 13%, to our core southwest Wyoming (Pinedale) acreage position, with much of it providing exploratory, horizontal development opportunity.  We plan to drill 11% fewer development wells through year-end while we use those resources to drill three exploratory, horizontal wells*.  With this decision, we've modified our production forecast by approximately 3%, while creating a significant resource expansion opportunity . . . ."

53.     Also on August 9, 2017, Ultra reported its 2Q17 results on Form 10-Q, which it filed with the SEC.  The Form 10-Q contained the quarterly operational and financial information provided in the 2Q17 release and was signed by defendants Watford and Shaw, who also provided signed certifications attesting to its accuracy.

54.     The same day, August 9, 2017, Ultra held an earnings call to discuss the Company's 2Q17 financial results with analysts and investors hosted by defendants Watford, Shaw and Johnson. In his prepared remarks, defendant Shaw claimed that the value of the Company's borrowing base (which was tied to the value of its reserves) had been set "artificially low" at $1.2 billion and that the true value was as high as $1.9 billion.  He claimed that the Company was currently working to significantly increase its borrowing base to reflect the true value of the Company's reserves, which would allow it to grow production.  He stated in pertinent part:

> At emergence from Chapter 11, *our borrowing base was set at an artificially low $1.2 billion.  Our midyear reserves valuation at our agent bank's price deck suggests that our bond base can be as large as $1.9 billion*.  We're currently

working with our banks to increase the borrowing base, which will allow us to either increase the size of the credit facility or increase our term loan and pay down the credit facility with the proceeds.

55.     Defendant Shaw also pointed to the Company's purportedly massive inventory of

PUD well sites and the values attributed to a recent competitor asset sale, which he claimed further

supported the Company's lofty reserve valuations.  He stated in pertinent part:

> Finally, we have received a lot of questions about QEP's sale of their Pinedale acreage and what we think that means relative to our valuation. First of all, we think that the value that QEP received is very positive for us.  Given that QEP has publicly stated in the past that they only had around 200 remaining drilling locations as compared to our nearly 5,000 locations and because of our higher margins by at least $0.40 per Mcfe due to mostly better midstream contracts, it is difficult to make a direct comparison of our assets.

> *          *          *

> ***Applying that value to our PDP reserves of 2.6 Tcfe gives us a total PDP value of $3.1 billion.  This $3.1 billion PDP value is the exact amount that we used last year in our business plan work that we performed that resulted in a $7 billion to $8 billion total enterprise value when our 4,900 undeveloped locations and other probable and possible reserves are included***.  So we think that the value that QEP received is at least consistent with our view of the value of our proved, developed reserves when we adjust for our higher margins.

> Another way to think about the relative valuation is that it appears that QEP sold their assets at over 6x cash flow which is a material premium to our current trading level, considering our 2018 EBITDA guidance.  And that is despite QEP's low future location count, declining production and onerous mainstream contracts. ***So overall, we think that the value that QEP received for their Pinedale assets is a positive marker for how our assets should be valued, if one considers that we have significantly more undeveloped reserves and much lower cost structure and no minimum volume requirements in our midstream contracts***.

56.     On the call, defendant Johnson claimed that Ultra's 2017 development program was

"back-end loaded" and would be supported by the further development of horizontal wells as the

year progressed, stating in pertinent part:

> Our teams have been busy evaluating resource expansion in Pinedale, with an emphasis on horizontal drilling on the flanks of the field.  In 2016, we drilled and

- 20 -

tested the first horizontal well in Pinedale.  3 horizontal wells have also been drilled on the far eastern part of the Jonah field, adjacent to Pinedale and geologically analogous to our assets in Pinedale.  *We are encouraged by all the results so far, and as a result, we now plan to drill and test 3 horizontal wells later this year*.

57.     Defendant Watford echoed this sentiment, stating in pertinent part:

*We have an extensive inventory of high returning undrilled locations*, *one where the internal rate of returns of our second quarter wells average 38%.  We have a very real opportunity of significant resource expansion with the horizontal program we have planned*.  And we are working on improving our liquidity with an eye on leverage ratios as we work towards alternatives on increasing shareholder returns.

58.     Later, in response to an analyst question, defendant Watford claimed that Ultra could achieve up to 20% production growth in 2018, stating in pertinent part:

We've run a bunch of sensitivities based on our forecast of what wells we would drill in the development program because we don't have any production forecasts for any success in horizontal program.  But we can achieve 20% per annum growth, '18 over '17, and have free cash or have cash flow equal CapEx.  I'm not going to address the rig count that comes with that, but just keep that in mind that if we want cash flow neutrality and no new net debt in 2018 over '17, *we can still achieve the plus or minus 20% production growth.  To the extent we want less or greater production growth and you see what we have to do with dialing up or down our CapEx*.

59.     On September 18, 2017, Ultra issued a press release entitled "Ultra Petroleum Provides Operational and Financial Update."  The release stated that Ultra's net daily production had increased 8% to 796 million cubic feet of gas equivalent ("MMcfe") as compared to 2Q17 and that the number of drilled and producing wells had continued to increase.  It also stated that the Company's horizontal drilling program had continued to progress and that the Company's borrowing base had been slightly increased by lenders from $1.2 billion to $1.4 billion.

60.     On November 7, 2017, Ultra issued a press release announcing its financial and operational results for the third quarter of 2017 ("3Q17").  For the quarter, Ultra reported revenues of $217.6 million, a 9% increase from the previous year's third quarter.  Ultra also reported

production of 71.1 Bcfe.  The release provided a positive update on the Company's horizontal well drilling program, stating that a recently drilled well in Pinedale had "encountered significant gas shows throughout the entire 10,300' lateral," which supported expansion of the program to two additional wells.  The release further stated that fourth quarter 2017 production would be approximately 75 Bcfe and quoted defendant Watford as stating: "'The third quarter was a solid one for us as we transition from a more reactive, restructuring phase to one focused on thoughtful, strategic capital allocation that balances growth with free cash flow generation and resource expansion . . . .'"

