**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

Civil Action No. 20-cv-02652-RMR-STV (consolidated for all purposes with Civil Action No. 20-cv-02820)

---

ULTRA PETROLEUM INVESTOR GROUP, Individually and on behalf of all others similarly situated,

        Plaintiffs,

   v.

MICHAEL D. WATFORD,
C. BRADLEY JOHNSON,
ULTRA PETROLEUM, INC.,
FIR TREE CAPITAL MANAGEMENT LP N/K/A FIR TREE PARTNERS, INC., and
EVAN LEDERMAN,

        Defendants.

---

**DEFENDANT EVAN LEDERMAN'S
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

PAGE

**PRELIMINARY STATEMENT** ........................................................................................................1

**FACTUAL BACKGROUND** ............................................................................................................3

**ARGUMENT** .....................................................................................................................................6

I.    Plaintiffs Fail to Plead a Primary Violation of the Securities Laws................................................7

II.    Plaintiffs Fail to Plead that Mr. Lederman Had "Control" over Any Primary Violation. ...............................................................................................................................8

    A.    Mr. Lederman Did Not Have "Control" over Ultra on or before February 28, 2018. ...........................................................................................................................8

    B.    Plaintiffs Fail to Plead Mr. Lederman's Control over Any Alleged Securities Fraud that Occurred after February 28, 2018. .......................................................9

        1.    Plaintiffs' Allegations of Mr. Lederman's Day-to-Day Control Fail. .................9

        2.    Plaintiffs Fail to Allege Mr. Lederman's Control Over the Underlying Fraud. .........................................................................................................................10

**CONCLUSION** ...............................................................................................................................13

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Adams v. Kinder-Morgan, Inc.*,
   340 F.3d 1083 (10th Cir. 2003) ............................................................................... 6, 7, 8, 9

*Andropolis v. Red Robin Gourmet Burgers, Inc.*,
   505 F. Supp. 2d 662 (D. Colo. 2007) ............................................................................ 11-12

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................................ 7

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................................ 7

*Bryson v. Gonzales*,
   534 F.3d 1282 (10th Cir. 2008) ......................................................................................... 7

*DiTucci v. Ashby*,
   2020 WL 1249627 (D. Utah Mar. 16, 2020) .................................................................... 7

*GFF Corp. v. Associated Wholesale Grocers Inc.*,
   130 F.3d 1381 (10th Cir. 1997) ......................................................................................... 7

*In re Gold Resource Corp. Sec. Litig.*,
   776 F.3d 1103, 1118 (10th Cir. 2015) ............................................................................... 7

*Grubka v. WebAccess Int'l*,
   445 F. Supp. 2d 1259 (D. Colo. 2006), *amended*,
   2006 WL 2527815 (D. Colo. Aug. 31, 2006) ................................................................. 8, 9

*Medina v. Clovis Oncology, Inc.*,
   215 F. Supp. 3d 1094 (D. Colo. 2017) ............................................................................. 10

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
   838 F. Supp. 2d 1148 (D. Colo. 2012) ............................................................................. 11

*In re Qwest Commc'ns Int'l Sec. Litig.*,
   387 F. Supp. 2d 1130 (D. Colo. 2005) ............................................................................. 10

*Santa Fe Indus. Inc. v. Green*,
   430 U.S. 462 (1977) .......................................................................................................... 12

*Teachers Ret. Sys. of La. v. Qwest Commc'ns Int'l*,
　　2005 WL 2359311 (D. Colo. Sept. 23, 2005) ................................................................. 8, 11

*In re Thornburg Mortg. Sec. Litig.*,
　　824 F. Supp. 2d 1214 (D.N.M. 2011), *aff'd on other grounds sub nom.
　　Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013) .......................... 10, 11

*Universal Am. Corp. v. Partners Healthcare Sols. Holdings*,
　　176 F. Supp. 3d 387 (D. Del. 2016) ...................................................................................... 7

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
　　2008 WL 879023 (D. Colo. Mar. 28, 2008) ....................................................................... 11

STATUTES & RULES

Federal Rule of Civil Procedure 9(b) ................................................................................. 6

Federal Rule of Civil Procedure 12(b)(6) ..........................................................................1

Section 20(a) of the Securities Exchange Act of 1934 ......................................................*passim*

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Evan Lederman respectfully moves to dismiss the claims against him in the Amended Class Action Complaint, dated July 9, 2021, Dkt. No. 47 (the "amended complaint" or "CAC") with prejudice.

