# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-02652-RMR-STV
 (Consolidated for all purposes with Civil Action No. 1:20-cv-02820)

SCOTT HEINER,
BALA SETTU,
GEOFFREY POLYCHRONIS,
MAHDI RIYAD ISSA,
YOAV GIVON,
MICHAEL ALTMAN, Individually and on Behalf of All Others Similarly Situated,

 Plaintiffs,

v.

MICHAEL D. WATFORD,
C. BRADLEY JOHNSON,
ULTRA PETROLEUM, INC.,
FIR TREE CAPITAL MANAGEMENT LP N/K/A FIR TREE PARTNERS INC., and
EVAN LEDERMAN,

 Defendants.

---

## [PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATION OF
## THE FEDERAL SECURITIES LAWS

---

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.    JURISDICTION AND VENUE .................................................................................. 7

III.    PARTIES .................................................................................................................... 7

IV.    GLOSSARY OF OIL AND GAS INDUSTRY TERMS ............................................ 9

V.    BACKGROUND ...................................................................................................... 12

A.  Oil and Gas Wells Are Depleting Assets ...................................................... 12

B.  Ultra's Pinedale Field ................................................................................... 13

C.  Ultra Drills Thousands of Wells in the Pinedale Field ................................. 13

D.  Ultra Files For Bankruptcy in 2016 and Exits With $2 Billion in Debt ................. 14

E.  Defendants Promise Safe and Predictable Returns ....................................... 16

VI.    DEFENDANTS' FRAUDULENT CLASS-PERIOD CONDUCT ............................ 18

A.  Defendants Fraudulently Omit to Disclose that Production from Ultra's 2017
     Wells Was Bound to be Poor ......................................................................... 18

     i.    Ultra Upgrades To An 8-Rig Fleet ......................................................... 18

     ii.    Because Sublette County Is Ecologically Fragile, Operators Must Prepare and Drill
           From Drilling Pads .............................................................................. 19

     iii.    Operators May Not Build Drilling Pads In Winter Or Spring ............................ 20

     iv.    Ultra Had Not Built Enough Drilling Pads In 2016 To Support A 2017 Drilling Plan ... 21

     v.    Defendants Knew They Had Not Prepared Enough New Drilling Pads In 2016 To
           Support An Eight-Rig Drilling Plan ..................................................... 21

     vi.    Defendants Made False and Misleading Statements About Ultra's 2017 Wells That
           Caused Investors' Losses .................................................................. 23

B.  Defendants Misleadingly Describe an Attempt to Drill A Showpiece Well As A "Test" That Is "Indicative" of the Pinedale's Potential ..............................................27

i.  Ultra Spends Six Months Finding A Location Where An Unlikely Confluence of Factors Creates A Uniquely Good Location To Drill A Horizontal Well ...............................27

(1)  The Warbonnet Pad Is Located In A Uniquely Productive Area .........................27

(2)  Environmental Regulations Further Restrict the Available Locations ...............32

ii.  Fir Tree Buys Out Debt To Establish A Significant, But Not Controlling, Position In Ultra ...........................................................................................................................34

iii.  Fir Tree Executes Its Business Plan ........................................................................37

iv.  Fir Tree Purportedly Exerts Influence Over Ultra—But Not Control ..................37

v.  In Reality, Fir Tree Controls Ultra .........................................................................39

vi.  Defendants Make False Statements About Ultra's Horizontal Well Drilling Program That Damage Investors .................................................................................45

VII.  ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER .............................54

PLAINTIFFS' CLASS ACTION ALLEGATIONS .................................................................55

NO SAFE HARBOR ..................................................................................................................59

COUNT I .....................................................................................................................................59

COUNT II ...................................................................................................................................61

PRAYER FOR RELIEF ............................................................................................................63

DEMAND FOR TRIAL BY JURY ...........................................................................................63

I.  INTRODUCTION ....................................................................................................... 1

II.  JURISDICTION AND VENUE ................................................................................. 7

III.  PARTIES ..................................................................................................................... 7

IV.  GLOSSARY OF OIL AND GAS INDUSTRY TERMS ............................................ 9

V.  BACKGROUND ........................................................................................................ 12

A.  Oil and Gas Wells Are Depleting Assets ..................................................... 12

B.  Ultra's Pinedale Field .................................................................................... 13

ii

C.  Ultra Drills Thousands of Wells in the Pinedale Field ................................................. 13

D.  Ultra Files For Bankruptcy in 2016 and Exits With $2 Billion in Debt ........................ 14

E.  Defendants Promise Safe and Predictable Returns ........................................................ 16

VI.   DEFENDANTS' FRAUDULENT CLASS-PERIOD CONDUCT .................................... 18

A.  Defendants Fraudulently Omit to Disclose that Production from Ultra's 2017 Wells
Was Bound to be Poor ..................................................................................................... 18

i.    Ultra Upgrades To An 8-Rig Fleet............................................................................ 18

ii.   Because Sublette County Is Ecologically Fragile, Operators Must Prepare and Drill
From Drilling Pads.................................................................................................... 19

iii.  Operators May Not Build Drilling Pads In Winter Or Spring ................................. 20

iv.  Ultra Had Not Built Enough Drilling Pads In 2016 To Support A 2017 Drilling Plan
................................................................................................................................... 21

v.   Defendants Knew They Had Not Prepared Enough New Drilling Pads In 2016 To
Support An Eight-Rig Drilling Plan ......................................................................... 21

vi.  Defendants Made False and Misleading Statements About Ultra's 2017 Wells That
Caused Investors' Losses ......................................................................................... 23

B.  Defendants Misleadingly Describe an Attempt to Drill A Showpiece Well As A "Test"
That Is "Indicative" of the Pinedale's Potential............................................................ 27

i.    Ultra Spends Six Months Finding A Location Where An Unlikely Confluence of
Factors Creates A Uniquely Good Location To Drill A Horizontal Well .............. 27

ii.   Fir Tree Buys Out Debt To Establish A Significant, But Not Controlling, Position
In Ultra ..................................................................................................................... 34

iii.  Fir Tree Executes Its Business Plan.......................................................................... 37

iv.  Fir Tree Purportedly Exerts Influence Over Ultra – But Not Control ..................... 37

v.   In Reality, Fir Tree Controls Ultra............................................................................ 39

vi.  Defendants Make False Statements About Ultra's Horizontal Well Drilling Program That
Damage Investors..................................................................................................... 45

VII.   ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER ................................ 54

PLAINTIFFS' CLASS ACTION ALLEGATIONS................................................................. 55

NO SAFE HARBOR ................................................................................................................ 59

COUNT I .................................................................................................................................. 59

COUNT II ................................................................................................................................. 61

PRAYER FOR RELIEF ........................................................................................................... 63

DEMAND FOR TRIAL BY JURY .......................................................................................... 63

iv

Lead Plaintiffs Scott Heiner, Bala Settu, Geoffrey Polychronis, Mahdi Riyad Issa, Yoav Givon, and Named Plaintiff Michael Altman, individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants (defined below), allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters.

## I.    INTRODUCTION[1]

1.    This is a securities class action brought on behalf of all persons who or that purchased the common stock of Ultra Petroleum, Inc., from May 10, 2017 through March 7, 2019, both dates inclusive, and were damaged thereby, seeking remedies under Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act").[2]

2.    In April 2017, Ultra emerged from bankruptcy with a $2 billion debt problem looking for a quick way to boost their stock price and let the shareholders it had acquired in its bankruptcy sell their position. It tried two. First, Defendants maintained Ultra had planned for an explosive 2017 in which it would drill huge number of wells which would be, crucially, of high quality. But even as they made their statements, Defendants knew that having failed to prepare Ultra for a bumper drilling year, the only wells they could drill in 2017 would be mediocre. When these wells proved mediocre, Ultra's stock price fell. Second, Defendants made Ultra's technical staff spend six months carefully reviewing reams of data to identify a unique location and unique geological strata within their acreage that would produce an extraordinary well. They misleadingly

---

[1] Unless otherwise noted, all emphases are added.

[2] Excluded from the Class are Defendants herein, all current and former officers or directors of Ultra, and all such excluded persons' immediate families and their legal representatives, heirs, successors or assigns, and any entity which such excluded persons controlled or in which they have or had a controlling interest.

1

called the resulting wells drilled there a "test" that was "indicative" of the field's potential; they were showpieces whose results Defendants knew would not be repeated with later wells. When the announcement of the wells' productivity failed to cause Ultra's stock price to skyrocket, Defendants had no choice but to test other locations that did not benefit from the unique confluence of factors that made the showpiece wells so productive. The new wells were not nearly as productive, and Ultra's stock price fell. Ultra's emergence from bankruptcy proved to be a brief reprieve. In May 2020, it filed for bankruptcy for the second time in four years, and this time it wiped out not only its shareholders but most of its creditors.

3.      Ultra is a gas exploration and development company focused on the Pinedale gas Field in Wyoming. Historically low gas prices, and $3.75 billion in debt, pushed Ultra into bankruptcy in early 2016. When gas prices rebounded in late 2016, Defendants secured financing to pay out about two-thirds of its debt in cash and converted the remainder to equity.

4.      While the abortive bankruptcy solved Ultra's immediate problem, it still had $2 billion in debt. Further, after emergence from bankruptcy, a significant portion of Ultra's shares were owned by private equity funds whose business models did not allow for gradual appreciation of share price, because they had to sell their stock and return cash to their investors. Defendants sought to quickly increase Ultra's stock price.

5.      With few ~~borrowing~~financing options available, Ultra announced that it would fund its 2018 drilling program from 2017 cash flows. To that end, Defendants announced an expansive 2017 drilling plan at a level it had not seen since 2012. In 2017, Ultra would lease eight of the massive, state-of-the-art rigs used to drill wells. These rigs would, as Defendants told investors in a call to discuss Q1 2017 earnings, deliver high-quality wells throughout 2017. The success of this venture was vitally important. Failure to dig high-quality wells would not only directly reduce

2017 and 2018 production, it would also reduce the cash available for drilling in 2018, and thus indirectly reduce Ultra's expected production increase that year.

6.      Announcing Q1 2017 results in May 2017, Defendants misleadingly told investors that the wells Ultra drilled in 2017 would be of high quality. But Defendants knew their statements were not true. Environmental conditions in the Wyoming field in which Ultra drills its wells prevent it from preparing drilling pads, the large structures on which it drills its wells, in the winter or spring. Yet in 2016, amidst its bankruptcy, Ultra had failed to prepare enough new pads to drill wells. It could not address the problem in 2017 because the 12-month period it takes to obtain a permit to construct a pad requires seeking approval for 2017 pads in 2016. So, as Defendants knew by Q1 2017, at the latest, when they approved Ultra's 2017 drilling plan, Ultra would drill wells on legacy pads built in unproductive locations, and these wells would produce poor results.

7.      On August 9, 2017, Ultra announced its Q2 2017 results. Ultra reduced both its 2017 and 2018 guidance.  Ultra's stock price fell 14.38%.

8.      Announcing Q3 2017 results, Defendants admitted that Ultra was drilling poor wells. They admitted, too, that they had known as much all along. They even implied that their "uneven" communications may have materially misled investors. But, they said, Ultra would henceforth drill wells in the productive core of the Pinedale field.

9.      On March 14, 2018, in an investors presentation, Defendants disclosed that because the 2017 wells had continued to underproduce, Ultra's costs to acquire new reserves was not sustainable. Ultra's stock price fell by 12.3%

10.      Ultra tried another quick fix. Historically, Ultra's Wyoming property, the Pinedale field, had been developed with vertical wells. Defendants told investors that Ultra would drill

3

horizontal wells[3] on the Pinedale's eastern flank. The horizontal wells would, Defendants hoped, prove that there was more gas in the field than what operators had previously known.

11.    Defendants announced that Ultra would drill three horizontal wells in 2017. Defendants called the wells a "science experiment" meant to *test* the expansion's potential. Two of the three wells, which were drilled in the same location (the Warbonnet 9-23 and nearby Warbonnet 9-24), produced outstanding results. Defendants claimed these wells were "indicative" of the expansion's production value, representing that the entire field would be as productive.

