**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Regina M. Rodriguez**

Civil Action No. 1:20-cv-02652-RMR-STV (Consolidated with Civil Action No. 1:20-cv-02820)

ULTRA PETROLEUM INVESTOR GROUP, Individually and on Behalf of All Others Similarly Situated,

     Plaintiffs,

v.

MICHAEL D. WATFORD,
C. BRADLEY JOHNSON,
ULTRA PETROLEUM, INC.,
FIR TREE CAPITAL MANAGEMENT LP N/K/A FIR TREE PARTNERS INC., and
EVAN LEDERMAN,

     Defendants.

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

---

**BERENS LAW LLC**
Jeffrey A. Berens
2373 Central Park Boulevard, Suite 100
Denver, Colorado 80238
Telephone: (303) 861-1764
Facsimile: (303) 395-0393
jeff@jberenslaw.com

*Liaison Counsel*

**LEVI & KORSINSKY, LLP**
Nicholas I. Porritt
Adam M. Apton
Adam C. McCall
1101 30th Street N.W.
Washington, D.C. 20007
Telephone: (202) 524-4290
Facsimile: (212) 333-2121
nporritt@zlk.com
aapton@zlk.com
amccall@zlk.com

[Additional Counsel on Signature Page]

Dated: June 29, 2022     *Attorneys for Plaintiffs*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

FACTS ............................................................................................................................... 4

    A. Ultra's Background and Bankruptcy. ....................................................................... 4

    B. Ultra's Bankruptcy led to Ultra entering "Growth Mode" in 2017. ....................... 5

    C. Ultra Conceded it was Underprepared for its 2017 Drilling Plan. .......................... 8

    D. Defendants Released the Results of its Horizontal Drilling "Tests". ..................... 10

    E. Fir Tree Buys Out Ultra's Debt, Adds Another Director to the Board, and Imposes its
Own Business Plan to Drill only Horizontal Wells. ................................................... 13

    F. Defendants' False Statements Cause Plaintiffs' Losses. ......................................... 17

LEGAL STANDARD .......................................................................................................... 19

ARGUMENT ....................................................................................................................... 20

    I. DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND SEC
RULE 10B-5. ................................................................................................................. 20

    A. The Complaint Adequately Pleads False Statements ............................................... 20

        1. Defendants Materially Misrepresented the 2017 Drilling Plan and its Capabilities
21

            a. *Defendants' statements were materially false.* ...................................... 21

            b. *Defendants cannot rely on the PSLRA Safe Harbor.* ............................ 24

            c. *Plaintiffs' claims are not time barred as Defendants ignore Tenth
Circuit Law* ...................................................................................... 26

        2. Defendants Materially Misrepresented Ultra's "horizontal" drilling program. ..... 28

            a. *Defendants' Statements were materially false* ...................................... 28

            b. *Defendants cannot rely on the PSLRA Safe Harbor.* ............................ 33

            c. *Defendants are still liable for statement of opinion* .............................. 34

        3. Defendants Materially Misrepresented its Relationship with Fir Tree and
Lederman. ....................................................................................................... 36

i

B.  Defendants Acted With Scienter...................................................................................... 38

    1.  Defendants Knew That They Had Not Prepared Enough New Drillings Pads in
2016 To Support Their Eight-Rig Drilling Plan. ........................................................ 39

    2.  Defendants Knew They Misrepresented The Horizontal Drilling Program. ........ 40

    3.  Defendants Had A Motive to Commit Fraud......................................................... 43

II.  DEFENDANTS MICHAEL D. WATFORD, C. BRADLEY JOHNSON, FIR TREE
CAPITAL MANAGEMENT, AND EVAN LEDERMAN ARE LIABLE UNDER THE
EXCHANGE ACT AS CONTROL PERSONS. ..................................................................... 46

A.  Defendants Watford and Johnson are Liable for Control Person Claims................... 46

B.  Defendant Lederman and Fir Tree are Liable for Control Person Claims.................. 46

CONCLUSION.............................................................................................................................. 50

CERTIFICATE OF SERVICE ....................................................................................................... 1

## TABLE OF AUTHORITIES

### Cases

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ................................................................................. passim

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083(10th Cir. 2003) ........................................................................................ 35

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ........................................................................................................ 19

*Anderson v. Spirit Aerosystems,*
  827 F.3d 1229 (10th Cir. 2016) ...................................................................................... 45

*Atlas v. Accredited Home Lenders Holding Co.*,
  556 F. Supp. 2d 1142 (S.D. Cal. 2008) .......................................................................... 36

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988) .................................................................................................. 19, 21

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .......................................................................................... 37

*City of Philadelphia v. Fleming Cos., Inc.*,
  264 F.3d 1245 (10th Cir. 2001) ...................................................................................... 44

*Frater v. Hemispherx Biopharma, Inc.*,
  996 F. Supp. 2d 335 (E.D. Pa. 2014) .............................................................................. 28

*Hsu v. Puma Biotechnology, Inc.*,
  213 F. Supp. 3d 1275 (C.D. Cal. 2016) .......................................................................... 32

*In re Atossa Genetics Inc. Sec. Litig.*,
  868 F.3d 784 (9th Cir. 2017) .......................................................................................... 25

*In re Forest Lab'ys Sec. Litig.*,
  2006 WL 5616712 (S.D.N.Y. July 21, 2006) .................................................................. 42

*In re Lernout & Hauspie Sec. Litig.*,
  208 F. Supp. 2d 74 (D. Mass. 2002) ............................................................................... 40

*In re Molycorp, Inc. Sec. Litig.*,
  157 F. Supp. 3d 987 (D. Colo. 2016) .................................................................. 35, 46, 49

*In re NPS Pharms., Inc. Sec. Litig.*,
  2007 WL 1976589 (D. Utah July 3, 2007) ...................................................................... 47

*In re Overstock Sec. Litig.*,
2020 WL 5775845 (D. Utah Sept. 28, 2020) .......................................................................... 24

*In re Quality Sys.*,
865 F.3d 1130 (9th Cir. 2017) ................................................................................................ 25

*In re Qwest Communs. Int'l, Inc. Sec. Litig.*,
396 F. Supp. 2d 1178 (D. Colo. 2004).................................................................................... 50

*In re Qwest Communs. Int'l, Inc. Sec. Litig.*,
387 F. Supp. 2d 1130 (D. Colo. 2005).................................................................................... 27

*In re SemGroup Energy Partners, L.P. Sec. Litig.*,
729 F. Supp. 2d 1276 (N.D. Okla. 2010)........................................................................... 43, 46

*In re Sprint Corp. Sec. Litig.*,
232 F. Supp. 2d 1193 (D. Kan. 2002).............................................................................. 20, 26

*In re Stone & Webster, Inc., Sec. Litig.*,
414 F.3d 187 (1st Cir. 2005)................................................................................................... 33

*In re Thornburg Mortg. Sec. Litig.*,
824 F. Supp. 2d 1214 (D.N.M. 2011) ..................................................................................... 49

*In re UTStarcom, Inc. Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) .................................................................................... 40

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016).................................................................................................... 23

*In re Williams Sec. Litig.*,
339 F. Supp. 2d 1206 (N.D. Okla. 2003)................................................................................ 26

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
14 F.4th 141 (2d Cir. 2021) .............................................................................................. 23, 31

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
19 F.4th 601 (4th Cir. 2021) ................................................................................................... 36

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .................................................................................................. 23

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) .................................................................................................. 25

*Maher v. Durango Metals, Inc.*,
144 F.3d 1302 (10th Cir. 1998) ................................................................................... 46, 47, 50

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
    513 F.3d 702 (7th Cir. 2008) ...................................................................................... 33, 45

*Manasfi v. Malone,*
    2007 WL 891871 (D. Colo. Mar. 22, 2007) ..................................................................... 27

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S. Ct. 1309 (2011)............................................................................................... 38, 43

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.,*
    2019 WL 5394011 (M.D. Fla. Oct. 16, 2019) ..................................................................... 23

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990)............................................................................................ 21

*Medina v. Clovis Oncology, Inc.*,
    215 F. Supp. 3d 1094 (D. Colo. 2017)................................................................... 20, 25, 48

*Miller v. Thane Int'l, Inc.*,
    519 F.3d 879 (9th Cir. 2008) ......................................................................................... 21

*Mishkin v. Zynex Inc.*,
    2011 WL 1158715 (D. Colo. Mar. 30, 2011) ..................................................................... 25

*Mobley v. McCormick*,
    40 F.3d 337 (10th Cir. 1994) ......................................................................................... 19

*Nakkhumpun v. Taylor*,
    782 F.3d 1142 (10th Cir. 2015) ................................................................................. 28, 38

*New Jersey & its Div. of Inv. v. Sprint Corp.*,
    314 F. Supp. 2d 1119 (D. Kan. 2004)................................................................................ 21

*Nguyen v. Endologix*,
    962 F.3d 405 (9th Cir. 2020) ......................................................................................... 45

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003) ........................................................................... 20, 36, 41, 45

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)............................................................................................ 43

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) ......................................................................................... 41

*Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ..................................................................................... 34

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................ 34, 35

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
    432 F. Supp. 3d 131 (D. Conn. 2019)......................................................... 28

*Osher v. JNI Corp.*,
    183 F. App'x 604 (9th Cir. 2006) ............................................................... 50

*Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.*,
    372 F. Supp. 3d 1139 (D. Colo. 2019)........................................................ 40

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) .................................................................. 45

*Robbins v. Oklahoma*,
    519 F.3d 1242 (10th Cir. 2008) .................................................................. 19

*S. Ferry LP v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ..................................................................... 41

*Schueneman v. Arena Pharmaceuticals, Inc.*,
    840 F.3d 698 (9th Cir. 2016)...................................................................... 42

*SEC v. Merch. Capital, LLC*,
    483 F.3d 747 (11th Cir. 2007) ................................................................... 21

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) ................................................................... 26

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    No. 17-CV-8457 (JMF), 2021 WL 311003, (S.D.N.Y. Jan. 29, 2021) ................. 36

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) ................................... 31, 45

*Sterlin v. Biomune Sys.*,
    154 F.3d 1191 (10th Cir. 1998) .................................................................. 27

*Sutton v. Utah State Sch. for the Deaf & Blind*,
    173 F.3d 1226 (10th Cir. 1999) .................................................................. 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................. 38

*TSC Indus. v. Northway*,
    426 U.S. 438 (1976)............................................................................ 20, 36

*United Water & Sanitation Dist. v. Geo-Con, Inc.*,
    488 F. Supp. 3d 105 (D. Colo. 2020) ....................................................................... 31

*Va. Bankshares v. Sandberg*,
    501 U.S. 1083 (1991) ............................................................................................... 23

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc*.,
    2008 WL 879023 (D. Colo. Mar. 28, 2008) ........................................................... 34

*Yellowdog Partners, LP v. Curo Grp. Holdings Corp.*,
    426 F. Supp. 3d 864 (D. Kan. 2019) ....................................................................... 48

*Zaghian v. Farrell,*
    675 F. App'x 718 (9th Cir. 2017) ............................................................................ 42

## <u>Statutes</u>

15 U.S.C. § 78u-4(b)(1) ................................................................................................... 19

15 U.S.C. § 78u-4(b)(2) ................................................................................................... 19

15 U.S.C. § 78u-5(i)(1) .................................................................................................... 24

15 U.S.C. §78u-5 .............................................................................................................. 24

Lead Plaintiffs Scott Heiner, Bala Settu, Geoffrey Polychronis, Mahdi Riyad Issa, Yoav Givon, and Named Plaintiff Michael Altman, ("Plaintiffs") hereby submit this opposition to the motions to dismiss of Defendants Michael D. Watford and C. Bradley Johnson,[1] Fir Tree Capital Management,[2] and Evan Lederman.[3]

## INTRODUCTION

This is a clear case of securities fraud. Ultra Petroleum, Inc. and Defendants Watford and Johnson failed dismally the first time they tried to explore and develop gas fields. Ultra initially filed for bankruptcy in 2016 owing billions of dollars in debt. A revival in natural gas prices enabled it to emerge from bankruptcy in 2017 but it still owed over $2 billion in debt and had an effective controlling shareholder in Fir Tree Capital Management, run by Defendant Evan Lederman, and other private equity firms. These firms follow a playbook with their oil and gas investments: find a relatively undeveloped field with relatively little proved reserves, quickly drill wells in the best areas to "prove up" the reserves, and sell their interest. This was exactly the playbook followed by Ultra.

Upon leaving bankruptcy in April 2017 it announced that it was in "growth mode" and in position to drill new blockbuster wells. Unbeknownst to investors, however, there would be no such wells, because Ultra had failed to prepare drilling pads to support them. When this failure was revealed to the market and Ultra's stock price fell, Ultra turned to "experimental" horizontal wells even though its primary field, Wyoming's Pinedale field, had historically been developed using vertical wells. Ultra's geologists spent six months finding the single best location in all its Pinedale acreage to "test" its horizontal drilling program. The location was not representative of

---

[1] References to the Motion to Dismiss of Defendants Watford and Johnson (ECF No. 84) shall be referred to as "Defs. Br. at __".