61.     The same day, November 7, 2017, Ultra held an earnings call to discuss the Company's 3Q17 financial results with analysts and investors hosted by defendants Watford, Shaw and Johnson.  During the call, Ultra's executives claimed that although the Company had revised its production guidance for fiscal 2017 slightly downwards due to "one-time and non-recurring and fully isolated" issues, these issues did not impact "overall inventory quality."  Defendant Watford further stated, in pertinent part:

> We are in a very strong position, now w[ith] handicaps from bankruptcy behind us and we couldn't be more excited for everything happening at the company.  *We remained confident in our ability to grow production 20% in 2018, while living within free cash flow using a 100% vertical program, and we are extremely excited about our much recent horizontal well that is currently flowing at 21 million cubic feet a day, and is still increasing and it has a 10% oil cut.  We believe this well is indicative of horizontal potential in the field, which could result in potentially 16 new horizontal wells, they are incremental to our vertical well inventory*.
>
>         *. . . [G]iven the recent successful horizontal well result, we may even be able to grow at the same rates, but with more free cash flow generation*.

62.     Later on the call, defendant Johnson elaborated on the "staggering potential" of the Company's horizontal well program, stating in pertinent part:

So last quarter we shared plans to drill up to 3 horizontal well by the end of this year. I will show more about our current activity on moment [sic]. But first, let's go to slide 16, horizontal program potential, where we provide a summary of the potential we see based on recent results in ongoing study by our technical teams. The top of this slide we provide potential economics of a horizontal well in Pinedale. Inputs on the left include actual data from analogous well**s. *The result[s] shown at the right are compelling with a potential for 70% returns F&D costs approaching $0.50, and a recycle ratio over 4x, at the bottom of the page, we have updated the potential resource that currently includes 1,600 potential locations around the flanks of Pinedale. We have also estimated that these locations would translate to 700 net locations to Ultra and that resource potential range of 19 Tcfe to 48 Tcfe, and the potential of each well having an NPV10 value of nearly $13 million each*.**

63.    In a similar vein, defendant Watford summarized the Company's recent results and purported production prospects as follows:

*We believe we are a Tier 1 natural gas producer with extensive, attractive and predictable inventory*. We've discussed our historical EUR's and future inventory, why we are drilling, where we are, and where we are headed in the upcoming years. We shared the results of using Wyoming State production data correctly and the impact on rate of return and EUR's. We enjoy low cost and high margins that were improved through the reorganization process, and we have no firm transportation costs. *We have an exciting resource expansion opportunity with exceptional returns. Early identification of 1,600 gross horizontal well locations on the flanks of Pinedale is significant and material. With a preliminary estimate of NPV 10 at $12.8 million per location and a recycle ratio of 4.6x, the value creation is quite notable. And we are focused on balancing free cash flow generation with growth*.

64.    On November 9, 2017, Ultra reported its 3Q17 results on Form 10-Q, which it filed with the SEC. The Form 10-Q contained the quarterly operational and financial information provided in the 3Q17 release and was signed by defendants Watford and Shaw, who also provided signed certifications attesting to its accuracy.

65.    On November 15, 2017, Ultra issued a press release providing a positive update on its horizontal well results. The release stated in pertinent part:

**Pinedale Horizontal Program Update**

Last week, the Company announced a test rate of 21 million cubic feet equivalent per day (MMcfe/d) for its two-mile horizontal well targeting the Lower Lance A interval.  Yesterday, this well achieved a 24-hour test rate of 42 MMcfe/d.  Flow-back parameters include a gas rate of 38 MMcf/d, a condensate rate of 700 barrels per day and a flowing casing pressure of 3,000 psi.  This morning's spot rate is 46 MMcfe/d.

"The well has steadily increased over the past week and remains on a controlled choke.  With only 17% of the frac fluid recovered to date, and flowing pressures well above normal operating pressure, we expect to manage the flow-back for several more weeks," said Brad Johnson, Senior Vice President, Operations.  "*In addition to being excited about this well's high productivity, we are also encouraged that it is generating a condensate yield of 18 barrels per MMcf, which is more than double the historic field average*."

The Company is in the process of drilling two additional horizontal wells.  One will test a deeper Mesaverde interval and one will be a half mile offset to the WB 9-23-A1H in the same Lower Lance A target interval.  Both wells are expected to be online by the end of January.

66.     On November 16, 2017, Ultra filed with the SEC a current report on Form 8-K which stated that "the conditions that raised substantial doubt about the Company's ability to continue as a going concern," as originally disclosed in the Company's FY16 10-K, "no longer exist."

67.     The statements referenced in ¶¶50, 52-66 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants:

(a)     that Ultra's proved reserves were materially overstated and, therefore, worth hundreds of millions of dollars less than represented;

(b)     that Ultra's proved undeveloped reserves were of *de minimis* value because they contained low quality deposits that lacked a commercially viable path to development;

(c)     that Ultra was unable to meet the production and development estimates provided to investors and such estimates lacked a reasonable basis;

(d)     that Ultra was unable to withstand even a modest downturn in the price of natural gas because, *inter alia*, Ultra's business had less financial and production flexibility than claimed;

(e)     that Ultra did not have the technical or financial capabilities or available asset base to sustainably grow its oil and natural gas production by any meaningful amount; and

(f)     that Ultra lacked the production capabilities or asset base necessary to meaningfully grow production through horizontal well drilling, and initial test wells were not representative of the Company's actual horizontal well prospects.

68.     On February 28, 2018, Ultra issued a press release announcing its financial and operational results for the fourth quarter of 2017 ("4Q17") and for fiscal 2017 ("FY17").  For the quarter, Ultra reported revenues of $240.6 million and production of 74.5 Bcfe.  For the year, Ultra stated that total revenues increased 24% year over year to $891.9 million and that it had achieved production of just 267.7 Bcfe.  The release revealed that Ultra was reducing its 2018 capital plan to $400 million and reducing its operated rig fleet from seven to just four rigs – far below the estimates previously provided to investors.  The release also estimated the value of the Company's PDP reserves at $2.1 billion and the value of its PUD reserves at just $233 million based on current reference prices.

69.     On this news, the price of Ultra stock declined 10% to $3.69 per share on unusually high volume of more than 11 million shares traded.  However, because defendants did not reveal the

full truth about Ultra's business, operations and prospects, the price of the stock remained artificially inflated.