## PRELIMINARY STATEMENT

The amended complaint names Mr. Lederman as a defendant in only a single count—Count II—as an alleged "control person" under Section 20(a) of the Securities Exchange Act. Plaintiffs do not allege that Mr. Lederman made or approved any of the allegedly misleading statements described in the amended complaint. Those statements—primarily concerning gas drilling activities of Ultra Petroleum Corporation ("Ultra" or "the Company")—were all attributed to Ultra or two of its former officers.

Instead, plaintiffs seek to hold Mr. Lederman liable on a more attenuated theory. Specifically, plaintiffs allege that Mr. Lederman became a control person when he was appointed chair of Ultra's board on February 28, 2018, *nine months* after the alleged fraud began and after almost all of the allegedly misleading statements had been made. Plaintiffs attempt to support this theory by claiming that, starting then, Mr. Lederman assumed control of *business decisions*—but, importantly, not disclosures—relating to Ultra's earlier decision "to switch to horizontal drilling." None of those allegations pleads a valid control person claim under Section 20(a).

*First*, for the reasons given in the Ultra Defendants' Brief,[1] plaintiffs have failed to plead any primary violation of the securities laws. For that reason alone, the control person claims against Mr. Lederman must be dismissed.

*Second*, even if plaintiffs had sufficiently pled a primary violation by one of the other

---

[1] This motion refers to the motion to dismiss filed today on behalf of Michael D. Watford and C. Bradley Johnson, Dkt. No. 62, as the "Ultra Defendants' Brief" or "Ultra Def. Br."

defendants, the control person claims against Mr. Lederman would still fail because plaintiffs have not sufficiently pled control.

As a threshold matter, Mr. Lederman bears no responsibility for any of the alleged misstatements made prior to or on February 28, 2018, when he became chair.  Plaintiffs do not allege Mr. Lederman was a control person before that time, and there is no plausible basis to hold him liable for those earlier statements, which constitute the vast majority of alleged misstatements asserted in the amended complaint.

Nor can plaintiffs hold Mr. Lederman liable as a control person for the handful of alleged misstatements made after February 28, 2018, because plaintiffs fail to allege that Mr. Lederman controlled any underlying violation of the securities laws or the day-to-day management of Ultra.  Plaintiffs' control person allegations depend on the assertion that Mr. Lederman somehow steered Ultra toward an ill-fated decision to focus on horizontal drilling.  But the amended complaint and the documents it incorporates by reference make clear that, months *before* Mr. Lederman joined the board, Ultra had *already* drilled several horizontal wells and told its investors that it would focus on horizontal drilling.  At most, therefore, Mr. Lederman is alleged—in his capacity as only one of the Company's seven non-executive board members—to have directed a single strategic plan that was indisputably made and publicly announced months before he even arrived at the company.  This does not constitute the general day-to-day control over management sufficient to meet plaintiffs' burden to plead control.  Even more fundamentally, the securities laws do not impose liability for *decisions*; they impose liability only for *disclosures*.  And the amended complaint does not allege that Mr. Lederman had any control over any disclosures here, much less the statements made after February 28, 2018 that plaintiffs claim are misleading.  In fact, the core statements at issue after that date were verbal responses by another defendant to third-party questions on a live earnings call;

2

plaintiffs do not (and cannot) allege that Mr. Lederman somehow controlled an Ultra officer's spontaneous answers to questions on a call in which Mr. Lederman did not even participate. The Section 20(a) claim must be dismissed.[2]

## FACTUAL BACKGROUND

Ultra was a publicly traded energy company focused on natural gas exploration in Wyoming. CAC ¶ 28. Plaintiffs allege that beginning in May 2017, two Ultra executives, Mr. Watford and Mr. Johnson, made a series of allegedly misleading statements to investors, including statements about the Company's drilling operations in Wyoming's Pinedale region.