12.    In truth, for six months, Ultra's technical staff had spent one quarter to one half of their time selecting locations to drill wells that would yield maximum production, knowing that these locations were *not* representative of the field overall. Ultra's technical staff found a small site in the Pinedale field that was perfect for drilling because of an unlikely confluence of factors. ~~*First*,~~

13.    Most importantly, the Warbonnet 9-23/24 – including its horizontal path – was located in the Pinedale field's *core*, ~~so it would tell Ultra little about conditions on the field's flank where it told investors it would drill later wells. *Second*,~~not its flanks. Thus, there was no *testing* involved. Further, while the ~~Warbonnet 9-23/24 area had seen little~~ core is known to contain gas, years of drilling vertical ~~drilling that would reduce~~wells has sapped its gas pressure and, therefore, production. ~~*Third*~~The Warbonnet 9-23/24 is unique in that it was drilled and extended into the core but its path went under an area covered with a lake and other topographical features that

---

[3] When drilling horizontal wells, the operator turns 90 degrees when it reaches a pre-selected highly productive strata. The operator then continues to drill perpendicularly for 1,000 to 10,000 feet, which gives horizontal wells their name.

precluded drilling vertical wells. Thus, the Warbonnet 9-23/24 was not an expansion well, and it was drilled in an untapped area known to be productive.

12.14.   Even so, the area around the Warbonnet 9-23/24 had seen enough vertical wells for Ultra to be able to pinpoint a *200-foot* interval some 10,000 feet underground that was unusually productive. And *fourth*finally, while operators had not developeddrilled many wells in the Warbonnet area around the Warbonnet 9-23/24 area and its path because it was expensive or impossible to drill a vertical well there;, the wells that had been drilled had been exceptional.

13.15.  While these conditions applied to a tiny area in the Pinedale field's core, around the Warbonnet 9-23/24 area, they prevailed nowhere else in the Pinedale field. So the wells' production would tell Ultra little about conditions on the field's flank, where Ultra intended to drill later wells. The wells, therefore, were not meant to "test" anything; they were meant to convey the false impression that the entire flanks were extraordinary.

14.16.  But the announcement failed to have its intended effect of making Ultra's stock price skyrocket, frustrating its private equity owners' business plan of quickly selling their shares. One private equity shareholderOne of Defendant Fir Tree's partners called the market reaction "unbelievable". So when Ultra's minority private equity shareholders took de facto control in February 2018, they directed it to expand its horizontal "testing" to a full-fledged drilling program, over its senior management's and technical team's protests.

15.17.  As its management and technical team had warned, Ultra's horizontal wells did not produce in line with the Warbonnet 9-23/24. Drilled in the Pinedale's flanks (rather than its core), without extensive preparatory work, with too few vertical wells to guaranteesuggest success, and without the unique confluence of factorsproductive undrilled rock that had made the Warbonnet 9-23 area exceptional, Ultra's horizontal wells failedperformed poorly.

16.18.  In a May 10, 2018 press release to discuss Q1 2018 results, Defendants disclosed the results of the first two new horizontal wells Ultra had drilled. Both were poor; one produced less than 25% of the larger of the two initial wells. Ultra's stock price fell by 29.0% in two days.

17.19.  On a call on that same day, Defendants reassured investors, claiming the poor results only reflected the field's "variability," rather than the truth: that the Warbonnet 9-23/24 was the single best area in the entire Pinedale, and its results would not be repeated in the rest of the field.

18.20.  In an August 9, 2018 press release to announce Ultra's Q2 2018 results, Defendants announced the results of nine more horizontal wells. One produced less than 40% as much as the best well. The rest produced less than 25% as much. Ultra's stock price fell by 29.3%.

19.21.  In a November 3, 2018 call to discuss Ultra's Q3 2018 results, Defendants disclosed that Ultra was pausing horizontal drilling, but continuing to analyze the data it had obtained, and that it planned to drill more horizontal wells in 2019.

20.22.  Then, in a March 7, 2019 press release announcing Q4 2018 results, Defendants admitted that "our 2019 capital investment program does not include horizontal drilling." Ultra's stock price fell 11.8%. Ultra would never again drill another horizontal well again.

21.23.  Defendants' false statements concealed serious risks to Ultra's future. When these risks materialized, the company was unable to weather even temporarily low gas prices. Ultra shuttered its drilling program entirely by fall 2019. Ultra's inevitable bankruptcy filing came in May 2020. Ultra's second bankruptcy in four years proved much more destructive than its first. It wiped out unsecured and second lien creditors, and left shareholders more than a billion dollars out of the money. In just three years, during which they constantly lauded Ultra's conservative drilling practices, Defendants destroyed more than three billion dollars in value.

## II.    JURISDICTION AND VENUE

~~22.~~24.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

~~23.~~25.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

~~24.~~26.  Venue is proper in this judicial district under §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

~~25.~~27.  In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

~~26.~~28.  Lead Plaintiffs Scott Heiner, Bala Settu, Geoffrey Polychronis, Mahdi Riyad Issa, Yoav Givon, and Named Plaintiff Michael Altman, as set forth in their PSLRA Certifications which were previously filed and are incorporated by reference, purchased Ultra common stock at artificially inflated prices during the Class Period and were damaged thereby.

~~27.    Named Plaintiff Michael Altman, as set forth in his PSLRA Certification which was previously filed and is incorporated by reference, purchased Ultra common stock at artificially inflated prices during the Class Period and was damaged thereby.~~

~~28.~~29.  Defendant Ultra Petroleum is incorporated under the laws of the Province of Yukon, Canada. Its principal offices were located in Houston until October 2018, when it moved to 116 Inverness Drive East, Suite 400, Englewood, CO 80112. Its name is a misnomer, as it makes

7

most of its money developing and selling gas, not petroleum. During the Class Period, and for the twenty years that preceded it, Ultra's primary asset was an interest in a gas field in Wyoming, the Pinedale field. Ultra also had interests in a nearby field, the Jonah field, as well as small assets in Utah, Colorado, and Pennsylvania, which it sold during the Class Period. During the Class Period, Ultra's shares traded on the NASDAQ under ticker symbol UPL. Defendant Ultra is sued to the extent of its available insurance.

29.30.  Defendant Michael D. Watford served as Ultra's CEO from September 1999 until he was forced out in March 2018. Watford directed Ultra's disastrous over-leveraging that led to its first bankruptcy. He holds an undergraduate degree in Finance and an MBA and has worked in the oil and gas industry for substantially all of his career.

30.31.  Defendant C. Bradley Johnson joined Ultra as its Director – Reservoir Engineering in September 2008. In February 2011, he was promoted to Vice President – Reservoir Engineering & Development, and in April 2014 to Senior Vice President – Operations. In March 2018, he replaced Watford as Ultra's CEO until his termination in October 2020. He holds both undergraduate and master's degrees in petroleum engineering.

31.32.  Defendant Fir Tree Capital Management LP, n/k/a Fir Tree Partners Inc. is a hedge fund with its principal executive offices at 505 W 46th Street, 28th floor, New York, NY 10036. In 2015 and 2016, Fir Tree acquired substantial positions in several small development-stage companies other than Ultra, including SandRidge Energy, Inc., Jones Energy Inc., Linn Energy Inc., and Legacy Reserves LP. Defendant Evan Lederman served on all these companies' boards.

32.33.  Defendant Evan Lederman served as the Chairman of Ultra Petroleum from February 28, 2018 through at least June 4, 2020. Lederman was Fir Tree's nominee thereon. From

8

February 2011 through January 2021, Evan Lederman worked for Fir Tree Partners, where he was a Partner and member of its Risk Committee. Lederman holds a J.D. from NYU School of Law.

33.34. Fir Tree, Watford, Johnson, and Lederman are sometimes referred to as the "Controlling Defendants."

34.35. Lederman and Fir Tree are sometimes referred to as the "Fir Tree Defendants", while Watford, Johnson, and Ultra are sometimes referred to as the "Ultra Defendants".

## IV.    GLOSSARY OF OIL AND GAS INDUSTRY TERMS

35.36. **CFE**: A cubic foot equivalent (CFE) is a unit of energy based on the approximate energy released by burning one cubic foot of gas, or about 1,028 BTUs. One thousand cubic feet equivalent is mcfe, one million is mmcfe, one billion is bcfe, and one trillion is tcfe.

36.37. **Decline Curve Analysis.** Decline curve analysis is a graphical tool for estimating the recoverable reserves of a well based on past production history. Past production of oil and gas is plotted for consecutive time periods, and then a decline (or "type") curve is fit to the production data points and extrapolated to predict future performance. The underlying assumption is that whatever causes controlled the trend of the curve in the past will continue to govern its trend in the future in a uniform manner. The accuracy of the analysis depends on the availability of sufficient past production. A **Type Curve** is a graphical curve derived from a Decline Curve Analysis that can be used to forecast the expected average performance of a group of wells in a particular geological formation.

37.38. **Developed Reserves.** Developed oil and gas reserves are reserves of any category (e.g., Proved, Probable) that can be expected to be recovered:

    (i)     Through existing wells with existing equipment and operating methods or in which the cost of the required equipment is relatively minor compared to the cost of a new well; and

    (ii)    Through installed extraction equipment and infrastructure operational at the time of the reserves estimate if the extraction is by means not involving a well.

~~38.~~39.  **Estimated Ultimate Recovery (EUR).** Estimated ultimate recovery is the sum of reserves remaining as of a given date and cumulative production as of that date.

~~39.~~40.  **PDP:** stands for Proved Developed Producing, and refers to wells that have already been drilled and completed, and are producing. **PDP Reserves** refers to reserves based on PDP wells.

~~40.~~41.  **PUD:** stands for Proved Undeveloped, and refers to wells that have yet to be drilled and completed. **PUD Reserves** refers to reserves based on PUD wells.

~~41.~~42.  **Probable Reserves.** Probable reserves are those additional reserves that are less certain to be recovered than proved reserves but which, together with proved reserves, are as likely as not to be recovered.

    (i)     When deterministic methods are used, it is as likely as not that actual remaining quantities recovered will exceed the sum of estimated proved plus probable reserves. When probabilistic methods are used, there should be at least a 50% probability that the actual quantities recovered will equal or exceed the proved plus probable reserves estimates.

    (ii)    Probable reserves may be assigned to areas of a reservoir adjacent to proved reserves where data control or interpretations of available data are less certain, even if the interpreted reservoir continuity of structure or productivity does not meet the

reasonable certainty criterion. Probable reserves may be assigned to areas that are structurally higher than the proved area if these areas are in communication with the proved reservoir.

(iii)     Probable reserves estimates also include potential incremental quantities associated with a greater percentage recovery of the hydrocarbons in place than assumed for proved reserves.

42.43.  **Proved Reserves.** Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible—from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations—prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for the estimation. The project to extract the hydrocarbons must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.

43.44.  **Reasonable Certainty.** If deterministic methods are used, reasonable certainty means a high degree of confidence that the quantities will be recovered. If probabilistic methods are used, there should be at least a 90% probability that the quantities actually recovered will equal or exceed the estimate. A high degree of confidence exists if the quantity is much more likely to be achieved than not, and, as changes due to increased availability of geoscience (geological, geophysical, and geochemical), engineering, and economic data are made to estimated ultimate recovery (EUR) with time, reasonably certain EUR is much more likely to increase or remain constant than to decrease.

11

44.45.  **Reserves.** Reserves are estimated remaining quantities of oil and gas and related substances anticipated to be economically producible, as of a given date, by application of development projects to known accumulations. In addition, there must exist, or there must be a reasonable expectation that there will exist, the legal right to produce or a revenue interest in the production, installed means of delivering oil and gas or related substances to market, and all permits and financing required to implement the project.

V.    **BACKGROUND**

A.    **Oil and Gas Wells Are Depleting Assets**

45.46.  Oil and gas wells are ~~depreciating~~depleting assets. Each individual well's production declines from its initial production peak, typically reached sometime in the first month of operation. Thus, unless the operator drills new wells, the operator's production will necessarily decline over time.

46.47.  The oil and gas industry uses a mathematical formula to estimate oil and gas reserves. The peak 24-hour production, called initial production, is a key input into determining the well's overall lifetime productivity. Indeed, the formula is based on a well's initial production rate and the rate of decline.

47.48.  For PUDs, the initial production rate has to be estimated using all available data, including results of earlier wells in the same location, geology, and seismic imaging. When it is known, a PDP's initial production provides a rough estimate of its total lifetime production and profitability.

48.49.  Because decline rates are generally similar within a field, a well's initial production rate is the most important new information operators learn when drilling a well. Using a well's initial production, technical staff can estimate the well's EUR.

**B.    Ultra's Pinedale Field**

49.50.  The Pinedale Anticline is a geologic formation located in Sublette County, Wyoming. It stretches from about 8,000 feet in depth to about 14,000 feet. It includes both the Lance (8,000-12,000 feet) and Mesaverde (12,000-14,000 feet) formations, which date from about 70 million years ago.

50.51.  The Pinedale Anticline is a tight gas formation. Gas is trapped in various discrete unconnected sand pockets contained within other rocks which do not contain gas. Operators find gas by drilling through the sand pockets which frees up the gas in the pocket for extraction. A well's productivity generally depends on the number of sand pockets encountered and their size.