[2] References to the Motion to Dismiss of Defendant Fir Tree (ECF No. 87) shall be referred to as "Fir Tree Br. at __".

[3] References to the Motion to Dismiss of Defendant Lederman (ECF No. 86) shall be referred to as "Lederman Br. at __"

1

the entire field but instead was cherrypicked to have every possible advantage: it was in the Pinedale's core, in an area that vertical wells showed was promising but which had not seen much drilling. Moreover, Ultra identified the single best geological layer for drilling, a narrow 200-foot section nearly 10,000 feet deep. Ultra drilled a well there, and Defendants claimed investors could expect similar wells in the future – notwithstanding that the well was a showpiece. When Defendants' statements about that well failed to cause Ultra's stock price to soar, its private equity majority stockholders sought to drill more horizontal wells, in a desperate bid to boost its stock price so they could exit. The plan failed – there were no more perfect locations, and Ultra could not spend six months to site every horizontal well. In 2018, Ultra successively announced poor horizontal drilling results, causing its stock price to fall. It filed for bankruptcy for the second time in four years in May 2020.

Not only was Ultra development plan a dismal failure for a second time, its management, including Defendants Watford and Johnson knew it would fail and misled investors anyway. They knew Ultra's legacy vertical wells would not perform as they told investors. Then, when they pivoted to horizontal wells, they knew the "test" well was not representative of the entire field. For six months, Ultra's technical staff had spent one quarter to one half of their time selecting a single perfect location to drill wells that would yield maximum production, knowing that this location was *not* representative of the field overall. Ultra's technical staff found a small site in the Pinedale field, the Warbonnet 9-23/24, that was perfect for drilling because of an unlikely confluence of factors. *First*, Warbonnet 9-23/24 was located in the Pinedale field's core, so it would tell Ultra little about conditions on the field's flank where it told investors it would drill later wells. *Second*, the Warbonnet 9-23/24 area had seen little vertical drilling that would reduce gas pressure and, therefore, production. *Third*, the Warbonnet 9-23/24 area had seen enough vertical wells for Ultra to be able to pinpoint a *200-foot* interval some 10,000 feet underground that was unusually productive. And *fourth*, while operators had not developed the Warbonnet 9-23/24 area because

2

it was expensive to drill a vertical well there, the wells that had been drilled had been exceptional. Indeed, Defendant Johnson told an Ultra investor, Louis Talarico, that Ultra *expected* that the Warbonnet 9-23/24 wells be bad. Thus, Defendants knew that the test wells were, by design, not repeatable and were an anomaly.

Later, after the announcement of the "test" well results failed to boost Ultra's stock price, Fir Tree, a private equity shareholder, then took day-to-day control of Ultra in February 2018 and appointed Defendant Lederman as director. Upon taking control, they directed Ultra to expand its horizontal "testing" to a full-fledged drilling program, over its senior management's and technical team's protests. However, as its management and technical team warned internally, Ultra's horizontal wells did not produce in line with the Warbonnet 9-23/24. Drilled in the Pinedale's flanks (rather than its core), without extensive preparatory work, with too few vertical wells to guarantee success, and without the unique confluence of factors that made the Warbonnet 9-23 area exceptional, Ultra's horizontal wells failed.

On March 7, 2019, Ultra disclosed to investors that it would be ending the horizontal drilling program and that Ultra's "2019 capital investment program does not include horizontal drilling." On this news, the price of Ultra's stock fell from its previous close of $0.68 to close at $0.60, down $0.08 (11.8%).

Ultra shuttered its drilling program entirely by fall 2019. Ultra's inevitable bankruptcy filing came in May 2020. Ultra's second bankruptcy in four years proved much more destructive than its first. It wiped out unsecured and second lien creditors, and left shareholders more than a billion dollars out of the money. In just three years, during which they constantly lauded Ultra's conservative drilling practices, Defendants destroyed more than three billion dollars in value.

## FACTS

### A.  Ultra's Background and Bankruptcy.

Ultra is a gas exploration and development company focused on just one field, the Pinedale field in Wyoming, which accounts for 95% of Ultra's reserves, 90% of its acreage position, and 86% of its production. ¶¶3, 58.[4] Ultra produces some oil, but a large majority of its production is gas. *Id.*

In the early 2010's, Ultra took on unsustainable debt. The low gas prices that prevailed in 2015 and early April 2016 pushed Ultra into bankruptcy, where it reported outstanding debts of $3.75 billion. ¶59. Yet when gas prices rebounded in late 2016 and early 2017, Ultra executed a plan to exit bankruptcy without impairing any creditors. ¶60. In order to do this, Ultra took on $2.4 billion in debt exiting bankruptcy. ¶61. All creditors were paid in full in cash, except creditors who held $1.34 billion in unsecured notes issued by Ultra's holding company, who were paid in shares. ¶¶59-60. Equity investors were diluted but still retained ownership of 41% of the reorganized company.  ¶60. After paying off all existing creditors, Ultra was left with $2.0 billion in debt. ¶63.

The most significant of Ultra's new investors was Fir Tree, a hedge fund with a history of acquiring substantial positions in small development-stage energy companies. ¶32. As a private equity firm, Fir Tree has a short investment horizon that puts them in conflict with long-term shareholders. ¶150. When gas prices were high, for private equity companies would form subsidiaries to acquire fields and drill exploratory wells. ¶¶147-48. If these wells were successful, the subsidiaries would recognize the provide reserves, which would increase the value of the company's fields. *Id.*  The subsidiaries would sell the fields, allowing the private equity companies to return their investors' capital to them in relatively short order. *Id.*  Therefore, private equity

---

[4] All "¶" citations refer to Plaintiffs' Second Amended Class Action Complaint for Violation of the Federal Securities Laws filed on May 19, 2022 (ECF No. 75-2; ECF No. 77 Order).

companies such as Fir Tree did not drill to produce oil, but to benefit from the price appreciation of their oil fields when speculative reserves were proved. *Id.*

When gas prices were low, private equity companies, including Fir Tree, took advantage of the oil and gas companies' bankruptcies. ¶149. Instead of creating a subsidiary to find undeveloped fields, they would acquire a bankrupt (or soon-to-be bankrupt) company's debt at a deep discount and use the leverage their position provides to push to receive large portions of the company's post-bankruptcy equity. *Id.* The private equity companies then carry out the remained of their business plan—hoping to benefit from the price appreciation of oil fields when speculative reserves were proved. *Id.* That is exactly what Fir Tree did here.

During Ultra's bankruptcy, Fir Tree acquired Ultra's debt at a deep discount. *Id.* When Ultra emerged from bankruptcy, Fir Tree owned 15.6% of its shares. ¶154. Fir Tree reportedly acquired $440 million face value (or 32.8%) of the $1.34 billion unsecured HoldCo Notes. ¶155. Fir Tree's position in the notes was converted into 11.8% of Ultra's shares. ¶144. Fir Tree acquired its remaining 3.8% position through a rights offering issued in connection with the bankruptcy, paying approximately $95 million for these additional shares. *Id.* Fir Tree also appointed two of Ultra's directors at that time "*from a list of director candidates proposed by individual members of the*" committee of holders of Fir Tree's corporate unsecured notes. *¶*156. As the largest holder in that class, Fir Tree exerted substantial pressure on the selection. *Id.* Ultra ultimately exited its first bankruptcy in April 2017 with $2 billion in debt. ¶¶62-63. To inspire investor confidence and boost their stock price, Defendants told investors that they were exiting bankruptcy in "growth mode." ¶70.

**B. Ultra's Bankruptcy led to Ultra entering "Growth Mode" in 2017.**

After exiting bankruptcy, Defendants sought to boost their stock price in order to let the post-bankruptcy shareholders, including Fir Tree, sell their positions. ¶2. In order to do this, Defendants told investors on a May 3, 2017 Q1 2017 call that Ultra had planned for an explosive

2017 in which it would drill a large number of wells which would be, crucially, of high quality. *Id.* Defendants specifically told investors that "[w]ell quality will improve as we progress into 2017" and that ultimate gas recoveries would be 4 Bcf per well, indicating that experimenting with frac stages and the Type Curve Analysis would not affect production. ¶104.[5]

Making a virtue of necessity, Defendants boasted that Ultra would fund its drilling program from cash flows because it was "damn sensitive about debt". ¶70. Nevertheless, relying on cash flows is risky, because low revenue in one year will directly impact the capex or "growth" in the next year. ¶73. Accordingly, bad wells drilled in 2017 will produce less gas, and thus less cash, in 2018. ¶73. So not only would poor 2017 wells directly reduce 2017 production, they would also reduce the cash Ultra had available to drill new wells in 2018. ¶73.

Relying on cash flows leads to other issues, including uncertainties in equipment and drilling capabilities due to gas price fluctuations. Drilling rigs weigh 500 tons and can cost $100,000 to move due to their size and weight. ¶74. Leasing a rig is expensive, rarely falling below $10,000/day. ¶75. Therefore, when gas prices fell in 2015, Ultra reduced its rig fleet to just four. ¶76. However, when prices rose again in late 2016 and early 2017, Ultra set about rebuilding the fleet to eight leased rigs. *Id.* On a February 2017 call, Defendants told investors that Ultra was then

---

[5] Capitalized terms are defined in Section IV of Plaintiffs' Amended Class Action Complaint. A cubic foot equivalent (CFE) is a unit of energy based on the approximate energy released by burning one cubic foot of gas, or about 1,028 BTUs. ¶36 One thousand cubic feet equivalent is mcfe, one million is mmcfe, one billion is bcfe, and one trillion is tcfe. *Id.* Decline Curve Analysis. Decline curve analysis is a graphical tool for estimating the recoverable reserves of a well based on past production history. ¶37. Past production of oil and gas is plotted for consecutive time periods, and then a decline (or "type") curve is fit to the production data points and extrapolated to predict future performance. *Id.* The underlying assumption is that whatever causes controlled the trend of the curve in the past will continue to govern its trend in the future in a uniform manner. The accuracy of the analysis depends on the availability of sufficient past production. *Id.* A Type Curve is a graphical curve derived from a Decline Curve Analysis that can be used to forecast the expected average performance of a group of wells in a particular geological formation. *Id.*

6

adding a fifth rig and beginning operations in April. *Id*. On a May 3, 2017 call to discuss Q1 2017 earnings, Defendants announced that Ultra had leased its sixth and seventh rigs, and was actively negotiating for an eighth. ¶77.

On May 3, 2017, Defendants also told investors that they would "test" the concept of using horizontal wells to expand the Pinedale anticline in 2017. ¶¶119-20. The Pinedale anticline follows the path of an ancient narrow river delta. *Id.* Operators who drill outside of this delta risk not finding any oil or gas. *Id.* But because the Pinedale anticline is so narrow, operators who manage to expand its breadth can find themselves quickly multiplying their reserves. *Id.* Defendants told investors on the May 3, 2017 Q1 2017 Call that Ultra was "taking horizontal development on the edges and fringes of the field and expanding the resource." ¶120. In a press release announcing Q2 2017 results, Defendant Watford said that Ultra planned to drill "three *exploratory*, horizontal wells." ¶190. Defendant Watford elaborated on this during the earnings call stating that they were "displacing development vertical well drilling for the second half of the year so we can fund the horizontal experiment" and that it was "a science project." ¶191.

Given Ultra's $2 billion in new debt, combined with these new tests and the uncertainty of oil and gas prices, Defendants also sought to reassure investors that low prices would not reduce Ultra's share price and force Ultra into another trip to bankruptcy court. ¶65. For example, on June 28, 2017 Defendant Watford told investors that Ultra would remain profitable however low and for however long gas prices fell. ¶66. Ultra's website claimed that "Ultra is the top natural gas producer in the State of Wyoming," and that "production in Pinedale," alone, "can support the Company in virtually any reasonable commodity price environment." ¶67. Defendant Watford also reassured investors that the Pinedale field was "derisked" and "delineated", with "2,800 wells" that have more or less the same production profile. ¶68.

### C.  Ultra Conceded it was Underprepared for its 2017 Drilling Plan.

To protect the Pinedale area's ecologically fragile environment, federal regulations mandate that operators drill all wells in the Pinedale field from multi-well drilling pads. ¶78. Therefore, any drilling rig needs to be located on a drilling pad. ¶78. A drilling pad is a location which houses the wellheads for a number of wells and can measure anywhere from 5 to 15 acres. ¶79. However, both for ecological and safety reasons, operators cannot construct drilling pads during winter or spring. ¶84. Further, before building a drilling pad, an operator must secure a Master Drilling permit. ¶85. To obtain the permit is a long, complex, and cumbersome process that takes about 12 months from the date of application. ¶85. Therefore, the pads on which Ultra drilled its 2017 wells were completed in the summer and fall of 2016, which was in the midst of Ultra's bankruptcy when gas prices were low. ¶86.