70.     For example, the FY17 release quoted defendant Johnson, recently promoted to interim CEO, as stating:

> "The 2018 vertical program should deliver stronger economic results and will be an important free cash flow component of our capital program in 2018 as we accelerate our transition to higher-return horizontals."

>                    *        *        *

> "*In Wyoming, production is expected to increase by 7% to 11%, driven by a reduced, but high-graded vertical drilling program, that by itself is expected to deliver $175 million of free cash flow at the asset level, and growing horizontal production. This cash flow generation, plus proceeds from the expected Utah divestiture, will help fund accelerated horizontal activity in 2018 that will be ramped up over 5 times year-over-year* . . . ."

71.     The FY17 release also stated that Ultra was "focused on capital efficiency, cash flow visibility and accelerating the horizontal program, all within cash flow," with an expected production range of between 280 to 290 Bcfe for the year and an average daily production rate of between 790 to 810 MMcfe per day ("MMcfe/d") in the first quarter of 2018.  The release also indicated that the value of the Company's PUD reserves was likely substantially higher than the amount set by SEC accounting rules, because it did not include the majority of the expected value from the Company's horizontal well drilling program, stating in pertinent part:

> *Proved undeveloped reserves include only 4 horizontal locations (immediate offsets to producing horizontal wells at year end) of the 1,600 potential horizontal locations identified by the Company*.  The remaining PUD bookings include a reduced inventory of previously booked vertical PUDs in order to comport with the Company's 5-year development plan.  This 5-year plan accounts for an expected increase in drilling horizontal locations that do not currently meet SEC guidelines for proved reserves due to the early stages of this resource expansion program.

- 26 -

72.     Also on February 28, 2018, the Company filed with the SEC its annual financial report for FY17 on Form 10-K.  The FY17 10-K reported the same financial and operational results as the February 28, 2018 press release and was signed by defendants Watford and Shaw, who also provided signed certifications attesting to its accuracy.

73.     The same day, February 28, 2018, Ultra held an earnings call to discuss the Company's 4Q17 and FY17 financial results with analysts and investors hosted by defendants Johnson and Shaw.  In his prepared remarks, defendant Johnson stated that the Company's PUD reserves were significantly understated because they did not include the expected increase in production from the Company's horizontal well drilling program, stating in pertinent part:

> For year-end '17, our SEC proved reserves included nearly 2.4 Bcfe of proved developed reserves.  Because we are in early stages of our horizontal program, the incremental reserves are not immediately booked as PUDs.  However, based on the earlier results, we are directing 1/3 of our operated drilling investments to horizontal wells as we throttle down our vertical program.  *This shift is appropriately reflected in our PUD reserves for year-end 2017 for a smaller set of vertical PUDs comports with a reduced vertical program and a horizontal effort that should add PUDs in a more significant way beginning in 2018*.

> Our 78,000 net acres is the dominant position in Pinedale.  We have 27,000 net acres within the historical economic boundary of vertical well development and another 28,000 net acres corresponding to the nearly 1,600 gross horizontal locations identified on the immediate flanks of the field, and we also have another 23,000 net acres beyond the immediate flanks that are also perspective for horizontals.

> *With 4,600 vertical locations that are low risk and resilient to commodity price cycles and 1,600 horizontal locations with the potential for exceptional returns and incremental resources, Ultra has a long runway of drilling locations to focus its investment efforts*.

> In 2017, we delivered consistent production growth with the drilling of 212 vertical wells in Pinedale.  In November, we announced a very significant horizontal well with an IP of 51 million cubic feet equivalents per day, which included an oil rate of 705 barrels of oil.  *That oil rate alone might qualify this well for sweet spot status in many other oil plays in North America*.

\*   \*   \*

These results have established positive momentum for Ultra as we move into 2018.

74.     Defendant Johnson further stated that Ultra would "focus on capital efficiency, cash flows visibility and a disciplined approach to optimize investment returns" in 2018.  He claimed this plan involved a transition to more horizontal drilling, as well as "a more robust program for hedging, free cash flow generation and improved communication to investors."  He also stated that Ultra expected to achieve $540 million in EBITDA, "with sufficient headroom" to ensure the Company stayed below its lender leverage covenants.

75.     On the call, defendant Johnson emphasized the immense opportunity purportedly provided by the Company's horizontal well drilling program.  He stated in pertinent part:

In 2017, we drilled 3 horizontal wells.  In 2018, we plan to drill between 15 and 20 horizontal wells and have already started the planning for a 3-rig 36-horizontal well per year program in 2019.

\*   \*   \*

With the impressive results we have achieved so far in this program, we have implemented an accelerated ramp-up of horizontal activity.  *In the first half of 2018, we expect to drill 6 to 8 horizontals with another 9 to 12 horizontals in the second half of the year*.  By the end of this year, we expect each of the 4 rigs in our operated fleet to be utilized to drill a horizontal.

\*   \*   \*

*The potential is very compelling, with internal rates of return exceeding 100% and a breakeven price of $1.03 per Mcf.  The gross resource potential of 48 Tcfe for flank horizontals is incremental to the 39 Ts of resource already assigned to the core of Pinedale*.

Slide 19 provides a comparison of returns between vertical and horizontal wells.  We provide a sensitivity to gas prices ranging from $2 to $4.  *As you might expect, the horizontal wells offer significant upside, which compels us to pursue this opportunity*.

76.     On March 12, 2018, Ultra issued a press release providing an update on its horizontal well program and additional information regarding the Company's expected 2018 operational and financial results.  The release stated that a recently completed well, WB 9-23 A-2H, had far exceeded production expectations, producing a gas rate of 49.2 million cubic feet per day ("MMcf/d") and 873 barrels of oil per day with an initial 24-hour production rate of 54.5 MMcfe/d. Defendant Johnson was quoted as stating that, as result, Ultra was "'accelerating the horizontal program'" with two additional wells expected to come online in April.

77.     On April 19, 2018, Ultra issued a press release stating that its first quarter production was "above" the mid-point of guidance and informing investors that its borrowing base of $1.4 billion had been reaffirmed by creditors.