### *Evan Lederman and Fir Tree Capital Management.*

Mr. Lederman was a partner at Fir Tree Capital Management ("Fir Tree"), an investment manager for numerous investment funds. *Id.* at ¶¶ 31-32. Fir Tree was a minority investor in Ultra, holding, at its peak in September 2017, approximately 18% of the shares outstanding. *Id.* at ¶¶ 144-145. The amended complaint does not allege that either Mr. Lederman or Fir Tree played any role whatsoever in the management or operations of Ultra—or exercised any control over Ultra—prior

---

[2] Mr. Lederman notes that there will almost surely be an additional independent ground to dismiss this case promptly as to some or all of the plaintiffs—namely that their claims have been released by operation of the court-approved plan of reorganization (the "Plan") resolving Ultra's second bankruptcy. In particular, the Plan—which was confirmed on August 22, 2020, by the United States Bankruptcy Court for the Southern District of Texas—contains a broad release of all claims against Mr. Lederman and other former officers and directors of Ultra, including claims by any equity holders of Ultra who did not expressly and properly opt out. Order Confirming the Second Amended Joint Chapter 11 Plan at ¶ 46, *In re Ultra Petroleum Corp.*, Case No. 20-32631, (Bankr. S.D. Tex. Aug. 22, 2020), ECF No. 736; *see also id.* Art. I, definition of "Releasing Parties."

If the amended complaint were to survive this motion to dismiss, Mr. Lederman would immediately seek discovery to confirm that these plaintiffs did not properly opt out from the Plan and that their claims are barred by the release in the Plan; provided that this discovery confirms these facts, Mr. Lederman would promptly bring an early motion for summary judgment on the basis of the release.

to February 28, 2018.

Pursuant to a "Cooperation Agreement" between Fir Tree and Ultra, announced on January 30, 2018, Fir Tree selected Mr. Lederman as one of seven Ultra directors and the non-executive chair of the board of Ultra. *Id.* at ¶ 147. The agreement took effect on February 28, 2018 when Mr. Lederman assumed the role of chair, which he held until "at least June 4, 2020." *Id.* at ¶ 32.

### Ultra's Decision Prior to Mr. Lederman's Arrival to Focus on Horizontal Drilling Operations.

On August 9, 2017—nearly seven months **before** Mr. Lederman joined Ultra as its board chair—plaintiffs allege that Ultra "disclosed that it would drill three horizontal wells in 2017." *Id.* at ¶ 175. On November 7, 2017, Ultra announced that it "[s]uccessfully drilled and completed" its first horizontal well, *id.* at ¶¶ 141, 181, and that it would be devoting substantial resources to horizontal drilling in 2018, *id* at ¶¶ 179-185.

During the November 7 call, the Company repeatedly disclosed to investors its intentions to explore "a significant resource expansion opportunity with horizontal wells." Ex. 5 at 4 (Q3 2017 Earnings Call).[3] Ultra confirmed for investors that it would be "without a doubt" drilling additional horizontal wells in 2018—drilling that would supplant some of the vertical drilling efforts—and that it might drill double-digit wells by the end of that year. *Id.* at 10, 12; *see also* CAC ¶ 183 (describing the "horizontal potential in the field, which could result in potentially 16 new horizontal wells . . .").

On January 30, 2018—still a month before Mr. Lederman joined Ultra's board—the Company announced that, consistent with its announcement months before, it had completed drilling of its first three horizontal wells and also communicated to investors that it "look[ed]

---

[3] References to "Ex. __" are to the exhibits attached to the declaration of David Holman filed in support of Mr. Johnson and Mr. Watford's motion to dismiss. Dkt. No. 63-1.

4

forward to drilling more horizontal wells in 2018 and beyond." CAC ¶ 188.