51.52.  Oil and gas reserves are not spread evenly through geological strata. Upon reaching a strata known to be particularly productive, called a target zone, an operator can turn the well by 90 degrees. By continuing to drill horizontally, typically for 1,000 to 10,000 feet (hence, "horizontal wells"), the operator can exploit more hydrocarbon pockets in productive areas.

**C.    Ultra Drills Thousands of Wells in the Pinedale Field**

52.53.  In 1996, Ultra acquired acreage in the Pinedale field and the nearby Jonah field. This was Ultra's first major oil and gas-related acquisition.

53.54.  Ultra struck gas. Ultra identified a so-called sweet spot, where oil and gas wells are especially productive. By the end of 1998, Ultra had drilled nine wells in that sweet spot.

54.55.  Defendant Watford became Ultra's CEO in January 1999. Within 90 days, Watford sold off many of Ultra's holdings, to place Ultra's long-term focus squarely on the Pinedale field.

13

55.56. Ultra participated in the drilling of 24 wells in the Pinedale field in 2001, 26 wells in 2002, and in 2003 increased its reserves by 50% to 1.03 tcfe.

56.57. Ultra's findings sparked a mini-boom in the Pinedale and Jonah fields. In the following decades, Ultra drilled thousands of wells in the Pinedale. Other operators also developed the field.

57.58. At the beginning of the Class Period, the Pinedale field accounted for 95% of Ultra's reserves, 90% of its acreage position, and 86% of its production. The Pinedale field would continue to be Ultra's main asset through the end of the Class Period.

**D.      Ultra Files For Bankruptcy in 2016 and Exits With \$2 Billion in Debt**

58.59. Ultra's shares once traded for more than \$100 each. But by 2014, Ultra and its subsidiary's outstanding debt approached \$4 billion. Ultra's highly leveraged balance sheet left it unable to weather lower gas prices that prevailed in 2015 and the first three months of 2016. In April 2016, Ultra filed for bankruptcy, reporting outstanding debts of \$3.75 billion, including \$1.34 billion in unsecured notes issued by the Ultra holding company ("HoldCo Notes").

59.60. When gas prices rebounded during the bankruptcy, Ultra proposed a plan that paid off all debt creditors in cash in full except holders of HoldCo Notes, who would be paid in shares. Equity investors would collectively retain ownership of 41% of the company.

60.61. Ultra exited the 2016 Bankruptcy in April 2017. To pay off its creditors, Ultra secured approximately \$2.98 billion worth of exit refinancing, consisting of \$2.4 billion in debt and \$580 million in equity funding:

| Revolving Credit Facility | $400 million |
|---|---|
| 7-year secured term loan | $800 million |
| 5-year unsecured note | $700 million |
| 8-year unsecured note | $500 million |
| Rights offering | $580 million |
| *Total* | *$2,980 million* |

61.62.  Ultra's new common stock was held by:

| Former shareholders | 41% |
|---|---|
| HoldCo Noteholders | 36% |
| Purchasers in rights offering | 23% |
| *Total* | *100%* |

62.63.  After paying off all existing creditors, Ultra was left with $2.0 billion in debt, its debt problem thus only half solved.

63.64.  Ultra employees, including several of the Defendants, benefitted handsomely from the reorganization. Insiders were estimated to share 7.5% of Ultra's new shares in the reorganized Company, worth approximately $300 million at the time. Defendant Watford alone was estimated to have received $35 million worth of Ultra shares for his role in steering the Company through its reorganization, roughly ten times his annual compensation. *The Wall Street Journal* covered the surprising payouts in an April 2017 article entitled "Most Lucrative Energy Job? Some Say It's CEO of a Bankrupt Company." The article cited one industry insider who observed that, based on

15

Ultra's example, "surprising[ly]," "the most lucrative job in the oil-and-gas industry in the last year is a senior executive at a bankrupt company."

### E.    Defendants Promise Safe and Predictable Returns

~~64.~~65.  Upon emerging from a bankruptcy linked to low gas prices, Defendants sought to reassure investors that low prices would not force Ultra into another trip to bankruptcy court.

~~65.~~66.  For example, on a June 28, 2017 call at the JPMorgan Energy Equity Investor Conference, Defendant Watford told investors that Ultra would remain profitable however low and for however long gas prices fell:

> High quality and deep asset base with attractive returns, low-risk repeatable. We have 2,600 locations drilled in Pinedale and Jonah Field. Predictable development. Attractive realized prices, low cost operator, probably some - almost the lowest, if not the lowest cash cost. Uinta and Marcellus provide additional upside, and we have a very strong balance sheet now and cash flow profile . . . .
>
> * * *
>
> Because we believe that with a low cost company, ***we can make money throughout the commodity cycles — commodity price cycles.***

~~66.~~67.  Indeed, Ultra's website claimed that "Ultra is the top natural gas producer in the State of Wyoming," and that "production in Pinedale," alone, "can support the Company in virtually any reasonable commodity price environment."[4]

~~67.~~68.  On the June 28, 2017 call, Defendant Watford reassured investors that the Pinedale field was "derisked" and "delineated", with "2,800 wells" that have more or less the same production profile:

> ***Our field is derisked and delineated.*** You can see that part of the slide on the left,

---

[4]  *See* Ultra Petroleum Corp., Operations, as of May 7, 2020 (available at https://web.archive.org/web/20200518100018/https://www.ultrapetroleum.com/operations/).

16

if you can see it, shows all the producing wells in the field. We operate most of the fields. QEP operates a bit in the North. And we have about 25% working interest in all their wells.

***

This is our normalized type curve. This is a 4 bcfe type curve with IPs [initial production] at 6 million a day, more or less. *We've got 2,800 wells that look like – just like this with very little variations* based on actual well size. So lots of history. *This is not anything that's new or uncertain.*

68.69.  Watford closed his prepared remarks by calling attention to Ultra's reliability:

Summary: A Western Basin-focused natural gas company, recently got its feet back from underneath it. High margins, low costs, tens of years of inventory, repeatable, predictable development, no pipeline issues, no pipeline transportation issues. And a good-looking balance sheet and forecast of growing cash flow. And that's it. Thank you.

69.70.  Defendant Watford claimed during a February 22, 2017 earnings call that Ultra was exiting bankruptcy in "growth mode." But with its huge debt load and recent bankruptcy, Ultra had difficulty finding funding. On a May 3, 2017 call to discuss Ultra's Q1 2017 earnings, Defendant Watford told investors Ultra was "damn sensitive about debt so that we want to be careful."

70.71.  Making a virtue of necessity, Defendants boasted that Ultra would fund its drilling program from cash flows.

71.72.  For example, on a May 3, 2017 call to discuss Ultra's Q1 2017 earnings, Defendant Watford explained that:

Q: Right. But – okay. But you are – I think you projected early look, you might have called it, 25% growth in 2018. So I guess the point of that is, don't know exactly where the CapEx budget will wind up. But you think you'll have enough flexibility in cash flow that you can spend that much to grow that fast...
[]
**Defendant Watford**: *Yes. So we're very sensitive to cash flow. Or let me say it differently, that CapEx is equal to or less than cash flow*.

17

72.73.  Relying on cash flows for capital expenditures is a risky ~~practice,~~because one year's

poor production results would necessarily impact operations in future periods. Drilling poor quality

wells in 2017 would cut 2018 production in two ways ~~Because wells are a depleting asset, a~~

~~company's most productive wells are those that it drilled recently.~~. Drilling bad wells in 2017

would substantially reduce production in 2018, when the 2017 wells were still near their prime

production output.  ~~Further~~And also, bad wells drilled in 2017 will produce less gas, and thus less

cash, in 2017. So not only would poor 2017 wells directly reduce 2018 production, they would

also reduce the cash Ultra had available to drill new wells in 2018.

## VI.    DEFENDANTS' FRAUDULENT CLASS-PERIOD CONDUCT

### A.    Defendants Fraudulently Omit to Disclose that Production from Ultra's 2017 Wells Was Bound to be Poor

*i.    Ultra Upgrades To An 8-Rig Fleet*

73.74.  The rigs operators use to drill wells are colossal marvels of technology. The "rig"

actually refers to several independent buildings. The rig itself may measure 7-10 stories tall and

weigh some 500 tons. Because they are so large, drilling rigs are difficult to move, and assembling

and disassembling a rig can cost $100,000.

74.75.  Ultra, like most operators, leases drilling rigs rather than owning them outright.

While rig lease prices vary based on type, supply, and demand, they rarely fall below $10,000/day,

and sometimes substantially exceed that price.

75.76.  When gas prices collapsed in 2015, Ultra reduced its leased drilling rig fleet to just four. But when prices rose again in late 2016 and early 2017, Ultra set about rebuilding the fleet to eight leased rigs. On a February 2017 call, Defendants told investors that Ultra was then adding a fifth rig and beginning operations in April.

76.77.  Ultra's leasing spree continued apace. On a May 3, 2017 call to discuss Q1 2017 earnings, Defendants announced that Ultra had leased its sixth and seventh rigs, and was actively negotiating for an eighth.

ii.     *Because Sublette County Is Ecologically Fragile, Operators Must Prepare and Drill From Drilling Pads*

77.78.  To protect the Pinedale area's ecologically fragile environment, federal regulations mandate that operators drill all wells in the Pinedale field from multi-well drilling pads.

78.79.  Drilling pads are well drilling sites that support multiple wells.[5]  They are built from locally available materials. When the drilling is completed, much of the pad is deconstructed and the area is returned to wildlife. Drilling pads can measure anywhere from 5 to 15 acres.



---

[5] The wells are drilled laterally so they do not draw from the same small area.

*iii.    Operators May Not Build Drilling Pads In Winter Or Spring*

~~79.~~80.  South Central Wyoming is home to the Red Desert. The Red Desert is comprised of both a high altitude desert and a semi-arid sagebrush steppe. The Red Desert's sagebrush steppe covers the ground under which the Pinedale field is located.

~~80.~~81.  Former Employee ("FE") 1 served as an Ultra Staff Reservoir Engineer from August 2011 through October 2018, and its Asset Manager – Wyoming from October 2018 through November 2018. As Reservoir Engineer, FE 1 supported the transition to horizontal drilling in the Pinedale oilfield.  FE 1 also prepared "hundreds of slides" for Board meetings.

~~81.~~82.  According to FE 1, the topsoil that covers the sagebrush steppe in the Pinedale field, and prevents it from becoming a desert, is paper-thin. At times, it is only 3 inches deep.

~~82.~~83.  According to FE 1, preparing a drilling pad includes scraping off the topsoil then levelling out the ground by adding as much as 10 feet of fill. Drilling rigs weigh several hundred tons and can only be safely moved on perfectly level soil. In the summer and fall, the topsoil and fill are smooth, so the drilling pad can be prepared for the well.

~~83.~~84.  But both for ecological and safety reasons, operators cannot construct drilling pads during winter or spring. Wyoming winter temperatures average between 0° and 15~~°,~~° Fahrenheit, and can reach -40~~°.~~° Fahrenheit. These temperatures freeze both the topsoil and fill. When frozen, topsoil and fill cannot be scraped. Instead, they come off in big chunks. It is thus impossible to create the perfectly level ground drilling rigs require to operate. Further, because the topsoil comes off in big chunks, operators risk damaging the topsoil they build their pads on so that it can never be restored after drilling is complete and the site is returned to nature. Thus, operators do not build pads when the ground is frozen, which makes building new drilling pads in the winter or spring impossible.

20

84.85.  To build each drilling pad, an operator must secure a Master Drilling permit. The process is long, complex, and cumbersome. It involves several inspections from various government offices such as both the Bureau of Land Management ("BLM") and the U.S. Fish & Wildlife Service, as well as various Wyoming state entities. It takes about 12 months from the date of application to secure the Master Drilling Permit. Thus, the pads on which Ultra drilled its 2017 wells had to be completed in 2016.

*iv.    Ultra Had Not Built Enough Drilling Pads In 2016 To Support A 2017 Drilling Plan*

85.86.  Ultra built its 2017 drilling pads in the summer and fall of 2016, when it was embroiled in the chaos of its first bankruptcy.

86.87.  Further, Ultra's drilling plans are governed by the price of gas – and gas prices did not rebound until very late in 2016, limiting Ultra's ability to prepare drilling pads.

87.88.  With its attention elsewhere, and anticipating a relatively small drilling season, Ultra had built few pads in 2016. When gas prices rebounded in late 2016, Ultra found itself with far too few pads for its 8-rig 2017 drilling objectivesplan – and no way to build any new ones.

88.89.  Ultra was thus forced to place several rigs on legacy drilling pads that were located in poor-producing areas in the EastEastern part of the Pinedale field., which was less productive.