With its attention elsewhere during the first bankruptcy, and anticipating a relatively small drilling season, Ultra had built only a few pads in 2016. ¶88. When gas prices rebounded in late 2016, Ultra found itself with far too few pads to expand to its new 8-rig 2017 drilling plan – and no way to build any new ones until the following year. ¶88. Ultra was thus forced to place several rigs on legacy drilling pads – pads that Ultra had previously built but decided not to drill – that were located in the East of the Pinedale field, which was less productive. ¶¶89, 95. Similarly, these legacy pads had not been "high graded", meaning that they had not identified the most productive and profitable acreage on the pad. ¶¶95-96.

Therefore, despite Ultra's previous statements about exiting bankruptcy in growth mode, on August 9, 2017, during Ultra's Q2 2017 earnings call, Ultra announced reductions in both its 2017 and 2018 guidance. ¶7. Ultra's stock price fell 14.38%. *Id.* Despite having to reduce guidance due to a 3% reduction in production growth (from 25% to 22%) and projected 2018 production growth rate by 5% (from 25% to 20%), Defendants affirmed that the wells Ultra drilled in the remainder of 2017, using the new rigs, would continue to perform as well as the wells drilled in

8

the first quarter, that used the four rigs that Defendants adequately prepared. ¶¶106, 109. Defendants told investors that, "[u]pon arrival of the additional rigs, operational performance has been strong. And these rigs have quickly approached the fleet average on several key operational metrics." ¶109. This was an indication to investors that estimated remained quantities of oil and gas were anticipated to be economically producible in the near future.  Defendant Johnson told investors to expect the same quality of wells in Q3 and Q4 2017 that they had seen in Q2 indicating that they "expect the next 2 quarters to deliver similar results." ¶110. Asked whether there was "a potential for [the 4 bcf EUR for vertical wells] to creep up over the next few quarters", Defendant Johnson further agreed, stating, "Sure. I think that's fair . . . So looking forward, I think we're going to continue to see 4 b[cfe] wells and greater than 35% returns for the balance of this year." ¶111.

In a report published immediately after the call, an analyst employed by Cowen & Co. wrote that "[i]mportantly, [the guidance reduction] does not at all appear [to be] a well performance issue." ¶113.

However, just one quarter later, on November 7, 2017 Defendant Watford again indicated that Ultra would not meet its already cut guidance, stating that "[w]e expect production for the full year 2017 to be slightly below guidance." ¶115. Watford blamed "issues caused by recent bankruptcy and third parties." *Id.* Watford admitted the chief culprit was that Ultra had not built enough drilling pads in the summer of 2016, meaning that "our 2017 program led some rigs being placed on legacy pads that were located in sub-optimal yet still economic areas along the eastern flank of our field." *Id.* Defendant Johnson further explained that "[i]n 2017, the activity has been primarily on the east flank of the field. The activity in this area was not the result of high grading our inventory." ¶116. According to Johnson, Ultra "placed new rigs as part of our ramp up on pads that were available" whereas "[n]ormally, [Ultra] plan and construct pads up to a year before we drill them." *Id.*

Indeed, FE 1 provides information that clinches the showing that Defendants would have known that their statements were false when they made them. According to FE 1, Ultra solidifies the next year's drilling plan in Q3/Q4. ¶92. Ultra's senior management and the Board approve the plan at a Board meeting in the fourth quarter of the previous year or the first quarter of the year. *Id.* Thus, even as Defendants made their statements beginning with the Q1 2017 earnings call, they knew exactly where Ultra would drill its wells in 2017, and what the results would be.

Johnson admitted that "due to the uncertainty surrounding our in-court restructuring, some of that predrill effort [i.e., the drilling of new pads] was on hold." ¶116. He further explained that production was lower because of drilling on legacy pads, stating, Ultra "began our 4 to 8 rig ramp up earlier this year, rigs were deployed mostly to the east flank. [] [T]he east flank typically delivers lower IP's and lower EUR's than average[.]" *Id.*

### D. Defendants Released the Results of its Horizontal Drilling "Tests".

Oil and gas reserves are not spread evenly through geological strata. ¶52. Upon reaching a strata known to be particularly productive, called a target zone, an operator can turn the well by 90 degrees. *Id.* By continuing to drill horizontally, typically for 1,000 to 10,000 feet (hence, "horizontal wells"), the operator can exploit more hydrocarbon pockets in productive areas. ¶51.

Ultra first tested drilling horizontal wells in 2016, but the only well it drilled was not nearly productive enough to justify the cost. ¶121. After drilling a poor horizontal well in 2016, Defendants' knew they would have to come up with a different strategy this time around. Therefore, in order to drive up Ultra's share price, Defendants told investors Ultra would drill more horizontal wells purportedly to "test" the concept of using horizontal wells to expand the Pinedale field. ¶¶119-21. Ultra completed the first of three horizontal wells planned for 2017 in October. ¶122. Two wells were drilled on the Warbonnet 9-23 pad, and the third on the Warbonnet 9-24 pad a mere half-mile away ("Warbonnet Pads"). *Id.* The first Warbonnet well's initial production was 51 mmcfe/day. *Id.* The second, which was drilled in the Mesaverde, was less productive but

10

still profitable. *Id.* The third, drilled on the 9-24 pad, reached more than 50 mmcfe/day. *Id*. These were exceptional results that would, if repeatable, justify a much higher price for Ultra's shares. *Id.*

And, Defendants told investors the results may be repeatable. For example, on November 7, 2017, Defendants stated that they had "[s]uccessfully drilled and completed a 2-mile horizontal well on the east flank of Pinedale" (¶195) and that the results were "indicative of horizontal potential in the field, which could result in potentially 16 new horizontal wells, they are incremental to our vertical well inventory." ¶197. Due to the success of the "experiment," Defendants indicated that Ultra would "recalculate and come up with significantly better economics with much higher returns." ¶198. Defendants continued to mislead investors about the horizontal drilling program. On January 30, 2018, Defendants represented that the three horizontal test wells "verif[ied] the significant resource potential beyond the previous commercial boundary of the Pinedale Anticline." ¶202. Similarly, on February 28, 2018, Defendants indicated that the test wells were "repeatable" stating Ultra was "focus[ed] on delivering repeatable results." ¶204.

The market believed Defendants that the first Warbonnet well was representative. ¶201. In a December 4, 2017 report, an analyst employed by NatAlliance securities concluded that "[t]his is UPL's third ever [sic] horizontal well at Pinedale so the Company is most likely going to be able to reduce costs and might be able to achieve better results." *Id.* However, as Ultra's first test in 2016 were unsuccessful, Ultra put forth extra safeguards to guarantee success this time around, assuring that the results were not repeatable, by design. ¶130. Louis C. Talarico, III, a then-shareholder of Ultra, met with Defendant Johnson on December 9, 2019 at 4:00pm CST at Hotel Zaza in Houston, Texas. ¶128. The meeting focused on Ultra's horizontal development programs. ¶128. At the meeting, Mr. Talarico asked Johnson why the Warbonnet 9-23/24 wells were so good, while the remainder were not. ¶129. Johnson admitted that Warbonnet 9-23/24 wells were drilled in the core of the field, including at least a large portion of the wells' horizontal path. *Id*. But the

11

wells' path ran under a lake and other topographical features that had precluded any vertical drilling. *Id*. With no vertical wells to deplete the area around the well, the Warbonnets 9-23/24 wells would be productive. *Id.* Johnson admitted to Mr. Talarico that ***he had known*** that the Warbonnet 9-23/24 would be strong performers. *Id*.

Additionally, according to FE 1, whose team served "almost like a quarterback" in finding and selecting wells, Ultra's technical team had spent six months trying to find the single best possible location in the entire Pinedale. ¶121. FE 1 estimates that between one quarter and one half of FE 1's time during those six months was spent identifying that location. *Id*. Ultra's geologists spent countless hours examining well-log data which showed productivity of various geological strata, looking at drilling cross-sections to analyze sand potential, and resolving complicated issues like how long to drill the horizontal wells. *Id*.

As a result of these analyses, Ultra had identified a single perfect location to drill a horizontal well: the Warbonnet Pads. ¶131. According to FE 1 and Ultra's then-CFO Jerald J. Stratton's testimony testified in Ultra's second bankruptcy, in response to a question by Mr. Talarico, the location had at least four advantages that made it unique. ¶¶131, 133. First, it was located in the Pinedale field's core, not its flank. ¶¶131, 133. Second, wells drilled in developed fields will sometimes produce less because the existing wells have reduced pressure. ¶¶131, 133. But relatively few vertical wells had been drilled in near the Warbonnet Pads. ¶133. Third, enough vertical wells had been drilled that Ultra's geologists could identify a precise interval that appeared to be exceptionally productive in the Warbonnet Pads' location: the Lower Lance A-1, ¶¶131, 33, a mere 200-foot interval located some 10,000 feet underground. ¶131. Fourth, the Lower Lance A-1 was especially productive in the Warbonnet Wells' area. ¶133.

Stratton also confirmed that the location of the Warbonnet 9-23/24 had not lent itself to vertical drilling and that the Warbonnet 9-23/24 actually went west. ¶134. Stratton even admitted that there were no vertical wells in Section 19, which is directly west, not east of the Warbonnet

9-23/24. ¶135. Moreover, according to FE 1, Ultra had not drilled the Warbonnet Wells where its rigs happened to be. ¶123. Instead, after identifying the very best possible location, Ultra had spent considerable time and money moving the rig into position. ¶¶74, 123.

Additionally, the results were not repeatable because the Warbonnet pads were one of the few places Ultra was allowed to drill due to environmental regulations. ¶127. As Stratton testified on July 24, 2020, BLM regulation made locations like the Warbonnet vanishingly rare, and due to high regulations, they were prevented from putting a pad in certain places. ¶¶133, 134. FE 1 explains that the Pinedale field was designated as part of the core habitat of a protected species, the greater sage grouse. ¶143. Moreover, sage grouse protections were particularly constricting on or near the Pinedale field's flanks. *Id.*

In sum, the "test" wells were showpieces, not experiments. The results were manipulated and showed nothing about the Pinedale field's potential. Over the next year, Ultra's new horizontal wells never came close to matching the Warbonnet 9-23 and Warbonnet 9-24. ¶123.

**E. Fir Tree Buys Out Ultra's Debt, Adds Another Director to the Board, and Imposes its Own Business Plan to Drill only Horizontal Wells.**

After Ultra reduced guidance on August 9, 2017, Fir Tree decided to take a more hands on approach. In late August and early September 2017, Fir Tree bought another 2.9% of Ultra's shares, spending approximately $64 million. ¶157. These additional purchases brought Fir Tree's holdings to 18.5% of Ultra's stock. *Id.*

On September 18, 2017, Fir Tree issued a press release titled "Fir Tree Partners Announces Intention to Pursue Value-Maximizing Strategic Alternatives for Ultra Petroleum Corp." ¶158.  On September 27, 2017, Ultra published a press release "announc[ing] today its intention to work collaboratively with Fir Tree Partners [] to pursue value-maximizing strategies." ¶159.

However, when the announcement of the horizontal "tests" at the Warbonnet wells did not have the impact on Ultra's stock price that Fir Tree had anticipated, Fir Tree decided to take matters into its own hands. Ultra's stock price increased by only 5% when it announced the first Warbonnet

13

well's results on November 7, 2017, and fell by 2.4% when it announced the second on January 30, 2018. ¶152-53.  Indeed, as a Fir Tree managing partner told the Wall Street Journal, "[a]s these [oil and gas] companies have emerged [from bankruptcy], the public markets' response has been really unbelievable to us. It's historic how poorly they've [i.e., their stock price] performed." ¶152.

On January 30, 2018, Ultra and Fir Tree announced that they had entered into a contract styled a Cooperation Agreement. ¶160. The Cooperation Agreement entitled Fir Tree to one representative on Ultra's board; it selected Defendant Lederman who took his seat on February 28, 2018. ¶160, 168. Fir Tree was also entitled to significant influence in selecting an independent director. ¶160. Fir Tree proposed 3-5 candidates for the seat; Ultra selected one. ¶148. Two directors resigned from Ultra's board to make space for the new directors. ¶160. In exchange, Fir Tree agreed to "Standstill Provisions" requiring it to refrain from buying more than 25% of Ultra's voting securities, soliciting proxies, facilitating any tender or exchange offer, take-over bid, or the like, or seeking any additional board candidates to Ultra's seven-person board. ¶161.

Defendants told investors that Fir Tree had influence over the company's direction, not control of its day-to-day operations. For example, on February 28, 2018, the date the directors secured by Fir Tree through the Cooperation Agreement took their seats, Mr. Talarico called out-going CEO Watford and spoke with him for fifteen to twenty minutes. ¶163. Mr. Watford explicitly told Mr. Talarico that Fir Tree was in control of Ultra. *Id.* Additionally, on April 27, 2018, Ultra stated that the independent Chairman of the Board would have the role of "providing guidance to and oversight of management" while the CEO would be responsible for the "day-to-day business and operations". ¶206. Likewise, Defendants indicated that Ultra had mitigated the incentive for management to take risks by "engaging both the Board and management in our internal processes to identify circumstances that may create unnecessary risk." ¶209.