78.     The statements referenced in ¶¶68, 70-77 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants:

(a)     that Ultra's proved reserves were materially overstated and, therefore, worth hundreds of millions of dollars less than represented;

(b)     that Ultra's proved undeveloped reserves were of *de minimis* value because they contained low quality deposits that lacked a commercially viable path to development;

(c)     that Ultra was unable to meet the production and development estimates provided to investors and such estimates lacked a reasonable basis;

- 29 -

(d)      that Ultra was unable to withstand even a modest downturn in the price of natural gas because, *inter alia*, Ultra's business had less financial and production flexibility than claimed;

(e)      that Ultra did not have the technical or financial capabilities or available asset base to sustainably grow its oil and natural gas production by any meaningful amount; and

(f)      that Ultra lacked the production capabilities or asset base necessary to meaningfully grow production through horizontal well drilling and initial test wells were not representative of the Company's actual horizontal well prospects.

79.      On May 10, 2018, Ultra issued a press release announcing its financial and operational results for the first quarter of 2018 ("1Q18").  For the quarter, Ultra reported revenues of $225.4 million, a 2% increase from the previous year's first quarter.  The press release also reported production of 72.3 Bcfe, an increase from 64.0 Bcfe in 1Q17.  However, the Company provided disappointing results for its recently drilled horizontal wells, WB 9-23 A-3H and WB 8-25 A-1H, of only 11.7 MMcfe/d and 28.5 MMcfe/d, respectively – a fraction of the production rates defendants had earlier touted to investors.

80.      On this news, the price of Ultra stock declined 29% to $1.74 per share over two trading days on unusually high average daily volume of more than eight million shares traded.  However, because defendants did not reveal the full truth about Ultra's business, operations and prospects, the price of the stock remained artificially inflated.

81.      For example, the release raised Ultra's 2018 production guidance to 285 to 295 Bcfe.  The 1Q18 release also quoted defendant Johnson as stating that Ultra's business could provide strong returns even if prices declined materially, stating in pertinent part as follows:

"Based on encouraging early results, we have significantly ramped up horizontal well development and now plan to drill 25-30 horizontal wells this year while maintaining our $400 million capital expenditure guidance. *We believe, on average, the horizontal program can provide strong economic returns at, or even materially below, current strip pricing* . . . ."

82.     On May 10, 2018, Ultra reported its 1Q18 results on Form 10-Q, which it filed with the SEC. The Form 10-Q contained the quarterly operational and financial information provided in the 1Q18 release and was signed by defendants Johnson and Shaw, who also provided signed certifications attesting to its accuracy.

83.     Also on May 10, 2018, Ultra held an earnings call to discuss the Company's 1Q18 results with analysts and investors hosted by defendants Johnson and Shaw. During the call, defendant Johnson stated that Ultra's horizontal program was running ahead of schedule, stating in pertinent part:

The 3 rigs currently drilling horizontal wells and a growing inventory of permits and approved drilling units, *the company's ramp-up of horizontal activity is well ahead of our original schedule*. We are now planning up to 30 horizontal wells this year with 7 horizontal wells already drilled in the first quarter. With this increase in activity, we are also accelerating the drilling of horizontal wells in the core of the field and also on the Western flank. *We look forward to these results as we expect to continue to expand the resource and also to gain recognition for a larger inventory of horizontal locations*.

84.     On May 22, 2018, defendant Johnson appeared at the Barclays High Yield Bond & Syndicated Loan Conference, during which he claimed that Ultra could "deliver compelling returns" even if gas prices declined significantly. Defendant Johnson, for example, stated:

So 3 major takeaways from the economic summary here: *our horizontal wells can deliver compelling returns if prices are materially lower than current strip, our laterals with less net pay require less frac stages and result in lower costs, and smaller wells with lower cost deliver good returns even at stressed pricing*.

- 31 -

85.     The statements referenced in ¶¶79, 81-84 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants:

(a)     that Ultra's proved reserves were materially overstated and, therefore, worth hundreds of millions of dollars less than represented;

(b)     that Ultra's proved undeveloped reserves were of *de minimis* value because they contained low quality deposits that lacked a commercially viable path to development;

(c)     that Ultra was unable to meet the production and development estimates provided to investors and such estimates lacked a reasonable basis;

(d)     that Ultra was unable to withstand even a modest downturn in the price of natural gas because, *inter alia*, Ultra's business had less financial and production flexibility than claimed;

(e)     that Ultra did not have the technical or financial capabilities or available asset base to sustainably grow its oil and natural gas production by any meaningful amount; and

(f)     that Ultra lacked the production capabilities or asset base necessary to meaningfully grow production through horizontal well drilling, and the development of the Company's horizontal wells had continued to underperform the representations provided to investors.

86.     On August 9, 2018, Ultra issued a press release announcing its financial and operational results for the second quarter of 2018 ("2Q18").  For the quarter, Ultra reported revenues of $190.1 million, a 10.6% decrease from $212.7 million in 2Q17.  The release also reported

production of 70.9 Bcfe.  The release stated that Ultra had recently reduced its rig count from four to three and reduced the Company's 2018 production guidance to a range of 273 to 283 Bcfe.  In a striking reversal, the Company stated that it was once again focusing on vertical well development, with two out of the three operating rigs dedicated to vertical wells.  The release quoted defendant Johnson as stating that, while Ultra "'had some encouraging results'" from horizontal wells in the Pinedale field, "'the average performance of these wells in the second quarter was below expectations.'"

87.     On this news, the price of Ultra stock declined 40% to $1.01 per share over three trading days on unusually high average daily volume of nearly nine million shares traded.  However, because defendants did not reveal the full truth about Ultra's business, operations and prospects, the price of the stock remained artificially inflated.

88.     For example, on August 9, 2018, Ultra held an earnings call to discuss the Company's 2Q18 results with analysts and investors hosted by defendants Johnson, Shaw and Stratton. Defendant Stratton claimed on the call that based on Ultra's extensive experience, technical expertise and accumulation of well and reserve data, the Company was well positioned to realize the full potential of the Company's reserves through its horizontal well drilling program, even if gas prices were substantially depressed.  He stated in pertinent part:

> Ultra has taken a disciplined process and data-driven approach, leveraging our existing staff with the most respected resources in oil and gas to understand the opportunities presented by horizontal drilling in Pinedale. ***Using this process, data from the horizontal wells drilled to-date in over 2,100 vertical wells drilled by the company, Ultra is well-positioned to unlock the full value of the asset***.