On February 28, 2018—the same day that Mr. Lederman assumed the role as the chair, but prior to any alleged action he took in that (or any other) capacity—the Company disclosed to investors that it was undertaking an "accelerated ramp-up of horizontal activity," Ex. 3 at 6 (Q4 2017 Earnings Call), and a corresponding "throttl[ing] down [of] our vertical program," *id.* at 3; *see also id.* at 4 (stating that, "[i]n 2018," Ultra planned for "a reduction of vertical drilling in Pinedale that gives way to increased horizontal activity"). As plaintiffs allege, Ultra told investors on that call that "by the close of 2018, Ultra's rigs would only be drilling horizontal wells." CAC ¶¶ 142, 190. The Company went on to explain that it planned to drill "between 15 and 20 horizontal wells" in 2018 and was planning for 36 horizontal wells per year beginning in 2019. Ex. 3 at 6 (Q4 2017 Earnings Call).

Plaintiffs do not allege that Mr. Lederman played any role in connection with this series of decisions—or the disclosures to investors—relating to the reallocation of its resources to horizontal drilling and the plan to phase out vertical drilling altogether in 2018.

### *Plaintiffs' Allegations of "Control."*

Plaintiffs also do not allege that Mr. Lederman had any role whatsoever in any specific communications with investors or in Ultra's disclosure apparatus more generally. Nor do they allege that he had generalized day-to-day control over Ultra's management or policies.

Instead, plaintiffs allege that Mr. Lederman "controlled Ultra" with respect to a specific business strategy: "Ultra's decision to switch to horizontal drilling." CAC ¶ 151. Even though Ultra had already announced its shift to horizontal drilling, and had in fact already drilled several horizontal wells, before Mr. Lederman became chair on February 28, 2018, plaintiffs plead that at some unspecified time in the 71 days between when he assumed his role as chair and May 10, 2018,

Mr. Lederman "held a meeting with Johnson and members of Ultra Petroleum's technical team in which he ordered them to focus on horizontal drilling." *Id.* at ¶¶ 154-58.

Plaintiffs, however, do not (and cannot) allege that Mr. Lederman exercised control over any of the alleged misstatements. In fact, three of the five purported misrepresentations after February 28, 2018 were oral statements by Mr. Johnson in response to questions on an earnings call. *See id.* at ¶ 199 (describing the "geological nature" and "variability" of Pinedale); *id.* at ¶ 201 (explaining that Ultra "[was] excited about the upcoming [horizontal] wells and . . . [had] confidence to go faster"); *id.* at ¶ 202 (stating that the focus to "horizontal wells is just, for us, the obvious thing to do given the superior returns"). Nor do plaintiffs allege that Mr. Lederman had any control over the April 27, 2018 amendment to Ultra's 2017 10-K, which contained the only other alleged misstatements that post-dated February 28, 2018.[4]

## ARGUMENT

To state a claim for control person liability under Section 20(a) of the Securities Exchange Act, plaintiffs must plead: "(1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1107 (10th Cir. 2003) (quotation marks omitted). Plaintiffs' underlying securities fraud claims are subject to the heightened pleadings standard of both the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b). Ultra Def. Br. at 6-7. As to the element of

---

[4] Plaintiffs contend that two aspects of the amended 10-K were allegedly misleading: (1) its description of the distinct roles of the chair of the board and the Chief Executive Officer, which the Company opined "allows the [CEO] to focus on the day-to-day business and operations while allowing [the chair] to lead the board in its fundamental role of providing guidance to and oversight of management," *id.* at ¶ 192; and (2) its assertion that Ultra "mitigate[s] incentives to take undue risk," including "by engaging both the Board and management in our internal processes to identify circumstances that may create unnecessary risk," *id.* at ¶ 195. Neither of these generalized statements of optimism is actionable for the reasons set forth in the Ultra Defendants' Brief.

"control," plaintiffs must plead "facts from which it can . . . reasonably be inferred that the individual defendant[] [was a] control person[]." *Adams*, 340 F.3d at 1108.  "[F]actual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997).

To avoid dismissal, plaintiffs must provide "enough facts to state a claim to relief" on the issue of control "that is plausible on its face" and sufficiently moves the allegations "across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) ("[A] complaint still must contain either direct or inferential allegations respecting **all the material elements** necessary to sustain a recovery under some viable legal theory.") (emphasis added) (quotation marks omitted).[5]  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not shown that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation and alteration marks omitted).