*v.    Defendants Knew They Had Not Prepared Enough New Drilling Pads In 2016 To Support An Eight-Rig Drilling Plan*

89.90.  Defendants knew that Ultra had not prepared enough drilling rigs because, among other things, drilling locations were set out in a drilling plan Defendants approved.

90.91.  In a letter to the SEC dated September 3, 2015, Defendants admitted that "With respect to the development plans underlying our disclosed reserve estimates, ***each year our senior***

21

*management and our board of directors adopts a development plan based on the best information available at the time of adoption.*"

91.92.  According to FE 1, while the next year's drilling plan is constantly evolving during the first part of the year, Ultra's technical staff and senior managers begin solidifying the next year's drilling plan in Q3/Q4. Ultra's senior management and the Board formally approve the drilling plan at a Board meeting in the fourth quarter of the previous year or first quarter of the year.

92.93.  So by Q1 2017, Ultra's senior managers and Board members, including Defendants Johnson and Watford, had formulated, analyzed, and approved the 2017 drilling plan which called for wells to be drilled in inferior locations.

93.94.  Defendants knew, too, that the wells would underperform.

94.95.  Legacy drilling pads are pads that Ultra had built for drilling, but decided against drilling. "High grading" means drilling the most productive and profitable acreage.

95.96.  Defendants would admit on a call to discuss Ultra's Q3 2017 earnings on November 7, 2017 ("Q3 2017 Call") that Ultra had not high graded the legacy pads on which it drilled certain of its 2017 wells.

96.97.  Defendant Johnson would also admit that "[t]he main driver in a range of outcomes is the part of the field we happen to be developing in any given year."

97.98.  Defendants would admit on that call, too, that they knew the East of the Pinedale field, on which Ultra placed several of its rigs, is characterized by lower initial production and lower EURs.

98.99.  Accordingly, Defendants knew the wells Ultra would drill in 2017 would underperform.

22

vi.    *Defendants Made False and Misleading Statements About Ultra's 2017 Wells That Caused Investors' Losses*

~~99.~~100.        On May 3, 2017, Ultra published a press release announcing, and held a conference call to discuss, its Q1 2017 earnings ("Q1 2017 PR" and "Q1 2017 Earnings Call").

~~100.~~101.        The Q1 2017 PR stated:

The first quarter average initial production (IP) rate for new operated wells brought online was 6.0 million cubic feet equivalent (MMcfe) per day.  During April 2017, the IP rate for first eleven operated wells brought online was 7.3 MMcfe per day.

~~101.~~102.        On the Q1 2017 Earnings Call, Defendant discussed Ultra's eight-rig 2017 drilling program and its impact on oil production.

~~102.~~103.        In prepared remarks, Defendant Johnson stated:

Wells spud online during the first quarter had an average initial production rate of 6 million [cubic feet] equivalent per day. ***Well quality will improve as we progress into 2017.*** For example, the first 11 wells spud online in April from 4 different pads averaged 7.3 million cubic feet equivalent per day.

~~103.~~104.        Asked specifically whether "4 Bcf per well is still the right number", Defendant Johnson said "yes":

Q: You mentioned that you were experimenting with frac stages. So I just wanted to see if there were any early indications of how that's affecting type curves and ultimate recoveries. ***Or is 4 Bcf per well [] still the right number?***"
**Defendant Johnson**: ***Yes***. []

~~104.~~105.        Defendants' emphasized statements in Paragraphs 102-104 were misleading because: (a) Ultra had not built enough drilling pads to accommodate an 8-rig drilling plan; (b) Ultra's drilling plan called for certain newly-arriving drilling rigs to be moved to legacy pads that had not been high-graded for production; and (c) as a result, (i) well quality would not improve through 2017 but would instead decline when Ultra ran out of new drilling locations; and (ii) Ultra could not maintain 4 Bcf wells through 2017.

23

105.106.    On August 9, 2017, Defendants held a call to discuss Ultra Petroleum's Q2 2017 earnings. In the call, Defendants reduced projected 2017 production growth rate by 3% (from 25% to 22%) and projected 2018 production growth rate by 5% (from 25% to 20%).

106.107.    On August 9, 2017, Ultra's stock price fell from its previous close of $8.96 per share to close at $7.76 per share, down 14.38% ($1.20).

107.108.    In reducing guidance, Defendants falsely blamed, among other things, delays in delivering crews to rigs and an anticipated reduction in the vertical drilling budget as Ultra shifted a small amount of cash to drilling horizontal wells, rather than its true cause – poor 2017 wells.

108.109.    Indeed, Defendants falsely represented that the wells Ultra drilled in the remainder of 2017 would continue to perform as well as the wells Ultra had drilled in Q1:

> ***Upon arrival of the additional rigs, operational performance has been strong. And these rigs have quickly approached the fleet average on several key operational metrics.*** The success started well before the rigs arrived, directly related to several planning efforts, attention to detail on rig election, specifying important rig modifications required for our simultaneous operations protocol in Pinedale, leveraging strong relationships among our vendors to procure critical equipment and the onboarding of highly skilled personnel.

109.110.    Defendant Johnson told investors to expect the same quality of wells in Q3 and Q4 2017 that they had seen in Q2:

> Looking back at the well's bottom line this quarter, we estimate the program generated an internal rate of return of 38%. ***We expect the next 2 quarters to deliver similar results.***

110.111.    Asked whether there was "a potential for [the 4 bcf EUR for vertical wells] to creep up over the next few quarters", Defendant Johnson again agreed:

> Q: Then, I guess, it seems like these 24-hour rates quarter-over-quarter kind of keep creeping up. I guess now that you're seeing some longer-term data, is there any – I

24

guess, how is that looking versus sort of that 4 bcf type curve? I mean, is there a potential to see that sort of creep up over the next few quarters?

**Defendant Johnson**: *Sure. I think that's fair.* And just to note, we included in our press release a 7.4 million a day IP, that's up considerably from the First Quarter. That translates to an average EUR of about 4.1 bcfe for the quarter. And we are seeing some of the wells that underperformed a little bit in the last couple of quarters, they have actually improved. They flattened out. So our EUR estimates on those wells have actually climbed up a bit. *So looking forward, I think we're going to continue to see 4 b[cfe] wells and greater than 35% returns for the balance of this year.*

~~111.~~112.    Defendants' emphasized statements in Paragraphs 109-112were false and misleading because (a) Ultra had not built enough drilling pads to accommodate an 8-rig drilling plan; (b) Ultra's drilling plan called for certain newly-arriving drilling rigs to be moved to legacy pads that had not been high-graded for production; (c) Ultra's Q3 and Q4 wells would be poor quality; (d) Ultra's Q3 and Q4 wells could not reach 4 bcfe, let alone "creep up" above 4.1 bcfe; and (d) as a result, the wells drilled in Q3 and Q4 2017 were not capable of reaching the same result as Q2 2017 wells.

~~112.~~113.    Defendants succeeded in misleading the market. In a report published immediately after the call, an analyst employed by Cowen & Co. wrote that "[i]mportantly, [the guidance reduction] does not at all appear [to be] a well performance issue."

~~113.~~114.    On November 7, 2017, Defendants held a call to discuss Ultra's Q3 2017 results ("Q3 2017 Call").

~~114.~~115.    On the call, Defendant Watford admitted that "[w]e expect production for the full year 2017 to be slightly below guidance." Watford blamed "issues caused by recent bankruptcy and third parties." ~~The~~He explained that the chief culprit~~, Watford explained~~ was that Ultra had not built enough drilling pads in the summer of 2016:

25

> In Wyoming, due to weather and regulation, we are limited to building our drilling pads during the summer and fall after receiving a requisite approval. During the summer of 2016, and with the company battling a contested bankruptcy proceeding, we were unable to properly prep enough pads to optimize our ramp up from 2 rigs to 8 rigs in 2017. That meant that our 2017 program led some rigs being placed on legacy pads that were located in sub-optimal yet still economic areas along the eastern flank of our field.

~~115.~~116.      Defendant Johnson explained that not only did the 2017 wells underperform because they were placed on legacy pads, Ultra knew as much when it delivered its Q1 2017 Earnings Call:

> In 2017, the activity has been primarily on the east flank of the field. ***The activity in this area was not the result of high grading our inventory.*** Instead, we placed new rigs as part of our ramp up on pads that were available. Normally, we plan and construct pads up to a year before we drill them. However, due to the uncertainty surrounding our in-court restructuring, some of that predrill effort was on hold. We began our 4 to 8 rig ramp up earlier this year, ***rigs were deployed mostly to the east flank. [] [T]he east flank typically delivers lower IP's and lower EUR's than average[.]***

~~116.~~117.      The underperformance continued. In anticipation of the March 2018 Bernstein Conference in Berlin, on March 14, 2018, Defendants published the PowerPoint presentation they would deliver there. The new slide deck disclosed Ultra's 2017 finding and development costs. Finding and development costs measures the costs of researching and drilling wells divided by the total number of new reserves recognized, measured in thousand cubic foot equivalent. Because reserves are the denominator, finding and development costs is a good measure of the quality of wells Ultra drilled. Finding and development costs are only one of the many costs operators face. Operators must also pay lease operating expenses, taxes, debt servicing, among many others. In the slide deck, Ultra disclosed that 2017 finding and developing costs per mcfe was $1.21, or about half of Ultra's average realized price of $2.44/mcf ~~an unsustainable~~

26

level. Ultra Petroleum thus revealed that its 2017 drilling had cost so much money and produced such poor results that it would challenge its future plans and was unsustainable.

117.118.    On March 14, 2018, the price of Ultra Petroleum's stock fell from its previous close of $5.01/share to close at $4.43/share, down $0.58/share (12.3%).

**B.    Defendants Misleadingly Describe an Attempt to Drill A Showpiece Well As A "Test" That Is "Indicative" of the Pinedale's Potential**

*i.    Ultra Spends Six Months Finding A Location Where An Unlikely Confluence of Factors Creates A Uniquely Good Location To Drill A Horizontal Well*

**(1)    The Warbonnet Pad Is Located In A Uniquely Productive Area**

118.119.    The Pinedale anticline follows the path of an ancient river delta. It is thus a narrow formation only about 4-5 miles wide. Operators who drill outside of this delta risk not finding any oil or gas. But because the Pinedale anticline is so narrow, operators who manage to expand its breadth can find themselves quickly multiplying their reserves.

119.120.    That is precisely what Defendants proposed to do. As Defendants told investors on the May 3, 2017 Q1 2017 Call:

> Q: [] [O]n the comments around horizontal, there not being any horizontal test in the Pinedale, do you all – do you have any or know if anyone has any plans to try that? And do you have any – can you elaborate at all on that, the comments?
>
> **Defendant Johnson**: This is Brad. We actually – yes, I can comment. [] The concept in Pinedale would be, as you know, it's been developed vertically, historically. And the concept we are optimistic about *is taking horizontal development on the edges and fringes of the field and expanding the resource.*

121.    Ultra had drilled a horizontal well in 2016, which proved unpromising. . That well, though, was not nearly productive enough to justify the cost.

120.122.    Ultra told investors it would "test" the concept of using horizontal wells to expand the Pinedale anticline in 2017. Ultra completed the first of three horizontal wells planned

27

for 2017 in October. Two would be drilled on the Warbonnet 9-23[6] pad, and the third on the Warbonnet 9-24 pad a mere half-mile away ("Warbonnet Pads"). The first Warbonnet well's initial production was 51 mmcfe/day. The second, which was drilled in the Mesaverde, was less productive but still profitable. The third, drilled on the 9-24 pad, reached more than 50 mmcfe/day. These were exceptional results that would, if repeatable, ~~justifiy~~justify a much higher price for Ultra's shares.

123. ~~But the results were not repeatable—by design.~~ They were not repeated. Over the next year, Ultra Petroleum's new horizontal wells never came close to matching the Warbonnet 9-23 and Warbonnet 9-24. In March 2019, Ultra shuttered its horizontal drilling programs entirely.

124. In fact, the results had not been repeatable by design. Ultra had rigged the "experiment" to ensure it achieved unrepeatable, unrepresentative results.

125. Louis C. Talarico, III is a former shareholder of Ultra who established long only positions in securities of Ultra between March 2, 2018 and April 23, 2018, and held securities until the common stock was cancelled as a result of Ultra's bankruptcy proceedings in 2020.

126. Mr. Talarico has over twenty years of investing and corporate business transaction experience in the oil and gas sector. Mr. Talarico is an investment partner through a private investment limited liability company with non-party Karl F. Kurz.