Defendants' statements were important to investors because of the conflict between the interests of private equity owners and long-term shareholders. Private equity firms' short

14

investment horizon drives their business plan in oil and gas. According to a Haynes and Boone LLP partner, "[t]he investment model for private equity was to find the right people, invest money, have them drill one or two wells and then flip [the acreage]." ¶¶147, 150. Private equity firms are not drilling to produce oil, but rather to benefit from price appreciation when speculative reserves are proved. ¶147. The business model of private equity firms like Fir Tree put them in conflict with investors who want to buy and hold shares over the long term. ¶150.

Yet Defendants' statements were false. Fir Tree routinely overruled management and all of Ultra's technical staff in ordering a horizontal-focused drilling plan rather than a testing plan, interfered in day-to-day affairs like creating their own reserves and production estimates, bypassed management to interact directly with company employees, and designed the drilling plan themselves while ignoring industry standard models. ¶208. And far from *tempering* management's incentives to take undue risk, the Board itself was *requiring* that management undertake a reckless horizontal drilling plan. ¶210.

Fir Tree and Lederman decided to pivot Ultra solely to horizontal wells. ¶165. According to FE 1, while the next year's drilling plan is constantly evolving during the first part of the year, Ultra's technical staff and senior managers begin solidifying the next year's drilling plan in Q3/Q4. ¶92. Ultra's senior management and the Board formally approve the drilling plan at a Board meeting in the fourth quarter of the previous year or first quarter of the year. *Id.* In FE 1's experience, neither the Board of Directors as a body nor individual directors are involved in formulating drilling plans. ¶167. Management formulates the drilling plan working hand in glove with geologists, reservoir engineers, and other oil and gas professionals. *Id.* The drilling plan is then presented by the senior executives to the Board, whose role is limited to saying "yes or no" to the plan. *Id.* But this was not the way Fir Tree and Lederman had Ultra create the 2018 drilling plans. *Id.*

15

Between February 28, 2018, and May 10, 2018, Defendant Lederman held a meeting with Johnson and members of Ultra's technical team in which he ordered them to focus on horizontal drilling ("Lederman Meeting"). ¶168. According to FE 1, Defendant Johnson and the technical team advised that Fir Tree should continue to take a slow and steady approach to horizontal development that focused on drilling a few test wells and spending a lot of time studying each well. ¶169. According to FE 1, the technical staff at the Lederman Meeting also presented analysis showing that Ultra could continue to drill vertically while using vertical wells to test for horizontal potential. *Id.* For example, a vertical well can be tested for horizontal potential through pressure and injection testing. *Id.* That way, the technical staff told Lederman, the drilling costs could have remained in the area of $2.5 million for vertical drilling rather than $12.5 million for horizontal drilling. *Id.*

As Ultra had already set the budget and drilling plan, it was in no way prepared to expand the horizontal drilling program. ¶173. Despite this, Fir Tree, through Lederman, personally overrode the technical staff at the meeting, hyperbolically telling Ultra's management and its technical team that Ultra would never drill another vertical well in Pinedale. ¶170. According to FE 1, the meeting was strange because it occurred "after the normal cycle" in which a plan is formulated in Q3/Q4 and approved in Q4/Q1. ¶171. Indeed, before the Lederman Meeting, Ultra had already established a budget for additional horizontal testing. *Id.* However, after the Lederman Meeting, the budget changed. *Id.*

The decision to drill horizontally caused a litany of problems. ¶175. First, Ultra had not obtained Master Well permits to drill in attractive new locations and would have had to wait 12 months to obtain them. *Id.* So, according to FE 1, Ultra just drilled horizontal wells where it already had permits to drill vertical wells. *Id.* Second, with so many more horizontal wells to drill, Ultra's technical staff did not have time to carefully select locations. *Id.* According to FE 1, "we'd have done more were we able to" like picking out "several intervals" of drilling length to see what

16

worked. *Id.* Had they been given a chance, the technical staff "would have done more geological evaluation" to select drilling sites. *Id.* In the end, the decisions on where to drill were "kind of random". *Id.*

At "technical sessions" Ultra's technical team presented the models it had generated to estimate oil and gas reserves to the Board. ¶176. Andrew Teno was a Fir Tree director and employee, and Lederman's "right-hand man." *Id.* Despite having no technical training and only a bachelor's degree in finance, Lederman deputized Teno to build the case against Ultra's management and technical team to present at the technical sessions. ¶176-77.

Rather than use the industry specific software designed for oil drilling and to prevent human error, Teno entered information into an excel spreadsheet to create his own "model" to generate horizontal well predictions. ¶1179-80. Teno's models were consistently erroneous, requiring the technical staff to point out errors. ¶180. However, Teno's "model" gave Lederman "what he wanted" and were presented at Board Meetings and technical sessions. *Id.* The technical staff was then asked "why are you worse" than Teno's model (i.e., why does the technical staff's model predict less production than Teno's). *Id.* Leading the Board, Lederman would brush aside the technical team's model in favor of Teno's. *Id.* He insisted that the technical team "just fix" the models, meaning change the assumption to produce more favorable estimates. *Id.* To ensure the Board endorsed aggressive horizontal drilling, Lederman successfully pushed the Board to adopt Teno's models using implausible assessments, including drilling outcomes with just a 10% likelihood. ¶183.

**F.  Defendants' False Statements Cause Plaintiffs' Losses.**

The true nature of the horizontal drilling program was slowly revealed to investors. The truth began to emerge on May 10, 2018 when Ultra disclosed that two new horizontal wells that Ultra had completed were vastly inferior to the test wells, having initial production rates of 11.7 mmcfe and 28.5 mmcfe per day. ¶211. Ultra revealed that the poor production resulted from both

17

the extraordinary nature of the Warbonnet Pads and Fir Tree's influence into Ultra's operations, which caused Ultra to drill even poorer wells. *Id.* That day, the price of Ultra Petroleum's stock fell from its previous close of $2.45 per share to close at $2.01 per share, down $0.44 (19.8%). ¶212. The price of Ultra's stock fell again on May 10 to close at $1.74 per share, down another $0.26 (14%). *Id.*

Despite this partial revelation, Defendants continued to mislead investors about the horizontal drilling program, indicating that the Pinedale had "variability" and that due to the past results they were "excited about the upcoming wells" and that the past results "gives [them] the confidence to go faster" in drilling more horizontal wells. ¶215. Defendants also represented to investors that the horizontal wells had produced "superior returns" and therefore they would continue with the horizontal drilling program. ¶216.

However, again, the true nature of the program was partially revealed on August 9, 2018, when Ultra announced that had continued to see dismal results from its horizontal drilling program. ¶218. One of the nine new wells completed since Ultra's last update had initial production of slightly less than 40% of the Warbonnet, and none of the remaining wells reached even 25% of the Warbonnet's initial production. *Id.* Specifically, the wells' initial production was: 20.0 mmcfe, 11.7 mmcfe, 11.3 mmcfe, 8.4 mmcfe, 7.6 mmcfe, 7.1 mmcfe, 6.9 mmcfe, 4.5 mmcfe, and 4.1 mmcfe. *Id.* The poor production resulted from both the extraordinary nature of the Warbonnet Pads and Fir Tree's influence into Ultra's operations, which caused Ultra to drill even poorer wells. *Id.*

On March 7, 2019, Ultra disclosed to investors that it would be ending the horizontal drilling program and that Ultra's "2019 capital investment program does not include horizontal drilling." ¶208.  That day, the price of Ultra's stock fell from its previous close of $0.68 to close at $0.60, down $0.08 (11.8%). ¶223.

In May 2020, Ultra once again filed for bankruptcy. This time, it wiped out not only its shareholders but most of its creditors. ¶¶2, 23.

18

## **LEGAL STANDARD**

A motion to dismiss tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). To withstand a motion to dismiss "a complaint must contain enough allegations of fact 'to state a claim to relief that is plausible on its face.'" *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (citation omitted).

The Supreme Court "[has] recognized time and again, a 'fundamental purpose' of the various securities acts, 'was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.'" *Basic Inc. v. Levinson,* 485 U.S. 224, 234 (1988). "Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.'" *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972).

The Private Securities Litigation Reform Act ("PSLRA") requires a plaintiff to must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading" when alleging that a statement is false or materially misleading. 15 U.S.C. § 78u-4(b)(1). When alleging that a defendant acted with scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). However, the PSLRA did not "abolish the concept of notice pleading." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003). In fact, "[i]n the context of securities litigation, the Tenth Circuit has warned that dismissal is 'difficult to obtain'

19

due to the fact-sensitive nature of the relevant issues." *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1213 (D. Kan. 2002).

The elements of a securities fraud claim which Defendants challenge are: (1) that a defendant made a false statement (or omitted to state facts necessary to make other statements not misleading); (2) with scienter.  *Adams*, 340 F.3d at 1118.

## ARGUMENT

**I. DEFENDANTS VIOLATED SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10B-5.**

### A.  The Complaint Adequately Pleads False Statements.

Courts evaluate whether falsity is pled by looking to "the facts alleged in a complaint to determine whether, taken as a whole, they support a reasonable belief that the defendant's statements identified by the plaintiff were false or misleading." *Adams*, 340 F.3d at 1099. To determine whether a complaint adequately pleads falsity, the Tenth Circuit evaluates "(1) the level of detail provided by the facts stated in a complaint; (2) the number of facts provided; (3) the coherence and plausibility of the facts when considered together; (4) whether the source of the plaintiff's knowledge about a stated fact is disclosed; (5) the reliability of the sources from which the facts were obtained; and (6) any other indicia of how strongly the facts support the conclusion that a reasonable person would believe that the defendant's statements were misleading." *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1111 (D. Colo. 2017) (quoting *Adams*, 340 F.3d at 1099).

Whether a false statement is material is a "mixed question of law and fact" that is rarely appropriate for a decision on the face of the pleadings. *TSC Indus. v. Northway,* 426 U.S. 438, 450 (1976); *see No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934-35 (9th Cir. 2003) (declining to adopt a bright-line rule to determine

materiality, engaging in the fact-specific inquiry required by *Basic*, and finding that the plaintiffs had sufficiently pleaded materiality). Plaintiffs have satisfied this standard.

      1.   <u>Defendants Materially Misrepresented the 2017 Drilling Plan and its Capabilities</u>

      a.   *Defendants' statements were materially false.*

A statement or omission is "misleading as to a material fact" when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231-32. Critically, and for this reason, "'[t]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.'" *Miller v. Thane Int'l, Inc*., 519 F.3d 879, 886 (9th Cir. 2008) (*quoting McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)). Accordingly, even statements that are "literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Id*. "It is well established that a materially misleading omission of past performance information occurs when a promoter makes optimistic statements about the prospects of the business but fails to include past performance information that would be useful to a reasonable investor in assessing those statements." *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 768 (11th Cir. 2007).

For example, in *New Jersey & its Div. of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1126 (D. Kan. 2004), the company's statements that the executives' tenure was "long-term", while accurate, was misleading for failing to disclose that their termination was possible. *Id*. Defendants argued that "they had no duty to disclose the departures of Mssrs. Esrey and LeMay until the final decision was made to terminate their employment". *Id*. at 1131. However, the court rejected this argument, finding that plaintiff's allegations were sufficient where "the company had made an affirmative statement that was arguably untrue at the time it was made in light of other nondisclosed, albeit contingent, plans." *Id*.

21

Similarly, Plaintiffs adequately plead that Defendants' statements about the 2017 drilling plan are materially misleading. For example, despite having to reduce guidance, Defendants represented to investors that "[w]ell quality will improve as we progress into 2017" and affirmed that that "4 Bcf per well [was] still the right number." ¶104. Defendants stated that due to the additional rigs, "operational performance has been strong" and that "the next 2 quarters [will] deliver similar results." ¶110. Defendants further stated that Ultra would continue "to see 4 b[cfe] wells and greater than 35% returns for the balance of this year." ¶111.

These statements are materially false and misleading because they misleadingly omitted to disclose that Ultra had not prepared the field for its 2017 drilling program. ¶¶115-16. In reality, operational performance had not been strong, but was substantially limited due to the fact that Defendants had failed to produce enough drilling pads to support an 8-rig drilling plan, and placing rigs on legacy pads that were "sub-optimal", and failing to high grade their inventory. *Id*. Further, unbeknownst to investors, Defendants omitted the fact the Ultra had **already** seen a lack of production from its wells. *Id.*

Analyzing these facts under the *Adams* factors shows that Plaintiffs' allegations are more than strong enough to survive Defendants' motion. Regarding factors one and two—level of detail and number of facts provided—Plaintiffs support their allegations with numerous, precise factual details of how defendants failed to prepare for the 2017 drilling plan. ¶¶58-96. Thus, the first two *Adams* factors weigh in Plaintiffs' favor.

The third, fourth, and fifth factors—coherence and plausibility, source of information, and reliability of sources—also favor Plaintiffs. Considering that Plaintiffs' primary source of information are Defendants' own admissions and former employees, Plaintiffs' sources and reliability of information should be indisputable.