> *       *       *

> In particular, with the increases in oil mix from horizontal wells, our team is working to understand oil properties and completion designs that will allow for more

efficient recovery of both oil and gas. ***These results show strong, expected returns even when Henry Hub minus Rockies basis results in a net gas price below $2 per MMbtu***.

89.     In response to an analyst question about the value of the Company's PDP reserves, defendant Johnson stated that, if anything, Ultra's "PDP base has grown through the year" as the Company has "added wells."  As a result, Ultra's "PDP value is holding steady as we look at our numbers through the year."

90.     On August 9, 2018, Ultra reported its 2Q18 results on Form 10-Q, which it filed with the SEC.  The Form 10-Q contained the quarterly operational and financial information provided in the 2Q18 release and was signed by defendants Johnson and Shaw, who also provided signed certifications attesting to its accuracy.

91.     On September 25, 2018, Ultra stated that its lenders had reduced the Company's borrowing base by $100 million to $1.3 billion.

92.     On this news, the price of Ultra stock declined 23% to $0.98 per share on unusually high volume of nearly nine million shares traded.  However, because defendants did not reveal the full truth about Ultra's business, operations and prospects, the price of the stock remained artificially inflated.

93.     On November 8, 2018, Ultra issued a press release announcing its financial and operational results for the third quarter of 2018 ("3Q18").  For the quarter, Ultra reported revenues of $203.8 million and average production of 734 MMcfe/d, above the mid-point of guidance.  The release also narrowed Ultra's 2018 production guidance to a range of 274 to 278 Bcfe and increased the Company's capital budget to a range of $400 million to $415 million.  The release quoted

defendant Johnson as stating: "'We are very focused on bringing down well costs and expect significant further improvement in the fourth quarter and into 2019.'"  He continued:

> "We have expanded our technical efforts to analyze the significant amount of data we have gathered from the horizontal wells drilled this year.  We will use this data to refine and optimize our horizontal program prior to drilling our next set of horizontal wells.  While our near-term drilling efforts will be focused on our vertical program, ***we remain confident in our ability to unlock material incremental value from Pinedale through horizontal development***."

94.     Also on November 8, 2018, Ultra held an earnings call to discuss the Company's 3Q18 results with analysts and investors hosted by defendants Johnson, Shaw and Stratton.  On the call, defendant Johnson highlighted the purported success of the revamped vertical wells and the promise of Ultra's horizontal well program, stating in pertinent part:

> As we discussed last quarter, we adjusted our capital budget for the second half of 2018 to focus more on vertical wells.  In late July, we reduced our operating rig count from 4 to 3 and resumed drilling on pads solely dedicated to vertical development.  As a result, we brought online 19 operating wells with an average 24 hour IP of 7.4 million cubic feet equivalent per day.  ***Third quarter wells are tracking the midpoint of recent historical averages.  We expect to see continued strong results from our vertical development program that is focused on the core of the Pinedale Field***.  Vertical well cost were reduced to a quarterly average of $3.3 million per well, down 10% from 2Q '18.  In September, well cost average $3.1 million and I expect us to be close for that number for the rest of this year.

> *       *       *

> [O]ur capital plan continues to be driven by disciplined deployment of capital in pursuit of superior returns and increased visibility of cash flow.  ***In the near term, while we further study and refine our models for horizontal potential, we are focusing on our vertical program which can deliver returns greater than 20% even at these depressed gas price realizations***.

95.     On November 9, 2018, Ultra reported its 3Q18 results on Form 10-Q, which it filed with the SEC.  The Form 10-Q contained the quarterly operational and financial information

provided in the 3Q18 release and was signed by defendants Johnson and Shaw, who also provided signed certifications attesting to its accuracy.

96.     On February 19, 2019, Ultra issued a press release announcing that it had achieved fourth quarter and full-year 2018 production of 64.3 Bcfe and 275.1 Bcfe, respectively, within the Company's prior guidance.  The release also stated that the Company's lenders had reaffirmed Ultra's $1.3 billion borrowing base and that the Company's year-end reserves had a PV10 value of $2.4 billion, which included PDP reserves of 2.3 billion Bcfe and PUD reserves of 711 million Bcfe.

97.     The statements referenced in ¶¶86, 88-91, 93-96 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants:

(a)     that Ultra's proved reserves were materially overstated and, therefore, worth hundreds of millions of dollars less than represented;

(b)     that Ultra's proved undeveloped reserves were of *de minimis* value because they contained low quality deposits that lacked a commercially viable path to development;

(c)     that Ultra was unable to meet the production and development estimates provided to investors and such estimates lacked a reasonable basis;

(d)     that Ultra was unable to withstand even a modest downturn in the price of natural gas because, *inter alia*, Ultra's business had less financial and production flexibility than claimed; and

(e)      that Ultra did not have the technical or financial capabilities or available asset base to sustainably grow its oil and natural gas production by any meaningful amount through either its vertical or horizontal well drilling programs.

98.      On March 7, 2019, Ultra issued a press release announcing its financial and operational results for the fourth quarter of 2018 ("4Q18") and for the 2018 fiscal year ("FY18"). For the quarter, Ultra stated that it had produced 64.3 Bcfe and generated $273 million in total operating revenues.  For the year, Ultra stated that it had produced 275.1 Bcfe and generated $892 million in total operating revenues.   The release also provided disappointing 2019 capital expenditures guidance of $320 million to $350 million and a weak 2019 production forecast of only 240 to 250 Bcfe, substantially below 2018 results.

99.      On this news, the price of Ultra stock declined 12% to $0.60 per share on unusually high volume of nearly six million shares traded.  However, because defendants did not reveal the full truth about Ultra's business, operations and prospects, the price of the stock remained artificially inflated.

100.      For example, the disappointing 2019 production guidance was still well above the Company's actual production capacity.  The FY18 release also quoted defendant Johnson (recently confirmed as Ultra's permanent CEO and President) as stating that Ultra was well positioned to turn things around in 2019:

> "*We enter 2019 with positive momentum at Ultra*.  The Company is drilling vertical wells above recent historical averages, continuing the horizontal learnings, received a favorable ruling in the appeal of our make whole claim, experienced improvements in regional gas pricing and we have strengthened our balance sheet through debt reductions.  Our results in the fourth quarter reflect stabilization and improvement in the business and we intend to build upon these successes to increase value for our shareholders . . . ."