## I. Plaintiffs Fail to Plead a Primary Violation of the Securities Laws.

For the reasons set forth in the brief filed by Messrs. Johnson and Watford, plaintiffs have not sufficiently pled a primary violation of the securities laws.  Ultra Def. Br. §§ I, II.  Standing alone, this is dispositive as to control person liability.  *In re Gold Resource Corp. Sec. Litig.*, 776 F.3d 1103, 1118 (10th Cir. 2015) ("Because the district court properly dismissed plaintiff's claims relating to the primary violations of the securities laws, plaintiff's § 20(a) claim necessarily also fails.").  The

---

[5] As a court in this Circuit recently observed, the Tenth Circuit has not yet decided whether the heightened pleading standard under the PSLRA applies to the element of "control" under Section 20(a).  *DiTucci v. Ashby*, 2020 WL 1249627, at *7 (D. Utah Mar. 16, 2020).  Other jurisdictions have concluded that it does.  *See, e.g.*, *Universal Am. Corp. v. Partners Healthcare Sols. Holdings,* 176 F. Supp. 3d 387, 397 (D. Del. 2016).  Because plaintiffs' allegations of "control" here do not meet even the notice pleading standard, the Court need not decide this issue.

7

Section 20(a) claims against Mr. Lederman should be dismissed on this basis alone.

## II. Plaintiffs Fail to Plead that Mr. Lederman Had "Control" over Any Primary Violation.

Even if plaintiffs could plead a primary violation of the securities laws by other defendants, the allegations that Mr. Lederman controlled Ultra, or any of the primary violators of the securities laws, do not suffice to plead a claim under Section 20(a).

In the Tenth Circuit, "an allegation that a person was a member of [the] board of directors is insufficient, without a specific allegation demonstrating control or influence" over either "the wrongdoing or over the day-to-day business of the company, to bring that person under the statute." *Grubka v. WebAccess Int'l*, 445 F. Supp. 2d 1259, 1268 (D. Colo. 2006), *amended*, 2006 WL 2527815 (D. Colo. Aug. 31, 2006). To find Mr. Lederman liable as a control person, plaintiffs must plausibly allege facts showing that Mr. Lederman (1) "individually exerted control or influence over the day-to-day operations of" Ultra sufficient to "cause the direction of [its] management and policies," *Adams*, 340 F.3d at 1108 or (2) "controlled [Ultra or any other primary violator] with regard to the primary securities law violation alleged," *Teachers Retirement Sys. of La. v. Qwest Commc'ns Int'l*, 2005 WL 2359311, at *12 (D. Colo. Sept. 23, 2005). The allegations in the amended complaint fall short on both.

### A. Mr. Lederman Did Not Have "Control" over Ultra on or before February 28, 2018.

As a matter of law, Mr. Lederman cannot be a control person with respect to alleged misstatements that occurred on or prior to February 28, 2018—the day when Mr. Lederman became chair of Ultra's board and is alleged to have acquired control over Ultra. Prior to that date, plaintiffs have not alleged ***any conduct or action on the part of Mr. Lederman***, let alone conduct that could show that he possessed "power to direct or cause the direction of the management and

8

policies" of Ultra.  *Adams*, 340 F.3d at 1108.

The overwhelming majority of the alleged misrepresentations—including (i) *all* of the alleged misrepresentations relating to production from Ultra's 2017 wells, *see* CAC Sec. VI.A, (ii) the alleged misrepresentations about the decision to pivot to horizontal drilling on November 7, 2017, *id.* at ¶¶ 179-186, and (iii) the disclosed (and allegedly misleading) business judgment to expand those horizontal drilling operations over the course of 2018 on January 30 and February 28, 2018, *id.* at ¶¶ 188-191—predate any allegations of "control" on the part of Mr. Lederman.  Any Section 20(a) claim based on purported "control" during this period is legally infirm.

### B. Plaintiffs Fail to Plead Mr. Lederman's Control over Any Alleged Securities Fraud that Occurred after February 28, 2018.

As explained above, in order to establish "control," Tenth Circuit law requires plaintiffs to allege that Mr. Lederman either (1) controlled and managed the day-to-day policies of Ultra or (2) controlled the underlying fraud, here, the allegations of misstatements to investors.  *Grubka*, 445 F. Supp. 2d at 1268.  Plaintiffs' factual allegations regarding the time period post-dating February 28, 2018 are insufficient to meet either prong of this standard.