127. On March 7, 2022, Mr. Talarico filed a lawsuit against Ultra, Johnson, Lederman, and Fir Tree, and non-parties Jerald J. Stratton, Karn Chopra, and Centerview Partners LLC, in the United States District Court, Southern District of Texas, Houston Division, Case No. 4:21-cv-03689.

---

[6] "Warbonnet," "9" and "23" establish the geographical location of the Warbonnet wells.

128.    Mr. Talarico's complaint alleges that he and Mr. Kurz met in person with Defendant Johnson on December 9, 2019 at 4:00pm CST at Hotel Zaza in Houston, Texas. The meeting focused on Ultra's horizontal development programs.

129.    At the meeting, Mr. Talarico asked Johnson why the Warbonnet 9-23/24 wells were so good, while the remainder were not. Johnson admitted that Warbonnet 9-23/24 wells were drilled in the core of the field, including at least a large portion of the wells' horizontal path. But the wells' path ran under a lake and other topographical features that had precluded any vertical drilling. With no vertical wells to deplete the area around the well, the Warbonnets 9-23/24 wells would be productive. Johnson admitted that *he had known* that the Warbonnet 9-23/24 would be strong performers.

~~121.~~130.    According to FE 1, Ultra's technical team had spent six months trying to find the single best possible location in the entire Pinedale. FE 1 estimates that between one quarter and one half of FE 1's time during those six months was spent identifying those locations. FE 1's team was "almost like a quarterback" in the process of selecting the wells, organizing the efforts of the other groups. FE 1 therefore knew what other members of Ultra's technical team were doing. FE 1 estimates that Ultra's geologists ~~likewise~~also spent between a quarter and half of their time identifying well locations. The geologists spent countless hours examining well-log data which showed productivity of various geological strata, looking at drilling cross-sections to analyze sand potential, and resolving complicated issues like how long to drill the horizontal wells. These were questions that needed to be resolved even to obtain good overall statistical outcomes. But Ultra Petroleum had neither the time nor the money necessary to identify horizontal well locations at scale.

122.131.    According to FE 1, as a result of these analyses, Ultra had identified a single perfect location to drill a horizontal well: the Warbonnet Pads. The location had at least three advantageous characteristics. First, it was located in the Pinedale field's core, not its flank. Second, wells drilled in developed fields will sometimes produce less because the existing wells have reduced pressure. But relatively few horizontal wells had been drilled in near the Warbonnet Pads. Third, enough vertical wells had been drilled that Ultra's geologists could identify a precise interval that appeared to be exceptionally productive in the Warbonnet Pads' location: the Lower Lance A-1, a mere 200-foot interval located some 10,000 feet underground.

123.132.    Moreover, according to FE 1, Ultra had not drilled the Warbonnet Wells where its rigs happened to be. Instead, after identifying the very best possible location, Ultra had spent considerable time moving the rig into position.

124.133.    The testimony of Ultra's then-CFO Jerald J. Stratton in response to Mr. Talarico's questions given in Ultra's bankruptcy on July 24, 2020 confirms, and expands on, FE 1's report. Stratton testified that (1) the Warbonnet wells were located in the core of the Pinedale field; (2) though in the core, the Warbonnet location had seen very little vertical drilling, meaning that the vertical wells had not reduced the quantities of gas and oil available; (3) the wells targeted the Lower Lance A-1, the very best, 200-foot thick, strata some 10,000 feet below ground; and (4) the Lower Lance A-1 was especially productive in the Warbonnet Wells' area.

> Q (cross-examinationby Mr. Talarico): Can you identify the two monster wells on this page, perhaps by name and location.
>
> A: Sure. They show the highest IPs on the map. The 923-A2H and the 923-A-1H [i.e., the first and third Warbonnet Wells] both shown there with IPs of 50 million or greater.

Q: Thank you. Mr. Stratton, in your analysis of the field and the horizontal program, is there something about this area structurally that made it different from other areas in which horizontals were drilled?

A: I wouldn't say structure was a primary component. There were a number of components. *I think it was a core area for development in general in the field. There had not been a lot of vertical development within those acres. The target, the Lower Lance, A-1, was one of the better targets in most wells of our vertical program. So there was a lot of – and it was also probably the best producing from the standpoint of production logs that had been run on vertical wells through history.* So a lot of those pieces of evidence, I think, helped build the program to start drilling that particular target in the first two wells, or one of the early wells in this case.

Q: Okay. Thank you. But nothing unique structurally? []

A: Well, it was high on the – on the anti-cline. You can see it towards the center of the anti-cline where at least the wells start. It was just below, I think, another – and I'm not the geologic expert, our director of geology is, but I would say that there was an attribute of it being near the top of the Lower Lance sequence that also contributed to some of the higher productivity, because that tends to be capped by a higher percentage of shale that doesn't act as a cap rock, but I think *there's some accumulation of gas there that may be greater than other areas in the field.*

134.    Stratton confirmed that the location of the Warbonnet 9-23/24 had not lent itself to vertical drilling and that the Warbonnet 9-23/24 actually went west:

Q (by Mr. Talarico): Sure. *But as you move east to west on this pad* – on these [Warbonnet 9-23/24] wells, are there mountains or wildlife preserves, or a lake or lakes here, that – which would make it – lend itself more to horizontal drilling than vertical?

A: Well, we're surrounded by different items or different circumstances that would prevent us from putting a pad in certain places. *So, you know, the area is highly regulated in this particular location* as a result of combining all those concerns into a location that would be approved by the BLM.

135.    Finally, Stratton's testimony emphasizes that the Warbonnet wells' paths veered West, further into the Pinedale's core, rather than East, to its flanks. Mr. Talarico continued his line of question by focusing Stratton's attention on Section 19. In response, Stratton admitted that

there were no vertical wells in Section 19. The Warbonnet 9-23/24 are located in Sections 23 and 24 of Range 9[7]; Section 19 is directly West, not East.

125.136.    Ultra's later wells would be drilled adjacent to, but not in, the area in which the Warbonnet Pads were located. According to FE 1, this is because the Warbonnet Pads area is too small to accommodate a horizontal drilling program.

126.137.    Indeed, according to FE 1, the Warbonnet area measures only 10 sections, at most. On the Q2 2017 Call, Defendant Johnson indicated that Ultra had modeled an assumption that it could drill 4 wells per section. While Johnson claimed the assumption was "conservative," he acknowledged that Ultra's "potential" was only 8 wells per section. But Johnson made clear that both estimates were based on the assumption that Ultra could drill wells throughout the 5,000 foot column, rather than in a mere 200-foot interval. Thus, the Warbonnet area could accommodate only a handful of wells in the Lance A-1, which would not make a material difference to Ultra's prospects.

**(2)    Environmental Regulations Further Restrict the Available Locations**

127.138.    The Warbonnet Pad was exceptional for another reason: Ultra was allowed to drill there.

---

[7] The Warbonnet 9-23/24 wells are located right on the border of Sections 23 and 24. Thus, though they are in different sections, they are on the same drilling pad within a few years of each other.

128.139.    About 80% of the Pinedale field is located under U.S. government lands. As of 2012, Sublette County, in which the Pinedale field is located, was home to at least 14 endangered or threatened species,[8] including the bald eagle.[9]

129.140.    Wyoming supports 40% of the world's population of greater sage grouse, which between about 2012 and 2015 was under consideration for listing as a threatened species. The Upper Green River Basin, which contains the Pinedale field, was "the most productive remaining stronghold in Wyoming for the sage grouse."[10]

130.141.    Threats to the greater sage grouse sparked what the Secretary of the Interior called "the largest land conservation effort in U.S. history." These efforts included strict environmental limits on the locations and size of permitted drilling.

131.142.    The Pinedale field in particular is designated as part of the greater sage grouse's core area.[11]

132.143.    According to FE 1, sage grouse protections were particularly constricting on or near the Pinedale field's flanks.

133.144.    Stratton confirmed FE 1's account. As Stratton testified on July 24, 2020, BLM regulation made locations like the Warbonnet vanishingly rare:

---

[8] https://www.fws.gov/wyominges/PDFs/CountySpeciesLists/Sublette.pdf

[9] Bureau of Land Management, 2008 Pinedale Resource Management Plan, Appendix 3 at 23, available                at                https://wayback.archive-it.org/org-593/20190130164343/https://eplanning.blm.gov/epl-front-office/projects/lup/63200/78620/89699/Appendix03_MitigationGuidelinesandOperatingStandards.pdf

[10]    https://www.jhnewsandguide.com/news/environmental/anticline-sage-grouse-continuing-to-dwindle/article_e1c4d3ba-4ce6-5b00-bc3a-c01c94eb0b30.html

[11] Wyoming Sage-Grouse Land Use Plan Amendments, Map 3-19, available at https://eplanning.blm.gov/public_projects/lup/9153/48059/52222/73_Map_3-19_Sage-grouse_Seasonal_Habitat.pdf

Q: Okay. Thank you. How about the surface? Is there anything unique about the surface in [the Warbonnet Pads] area that lends itself better to horizontal drilling than vertical wells?

A: I wouldn't say the surface had a lot to do with it other than the surface location, you know, has to be something that, you know, *an area that we would be able to build a pad on without any stipulations or any other items that would prevent it from – you know, BLM's on-site assessment.*

Q: Sure. But as you move east to west on this pad – on these wells, are there mountains or wildlife preserves, or a lake or lakes here, that – which would make it – lend itself more to horizontal drilling than vertical?

A: *Well we're surrounded by different items or different surface circumstances that would prevent us from putting a pad in certain areas. So, you know, the area is highly regulated, so we had to pick our particular location as a result of combining all those concerns into a location that would be approved by the BLM.*

~~134.~~145.      Thus, the Warbonnet Wells were– by design – impossible to replicate.

ii.      *Fir Tree Buys Out Debt To Establish A Significant, But Not Controlling, Position In Ultra*

~~135.~~146.      The oil and gas industry is large and highly concentrated. The largest oil companies have billions of dollars to spend on development and production. They have established positions in blue chip oil fields. They built up reputational capital over decades. They have the patience to develop oil and gas assets and wait until  have built up reputational capital over decades. Because their shareholders are not looking for an immediate return, the major oil companies can develop oil and gas fields and recoup their investment over the long-term by selling the oil and gas they produce. Start-up costs are huge and new companies cannot hope to compete with the majors directly.

~~136.~~147.      In the early 2000's, private equity companies developed a business model to develop oil and gas while avoiding competing with the majors. Private equity companies do not have the capital, experience, or relationships to compete with major oil companies. Moreover, they

are obligated to return invested capital to investors in the funds they manage in relatively short order. So, instead of competing with the majors, as Haynes and Boom LLP partner Buddy Clark described it, "[t]he investment model for private equity was to find the right people, invest money, have them drill one or two wells and then flip it."[12]

137.148.    More specifically, the business plan was: (i) a private equity company forms a small subsidiary with just a few employees; (ii) the subsidiary identifies fields that have seen little development; (iii) the subsidiary acquires acreage in the field; (iv) the subsidiary drills exploratory wells in the oilfield; (v) if these wells are successful, the subsidiary can recognize proved reserves; (vi) the proved reserves increase the value of the company's acreage; and (vii) the subsidiary sells the acreage and returns money to the private equity company which then returns the money to its investors. Thus, the private equity companies were not drilling in order to produce oil, but rather to benefit from the price appreciation when speculative reserves are proved.

138.149.    The low gas prices prevailing 2015 and 2016, as well as the low oil prices that prevailed after 2014, pushed many relatively small public oil and gas companies into bankruptcy. Several private equity companies, including Fir Tree, a large Ultra shareholder, varied the traditional private equity business plan to take advantage of the bankruptcies. Instead of creating a new company and finding undeveloped oilfields, the private equity company acquires a bankrupt (or soon-to-be bankrupt) company's debt at rock-bottom prices. The private equity company then uses the leverage its position provides in the bankruptcy to push to receive large

---

[12]    https://www.spglobal.com/marketintelligence/en/news-insights/latest-news-headlines/ultra-s-bankruptcy-highlights-perils-for-private-equity-s-upstream-investments-58657328

portions of the company's post-bankruptcy equity.[13] The private equity company then carries out the remainder of the business plan.

139.150.       Private equity firms' short investment horizon puts them in conflict with long-term shareholders. Funds cannot tolerate steady good – but not great – returns, because they make their money by reselling rather than by gradual appreciation over time.

140.151.       Further, after the 2014-2016 oil and gas price collapses, private equity firms' business models began to fray. Even as oil and gas prices increased, investors proved reluctant to buy up recently-bankrupt companies' share price. They had plenty of reasons. The companies had just emerged from bankruptcy, and investors had recent experience showing that oil and gas prices can go down just as much as they can go up.