Finally, with regard to the sixth *Adams* factor—other indicia supporting the conclusion that a reasonable person would have been misled—Plaintiffs quote public reactions from analysts

22

showing that people were, in fact, misled. ¶113 (analysts commenting that "[i]mportantly, [the guidance reduction] does not at all appear [to be] a well performance issue."). Thus, each of the *Adams* factors weighs in favor of holding for Plaintiffs on the issue of falsity.

While Defendants charge Plaintiffs with misinterpreting one of the allegedly fraudulent statements, it is Defendants who err. Defs. Br. at 8. In response to a question of whether 4 bcf/well was still "the right number" given that Defendants had made efforts to improve them, Johnson said "Yes."[6] Defendants argue that Johnson was expressing uncertainty about whether the right number was 4 bcfe/well; in fact, he expressed uncertainty about whether the tests had improved the wells, such that the number was higher than 4 bcf/well. Because courts must "credit the plaintiffs' plausible theory when evaluating a Rule 12(b)(6) motion", it must also credit the plaintiffs' plausible interpretation of a statement. *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 146 (2d Cir. 2021).

Defendants also argue that none of the above statements were literally false or misleading. Defs. Br. at 7-9-. However, Defendants ignore the fact that courts routinely find that "[o]nce defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1008 (9th Cir. 2018); *see Va. Bankshares v. Sandberg*, 501 U.S. 1083, 1097 (1991) (to avoid liability, true statement must "discredit the other one so obviously that the risk of real deception drops to nil"); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016) ("The law is well settled . . . that so-called half-truths — literally true statements that create a materially misleading impression — will support claims for securities fraud." (internal quotation omitted)); *MAZ Partners LP v. First Choice Healthcare Sols., Inc.,* 2019 WL 5394011, at *9 (M.D. Fla. Oct. 16, 2019), *report and*

---

[6] See Exhibit 13. The transcript Defendants cite reports the statement slightly differently as "Yeah, this is Brad."

*recommendation adopted*, 2020 WL 1072582 (M.D. Fla. Feb. 14, 2020) (Even if a statement appears true on its face, it "is misleading in the securities fraud context if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.").

Defendants' sole case, *In re Overstock Sec. Litig.*, 2020 WL 5775845, *7 (D. Utah Sept. 28, 2020), does not hold otherwise. In *Overstock*, the court held that "[t]he Consolidated Complaint does not contain a contemporaneous allegation suggesting that any Defendant knew of, or had access to, information inconsistent with any challenged statement. Without such facts, Plaintiff fails to plead falsity with particularity as required by the PSLRA." *Overstock*, 2020 WL 5775845, at *7. Here Plaintiffs allege specific information and that Defendants knew facts that contradicted what they told the public, including that Ultra had not prepared for an 8-rig program, but omitted them from investors.

### b. *Defendants cannot rely on the PSLRA Safe Harbor.*

Defendants' reliance on the PSLRA Safe Harbor provision for four of the statements similarly fails. Defs. Br. at 9. The PSLRA precludes companies and individuals from being held liable for securities fraud in connection with certain "forward-looking" statements that are "identified" as such *and* are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5. The term "forward-looking statement" is defined as including future projections of revenue, plans for future operations, or statements of future economic performance. 15 U.S.C. § 78u-5(i)(1). If the alleged misleading statement at issue is not identified as "forward-looking," or accompanied by meaningful cautionary language then the PSLRA's safe harbor provision does not apply.

Defendants attempt to trigger the safe harbor by relying on words such as "expect" "looking forward", and "will" that are included in Ultra's false statements. Defs. Br. at 9. These

statements, however, do not become "forward-looking" simply because they include one of these verbs. Plaintiffs alleged that these statements were materially misleading at the time they were made because they concealed and/or obscured the fact that Defendants had failed to produce enough drilling pads to support an 8-rig drilling plan, placing rigs on legacy pads that were "sub-optimal", and failing to high grade their inventory. ¶¶115-16. Further, unbeknownst to investors, Defendants omitted the fact the Ultra had *already* seen a lack of production from its wells. *Id.* Therefore, as the falsity of these statements does not depend on a future contingency, these statements were not "forward-looking." *See*, *e.g.*, *In re Quality Sys.*, 865 F.3d 1130, 1141-42 (9th Cir. 2017) (analyzing circuit court case law regarding "mixed statements" of present and future facts and holding that safe harbor does not apply when statements omit material facts about present conditions); *Medina*, 215 F. Supp. 3d at 1123-24 (mere use of the words "could" and "potential" did not trigger safe harbor protection).[7]

Additionally, even forward-looking statements are not shielded by risk warnings that merely recite a "litany of generally applicable risk factors." *Lormand v. US Unwired, Inc*., 565 F.3d 228, 245 (5th Cir. 2009). Here, the relevant risk warnings cited by Defendants could apply to any generic oil company and are silent about the topics alleged. For example, the risk warnings cited in Defendants' brief say nothing about legacy pads, "high grading", or sub-optimal locations. *See* Defs. Br. at 11. Therefore, the risk warnings are not clear enough that "'reasonable minds' could not disagree that the challenged statements were not misleading." *See In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017); *Mishkin v. Zynex Inc.*, No. 09-CV-00780-REB-KLM, 2011 WL 1158715, at *5 (D. Colo. Mar. 30, 2011) ("to the extent the defendants rely on cautionary language in the press release, that cautionary language likely does not shield the relevant statements, assuming the other factual allegations in the complaint to be true."); *Sprint*,

---

[7] Defendants do not regard any other challenged statements regarding the 2017 drilling plan as potentially "forward-looking".

25

232 F. Supp. 2d at 1222 ("the inclusion of general cautionary language regarding a prediction would not excuse the alleged failure to reveal known material, adverse facts.").

Similarly, courts have found that a risk statement itself is materially misleading if it "speaks about the risks . . . in the abstract, with no indication that the risk 'may already have come to fruition." *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009), aff'd, 563 U.S. 27 (2011); *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1232 (N.D. Okla. 2003) ("The generic warnings of problems that can affect the Company's revenues are insufficient because Defendants failed to disclose that these problems had already manifested themselves and were severely and adversely impacting the Company's viability."). Here, the risk warnings relate to the "accuracy of assumptions" and the "cost of continuing" operations. Defs. Br. at 10. However, Defendants knew at the time of the statements that it was drilling on legacy pads and in sub-optimal locations. Therefore, to the extent that any of these risk warning are applicable, they themselves are false as Defendants knew of facts that would undermine the risk warnings themselves. Accordingly, Defendants' arguments that the four statements are protected by the PSLRA safe harbor fail.[8]

### c. Plaintiffs' claims are not time barred as Defendants ignore Tenth Circuit Law

Defendants' reliance on the statute of limitations is also misplaced. ***First***, Defendants completely ignore the fact that Plaintiffs allege that the truth was not fully revealed until March 14, 2018, when as a direct result of Defendants' fraudulent statements, Defendants published a PowerPoint presentation showing the low quality of the wells that Ultra had drilled. ¶117.

***Second***, Defendants completely ignore Tenth Circuit case law. The Tenth Circuit has held that "[w]hile we recognize there is a strong federal interest in requiring plaintiffs to file suit soon after they are put on notice of their claims, the applicable statute of limitations should not

---

[8] To the extent the PSLRA safe harbor does apply, Plaintiff also adequately alleges Defendants had actual knowledge of the falsity. *See* Section I. B.

precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims." *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1202 (10th Cir. 1998). Therefore, the Tenth Circuit has recognized that after plaintiffs are on inquiry notice, there exists "a period thereafter during which a diligent investor should have discovered the facts underlying the alleged fraud." *See In re Qwest Communs. Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1142 (D. Colo. 2005) (citing *Sterlin*, 154 F.3d at 1202-05). As courts in this circuit have noted, "[c]ase law suggests that a diligent investor should have discovered facts sufficient to form a complaint at least within six to twelve months of the [inquiry notice]." *Manasfi v. Malone,* No. CIV.A.06CV00280WDMPA, 2007 WL 891871, at *1 (D. Colo. Mar. 22, 2007). Here, even using the earlier November 2017 inquiry notice date cited by Defendants, Plaintiffs' complaint was filed within six to twelve months of the inquiry notice allowed by the Tenth Circuit. *See Qwest Communs.*, 387 F. Supp. 2d at 1142 ("the passage of six months following the storm warnings is not unreasonable" where due to the complexity, "rapid discovery of the alleged scheme following such storm warnings cannot reasonably be expected.").

*Third*, in order to succeed in its claim Plaintiffs must allege not merely that someone at Ultra knew its 2017 plan called for drilling wells on legacy pads, but that an individual defendant or someone whose scienter can be imputed to Ultra did. FE 1's report that Ultra's Board of Directors approved the 2017 drilling plan in Q1 2017 at the latest, including drilling on poor locations, is invaluable in showing that Defendants made their statements with scienter. Therefore, Plaintiffs could not have "discovered facts sufficient to form a complaint" until they were put on inquiry notice by interviewing the former employees cited in Plaintiffs' complaint. As these interviews occurred after the filing of the amended complaint, Plaintiffs' claims are not time barred.

2. <u>Defendants Materially Misrepresented Ultra's "horizontal" drilling program.</u>

a. *Defendants' Statements were materially false*

Companies mislead investors when they misstate the true reasons for corporate developments. For example, in *Nakkhumpun v. Taylor*, 782 F.3d 1142 (10th Cir. 2015), the defendants entered into an agreement to sell an asset. The agreement did not close. While defendants blamed the buyer's inability to obtain financing, in truth, the buyer had attempted to renegotiate the deal. *Id.* at 1148. Defendants' misstatements about the reason the transaction fell apart were materially misleading because the buyer's true reason suggested the asset was not worth what Defendants claimed. *Id.* In particular, companies mislead investors when they cherry pick data while claiming the data are representative, *e.g. Frater v. Hemispherx Biopharma, Inc.*, 996 F. Supp. 2d 335, 341 (E.D. Pa. 2014), or misstate the reason for their financial success. *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 147 (D. Conn. 2019).

Here, Defendants materially misrepresented the purpose and status of Ultra's horizontal drilling program and omitted to disclose that they were cherry-picking results. Defendants told investors Ultra was "taking horizontal development on the edges and fringes of the field and expanding the resource" (¶120) and described Ultra's horizontal drilling program as "exploratory", (¶190) an "experiment" and "science project". ¶191.

Defendants also misrepresented the results of the horizontal drilling program. For example, Defendants stated that they had "[s]uccessfully drilled and completed a 2-mile horizontal well on the east flank of Pinedale" (¶195) and that the results were "indicative of horizontal potential in the field, which could result in potentially 16 new horizontal wells, they are incremental to our vertical well inventory." ¶197. Due to the success of the "experiment," Defendants indicated that Ultra would "recalculate and come up with significantly better economics with much higher returns." ¶199.

28

Similarly, Defendants represented to investors that the test wells "verif[ied] the significant resource potential beyond the previous commercial boundary of the Pinedale Anticline" (¶202) and that Ultra was concentrating on "repeatable results." ¶204. Defendants then told investors that the poor horizontal results were simply due to "variability" in the Pinedale and that given the past performance Ultra was "excited" about the upcoming wells which gave Ultra "the confidence to go faster." ¶215. Defendants also told investors that the horizontal program had resulted in "superior returns". ¶216.

It was no such thing. Fir Tree and other private equity firms have neither the patience nor the resources to make money by actually selling oil and gas. ¶¶147-49. Instead, their business plan is to drill a few successful wells and then sell their shares, letting someone else worry about making money from actually producing and selling the hydrocarbons. *Id*.

In furtherance of this plan, Ultra spent six months finding the single best geological interval, the Lance A-1, in the single best well location in the Pinedale field, the Warbonnet 9/23-24. ¶121-22, 124. These wells were located in the core, not the fringe, of the Pinedale field. ¶122,24. They were located in one of the rare areas where Ultra was allowed to drill due to environmental restrictions. ¶¶138-45. Therefore, rather than being representative of the field, the "test" wells did not test anything; they were unrepresentative by design and intended to produce a manipulated unrepeatable result.

Indeed, in moving to dismiss Plaintiffs' claims, the Defendants inadvertently highlight the "test" wells' uniqueness. Defs. Br. 5-6. Defendants point out that three other horizontal wells drilled in the Warbonnet 9/23-24 location performed poorly. But these wells were located in the Lower Lance A-**2** (the 200-foot section beginning immediately below the A-1) or **C-1** (another 200 foot section of the Lower Lance). Defs. Ex. 10. Even small deviations from the initial sweet spot – whether geological or geographical – made for poor wells. ¶125

29

In this case, Defendants' ploy failed. Ultra's stock price barely increased when Defendants disclosed the first "test" well's results and fell when it disclosed the third "test" well's results. ¶152. A Fir Tree managing partner called oil and gas companies' failure to react to news which would previously have caused their stock price to soar "historic." *Id.*

The Complaint adequately alleges these statements were false and meets all the *Adams* factors. First, as to reliability (factor 5), the allegations are based on the sworn testimony of Ultra's own CFO, corroborated by a former employee. ¶¶119-22, 130-37, 138-44. They could not be more reliable. Second, the Complaint does not just state that the first wells were drilled in a perfect location, it alleges numerous detailed facts that show exactly why it was perfect (factors 1 and 2). *Id.* Third, Plaintiffs' allegations are consistent and coherent. Fir Tree's business plan is to drill one or two wells and sell all its shares when the price skyrockets. ¶¶147-48. That is exactly what it attempted to do here, and perfectly explains why Fir Tree took formal control over Ultra and doubled down on the horizontal strategy after the first wells failed to raise Ultra's stock price. ¶¶152, 168. Fourth, Plaintiffs disclose their sources (factor 3). And fifth, the market actually was misled by Defendants' statements, with one analyst stating that, if anything, production would only increase. ¶201.