101.     On March 7, 2019, Ultra held an earnings call to discuss the Company's FY18 results with analysts and investors hosted by defendants Johnson, Honeyfield (who had recently replaced Shaw as CFO) and Stratton.  In his prepared remarks, defendant Johnson emphasized the value of the Company's proved reserves and its purported ability to unlock that value, stating: "Our proved reserves now total over 3 trillion cubic feet of natural gas equivalents, most of which are PDP reserves.  With our improving balance sheet and knowledgeable team, we are set to use the momentum gained over the last 12 months to further unlock the value of our assets."  He continued in pertinent part:

> *Our high-quality Pinedale assets are set to deliver consistent and profitable results, particularly when combined with the experience of our teams at Ultra. With an Opal gas price of $2.50 and our current cost structure, we have over 1,200 economic locations within our vertical inventory*.  And with another 2,800 locations that are technically proven, we are driven to reduce costs so that we can unlock that value for shareholders.

102.     On March 8, 2019, the Company filed with the SEC its annual financial report for FY18 on Form 10-K.  The FY18 10-K reported the same financial and operational results as the March 7, 2019 press release and was signed by defendants Johnson and Honeyfield, who also provided signed certifications attesting to its accuracy.

103.     On May 9, 2019, Ultra issued a press release announcing its financial and operational results for the first quarter of 2019 ("1Q19").  For the quarter, Ultra reported revenues of $271.5 million, an increase of 20% from $225.4 million in 1Q18.  The release also stated that first quarter production averaged 691 MMcfe/d, above the mid-point of guidance.  The release quoted defendant Johnson as stating in pertinent part:

> "*The results from the first quarter demonstrate very good progress toward our objectives outlined for 2019*.  Net debt was reduced by more than $80 million, including the successful execution of our follow-on 2nd lien debt exchanges.

Production volumes exceeded our mid-point of guidance, driven by strong base production and development activity executed ahead of schedule. In 2019, we will continue to prioritize our efforts toward strengthening the balance sheet, expanding margins through continued cycle-time and cost reductions and optimizing the value of our assets . . . ."

104.    On May 9, 2019, Ultra also filed with the SEC a quarterly report on Form 10-Q and hosted an earnings call further reporting and discussing the Company's 1Q19 results and second quarter 2019 guidance. The 10-Q stated that the Company's borrowing base had been reaffirmed at $1.3 billion:

> On February 14, 2019, Ultra Resources entered into a Fourth Amendment to Credit Agreement (the "Fourth Amendment to Credit Agreement") with the RBL Administrative Agent and the RBL Lenders party thereto. Pursuant to the Fourth Amendment to Credit Agreement, the borrowing base was reaffirmed at $1.3 billion. Given the Revolving Credit Agreement was amended in February 2019 and the borrowing base was reaffirmed therein, the next scheduled borrowing base redetermination date is in October 2019.

105.    The 1Q19 Form 10-Q contained the quarterly operational and financial information provided in the 1Q19 release and was signed by defendants Johnson and Honeyfield, who also provided signed certifications attesting to its accuracy.

106.    The May 9, 2019 earnings call was hosted by defendants Johnson, Honeyfield and Stratton. In his prepared remarks, defendant Johnson stated that the Company had made significant progress on its debt reduction and production goals and would continue to maximize the value of the Company's reserves, stating in pertinent part:

> Over the quarter, we reduced our total debt by $80 million from year-end, demonstrating our ongoing focus on the balance sheet and progress toward meaningfully reducing debt. We posted 62.2 Bcfe of production in the first quarter, which is above the midpoint of our guidance. ***This outperformance was driven by strong base production and development activity occurring ahead of schedule. We will continue to be tenacious in our ongoing pursuit to reduce cycle times and well costs, maximize the value of our significant base production and provide cash flow visibility through our prudent hedging program***.

\*       \*       \*

Our overall strategy continues to be guided by the disciplined investment of capital and the pursuit of free cash flow. ***Our base production provides significant cash flows and is the fuel to invest in our business through our drilling and completion activities as cash flow continues to support ongoing operations and other efforts completed by the team in the first quarter to advance our business.***

With a clear strategy for 2019, our teams are empowered to execute the plan. We are fortunate to be in a position to be the stewards of a tremendous asset, and we are focused on low-cost, responsible development and the expansion of margins to drive value to our shareholders.

107.    On June 3, 2019, Ultra issued a press release stating that it had reduced its Pinedale rig count from three to two and also reduced its 2019 expected capital expenditures by $15 million to a new range of $305 million to $335 million.  However, the Company reaffirmed its 2019 production guidance, with defendant Johnson quoted as stating that improved efficiencies had allowed Ultra to "'accomplish our 2019 plan with the adjustment down to two operated rigs for the remainder of the year.'"

108.    The statements referenced in ¶¶98, 100-107 above were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations and financial condition, which were known to or recklessly disregarded by defendants:

(a)     that Ultra's proved reserves were materially overstated and, therefore, worth hundreds of millions of dollars less than represented;

(b)     that Ultra's proved undeveloped reserves were of *de minimis* value because they contained low quality deposits that lacked a commercially viable path to development;

(c)     that Ultra was unable to meet the production and development estimates provided to investors and such estimates lacked a reasonable basis;

- 40 -

(d)     that Ultra was unable to withstand even a modest downturn in the price of natural gas because, *inter alia*, Ultra's business had less financial and production flexibility than claimed; and

(e)     that Ultra did not have the technical or financial capabilities or available asset base to sustainably grow its oil and natural gas production by any meaningful amount through either its vertical or horizontal well drilling programs.

109.    On July 31, 2019, Ultra issued a press release announcing that the NASDAQ had commenced proceedings to delist Ultra's stock "as a result of the Company not regaining compliance with the $1.00 per share minimum bid price requirement for continued inclusion on Nasdaq."