#### 1. *Plaintiffs' Allegations of Mr. Lederman's Day-to-Day Control Fail.*

There are no well-pled allegations that Mr. Lederman controlled the day-to-day management and policies of Ultra or exerted sufficient control over its executives who did to support a finding of "control."  *Adams*, 340 F.3d at 1083.  In the 71 days between Mr. Lederman's appointment to the board and the last allegedly misleading statement in the amended complaint, plaintiffs have not alleged that Mr. Lederman (a single outside director) controlled the day-to-day management or policy of the Company as a whole.  *See* CAC ¶¶ 151-174.

Plaintiffs appear to allege that Mr. Lederman is liable as a "control person" because he

9

purportedly spearheaded Ultra's focus on horizontal drilling. But this conclusory contention about alleged control over a single facet of Ultra's business does not purport to establish the sort of broad-based, day-to-day corporate control that is required to meet this prong of the control person test. *Medina v. Clovis Oncology Inc.*, 215 F. Supp. 3d 1094, 1134 (D. Colo. 2017) (finding no control liability where plaintiff failed to "allege any control over the day-to-day operations of [the company]"). Rather, it supports, at most, an allegation that Mr. Lederman exerted control over a single, ongoing, previously announced business strategy for a limited period of time between February 28, 2018 and May 10, 2018. And, as set forth above, the decision to shift resources from vertical operations and begin ramping up horizontal drilling was made months *before* Mr. Lederman had any role at the Company. CAC ¶ 141.[6]

### 2. Plaintiffs Fail to Allege Mr. Lederman's Control Over the Underlying Fraud.

Plaintiffs likewise have failed to allege that Mr. Lederman exerted control over any person or mechanism responsible for allegedly making false or misleading statements to investors. *In re Qwest Commc'ns Int'l Sec. Litig.*, 387 F. Supp. 2d 1130, 1149 (D. Colo. 2005); *In re Thornburg Mortg. Sec. Litig.*, 824 F. Supp. 2d 1214 (D.N.M. 2011), *aff'd on other grounds sub nom. Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190 (10th Cir. 2013).

This pleading failure is dispositive because alleged control persons are not liable for fraud

---

[6] The allegations of former employees 1, 2, and 3 (as identified in the amended complaint) about Mr. Lederman personally mandating the focus on horizontal drilling after he arrived at the company in February 2018, CAC ¶¶ 153-155, 157-163, 166-67, 172, are likewise of limited or no relevance because they relate to a time *after* Ultra had already decided on, and publicly disclosed, its pivot to horizontal drilling. Allegations from former employee 4—which relate to Mr. Lederman's requests to see operational accounting information for the Company—neither relate to the underlying securities fraud nor substantiate any allegations that Mr. Lederman "controlled" Ultra. CAC ¶¶ 173-174.

unless they "exercised power or authority to cause [the Company] to engage in the alleged unlawful conduct." *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 879023, at *18 (D. Colo. Mar. 28, 2008). In other words, where, as here, the "allegations in the complaint do not indicate . . . the individual defendant[] controlled [the company] **with regard to the primary securities law violation alleged**," the Section 20(A) claims fail. *Qwest*, 2005 WL 2359311, at *12 (emphasis added); *see id.* (finding that because "there is no allegation that any individual defendant had management authority over Qwest's overall revenue picture or financial reporting to the public," there could be no control person liability); *see also In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1182 (D. Colo. 2012) (defining the relevant question as whether the defendant "had at least indirect control over the subject of the primary violation" and noting that the "authority to sign or not sign the registration statements at issue is sufficient indicia of 'control' over the representations and disclosures that went out to potential investors").[7]

At most, plaintiffs have alleged that Mr. Lederman was involved in **business decisions** to increase the rate at which the Company converted its operations to horizontal drilling. But those allegations do not legally subject Mr. Lederman to liability as a control person for alleged securities fraud involving allegedly fraudulent statements to investors about horizontal drilling or anything else. It is a first principle of the securities laws that business decisions are not actionable. *Andropolis*