141.152.       Ultra announced the first Warbonnet well's initial results on the Q3 2017 earnings call taking place on November 7, 2017. That day, the price of Ultra's shares only increased by 2.36%. On November 15, 2017, Ultra tried again, issuing a press release announcing slightly more detailed results for the first Warbonnet Well. Ultra's stock price increased by 5%. On January 30, 2018, Ultra announced the results of the Warbonnet 9-24 well, along with other news. Its stock price fell by 2.35%. The disclosures were clearly not having their intended effect. As a Fir Tree, managing partner told the *Wall Street Journal* that "[a]s these companies have emerged [from bankruptcy], the public markets' response has been really unbelievable to us. It's historic how poorly they've [i.e., their stock price] performed."[14]

---

[13]https://www.wsj.com/articles/behind-a-hedge-funds-billion-dollar-bet-on-busted-oil-companies-1526821200
[14] *Id.*

142.153.     So on a February 28, 2018 call to discuss Q4 and Year End 2017 results, Ultra announced that it would drill 15-20 horizontal wells in 2018. Further, Defendants announced that: (a) one-third of Ultra's drilling operations investment would go to horizontal drilling; (b) by April, all of Ultra will have upgraded its entire rig fleet to a more expensive type capable of drilling 10,000 foot (2 mile) horizontal wells; and (c) by the close of 2018, Ultra's rigs would only be drilling horizontal wells.

     *iii.    Fir Tree Executes Its Business Plan*

143.154.     When Ultra emerged from bankruptcy, Fir Tree owned 15.6% of its shares.

144.155.     Fir Tree reportedly acquired $440 million face value (or 32.8%) of  the $1.34 billion unsecured notes issued by the holding company. Fir Tree's position in the notes was converted into 11.8% of Ultra's shares. Fir Tree acquired its remaining 3.8% position through a rights offering issued in connection with the bankruptcy, paying approximately $95 million for these additional shares.

156.     Fir Tree helped select two of Ultra's directors at that time. The 2016 bankruptcy's disclosure statement provided that "two (2) additional directors [] shall be selected [] *from a list of director candidates proposed by individual members of the*" committee of holders of Fir Tree's corporate unsecured notes. As the largest holder in that class, Fir Tree exerted substantial pressure on the selection.

145.157.     In late August and early September 2017, Fir Tree bought another 2.9% of Ultra's shares, spending approximately $64 million. These additional purchases brought Fir Tree's holdings to 18.5% of Ultra's stock.

     *iv.    Fir Tree Purportedly Exerts Influence Over Ultra – But Not Control*

146.158.    On September 18, 2017, Fir Tree issued a press release titled "Fir Tree Partners Announces Intention to Pursue Value-Maximizing Strategic Alternatives for Ultra Petroleum Corp." In the Press Release, Fir Tree touted its "deep experience working collaboratively with management teams" and added that it was "excited to engaged with [Ultra Petroleum] on a variety of initiative in order to maximize stockholder value."

147.159.    Ultra responded positively to Fir Tree's overtures. On September 27, 2017, Ultra published a press release "announc[ing] today its intention to work collaboratively with Fir Tree Partners [] to pursue value-maximizing strategies."

148.160.    On January 30, 2018, Ultra and Fir Tree announced that they had entered into a contract styled a Cooperation Agreement. The Cooperation Agreement entitled Fir Tree to one representative on Ultra's board; it selected Defendant Lederman. Fir Tree was also entitled to significant influence in selecting an independent director. Fir Tree would propose 3-5 candidates for the seat; Ultra would select one. Two directors would resign from Ultra's board to make space for the new directors.

149.161.    In exchange Fir Tree agreed to "Standstill Provisions" requiring it to refrain from buying more than 25% of Ultra Petroleum's voting securities, soliciting proxies, facilitating any tender or exchange offer, take-over bid, or the like, or seeking any additional board candidates to Ultra's seven-person board.  Fir Tree also agreed that it would not:

> [T]ake any public action in support of or make any public proposal or request that constitutes or relates to [among other things]: (i) *advising, controlling, changing or knowingly influencing the Board or management of the Company, including any plans or proposals to change the number or term of directors or to fill any vacancies on the Board (except as provided for in this Agreement)* [or] (iii) any other material change in the Company's management, business or corporate structure[]

38

150.162.    Thus, the Cooperation Agreement purportedly formalized the rights Fir Tree's shareholdings granted it: influence, but not control.

163.    On February 28, 2018, the date the directors secured by Fir Tree through the Cooperation Agreement took their seats, Mr. Talarico called out-going CEO Watford and spoke to him for fifteen to twenty minutes. Mr. Watford explicitly told Mr. Talarico that Fir Tree was in control of Ultra.

v.    *In Reality, Fir Tree Controls Ultra*

164.    AccordingDefendant Watford admitted to Mr. Talarico that Fir Tree controlled Ultra.

151.165.    Additional former Ultra employees, corroborate Watford's statement that Fir Tree controlled Ultra, particularly with respect to Ultra's decision to switch to horizontal drilling.

152.166.    Oil and gas companies formulate drilling plans to guide future drilling. These plans will include both the number of wells the company will drill and the specific locations in which these wells will be drilled. As set out above, Ultra formulates a drilling plan every year and approves the plan at the previous year's Q4 or in Q1.

153.167.    In FE 1's experience, neither the Board of Directors as a body nor individual directors are involved in formulating drilling plans. Management formulates the drilling plan working hand in glove with geologists, reservoir engineers, and other oil and gas professionals. The drilling plan is then presented by the senior executives to the Board, whose role is limited to saying "yes or no" to the plan. But this was not the way Ultra Petroleum created drilling plans in 2018.

39

154.168.    According to FE 1, Defendant Lederman held a meeting with Johnson and members of Ultra Petroleum's technical team in which he ordered them to focus on horizontal drilling ("Lederman Meeting"). FE 1 believes the meeting likely took place around Q2 2018. Events confirm the meeting occurred at some point between February 28, 2018, and May 10, 2018. Lederman took his set on February 28, 2018. On May 10, 2018, Ultra held a call to discuss Q1 2018 results. On the call, Defendant Johnson stated that "[f]or the balance of 2018, we will continue to track gas prices and adjust our drilling program accordingly, limit vertical well development to high-graded areas of the core unless prices improve and continue to ramp up our horizontal activity."

155.169.    According to FE 1, Defendant Johnson and the technical team advised that Fir Tree should continue to take a slow and steady approach to horizontal development that focused on drilling a few test wells and spending a lot of time studying each well. According to FE 1, the technical staff at the Lederman Meeting also presented analysis showing that Ultra could continue to drill vertically while using vertical wells to test for horizontal potential. For example, a vertical well can be tested for horizontal potential through pressure and injection testing. That way, the technical staff told Lederman, the drilling costs could have remained in the area of $2.5 million for vertical drilling rather than $12.5 million for horizontal drilling.

156.170.    But Lederman personally overrode the technical staff at the meeting, hyperbolically telling Ultra's management and its technical team that Ultra would never drill another vertical well in the Pinedale.

157.171.    According to FE 1, the meeting was also strange because it occurred "after the normal cycle" in which a plan is formulated in Q3/Q4 and approved in Q4/Q1. Indeed, before

40

the Lederman Meeting, Ultra had established a budget for additional horizontal testing. After the Lederman Meeting, the budget changed.

158.172.    FE 1 learned of what transpired from four separate attendees. FE 1 also knew of the content of this and other meetings because FE 1's job responsibilities included preparing slides for meetings between senior management, Fir Tree, and Board Members.

159.173.    Ultra was in no way prepared to expand the horizontal drilling program. FE 2 started work at Ultra Petroleum in October 2005. From 2012 through November 2019, FE 2 served as Ultra Petroleum's VP, Drilling and Completions from February 2012 through November 2019. According to FE 1, FE 2 attended Board meetings and technical sessions. FE 2 confirms that Lederman personally directed the horizontal drilling program and that gave "no thought" to the strategy. Instead, Lederman directed that Ultra should "just do it," without regard to any existing plans.

160.174.    FE 3 was a Land Technician III and GIS Specialist from May 2012 to October 2018, and a Production Engineer from October 2018 to December 2020. FE 3 said the decision to switch to horizontal drilling "shock[ed]" FE 3 and the technical staff. FE 3 said the company was utterly unprepared to drill so many horizontal well so quickly. According to FE 3, Ultra's geologists and engineers had not "fleshed out" any sort of drilling plan. There was no drilling plan for Lederman to approve, only a mandate to focus on horizontal drilling.

161.175.    The decision to drill caused a litany of problems. First, Ultra had not obtained Master Well permits to drill in attractive new locations and would have had to wait 12 months to obtain them. So, according to FE 1, Ultra just drilled horizontal wells where it already had permits to drill vertical wells. Second, with so many more horizontal wells to drill, Ultra's technical staff did not have time to carefully select locations. According to FE 1, "we'd have done

41

more were we able to" like picking out "several intervals" of drilling length to see what worked. Had they been given a chance, the technical staff "would have done more geological evaluation" to select drilling sites.  In the end, the decisions on where to drill were "kind of random".

162.176.    The Board held "technical sessions" with Ultra Petroleum's technical team, according to FE 1, who learned of the meetings' contents from multiple colleagues who attended. At the meetings, the technical team presented the models it had generated to estimate oil and gas reserves.

163.177.    Andrew Teno was a Fir Tree director and employee and, according to FE 1, Lederman's "right-hand man." Teno has a bachelor's degree in finance. He does not have any graduate-level training. Nor does he have any technical degree.

164.178.    Lederman deputized Teno to build the case against Ultra's management and technical team to present at the technical sessions.

165.179.    It was Teno's practice to obtain the numbers underlying reserves estimates and production forecasts directly from Ultra's technical staff for his own use. Ordinarily, oil and gas companies use sophisticated industry-specific software to draft drilling plans, estimate reserves, and perform other tasks necessary to run their company (Ultra used ARES and ValueNavigator).[15] This software exists to prevent (or at least limit) human error. It automatically accounts for particular facts known to the oil and gas industry which modelers would otherwise have to remember – such as, for example, a particular tax holiday in a particular state. It also requires that modelers input all required information, preventing a modeler from inadvertently omitting a constraint.

---

[15] https://www.aresprism.com/oil-gas-project-management-software/

166.180.    The numbers Teno gathered were mere inputs into the software. They required technical analysis to be interpreted. But Teno entered the information the staff provided into an Excel spreadsheet. Teno then used the spreadsheet and his own "model" to generate predictions, including predictions of well productions. The technical staff regularly pointed out errors in Teno's models. For example, according to FE 1, Ultra might owe a percentage of a well's revenues to another company. Teno's model would assign 100% of the revenues to Ultra, thus making its economics look better. The errors Teno made "slanted [his estimates] upwards." According to FE 1, Teno's "model" gave Lederman "what he wanted" – i.e., its estimates were high. The predictions generated by Teno's model were presented at Board Meetings and technical sessions. The technical staff was then asked "why are you worse" than Teno's model (i.e., why does the technical staff's model predict less production than Teno's). Leading the Board, Lederman would brush aside the technical team's model in favor of Teno's. He insisted that the technical team "just fix" the models, meaning change the assumption to produce more favorable estimates.

167.181.    When the Board consulted the technical staff's model, it invariably ignored the most likely outcomes. According to FE 1, the technical staff would show the Board a range of probabilistic forecasts. As is customary in the industry, the technical staff estimated the likelihood of each outcome and, in particular, the 90th, 50th, and 10th percentile outcomes. The 90th percentile outcome is higher than 90% of estimates, and the 50th and 10th percentile outcomes are higher than 50% and 10%, respectively. In the industry, these three percentiles are important, because they correspond to the definitions of possible, probable, and proved reserves, respectively. They represent the range of possible outcomes to consider.

43

168.182.    Thus, for example, in providing an estimate of a well's production, the technical staff might provide the board with three numbers: 5 bcfe (10%), 9 bcfe (50%), and 14 bcfe (90%).

169.183.    When deciding on operations, Lederman and the Board would invariably use the 90th percentile estimate. Thus, when preparing Ultra's drilling plan, the Board would assume that the well in the example above would produce 14 bcfe. To ensure the Board endorsed aggressive horizontal drilling, Lederman successfully pushed the board to adopt such implausible assessments.

170.184.    The Board took the same approach with respect to costs. The technical team provided Fir Tree with ranges of cost estimates. Fir Tree always picked the lowest estimate because they always pushed the Board to accept "the ideal scenario."