Defendants' remaining arguments are without merit. They claim they'd disclosed the efforts made to locate a the Warbonnet 9/23-24 Lowe Lance A-1 interval. But they point to disclosure (which they truncate) that "[o]ur teams have been busy *evaluating resource expansion* in Pinedale *with an emphasis on* horizontal drilling on the flanks of the field." Defs. Br. at 13, Ex. 4 at 5. Defendants' disclosure suggests they engaged in comprehensive efforts to expand the entire field – not that they'd spent six months finding one well location.

Defendants also argue that "Ultra published a map showing precisely the surface location of the well: in the core." Defs. Br. at 14 (citing Ex. 12 at 19). Even if the Court considers Exhibit 12, the map Defendants refer to is simply titled "Horizontal Well Activity", does not specify what

30

areas are on the map, includes wells from 6 different locations, and does not label the core, flanks

or even pads. In short, it is impossible from the map to determine anything unless you are an expert.

While Defendants state the map purports to show "that the horizontal test well started in the core,

drilled laterally through the core, and ended by accessing the eastern flank" (Defs. Br. at 14), their

argument requires that the Court take judicial notice of the map for the truth of its contents, which

is impermissible on a motion to dismiss. *United Water & Sanitation Dist. v. Geo-Con, Inc.*, 488 F.

Supp. 3d 1052, 1057 (D. Colo. 2020). Further, the map doesn't even indicate where the core or

flank are, nor does it show where the drilling started or ended. While the map includes lines, it

fails to provide any details whatsoever. In fact, the map does not even include a legend identifying

North, South, East, and West, without which investors cannot determine in which direction the

lines go. Therefore, even if the map did disclose relevant information, and it did not, the map

would still be insufficient to reduce the risk of misleading investors to "nil" because it would take

a clairvoyant expert to ferret out the information Defendants claim appears in it. *Va. Bankshares,*

501 U.S. at 1097 ("not every mixture with the true will neutralize the deceptive. If it would take a

financial analyst to spot the tension between the one and the other, whatever is misleading will

remain materially so, and liability should follow.")

Defendants also claim that though the wellhead may have been located in the core, the

wells terminated in the fringe. Defs. Br. at 14. Ultra's CFO, Stratton testified that the Warbonnet

9/23-24 wells were promising ***because*** they were located in the core. ¶14. Stratton's testimony is

sufficiently reliable to ground Plaintiffs' allegations.

Defendants' remaining arguments advance alternative interpretation of the misleading

statements. But as this is a motion to dismiss, Plaintiffs need only plead a ***plausible*** interpretation

of Defendants' statements. *IWA Forest*, 14 F.4th at 147. However, Defendants' competing

interpretations would be irrelevant even if they were plausible. *Id.*; *see also Skiadas v. Acer*

*Therapeutics Inc.*, 2020 WL 3268495, at *9 (S.D.N.Y. June 16, 2020); *Hsu v. Puma*

*Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1286 (C.D. Cal. 2016) (plaintiff adequately alleged statement is misleading because defendants' interpretation "doesn't [] obviously control.").

Nevertheless, Defendants' interpretations are implausible. First, Defendants argue their statements were accurate because in many experiments, it takes a lot of money to achieve the "best" results. Defs. Br. at 13-14. In an experiment, the "best" results are the most accurate or representative ones. But in their "science experiment", Defendants spent time and money to find the "best", single most productive *well*, the one that was *least* representative of the Pinedale field's true potential.

Second, Defendants said the first Warbonnet well would cause them to "recalculate and come up with significantly better economics with much higher returns" for a typical well to be drilled in the future. ¶199. In their motion to dismiss, Defendants attempt to paraphrase this statement to fit their narrative and claim the statement is evidently true – it's "just math". Defs. Br. at 14-15. But their argument ignores that the first Warbonnet well would only improve economics for a typical well if it was representative of future typical wells. Indeed, the question Defendants were answering was "[i]s there anything different with the Warbonnet well or are you just trying to build in some conservatism?" Defs. Ex. 5 at 17.  There was something different in the Warbonnet well that made its inclusions improper: it was a showpiece well drilled in the single perfect location within the Pinedale field that told Defendants nothing about the field's potential and should not be incorporated in the calculation of a typical well. For the same reason, the Warbonnet wells did not "verif[y] significant resource potential beyond the previous commercial boundary of the Pinedale". ¶202. Further, while Defendants argue that the well was not used in the calculation, Defs. Br. at 15, their false statement was that the well would force Defendants to "*re*calculate".

Third, Defendants claim that Defendants' statements blaming poor results on "variability" were accurate because well production varied. Defs. Br. at 16. Defendants' interpretation turns the

32

statement into a tautology: well production varied because well production varied. And they ignore what they said was varying: "[t]he geological nature of [the] Pinedale". ¶213. The Pinedale's geological nature did not explain why the new wells were so much worse than Warbonnet 9-23/24: subsequent wells had worse results because the Defendants had deliberately drilled the Warbonnet wells to be *showpieces*.

Finally, Defendants claim Johnson's statement that shifting to horizontal wells is "the obvious thing to do" because, technically, a corporation is controlled by its board of directors. Defs. Br. at 16. Whatever the particulars of corporate control, a course of action opposed by a company's CEO (the speaker) and employees is not "obvious." ¶¶216-17.

### b. *Defendants cannot rely on the PSLRA Safe Harbor.*

Defendants argue that one statement is protected by the PSLRA safe harbor. Defs. Br. at 16-17. "The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement." *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005); *Makor Issues & Rights, Ltd. v. Tellabs Inc*., 513 F.3d 702, 705 (7th Cir. 2008) ("[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.").

For example, in *Tellabs*, a defendant stated that sales were "still going strong." *Tellabs*, 513 F.3d at 705. While a portion of the statement was forward-looking, the statement implied that sales were currently or "still" doing well, which was not entitled to protection as a forward-looking statement. *Id*.

Here, in response to a question about the horizontal drill program, Defendants responded that "*right now*, our focus is delivering repeatable results." ¶204. "Right now" is a statement of current fact, which created the impression that the horizontal program was designed to produce "repeatable results." In reality, Defendants knew the test wells had been manipulated and were not

33

repeatable; they just hoped for another miracle. Similarly, Defendants' statement that Ultra would "stay" in the same zip code implies that they are currently in that zip code. *Id.* These statements are therefore not forward-looking, and the PSLRA safe-harbor does not apply.

Even if the statement were forward looking, "the safe harbor provision of the PSLRA shields from liability forward-looking statements if they are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc*., No. 05-CV-01344WDMMEH, 2008 WL 879023, at *17 (D. Colo. Mar. 28, 2008). Again, Defendants point to just two risk disclosures that Defendants allege are "meaningful." Defs. Br. at 17 (referring back to the disclosures at Defs. Br. at 10-11). However, again, these disclosures fall well short and say absolutely nothing about horizontal wells, let alone "repeatable" results. *See Oklahoma Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 (9th Cir. 2019) (warnings insufficient as they "did not 'counterbalance [the] misleading impression created by [the initial misrepresentations]'").[9] The fact that Defendants rely on the same risk warnings for all of its "forward-looking statements" shows just how generic these warnings are.

### c.   *Defendants are still liable for statement of opinion*

Opinion statements are misleading if, among other things, they contain embedded statements of facts that are false. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185 (2015). Here, Defendants state that they were "optimistic about" its horizontal drilling "***on the edges and fringes of the field and expanding the resource.***" ¶120. The statement contains an embedded statement of fact: namely, that Ultra is in fact drilling on the

---

[9] Contrary to Defendants' arguments (Defs. Br. at 17), Plaintiffs also adequately allege that Johnson knew the statement was false. *See* Section I. B.

34

fringes and expanding the resource. But the Warbonnet 9-23/24 Pads were located in the Pinedale's core. ¶131. The location of the test site is a verifiable fact, not an opinion.

Further, in *Omnicare*, 575 U.S. at 185, 189, the Supreme Court found that statements of opinion are actionable if either "the speaker did not hold the belief she professed" *or* if the speaker omits information whose omission makes the statement misleading to a reasonable investor. Here Plaintiffs' allegations are largely misrepresentations of omissions, therefore, because Ultra's opinion did not "fairly align[] with the information in the issuer's possession at the time", investors "have cause to complain". *Id.* at 1329.

Defendants first argue that FE 1 should not be relied upon because he did not communicate with Defendants and did not definitively say there were no wells like the Warbonnet 9-23/24. Defs. Br. at 19. As to the latter, Plaintiffs allege that the Warbonnet 9-23/24 wells were designed to be showpieces with the information Ultra had on hand, not that it was inconceivable that through chance Ultra might drill a few equally good wells. As to the former, courts in the Tenth Circuit apply a "common-sense" approach to determine whether a witness's testimony is probative and reliable. *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1103 (10th Cir. 2003). Courts do not impose bright-line rules such as one requiring contact with defendants. Instead, provided the witness is reliable (and Defendants do not question FE 1's reliability), courts accept the facts the witnesses reports for what they are and then determine whether they are probative of either falsity or scienter. For example, in *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1008 (D. Colo. 2016), *as amended* (Jan. 28, 2016), the plaintiffs relied on statements from a former employee who reported the results who was not alleged to have spoken with the defendants. Just like here, the witness's report showed the information that was available to defendants should they choose to consult it, so the court accepted it. Here, the facts FE 1 reports show that the Warbonnet 9-23/24 wells were drilled as showpieces. The facts FE 1 reports in conjunction with the other allegations

35

in the Complaint, particularly Stratton's testimony and Defendant Johnson's confession to Talarico that Ultra intended to drill showpieces, sufficiently support both falsity and scienter.[10]

Similarly, Defendants' arguments relating to "immaterial[ity]" are unavailing. Defs. Br. at 20. Whether a false statement is material is a "mixed question of law and fact" that is rarely appropriate for a decision on the face of the pleadings. *TSC Indus., Inc.*, 426 U.S. at 450. Additionally, when read in context, the statements as a whole are unquestionably material given Ultra's efforts to exit bankruptcy and implement its horizontal drilling plan. Similarly, the fact that Defendants repeatedly discussed its horizontal drilling plan shows that these are material facts that an investor would consider, especially given that Ultra had eliminated its vertical drilling program. *See Am. W. Holding*, 320 F.3d at 934 ("materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information."); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008) (materiality of statement was "illustrated by the frequency with which Defendants emphasized" it in "press releases and other public statements").

### 3. Defendants Materially Misrepresented its Relationship with Fir Tree and Lederman.

Defendants also misled investors about Fir Tree's role in Ultra's operations. On April 27, 2018, Ultra stated that the independent Chairman of the Board would have the role of "providing guidance to and oversight of management" while the CEO would be responsible for the "day-to-day business and operations". ¶206. Likewise, Defendants indicated that Ultra had mitigated the

---

[10] None of Defendants' cases are to the contrary. Defendants cite the portion of *KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 609 (4th Cir. 2021) that determined whether the former employee's allegations sufficiently showed scienter standing alone. The court in *Sjunde AP-Fonden v. Gen. Elec. Co.*, No. 17-CV-8457 (JMF), 2021 WL 311003, at *8 (S.D.N.Y. Jan. 29, 2021) disregarded the former employee because they provided "confident supposition", not facts. And Plaintiffs do not, as in *Anderson* and *Wochos*, allege that the Defendants' statements are actionable because FE 1 disagreed with them, Defs. Br. at 19; the statements are actionable because, among other things, they contradicted the facts FE 1 reports.

incentive for management to take risks by "engaging both the Board and management in our internal processes to identify circumstances that may create unnecessary risk." ¶209.

These statements were misleading as Fir Tree did not limit itself to "guidance" and "oversight" of management. Rather, Fir Tree routinely interfered in day-to-day affairs like creating their own reserves and production estimates, bypassing management to interact directly with company employees, and designing the drilling plan themselves while ignoring industry standard models. ¶208. Further, Defendants' emphasized statements were misleading because far from tempering management's incentives to take undue risk, the Board itself was requiring that management undertake a reckless horizontal drilling plan. ¶210. Accordingly, as Defendants' statements "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists," they were materially false and misleading. *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

Defendants argue that because of Yukon Law, "[n]o reasonable investor could have read" Defendants' statement to mean that "the board would not make decisions for Ultra, including overruling management when it saw fit." Defs. Br. at 21. However, Defendants ignore the agreement between Ultra and Fir Tree. On January 30, 2018, Ultra and Fir Tree announced that they had entered a contract styled a Cooperation Agreement. ¶148. The Cooperation Agreement entitled Fir Tree to one representative on Ultra's board; it selected Defendant Lederman. ¶160. Fir Tree was also entitled to significant influence in selecting an independent director and two directors would resign from Ultra's board to make space for the new directors. *Id.* As part of the agreement, Fir Tree was also to refrain from advising, controlling, or influencing the management of the company. ¶161. Therefore, when read in connection with Defendants' April 27, 2018 amendments to Ultra's 10-K, investors would have reasonably believed that the Board as a whole, and Fir Tree in particular, would limit itself to "guidance" and "oversight" of management. ¶208.