110.    On August 9, 2019, Ultra issued a press release announcing its second quarter 2019 ("2Q19") financial and operational results.  The Company disclosed that total revenues for the quarter had decreased 18% to $155.4 million as compared to $190.1 million during 2Q18.  The release stated that the Company's once vaunted horizontal well program had been effectively halted. It also lowered 2019 projected capital investments to a range of $260 million to $290 million and annual production to a range of 238 to 244 Bcfe.

111.    On this news, the price of Ultra stock declined 31% to just $0.09 per share on unusually high volume of nearly 14 million shares traded.

112.    On August 22, 2019, NASDAQ formally delisted Ultra stock.

113.    On September 16, 2019, Ultra issued a press release announcing that the Company had amended its credit facility and suspended all drilling in its Pinedale field to "preserve its highest value inventory for future development locations to be developed under more favorable commodity

pricing conditions." The release further announced that "[i]n connection with the approval of the amendment to the Credit Facility, the fall borrowing base redetermination has been established at $1.175 billion, including $200 million of the commitment allocated to the Credit Facility."

114. On November 7, 2019, Ultra issued its third quarter 2019 ("3Q19") financial results in a press release, revealing that total revenues for the quarter had decreased to $144.2 million as compared to $203.8 million in 3Q18. The release also stated that Ultra had produced just 60.2 Bcfe during the quarter, a 4% decrease from 2Q19.

115. On February 18, 2020, Ultra filed a Form 8-K with the SEC announcing a number of negative changes to Ultra's credit facilities, stating in pertinent part as follows:

> As previously disclosed, on April 12, 2017, Ultra Resources, Inc. ("Ultra Resources"), the borrower and a subsidiary of Ultra Petroleum Corp. (the "Company"), entered into that certain Credit Agreement (as amended through December 21, 2018, the "Credit Agreement"), with the Company and UP Energy Corporation, as parent guarantors, Bank of Montreal, as administrative agent (the "Agent"), and the other lenders party thereto (collectively, the "Lenders"), providing for the Company's revolving credit facility (the "Credit Facility").

> On February 14, 2020, Ultra Resources entered into a Sixth Amendment to Credit Agreement (the "Sixth Amendment") with the RBL Agent and the RBL Lenders party thereto. Pursuant to the Sixth Amendment and the spring borrowing base redetermination, which is effective as of April 1, 2020, the Borrowing Base (as defined in the Credit Agreement) was reduced to $1.075 billion, with $100 million attributed to RBL commitments under the Credit Agreement. In accordance with the previously disclosed Fifth Amendment to Credit Agreement, the commitment for the Credit Facility automatically reduces from $200 million to $120 million on February 29, 2020, which will then further reduce to $100 million on April 1, 2020, pursuant to the Sixth Amendment.

> The Sixth Amendment also provides for (i) the establishment of quarterly borrowing base redeterminations, with the next redetermination occurring on July 1, 2020, and on each October 1, January 1 and April 1 thereafter and (ii) a reduction of the excess cash threshold, a part of the anti-cash hoarding provisions, from $25 million to $15 million at all times borrowings are outstanding under the Credit Agreement.

116.     On March 5, 2020, Ultra filed a Form 8-K with the SEC revealing that Ultra had unsuccessfully attempted to renegotiate its debt out of court, stating in pertinent part:

> Ultra Petroleum Corp. (the "Company") and its advisors recently engaged in negotiations with certain third party holders of the Company's long-term debt as part of the Company's on-going, proactive efforts to reduce indebtedness. In connection with these negotiations, the Company provided certain confidential information to such third party debtholders' advisors. At this time, the Company is not presently negotiating with the debtholders with respect to a potential transaction involving the Company's indebtedness.

117.     On March 31, 2020, Ultra filed with the SEC a Notification of Late Filing on Form 12b-25 with respect to its Form 10-K for the 2019 fiscal year ("FY19"). As explained in the notification, Ultra was unable to timely file its FY19 10-K because Ultra was "currently engaged in liability management efforts, through its ongoing engagement with Centerview Partners and is actively engaging in discussions with certain holders of the Company's long-term debt with respect to potential deleveraging or restructuring transactions."

118.     On April 14, 2020, the Company issued a press release announcing its financial and operational results for the fourth quarter of 2019 ("4Q19") and FY19 and disclosing that the Company's forthcoming annual report on Form 10-K would include a report from the Company's accounting firm expressing "substantial doubt about the Company's ability to continue as a going concern." As the release revealed: "The failure to deliver audited, consolidated financial statements without a going concern or like qualification or explanation results in a default under each of the Credit Agreement and Term Loan Agreement as of April 14, 2020." The release also reported that Ultra's revenue had declined significantly in the quarter to $170.9 (from $273.2 million in 4Q18) and to $742.0 million in FY19 (from $892.5 million in FY18). The release further revealed that year-end proved reserves stood at just 1,990 Bcfe and that, because the Company had suspended its drilling

operations, it no longer included its PUD reserves in its reserve valuations. It stated that 2020 production was expected to plummet to a range of just 182 to 192 Bcfe, with an annual capital investment budget of only $10 million to $20 million.

119.     On May 14, 2020, Ultra filed for Chapter 11 bankruptcy in the U.S. Bankruptcy Court, Southern District of Texas, Houston Division, under the caption *In re Ultra Petroleum Corp., et al.*, Case No. 20-bk-32631 (the "2020 Bankruptcy"). Also on May 14, 2020, Ultra announced a restructuring agreement that it had secured with a number of its creditors. Ultra continued to operate as a "debtor in possession" following its bankruptcy petition.

120.     In its 2020 Bankruptcy filings, Ultra estimated that the values of its oil and gas reserves based on a future net cash flows analysis and on a discounted future net cash flows analysis at a 10% discount rate, each before income tax, were just $1.907 billion and $1.217 billion, respectively, as of March 31, 2020. The Company ascribed no value to its PUD reserves.

121.     On August 21, 2020, the bankruptcy court in the 2020 Bankruptcy approved the Company's proposed plan of reorganization, which provided zero recovery to existing Ultra shareholders.

## CLASS ACTION ALLEGATIONS

122.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Ultra common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their families; the officers, directors and affiliates of Ultra and members of their immediate families; the legal representatives, heirs, successors or assigns of any of the foregoing; and any entity in which any defendant has or had a controlling interest.