---

[7] The District of New Mexico's decision in *In re Thornburg Mortgage Securities Litigation*, 824 F. Supp. 2d 1214 is instructive. There, the court held that an individual who was a director and senior executive vice president was not liable as a control person because plaintiffs "[did] not allege that [he] had any involvement in" any of the investor fora in which a company representative "allegedly made the actionable statements." *Id.* at 1294. The Court contrasted that with its analysis of another individual who was "not only . . . personally responsible for [the Company's] public statements to investors" but also had "direct managerial authority" as CEO of the company "during the time when the [p]rimary [v]iolations occurred." *Id.* at 1289. The CEO was properly alleged to be a control person, but the director/senior officer was not.

11

*v. Red Robin Gourmet Burgers, Inc.*, 505 F. Supp. 2d 662, 682 (D. Colo. 2007) ("[F]ederal securities laws were not intended to create a federal remedy for corporate misconduct . . . , including 'transactions which constitute no more than internal corporate mismanagement' or breach of fiduciary duties") (quoting *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977)). That principle is particularly apt here given that Ultra disclosed its business decisions on horizontal drilling every step of the way.

In any case, any allegation that Mr. Lederman even **could** have controlled the handful of post-February 28, 2018 statements about horizontal drilling would be wholly implausible.[8] All such statements were made by Mr. Johnson **in response to questions** on a live May 10, 2018 investor call. CAC ¶¶ 199, 201, 202. Neither Mr. Lederman nor anyone else from Fir Tree appeared on the call, and there is no suggestion anywhere that Mr. Lederman was involved in the preparation for that call, much less with respect to Mr. Johnson's real-time answers to specific questions. And in any event, Mr. Johnson's answers merely repeated what plaintiffs allege that Ultra had already told investors over the several months **before** Mr. Lederman even joined the company: that Ultra would be focused exclusively on horizontal drilling by the end of 2018,[9] that Ultra was excited about that strategic direction,[10] and that drilling at different locations in Pinedale could result in variable well

---

[8] The only other alleged misstatements that postdated February 28, 2018 were the highly generalized statements of opinion in the amended 10-K from April 2018 about the change in board structure. Here, too, plaintiffs have not alleged that Mr. Lederman exercised any control over the preparation of those statements, which are—in any event—unactionable for all the reasons set forth in the Ultra Defendants' Brief at 20-21.

[9] *Compare* CAC ¶ 142 (February 28, 2018) ("[B]y the close of 2018, Ultra's rigs would only be drilling horizontal wells"), *with id.* at ¶ 154 (May 10, 2018) ("For the balance of 2018, we will . . . continue to ramp up our horizontal activity").

[10] *Compare* Ex. 3 at 7 (February 28, 2018) ("[T]he horizontal wells offer[] significant upside, which compels us to pursue this opportunity."), *with* CAC ¶ 202 (May 10, 2018) ("[H]orizontal wells is just, for us, the obvious thing to do given the superior returns.")

12

performance.[11]  There is no basis to conclude that Mr. Lederman could ever have controlled Mr. Johnson's reiteration of these prior statements in response to specific questions on an earnings call.

## CONCLUSION

Because plaintiffs have not sufficiently pled an underlying violation of the securities laws (as set forth in the Ultra Defendants' Brief) and because plaintiffs have not alleged "control" over Ultra on the part of Mr. Lederman (as set forth above), Mr. Lederman respectfully requests that the Section 20(a) claims against him be dismissed with prejudice.

Dated:  October 29, 2021

Respectfully submitted,

By: /s/ *Edmund Polubinski III*

Edmund Polubinski III
Patrick W. Blakemore
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email: edmund.polubinski@davispolk.com

*Attorneys for Defendant Evan Lederman*

---

[11] *Compare* Ex. 5 at 11 (November 7, 2017) (describing the "range of reservoir quality" across locations in Pinedale), *with* CAC ¶ 199 (May 10, 2018) (describing "geographical . . . variability" across Pinedale resulting in uneven well performance).

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of October 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

By: */s/ Edmund Polubinski III*
Edmund Polubinski III