171.185.    According to FE 1, Brad Johnson attended substantially all Board meetings.

172.186.    Further, according to FE 1, who spoke with colleagues who had first-hand conversations with Lederman and Teno, Lederman and Teno directly called or emailed company personnel, circumventing company executives. FE 1 heard as much directly from the employees involved. Lederman and Teno would regularly ask lower-level Ultra employees to prepare "economic runs and production budgets." Lederman also issued "mandates" to employees. These mandates and interventions were not on behalf of the Board as a whole, but instead, from Lederman and Teno acting on behalf of Fir Tree.

173.187.    FE 4 started work in Ultra's accounting department in August 2015 then held a series of positions with increasing responsibility until FE 4 left its employ in April 2019. FE 4's job responsibilities included, among other things, setting financial reserves and capital expense accounting, which primarily pertained to the costs necessary to bring wells into operation.

44

FE 4 prepared financial portions of monthly "reporting packs" which also included operational data across all of Ultra's business. FE 4 reported directly to Maree Delgado beginning June 2017 through her departure. Maree Delgado initially served as Ultra's Controller but she was promoted to Chief Accounting Officer in August 2018.

174.188.    FE 4 also witnessed Defendant Lederman's micromanaging. Moreover, FE 4's colleague Preston Andersen, who served as Ultra Petroleum's Manager of Accounting from February 2017 through July 2018 and assistant controller from July 2018 to March 2019, regularly told FE 4 that he was preparing information for Fir Tree. FE 4 knew Mr. Andersen was preparing information for Fir Tree because he would tell FE 4 "Evan [Lederman] wants x, y, z." According to FE 4, Mr. Andersen "got a lot of requests" from Fir Tree, including for operational accounting reports. Further, according to FE 4, Lederman was included on many emails directly to Mr. Andersen.

> vi.    *Defendants Make False Statements About Ultra's Horizontal Well Drilling Program That Damage Investors*

175.189.    Ultra first disclosed that it would drill three horizontal wells in 2017 when it announced Q2 2017 results.

176.190.    The Q2 2017 Press Release quoted Defendant Watford as saying:

> We plan to drill 11% fewer development wells through year-end while we use those resources to drill ***three exploratory, horizontal wells.***

177.191.    On the Q2 2017 call, Defendant Watford described the drilling of the initial wells as a "science project" to determine whether the Pinedale field would support horizontal development:

> Q: And the acreage – so you increased the CapEx. Does that include the cost of drilling the new wells in addition to the price of the acreage? Or is that just the cost of drilling new wells?

> **Defendant Watford**: It's – the CapEx increase was largely for the acquisition of the acreage and the reserves that came with it[.] But we're basically displacing development vertical well drilling for the second half of the year *so we can fund the horizontal experiment*. And we're not proposing to see any production of any significance from the horizontal program. *We're just – this is a science project.* We think it has lots of upside. So we're displacing vertical wells. So we had to move the production guidance down a bit (inaudible) %. But the (inaudible) 80 Bs and 9,000 acres.

178.192.    Defendants' emphasized statements were false because: (a) Defendants were spending vast resources identifying the single best location for wells anywhere in the Pinedale field; (b) Defendants understood the horizontal wells they drilled would not be typical of the wells they would drill in a horizontal program; (c) the wells Defendants drilled would provide extremely limited information about any broader horizontal program; (d) the wells Defendants would drill were in the core of the Pinedale field, not its expansion; and, as a result, (e) the wells Defendants drilled were not "exploratory" or a "science experiment" but instead an effort to generate positive news by drilling the best possible horizontal wells Ultra could find.

179.193.    On November 7, 2017, Ultra issued a press release announcing and held a call to discuss Q3 2017 earnings ("Q3 2017 PR" and "Q3 2017 Call"). At that time, Ultra also announced initial results from the first Warbonnet well.

180.194.    The Q3 2017 PR quoted Defendant Watford as saying that "[t]he third quarter was a solid one for us as we transition from a more reactive, restructuring phase to one focused on thoughtful, strategic capital allocation that balances growth with free cash flow generation *and resource expansion.*"

181.195.    The Q3 2017 PR also claimed that Ultra had "[s]uccessfully drilled and completed a 2-mile horizontal well *on the east flank of Pinedale*."

46

182.196.    On the Q3 2017 Call, Defendant Johnson claimed Ultra was "extremely pleased" with the first horizontal.

183.197.    Defendant Watford, for his part, stated that "*[w]e believe this well is indicative of horizontal potential in the field*, which could result in potentially 16 new horizontal wells, they are incremental to our vertical well inventory."

198.    Defendant Watford also told investors that had Defendants ~~incorporated~~had the results of the first 2017 horizontal, they would have "recalculate[d] on and come up with significantly better economics with much higher returns.~~"~~":

> Q: Thanks, guys. I thought the incremental disclosure in today's presentation was very helpful. And I wanted to spend a little more time on the potential horizontal economics that you outlined on slide 16. My first question is on the IP [Initial Production], from what it looks like you estimate an IP in your potential go-forward economics of roughly 11 million cubic feet a day versus the well that came on at closer to 22. *Is there anything different with the Warbonnet well or are you just trying to build in some conservatism?*
>
> **Defendant Watford**: Sure. To be frank, we built these economics last week prior to the IP of our well. So we anted to anchor the economics here, based on actual data observed by other wells. So we used the IP of 11 million a day from the Antelope well, certainly double [sic] the IP rate of our well. *We would recalculate and come up with significantly better economics with much higher returns.*
> 184.

185.199.    Defendants also claimed that the Warbonnet Wells illustrated the potential of Ultra's flanks. For example, in prepared remarks, Defendant Johnson told investors:

> On slide 17, we illustrate the concept of drilling horizontal flank wells from preexisting pads used for vertical wells. Additionally, this horizontal program does not require incremental infrastructure to test and develop. *We are doing this very operation on the Warbonnet 9-24 pad right now.*

186.200.    Defendants' emphasized statements in Paragraphs 194-199 were false or misleading because: (a) Defendants had spent vast resources identifying the single best location for wells anywhere in the Pinedale field; (b) Defendants understood the horizontal wells they

drilled would not be at all typical of the wells they would drill in a horizontal program; (c) the Warbonnet Pad was a core area of the Pinedale anticline; (d) the wells were selected ***precisely because they were not*** "indicative of horizontal potential in the Pinedale Field"; (e) because the wells were not representative, they could not be considered in estimating the production of a typical well in the Pinedale; and (e) the Warbonnet Pad did not show wells were profitable anywhere else because its production depended on the unlikely confluence of a large number of positive factors in one area and was drilled in the core of the Pinedale field rather than the flanks.

187.201.     The market believed Defendants that the first Warbonnet well was representative. In a December 4, 2017 report, an analyst employed by NatAlliance securities concluded that "[t]his is UPL's third ever [sic] horizontal well at Pinedale so the Company is most likely going to be able to reduce costs and might be able to achieve better results."

188.202.     On January 30, 2018, Ultra published a press release announcing that:

> "The initial results of this well confirm the horizontal potential of the Mesaverde interval. We were expecting higher pressures and higher porosities in the Mesaverde and that is exactly what we encountered," said Brad Johnson. "To date, the Company has completed three horizontals on the east flank, each one targeting different intervals and ***each one verifying the significant resource potential beyond the previous commercial boundary of the Pinedale Anticline.*** We look forward to drilling more horizontal wells in 2018 and beyond."

189.203.     Defendants' statements were false because (a) Defendants had spent vast resources identifying the single best location for wells anywhere in the Pinedale field; (b) Defendants understood the horizontal wells they drilled would not be at all typical of the wells they would drill in a horizontal program; (c) the Warbonnet Pad was a core area of the Pinedale anticline, not an expansion; (d) the horizontal wells did not "verify[] the significant resource potential" in the flanks because they were hand selected to be the best conceivable wells Ultra

could drill; and (e) the Warbonnet well's results did not provide any information that could cause Ultra to update its model.

190.204.    On February 28, 2018, Defendants held a call to discuss Ultra's Q4 and FY 2017 earnings. On that call, Defendant Johnson stated that Ultra was "focus[ed on] delivering repeatable results":

> Okay. Then it looks like those next couple of horizontal wells are pretty close to your Warbonnet wells. What are your plans to delineate the play this year? Or are you going to stay pretty focused on that area that's been working for you?
>
> **Defendant Johnson**: Yes. We're going to stay in this same ZIP Code for a while. And we're definitely interested and want to learn more about the flanks. ***But right now, our focus is delivering repeatable results.***

191.205.    Defendants' emphasized statements in the above paragraph were misleading because (a) Defendants had spent vast resources identifying the single best location for wells anywhere in the Pinedale field; (b) Defendants understood the horizontal wells they drilled would not be at all typical of the wells they would drill in a horizontal program; (c) the Warbonnet Pad was a core area of the Pinedale anticline, not an expansion; and, as a result, (d) the horizontal wells did not "verify[] the significant resource potential" in the flanks because they were hand selected to be the best conceivable wells Ultra could drill; and, as a result, (e) the horizontal wells were not repeatable.

192.206.    On April 27, 2018, Ultra Petroleum filed with the SEC an amendment to its 2017 10-K, which Defendant Johnson signed. The amendment provided:

**Board of Directors' Leadership Structure**

> The Board of Directors currently has separate roles for the non-executive Chairman of the Board and the Chief Executive Officer. ***The Company believes the separation of the two roles allows the Chief Executive Officer to focus on the day-to-day business and operations while allowing the independent Chairman of the***

49

*Board to lead the board in its fundamental role of providing guidance to and oversight of management.*  Further, we believe the separate roles will better align the interests of shareholders and the management team in the Company's strategic plan going forward.

193.207._____The amendment named and described Defendant Lederman personally.

194.208._____Defendants' emphasized statements were false because Fir Tree did not limit itself to "guidance" and "oversight" of management in that it: (a) overruled management and all of Ultra's technical staff in ordering a horizontal-focused drilling plan rather than a testing plan; (b) interfered in day-to-day affairs like creating their own reserves and production estimates; (c) bypassed management to interact directly with company employees; and (d) designed the drilling plan themselves.

195.209._____The amendment also provided:

**What We Do**

**[]**

☑  **Mitigate incentives to take undue risk –** We mitigate the chance that our named executive officers may have incentive to take undue risk by using multiple performance measures and targets, different performance measures in our short and long-term incentive programs, *and by engaging both the Board and management in our internal processes to identify circumstances that may create unnecessary risk.* (first two emphases in original).

196.210._____Defendants' emphasized statements were misleading because far from tempering management's incentives to take undue risk, the Board itself was requiring that management undertake a reckless horizontal drilling plan.

197.211._____On May 10, 2018, before trading opened, Defendants issued a press release announcing Q1 2018 results. The press release disclosed that two new horizontal wells Ultra had completed had relatively low initial production rates of 11.7 mmcfe and 28.5 mmcfe per day. The

poor production resulted from both the extraordinary nature of the Warbonnet Pads and Fir Tree's

influence into Ultra's operations, which caused Ultra to drill even poorer wells.

198.212.    That day, the price of Ultra Petroleum's stock fell from its previous close of

$2.45 per share to close at $2.01 per share, down $0.44 (19.8%). The price of Ultra's stock fell

again on May 10 to close at $1.74 per share, down another $0.26 (14%).

199.213.    But the revelation did not dissipate all artificial inflation. On the call,

Defendants misleadingly maintained that the new wells had been drilled in similar conditions as

the Warbonnet wells and their poor results were due only to the Pinedale field's "variability":

> Q: I just wanted to dig in a little bit more detail on the latest 2 horizontal wells. Certainly, I guess, they had lower rates than some of the previous wells. And you guys indicated that these wells encountered less net sand, I guess, just over 5,000 feet, where some of the previous wells were more like 9,000 feet. Just trying to get a sense of why that was the case that these wells missed some other targets where maybe they were steered out of zone or maybe in this area of the field, maybe the sand disappeared for some period of time. What can you kind of tell us? Even though the actual lateral lengths of the wells were fairly similar to, I guess, the net sand, the hit was just a lot lower.
>
> **Defendant Johnson**: Sure. Yes. This is Brad. Good question. The latter – last 2 wells were both 2-mile wells, drilled in the Lower lance A interval. And they did encounter less net sand along the lateral. The – it's not an issue of drilling out of the zone. We target these wells. We pick our landing zone. And we stick with that stratigraphic interval as we drill outboard from the Pinedale anticline. And we do so with a lot of structural control based on our 3D seismic [data]. ***The geological nature of Pinedale does have variability and we certainly encountered that on these last 2 wells.***

200.214.    Defendants' emphasized statements were false because (a) the Warbonnet

had been selected as the best conceivable location in the Pinedale field, and the new wells were

not; (b) the Warbonnet wells were in no way representative of the Pinedale field's possibilities;

and (c) it was not the Pinedale field's variability but the Warbonnet's exceptionalism that

accounted for the disparity between the Warbonnet and new wells.