37

Further, Defendants again misconstrue Plaintiffs' allegations regarding risks. Defs. Br. at 21. Plaintiffs do not allege that Defendants could not take risks. Rather, Defendants failed to disclose the fact that Fir Tree caused Defendants to ignore internal reports and bet the company on a single plan that was unsubstantiated by internal data and opposed by management and Ultra's technical team, but which was tailor-made to advance Fir Tree's interests in selling its Ultra shares. ¶¶180-81, 210. Accordingly, Defendants' arguments fail.

### B. Defendants Acted With Scienter.

Scienter is "a mental state embracing (1) intent to deceive, manipulate, or defraud," or (2) recklessness. *Adams*, 340 F.3d at 1105. Plaintiffs can plead recklessness by showing either that defendants "knew about the danger of misleading buyers and sellers" or "the danger was so obvious that [Defendants] must have been aware of it." *Taylor*, 782 F.3d at 1149.

To find an inference of scienter, courts must, first, assume all the allegations in the Complaint are true; second, consider the Complaint and documents incorporated by reference and facts subject to judicial notice; and third, consider plausible competing inferences. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. The inquiry "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.,* at 323. A complaint survives dismissal "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. at 324. In other words, where there are equally strong inferences for and against scienter, the tie goes to the plaintiff. *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1324-25 (2011).

1. <u>Defendants Knew That They Had Not Prepared Enough New Drillings Pads in 2016 To Support Their Eight-Rig Drilling Plan.</u>

The Complaint adequately alleges Defendants knew that they had not prepared enough new drilling pads in 2016 to support their drilling plan and the available wells would not meet 2017 performance goals. The complaint explains that focusing on its first bankruptcy and anticipating a relatively small drilling season and low gas prices, Ultra had built few pads in 2016. ¶¶87-88. Defendants knew that pads could only be built during the summer and fall, and that it took 12 months to get the proper approvals. ¶¶84-85. Despite this knowledge, Defendants misrepresented to investors that the drilling in the second half would equal that of the first half, despite not preparing any of the pads for the additional rigs. Instead, based on the allegations from former employees and the time it takes to make the pads, Plaintiffs show that Defendants knew they were using legacy pads that were not high graded.

Moreover, one fact shows that Defendants acted with scienter. Every year, Ultra's Board of Directors approves its drilling plan. ¶91. According to FE 1, the drilling plan is approved by the first quarter of the relevant year at the latest. ¶92. The drilling plan was no small matter. An Ultra letter to the SEC explained that "With respect to the development plans underlying our disclosed reserve estimates, *each year our senior management and our board of directors adopts a development plan based on the best information available at the time of adoption.*" ¶91.

Watford and Johnson both sat on Ultra's Board. So by 2017, before their first Class Period-statements, Watford and Johnson had not only analyzed the data and proposed a drilling plan, they had approved it. ¶93. Thus, Watford and Johnson knew that Ultra would drill its 2017 wells on legacy pads that had not been high graded and that were drilled in the East of the Pinedale field, with lower initial production and lower EURs. ¶¶94-99.

Defendants' own admissions add to the inference of scienter. Defendants admitted on a call to discuss Ultra's Q3 2017 earnings that Ultra had not high graded the legacy pads on which it drilled certain of its 2017 wells and that they knew the East of the Pinedale field, on which Ultra

39

placed several of its rigs, is characterized by lower initial production and lower EURs. ¶¶96-98. Defendant Watford also admitted Ultra had not built enough drilling pads in the summer of 2016, resulting in the lower 2017 production. ¶115. Defendant Johnson admitted that Ultra knew these facts when Defendants delivered the Q1 earning's call. ¶116.

Based on these facts, Plaintiffs adequately allege exactly why and how Defendants knew their statements were materially false and how Defendants acted with scienter.

2.   Defendants Knew They Misrepresented The Horizontal Drilling Program.

In the Tenth Circuit, courts analyze allegations about the importance of the facts defendants misrepresented holistically with allegations suggesting the defendants' knowledge of those facts. *Peace Officers' Annuity & Benefit Fund of Georgia v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1154 (D. Colo. 2019). Plaintiffs "do much more [] than make generalized allegations related to scienter." *Id.* The Complaint makes particularized allegations that Ultra's horizontal drilling operations were critical to Ultra's operations. In fact, once the horizontal drilling operations failed, Ultra was forced into a second bankruptcy in four years. Further, after the 2017 drilling plan was finalized, Defendants "displaced" a portion of the budget to fund the horizontal drilling plan, presumably a Board-level decision. ¶191. Defendants then repeatedly described the project to investors as an "experiment" or "science project." *Id.* Indeed, after drilling the first Warbonnet 9/23-24 well, Defendants claimed it was "indicative" of the Pinedale's flank potential, even though the Warbonnet 9/23-24 was located in the Pinedale's core, not its flank. ¶197. In fact, Ultra's technical team spent a quarter to half of their time for six months identifying the single perfect Warbonnet 9-23/24 location and its Lower Lance A-1 interval. ¶130. They were selected precisely because they were not "indicative of horizontal potential[.]" ¶200; *see, e.g.*, *In re UTStarcom, Inc. Sec. Litig.,* 617 F. Supp. 2d 964, 974 (N.D. Cal. 2009) (allegations that revenue recognition issues "were well known throughout the Company" support strong inference of scienter); *In re Lernout & Hauspie Sec. Litig.*, 208 F. Supp. 2d 74, 87 (D. Mass. 2002) (same; collecting cases).

Indeed, Defendants specifically claimed that clearly communicating the horizontal development's potential was one of its near-term priorities. ¶226 ("Clarity / Disclosure. Increase clarity to the market regarding: [] potential significant impact that horizontal development can have on the Company's well returns and inventory."). When in March 12, 2018 Defendants boasted that they had "dramatically improv[ed] investor communication and transparency", they cited the "significant amount of information regarding its horizontal program." ¶¶228-29. Thus, Defendants did not merely make statements about Ultra's horizontal drilling program: they repeatedly told investors that they had access to significant amounts of information, and that those precise disclosures were critical and accurate. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (inference of scienter where defendants held to have known truth based on access to sales information in corporate database).

Then, Defendants bet the company on a gamble that Ultra could drill at least a few productive horizontal wells. *S. Ferry LP v. Killinger,* 542 F.3d 776, 786 (9th Cir. 2008) (holding that scienter can be inferred "where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter"); *Am. W. Holding*, 320 F.3d at 943 n. 21 (The company's maintenance problems, and the government's investigation into them, were so important to the company that it was "absurd to suggest that the Board of Directors would not discuss" them.).

The Complaint also alleges particularized facts showing that Defendants actually knew about the problems they concealed. For example, all Defendants sat on Ultra's Board, which approved its annual drilling plan. FE 1 cites a specific meeting at which Lederman personally ordered Ultra's management to rewrite the 2018 drilling plan to focus on horizontal drilling. ¶¶168-70. FE 1 reports that Lederman aggressively and hyperbolically told Ultra's management that Ultra would never drill another vertical well in Pinedale. ¶170. The meeting was stark; it came after the normal quarterly cycle and even after Ultra budgeted for horizontal testing. ¶171. FE 1 is

41

plainly reliable. FE 1's job included preparing slides for Board Meetings and FE 1 heard about that meeting from four separate people. ¶172. Additionally, Defendants Johnson and Lederman both attended the meeting. ¶169, 170. These facts show that Defendants Johnson and Lederman both knew the statements were false.

Further, Ultra's board held meetings with the technical team and discussed their models and projections for horizontal drilling. ¶¶176-81. The technical staff estimated the likelihood of each outcome, and as customary in the industry, focused on 90th, 50th, and 10th percentile outcomes. ¶181. When deciding on operations, Defendant Lederman and the Board would use the 90th. *Id.* To ensure the Board endorsed the aggressive horizontal drilling program, Defendant Lederman pushed the board to adopt such an implausible assessment, favoring the basic excel spreadsheet calculations of a Fir Tree director and employee over those generated with industry-specific software from Ultra's technical staff. ¶¶169-70, 183. The FE's accounts show that the Defendants knew what the data showed, and that it did not support their representations of their prospects. *Schueneman v. Arena Pharmaceuticals, Inc.*, 840 F.3d 698, 707 (9th Cir. 2016) (scienter based on allegation that defendants knew about negative data from "Rat Study"); *See Zaghian v. Farrell,* 675 F. App'x 718, 721 (9th Cir. 2017) ("strong inference of scienter" where defendants discussed "confidence" in product while in possession of contradictory information); *In re Forest Lab'ys Sec. Litig.*, No. 05 CIV. 2827 (RMB), 2006 WL 5616712, at \*10 (S.D.N.Y. July 21, 2006) (scienter adequately pleaded where plaintiffs alleged that defendants had "access to information" based upon receipt of study data). Therefore, this adds to the fact that Defendants knew their statements were materially false.

The December 9, 2019 meeting between Mr. Talarico and Johnson also supports Johnson's scienter. ¶128. There, Johnson admitted that he had known beforehand that the Warbonnet 9-23/24 would be atypically strong performers. *Id.* Johnson's confession that he knew the facts showing his statements were misleading when he made the statements supports a strong inference of

42

scienter. *In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1297 (N.D. Okla. 2010) ("One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting their public statements were materially inaccurate.") (quoting *Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001); *see also Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (same).In approving the horizontal drilling plan, Defendants also learned more information showing their statements were false. First, Defendants knew, based on past experience that Master Well permits were needed, and that Ultra had not obtained Master Well permits to drill in attractive new locations and would have had to wait 12 months to obtain them. ¶175. This is corroborated by the fact that, according to FE 1, Ultra just drilled horizontal wells where it already had permits to drill vertical wells. *Id.* Second, with so many more horizontal wells to drill, Ultra's technical staff did not have time to carefully select locations. *Id.* This shows that Defendants were at least deliberately reckless in not knowing their statements were materially false.

Defendants do not challenge the FE's accounts.[11] The Complaint describes the FEs' titles, tenures, and job responsibilities. The allegations above and more fully cited in the complaint more than adequately support a "probability" that the FEs "possess the information pleaded." *Adams*, 340 F.3d at 1100.

Accordingly, Plaintiffs adequately allege Defendants acted with scienter.

### 3.  Defendants Had A Motive to Commit Fraud.

Despite Defendants' arguments, Plaintiffs also plead motive. Defs. Br. at 23-24. A plaintiff may, but is not required to, plead a motive for the alleged fraud. *Matrixx*, 131 S. Ct. at 1324. If a plaintiff does so, these allegations are considered collectively with the totality of allegations in the

---

[11] Defendants argue that FE 1's allegations did not change the outcome of the three opinion statements (Defs. Br. at 19), but are silent as to the former employee allegations on scienter. *See* Defs. Br. at 22-25.

43

complaint to determine whether there exists a strong inference of scienter. *City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1261-62 (10th Cir. 2001).

Ultra exited its first bankruptcy in April 2017 with its shares held significantly by private equity investors. ¶4. Indeed, HoldCo Noteholders and purchasers in the rights offering collectively held 59% of its shares. ¶62. Private equity firms have neither the resources nor the time horizon to compete with oil and gas majors by making money from selling oil and gas. Instead, private equity firms' business model in the oil and gas industry is simple and consistent: buy undeveloped acreage whose reserves are not proved, drill a few wells to prove the reserves, and then flip their position. Thus, private equity firms' business model depends on short-term appreciation in Ultra's stock price.

Private equity firms, who held a significant portion of Ultra's shares and perhaps even a controlling position, could (and did) displace Ultra's Board of Directors and, thereby, its management. ¶160. Ignoring their wishes was a surefire way for Defendants Johnson and Watford to get fired. Further, if they did deliver short-term appreciation, Johnson and Watford could be confident that the private equity firms would sell their stake – thus ridding Johnson and Watford of these obnoxious and powerful shareholders.

Johnson and Watford thus had a motive to deliver exactly the short-term appreciation the private equity firms demanded. They followed the private equity business plan. They drilled a few showpiece horizontal wells and claimed they were indicative rather than exceptional. But, problematically, Ultra's stock price didn't soar, and the private equity firms didn't sell out. Fir Tree was shocked: "the public markets' response has been really unbelievable to us." ¶152.