123.     The members of the Class are so numerous that joinder is impracticable.  Ultra common stock previously traded on the NASDAQ and had millions of shares outstanding.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through discovery, plaintiff believes there are hundreds, if not thousands, of members in the Class. Record owners and other Class members may be identified from records procured from or maintained by the Company or its transfer agent and may be notified of the pendency of this action using a form of notice similar to that customarily used in securities class actions.

124.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members, including:

(a)      whether defendants violated the Exchange Act, as alleged herein;

(b)      whether the statements made by defendants misrepresented material facts about the business, operations and assets of Ultra; and

(c)      whether and to what extent Class members have sustained damages, as well as the proper measure of damages.

125.     Plaintiff's claims are typical of the claims of the Class, as all Class members were similarly affected by defendants' conduct in violation of the Exchange Act as complained of herein.

126.     Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in securities class actions.

127.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it exceedingly difficult, if

not impossible and impracticable, for Class members to individually redress the wrongs alleged. There will be no difficulty in managing this action as a class action.

## LOSS CAUSATION AND ECONOMIC LOSS

128.    As detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Ultra common stock and operated as a fraud or deceit on purchasers of Ultra common stock.  As detailed above, when the truth about defendants' misconduct was revealed, the value of Ultra common stock declined precipitously as the prior artificial inflation no longer propped up the price of Ultra common stock.  The declines in the price of Ultra common stock were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price declines negate any inference that the loss suffered by plaintiff was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff, was a direct result of defendants' fraudulent scheme to artificially inflate the price of Ultra common stock and the subsequent significant decline in the value of Ultra common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

129.    At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the Company's business and operations, as alleged herein.  Before and during the time of plaintiff's purchases of Ultra common stock, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or

misleading, causing the price of Ultra common stock to be artificially inflated.  Plaintiff and the Class purchased Ultra common stock at artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

130.    At all relevant times, the market for Ultra common stock was an efficient market for the following reasons, among others:

(a)    Ultra's stock met the requirements for listing, and was listed and actively traded on NASDAQ, a highly efficient and automated market;

(b)    as a regulated issuer, the Company filed periodic public reports with the SEC;

(c)    Defendants regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(d)    unexpected material news about the Company was rapidly reflected in and incorporated into the price of the Company's stock.

131.    As a result of the foregoing, the market for Ultra common stock promptly digested current information regarding the Company from publicly available sources and reflected such information in the price of Ultra common stock.  Under these circumstances, a presumption of reliance applies to plaintiff's purchases of Ultra common stock.

132.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions.  Because this action involves

- 47 -

defendants' failure to disclose material adverse information regarding the Company's business and operations, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

133. Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements ("FLS"), or were not identified as such by defendants, but rather, were statements of historical and present fact, and thus did not fall within any "Safe Harbor."

134. Defendants' verbal "Safe Harbor" warnings accompanying any of their oral FLS failed to provide meaningful cautionary statements regarding the specific facts and circumstances facing the Company, and thus were ineffective to shield those statements from liability.

135. Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Ultra who knew that the FLS was false. Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

136. Plaintiff incorporates the foregoing paragraphs by reference.

- 48 -

137.     Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

138.     These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and Class members in connection with their purchases of Ultra common stock.

139.     Plaintiff has suffered damages in that, in reliance on the integrity of the market, plaintiff paid artificially inflated prices for Ultra common stock.  Plaintiff would not have purchased Ultra common stock at the price paid, or at all, if plaintiff had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

140.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class suffered damages in connection with their purchases of Ultra common stock.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

141.     Plaintiff incorporates the foregoing paragraphs by reference.

142.     Defendants were control persons within the meaning of §20(a) of the 1934 Act.

143.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements plaintiff contends are false and misleading.  Defendants were provided with, or had, unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding plaintiff and the Class compensatory damages at an amount to be determined at trial and pre-judgment and post-judgment interest thereon;

C.    Awarding plaintiff's reasonable costs and expenses, including attorneys' fees; and

D.    Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Date: September 1, 2020

*S/ Rusty E. Glenn*
**SHUMAN, GLENN & STECKER**
600 17th Street, Suite 2800 South
Denver, CO  80202
Telephone:  303/861-3003
303/536-7849 (fax)
rusty@shumanlawfirm.com

Brett D. Stecker
**SHUMAN, GLENN & STECKER**
326 W. Lancaster Ave.
Ardmore, PA 1903
Telephone:  303/861-3003
303/536-7849 (fax)
brett@shumanlawfirm.com

**ROBBINS GELLER RUDMAN**
  **& DOWD LLP**
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com

**ROBBINS GELLER RUDMAN**
  **& DOWD LLP**
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

**PAUL L. ROBINSON, ESQ. LLC**
500 Paterson Plank Road
Union City, New Jersey 07087
Telephone:  201/627-3299
201/627-3301 (fax)
trginternationalllc@gmail.com

*Attorneys for Plaintiff*

DocuSign Envelope ID: 7BF152A0-ABAA-4382-BFD0-4F028A39DF3C

## CERTIFICATION OF NAMED PLAINTIFF
## <u>PURSUANT TO FEDERAL SECURITIES LAWS</u>

ESWARAN SUBRAMANIAN ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| <u>Security</u> | <u>Transaction</u> | <u>Date</u> | <u>Price Per Share</u> |
|---|---|---|---|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___27___ day of August, 2020.



ESWARAN SUBRAMANIAN

DocuSign Envelope ID: 7BF152A0-ABAA-4382-BFD0-4F028A39DF3C

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Account 1**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 12/03/2018 | 500 | $1.26 |
| 01/15/2019 | 2,000 | $0.80 |
| 01/24/2019 | 500 | $0.80 |
| 02/07/2019 | 1,000 | $0.68 |
| 03/08/2019 | 1,000 | $0.56 |
| 03/21/2019 | 100 | $0.64 |
| 03/21/2019 | 250 | $0.64 |
| 05/21/2019 | 200 | $0.45 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 08/01/2019 | 5,550 | $0.17 |

**Account 2**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 05/23/2018 | 3,500 | $2.14 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 06/12/2018 | 2,500 | $2.01 |
| 06/20/2018 | 1,000 | $2.20 |

Prices listed are rounded up to two decimal places.