51

201.215.    Defendant Johnson added that Ultra was accelerating because management

was "excited" about the earlier results:

> Q: Okay. And for your 5 horizontals tatthat are currently completing in flowback, any early signs you're getting from some of those? I see the frac stages were not quite as many – well, I guess, it is similar to your – the last 2 that you reported. One of them had a little bit lower lateral length. So anything you can comment on those 2 and maybe on wat you're seeing in the other 3?

> **Defendant Johnson**: So we are seeing, as we drill these wells, the continued range of net to gross, certainly within an acceptable range to us to continue to ramp up this program. As you see lower frac stages, we are – we frac sand. That's what we try to do. We don't have to frac the shale because we have sand. This is a sand play. And so we will adjust our fracs, frac counts downward in response, frankly, to the net to gross we encounter. And so the well cost performance continues to be very food. The execution continues to be very good. And we're excited about the results so far. ***And we're excited about the upcoming wells and collectively, all that gives us the confidence to go faster.***

202.216.    Asked directly why Ultra adopted a horizontal-focused drilling plan,

Defendant Johnson stated that "the opportunity to shift capital through horizontal wells is just, for

us, the obvious thing to do given the superior" returns:

> Q: [] I guess I was just wondering the thought behind – obviously, the horizontal program ramping that and seeing where the capital spend goes there. But then essentially netting that off and drilling fewer wells of the verticals. It was – I guess I'm focused on the decision to kind of keep the capital budget the same. Is that just because you'd rather wait and save some of those vertical wells for a rainy, or I guess a sunny day, when gas prices are better? Or is that just something you were just focused on maintaining your capital budget?

> **Defendant Johnson**: Well capital discipline is a pillar to our strategy. And we're not just going to drill wells to grow. We're going to do so in a prudent manner. And for 2018, we want to spend within cash flow. And that is our objective. And under current gas price environment, spending within cash flow calls for a budget that's right around $400 million. ***And in doing so, the opportunity to shift capital through horizontal wells is just, for us, the obvious thing to do given the superior returns.***

203.217.    Defendants' emphasized statements in Paragraphs 201-202 were false because (a) management and Ultra's technical team opposed the switch to horizontal drilling; (b) Fir Tree overruled management to order horizontal drilling; and (c) as a result, the decision to drill did not arise from "excitement" at the returns but from Fir Tree's desperation.

204.218.    On August 9, 2018, before trading opened, Defendants published a press release announcing Q2 2018 results. The press release announced that Ultra had continued to see dismal results from its horizontal drilling program. One of the nine new wells completed since Ultra's last update had initial production of slightly less than 40% of the Warbonnet, and none of the remaining wells reached even 25% of the Warbonnet's initial production. Specifically, the wells' initial production was: 20.0 mmcfe, 11.7 mmcfe, 11.3 mmcfe , 8.4 mmcfe, 7.6 mmcfe, 7.1 mmcfe, 6.9 mmcfe, 4.5 mmcfe, and 4.1 mmcfe. The poor production resulted from both the extraordinary nature of the Warbonnet Pads and Fir Tree's influence into Ultra's operations, which caused Ultra to drill even poorer wells.

205.219.    On August 10, 2018, the price of Ultra Petroleum's stock fell from its previous close of $1.69 per share to close at $1.26 per share, down $0.43 (29.3%).

206.220.    But Defendants maintained that Ultra could, through analysis of the data it gathered, identify locations where drilling in the Pinedale could prove profitable:

> "Ultra is in the beginning stages of developing the Pinedale field with horizontal wells. While we anticipated variable results, and had some encouraging results from multiple zones, overall the average performance of these wells in the second quarter was below expectations. We are expanding our technical efforts to better leverage our learnings in future horizontal wells. With 78,000 net acres and an operating team that has drilled more than 2,100 vertical wells in Pinedale, we are uniquely positioned to lead this effort, but it will take time and patience as we delineate Pinedale's significant horizontal potential," said Ultra Petroleum Interim Chief Executive Officer, Brad Johnson.

207.221.    On November 8, 2018, Defendants issued a press release and held an earnings call to discuss Ultra's Q3 2018 earnings. In the Q3 2018 Earnings Call, Defendant Johnson reassured investors that "we continue to advance the evaluation of our horizontal program and remain confident that further well data analysis and optimization will allow us to drill successful horizontal wells next year."

208.222.    On March 7, 2019, Ultra issued a press release announcing its Q4 and FY 2018 results. The press release disclosed that "*our 2019 capital investment program does not include horizontal drilling*." The press release marked the end of the horizontal program. Ultra would never drill another horizontal well again.

209.223.    On March 7, the price of Ultra's stock fell from its previous close of $0.68 to close at $0.60, down $0.08 (11.8%).

## VII.    ADDITIONAL FACTS FURTHER PROBATIVE OF SCIENTER

210.224.    Defendants told investors Ultra was providing exceptional disclosure about the horizontal drilling program even as they misled investors about that program.

211.225.    On September 27, 2017, Ultra Petroleum issued a press release quoting Defendant Watford as saying:

> Michael D. Watford, President, Chairman and CEO, said, "We are very engaged with all of our stakeholders, including a constructive dialog with Fir Tree Partners, and share their excitement for our business. We look forward to collaborating with them on both immediate and long-term initiatives to help drive shareholder value."

212.226.    The Press Release also provided:

In particular, the Company plans to address the following in the near-term:

*        *        *        *        *

54

- **Clarity / Disclosure**.  Increase clarity to the market regarding:

  - high quality and repeatability of the Company's inventory;
  - long term acreage development plans;
  - low cost structure / minimal well cost inflation;
  - abundant low priced pipeline capacity to transport gas; and
  - *potential significant impact that horizontal development can have on the Company's well returns and inventory.*

213.227.    Fir Tree's information was set out at the bottom of the Press Release:

**About Fir Tree Partners**

Fir Tree Partners, founded in 1994 and located in New York City (HQ) and Miami, is a value-oriented investment manager that manages private investment funds for endowments, charitable and philanthropic foundations, pension funds and other institutional and private investors. Fir Tree manages approximately $9.4 billion, invested worldwide in public and private companies across a wide variety of sectors and securities. Fir Tree has direct control over approximately 18.48% of Common Shares and total economic interest in approximately 22.12% of Common Shares of UPL.

214.228.    A March 12, 2018 press release quoted Defendant Lederman as saying:

"I am extremely excited to be elected Chairman of the Ultra Board and look forward to working closely with Brad and the rest of the Ultra management team to drive shareholder returns. We are all laser-focused on accelerating the horizontal program that generates best-in-class cash margins, de-levering the balance sheet, opportunistically hedging to provide cash flow visibility, *dramatically improving investor communication and transparency* and regaining the market's trust by consistently meeting and exceeding expectations," said Evan Lederman, Chairman of the Board.

215.229.    That same press released specifically identified disclosure about the company's horizontal wells, claiming "The Company has released a significant amount of information regarding its horizontal program."

### PLAINTIFFS' CLASS ACTION ALLEGATIONS

216.230.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired the publicly traded securities of Ultra Petroleum during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, Ultra Petroleum's officers and directors, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

217.231.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Ultra Petroleum or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

218.232.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

219.233.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

220.234.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts as alleged violated the federal securities laws;

56

(b)    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Ultra Petroleum;

(c)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Individual Defendants caused Ultra Petroleum to issue false and misleading SEC filings and public statements during the Class Period;

(e)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)    whether the prices of Ultra Petroleum's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

221.235.    Common questions of law and fact predominate over any questions affecting only individual Class members. Because the common stock of Ultra Petroleum traded in an efficient market and Defendants' false and misleading statements had impacted the price of Ultra Petroleum common stock, Plaintiffs will establish reliance for himself and the Class through the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in an efficient market;

(d)      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)      the Company traded on the NASDAQ, and was covered by many analysts;

(f)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)      Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

222.236.     Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market, establishing predominance.

223.237.     Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

224.238.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the

58

expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### NO SAFE HARBOR

225.239.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

### COUNT I
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against the Ultra Defendants**

226.240.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

227.241.    Plaintiffs assert this claim against the Ultra Defendants, basing the claim upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

228.242.    During the Class Period, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b), the Ultra Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations, omitted material facts, and

failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

229.243.    The Ultra Defendants violated §10(b) of the 1934 Act and Rule 10b-5(a) and (c) in that they employed devices, schemes and artifices to defraud and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Ultra Petroleum's securities and directly impacted the price of Ultra Petroleum's common stock during the Class Period.

230.244.    The Company and the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in Ultra Petroleum's name were materially false and misleading and omitted material information; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly or recklessly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Ultra Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements or material omissions, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

231.245.    The Ultra Defendants knew or recklessly disregarded the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by

60

them or other Ultra personnel to members of the investing public, including Plaintiffs and the Class.

232.246.    As a direct and proximate result of the scheme or artifice to defraud that lead directly to Ultra's disclosing materially false and misleading information, the market price of Ultra Petroleum's securities was artificially inflated during the Class Period. In ignorance of the falsity of the statements at issue, Plaintiffs and the other members of the Class relied on the statements described above and/or on the integrity of the market price of Ultra's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Ultra Petroleum's false and misleading statements and omissions.

233.247.    Had Plaintiffs and the other members of the Class been aware that the market price of Ultra's securities had been artificially and falsely inflated by the fraudulent scheme that caused Ultra to issue misleading financial statements, and by the material adverse information which the Company did not disclose, causing artificial inflation in Ultra's stock price, they would not have purchased Ultra Petroleum's securities at the artificially inflated prices that they did, or at all.

234.248.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

235.249.    By reason of the foregoing, the Ultra Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Ultra Petroleum's securities during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**

61

**Against the Controlling Defendants**

236.250.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

237.251.     During the Class Period, Ultra, by and through its officers and directors, violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

238.252.     The Controlling Defendants participated in the operation and management of Ultra and its operating units, and conducted and participated, directly and indirectly, in the conduct of Ultra's business affairs. As officers, directors and/or a controlling shareholder of a publicly owned company, the Controlling Defendants had a duty to disseminate accurate and truthful information with respect to Ultra's financial condition and results of operations, and to correct promptly any public statements issued by Ultra Petroleum which had become materially false or misleading.

239.253.     Because of their positions of control and authority as senior officers and controlling shareholders, the Controlling Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ultra disseminated in the marketplace during the Class Period. Throughout the Class Period, the Controlling Defendants exercised their power and authority over Ultra. The Controlling Defendants, therefore, were "controlling persons" of Ultra within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ultra's securities.

240.254.     Each of the Controlling Defendants, therefore, acted as a controlling person of Ultra. By reason of their senior management positions and/or directorship and/or controlling

62

shareholdings of Ultra, each of the Controlling Defendants had the power to direct the actions of, and exercised the same, to cause Ultra to engage in the unlawful acts and conduct complained of herein. Each of the Controlling Defendants exercised control over the general operations of Ultra and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

241.255.    By reason of the foregoing, the Controlling Defendants have violated Section 20(a) of the Exchange Act and are jointly and severally liable to the Plaintiffs and the other members of the Class for substantial damages that they suffered in connection with their purchases of Ultra's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, certifying Plaintiffs as Class representatives, and approving Lead Counsel and Local Counsel as counsel to the Class;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: July 9, 2021_____, 2022                    Respectfully submitted,

63

Respectfully submitted,

/s/ Jeffrey A. Berens /s/

Jeffrey A. Berens
Berens Law LLC
2373 Central Park Blvd
Suite 100
Denver, CO 80238
Telephone: (303) 861-1764
Email: jeff@jberenslaw.com

*Liaison Counsel*

Adam M. Apton
Levi & Korsinsky, LLP
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363-7500
Email: aapton@zlk.com

Melissa A. Fortunato
Marion Passmore
Bragar Eagel & Squire, P.C.
580 California Street, Suite 1200
San Francisco, California 94104
Telephone:  (415) 568-2124
Email: fortunato@bespc.com
Email: passmore@bespc.com

*Co-Lead Counsel for Plaintiffs*
Jonathan Horne
Phillip Kim
The Rosen Law Firm, P.A.
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: pkim@rosenlegal.com

*Additional Counsel for Plaintiffs*

64

## CERTIFICATE OF SERVICE

I hereby certify that on ~~July 9, 2021~~ ____, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses denoted on the Court's Electronic Mail Notice List.

/s/ ~~Jeffrey A. Berens~~
Jeffrey A. Berens
BERENS LAW LLC
2373 Central Park Boulevard, Suite 100
Denver, CO  80238-2300
(303) 861-1764 (Telephone)
jeff@jberenslaw.com

65