The private equity firms were the proverbial one-trick pony whose trick had not succeeded: they had no choice but to try again. The first wells were predictably exceptional, because they had been designed to be. Perhaps Ultra would get lucky and the next wells would be exceptional, too. Either way, private equity firms like Fir Tree, with limited time horizons and resources, had no

44

other way to profit from their oil and gas investments. Thus, this is a case where Defendants "may

have thought that there was a chance that the situation [] would right itself":

> If so, the benefits of concealment might exceed the costs. Investors do not like to think they're riding a roller coaster. Prompt disclosure of the truth would have caused Tellabs's stock price to plummet, as it did when the truth came out a couple of months later. ***Suppose the situation had corrected itself.*** [] It is like embezzling in the hope that winning at the track will enable the embezzled funds to be replaced before they are discovered to be missing.

*Tellabs*, 513 F.3d at 710; *accord Skiadas*, 2020 WL 3268495, at *11.

Defendants rely extensively on *Nguyen v. Endologix*, 962 F.3d 405 (9th Cir. 2020). There,

though, the plaintiffs alleged that the defendants sought the FDA's blessing of a drug there was no

chance it would approve. It was as if the embezzler spent the money on personal consumption and

somehow hoped not to get discovered. Thus, *Nguyen* applies to the narrow set of cases where the

plaintiffs allege the defendants knew their scheme would not succeed – not here, where the

Defendants allegedly concealed ***risks*** that could make their scheme unsuccessful. *Skiadas*, 2020

WL 4208442, at *8.

Finally, Defendants argue that this is a case where "the executive were overly optimistic

and failed to give adequate weight to the financial red flags, for the plaintiff supply little reason to

suspect malevolence rather than benign optimism." Def Br. at 25, quoting *Anderson v. Spirit

Aerosystems,* 827 F.3d 1229, 1238 (10th Cir. 2016). Rather, the Defendants weighed the red flags

– internally. They concealed their reckless gamble from the public in the hopes that wells four and

five would accomplish what wells one and three had not. Further, Plaintiffs allege specific facts

showing that Defendants had actual knowledge.

The Fir Tree Defendants and the Ultra Defendants also incorrectly claim that their lack of

insider sales is dispositive. *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 n.12 (10th Cir.

2003)("We will not, as defendants request, infer from the fact that they did not sell their Novell

stock that they lacked motive to defraud investors."); *Am. W. Holding Corp.*, 320 F.3d at 944 ("In

other words, the lack of stock sales by a defendant is not dispositive as to scienter."). Moreover,

45

because Ultra's stock price did not increase – "unbelievably", in Fir Tree's view – Fir Tree could not sell and make a profit. ¶152 ("The disclosures were clearly not having their intended effect.").

Plaintiffs' theory of scienter is simple, cogent, and compelling. Upon exiting bankruptcy, Defendants attempted to drive up their stock price. Therefore, Defendants told investors they were exiting bankruptcy in growth mode. When that did not work, Defendants turned to horizontal drilling to inflate its stock. However, the misrepresentations did not have their intended effect, and Ultra was forced to reveal the truth, causing its stock to plummet.

Considering the facts holistically, this theory is at least as likely as any opposing inference. Therefore, Defendants' arguments must fail.

## II.    DEFENDANTS MICHAEL D. WATFORD, C. BRADLEY JOHNSON, FIR TREE CAPITAL MANAGEMENT, AND EVAN LEDERMAN ARE LIABLE UNDER THE EXCHANGE ACT AS CONTROL PERSONS.

### A.  Defendants Watford and Johnson are Liable for Control Person Claims.

Defendants Watford and Johnson sole argument that they are not liable for control-person liability claims under Section 20(a) of the Exchange Act is that Plaintiffs fail to plead a Section 10(b) claim. *See* Defs. Br. at 25, n. 5. In light of the fact that Plaintiffs' primary violation allegations are sufficient to state a claim for relief, Defendants Watford and Johnson are also liable for control person claims. *See In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1014 (D. Colo. 2016) (upholding claims under Section 20(a) where plaintiff pleaded primary violation).

### B.  Defendant Lederman and Fir Tree are Liable for Control Person Claims.

Under Section 20(a), a plaintiff must allege both: "(1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person." *Adams*, 340 F.3d at 1107. Control is a "complex factual question" not "ordinarily subject to resolution on a motion to dismiss." *SemGroup*, 729 F. Supp. 2d at 1303 (N.D. Okla. 2010); *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1306 (10th Cir. 1998).

46

Because § 20(a) is remedial in nature, it "is to be construed liberally" and dismissal is only warranted "when a plaintiff does not plead any facts from which it can be reasonably inferred the defendant was a control person." *Id.* at 1302-04; *Maher*, 144 F.3d at 1305. Further, the Tenth Circuit requires neither allegations that a defendant culpably participated in the wrongdoing nor even that the defendant actually exercised control. *Maher*, 144 F.3d at 1305. Thus, because a defendant's control is not a circumstance of fraud, it need not be pled with particularity.

Further, the Court can reject Lederman's argument that the Complaint does not show his control because it depends on the premise that plaintiffs must allege actual control (Lederman Br. at 11-12), while *Maher* held that the mere possession of power, and even indirect power at that, suffices regardless of whether it is exercised. *Maher*, 144 F.3d at 1305. In *Adams*, which Defendants cite, there were no other than that the "person was a member of a corporation's board of directors". 340 F.3d at 1108.

First, the Complaint adequately state a claim for violation of Section 10(b). Second, to establish control, Plaintiffs "need only allege facts indicating the defendant had possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *In re NPS Pharms., Inc. Sec. Litig.,* 2007 WL 1976589, at *6 (D. Utah July 3, 2007).

Defendants Fir Tree and Lederman make multiple arguments as to why they are not control persons. Specifically, Fir Tree and Lederman argue that: (i) neither Fir Tree nor Lederman controlled a primary violator of the Act or their statements; (ii) Fir Tree did not control Lederman in his capacity as an Ultra director; and (iii) Fir Tree acted in good faith and did not induce a primary violation of the securities laws. Fir Tree Br. at 2-3; Lederman Br. at 2. These arguments are unpersuasive and ignore the detailed accounts of four former Ultra employees, and the statements made by Watford to Mr. Talarico that support Plaintiffs' allegation.

47

Defendant Fir Tree claims it did not have control over Ultra because they held a minority stake and did not elect a majority of directors.  Fir Tree Br. at 6-10. Contrary to Defendants' arguments, the Complaint makes particularized allegations showing exactly how Lederman and Fir Tree controlled Ultra, beyond just appointing directors. ¶¶165-88. First, Fir Tree's business model is to drill horizontal wells and then boast of the results so they can sell their shares.  ¶¶146-48. Second, the press release that announced Fir Tree's involvement stated that the company's public statements would thenceforth emphasize concerning horizontal developments. ¶¶225-27. Third, Defendant Lederman stated that after Fir Tree's involvement, Ultra had "dramatically improv[ed] investor communications and transparency", including "regarding [Ultra's] horizontal program." ¶228. Thus, the Complaint sufficiently alleges that Lederman and Fir Tree possessed the power—and though not required, that they exercised that power—to control the specific statements the Complaint alleges are actionable.

Fir Tree and Lederman also controlled Ultra's operations.  First, Defendant Watford admitted to Mr. Talarico that Fir Tree controlled Ultra. ¶164. Fir Tree also appointed two of Ultra's directors in 2016 prior to Lederman's appointment. ¶156. Additionally, four former employees corroborate Watford's statement and reported how Lederman controlled the direction of Ultra's operations and inserted himself into lower-level employees' work. ¶¶165-188.  He had his right-hand man create a parallel model to overestimate reserves, and used this model's output to push the Board to approve more horizontal drilling. ¶180. Thus, here, unlike in the cases cited by Lederman and Fir Tree, "Plaintiffs have alleged that these defendants actually exerted some measure of control, as supported by the company's own admission." *Yellowdog Partners, LP v. Curo Grp. Holdings Corp.*, 426 F. Supp. 3d 864, 878 (D. Kan. 2019); *see e.g. Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1133 (D. Colo. 2017)(cited by Defendants stating that "plaintiffs allegations fail to show that the Venture Capital Defendants had the power to direct or cause the direction of management and policies of Clovis.").

48

Fir Tree's characterization of the Plaintiffs' claims about its control over Mr. Lederman in his capacity as an Ultra Director as conclusory is also mistaken. Fir Tree nominated Lederman and could have removed him if it disapproved of his actions. Further, Lederman was a partner at Fir Tree for nearly a decade, ¶33, and represented Fir Tree on multiple Boards of Directors of oil and gas companies, including SandRidge Energy, Inc., Jones Energy Inc., Linn Energy Inc., and Legacy Reserves LP. ¶32. Finally, Lederman did exactly what Fir Tree wanted: pushed to develop horizontal wells quickly so Fir Tree could exit its position. ¶¶2, 148. Contrary to Fir Tree's argument that Plaintiffs have failed to show Fir Tree controlled Lederman or Ultra, these facts show that Lederman was acting on Ultra's behalf and managed Ultra's strategy. Accordingly, Plaintiffs are not simply arguing *respondeat superior* but have pled facts that demonstrate that Lederman (and Teno)'s mandates and interventions were done on Fir Tree's behalf.[12]

The same allegations demonstrate that Lederman had control over Ultra and that he possessed the power to direct or cause the direction of Ultra's the management and its policies. *Molycorp,* 157 F. Supp. 3d at 1018. Defendant Lederman held a meeting with Johnson and members of Ultra Petroleum's technical team in which he ordered them to focus on horizontal drilling. ¶168. He personally overrode the technical staff at that meeting, telling Ultra's management and its technical team that Ultra would never drill another vertical well in Pinedale. ¶170. As a result of Lederman's demands, the company changed their budget for additional horizontal testing. ¶171. Lederman also pushed the layman excel reports of a Fir-Tree employee over Ultra's technical staff to the Board to champion his prefer drilling policies. ¶¶177-80. Minimizing the technical staff, his efforts also led the Board to ignore the entirety of possible drilling outcome, focusing only on the most positive. ¶¶180-82.  He also directed Ultra employees

---

[12] Additionally, Fir Tree argues that they acted in "good faith" by not selling stock. Fir Tree Br. at 13-14. However, "good faith is an affirmative defense, thus inappropriate for the Court to consider on a motion to dismiss" and Fir Tree cites no case where the lack of stock sales meets the standard to show they are entitled to the defense. *In re Thornburg Mortg. Sec. Litig*., 824 F. Supp. 2d 1214, 1245 n.21 (D.N.M. 2011) (citing *Adams*, 340 F.3d at 1109 n.5.)).

49

in their day-to-day tasks and circumvented company executives. ¶¶186-88. Thus, the Complaint's allegations show Lederman "clearly possessed 'the power to direct or cause the direction of the management and policies of [Ultra]." *Maher*, 144 F.3d at 1305.

Fir Tree argues that the Court should not credit allegations from Mr. Talarico's complaint. Fir Tree Br. at 8. Courts routinely credit third party lawsuits and treat the allegations like any other confidential witness. *See In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1199 (9th Cir. 2015) (relying on allegations in an FTC complaint and settlement); *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 706–07 (9th Cir. 2012) (relying on allegations in an SEC complaint incorporated into the plaintiff's pleadings); *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 593 (N.D. Cal. 2019) (allegations in an SEC complaint incorporated into the plaintiff's pleadings). Here, Mr. Talarico reports in detail conversations he personally held, as well as the date on which they were held. His allegations are reliable and should be credited.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions to dismiss in their entirety.[13]

Dated: June 29, 2022                    BERENS LAW LLC

/s/ Jeffrey A. Berens          .
Jeffrey A. Berens
2373 Central Park Boulevard, Suite 100
Denver, Colorado 80238
Telephone: (303) 861-1764
Facsimile: (303) 395-0393
jeff@jberenslaw.com

---

[13] If the Court concludes that Plaintiffs' Complaint is deficient in any regard, Plaintiffs respectfully request leave to amend. *See Osher v. JNI Corp.*, 183 F. App'x 604, 605 (9th Cir. 2006) ("Leave to amend is to be granted with extreme liberality in securities fraud cases, because the heightened pleading requirements imposed by PSLRA are so difficult to meet."); *In re Qwest Communs. Int'l, Inc. Sec. Litig.*, 396 F. Supp. 2d 1178, 1209 (D. Colo. 2004) (granting leave to amend complaint in addition to previous amendments).

*Liaison Counsel*

LEVI & KORSINSKY, LLP
Nicholas I. Porritt
Adam M. Apton
Adam C. McCall
1101 30th Street N.W., Suite 115
Washington, D.C. 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121
nporritt@zlk.com
aapton@zlk.com
amccall@zlk.com

BRAGAR EAGEL & SQUIRE, P.C.
Melissa A. Fortunato
Marion Passmore
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 568-2124
Email: fortunato@bespc.com
Email: passmore@bespc.com

*Co-Lead Counsel for Plaintiffs*

51

## CERTIFICATE OF SERVICE

I, Jeffrey A. Berens, an attorney, hereby certify that on June 29, 2022, I caused a true and correct copy of the foregoing "PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS" to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List.

I certify under penalty of perjury that the foregoing is true and correct. Executed on June 29, 2022.

/s/ Jeffrey A. Berens           .
Jeffrey A. Berens