# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Regina M. Rodriguez

Civil Action No. 20-cv-02652-RMR-STV (consolidated for all purposes with Civil Action No. 20-cv-02820)

---

ULTRA PETROLEUM INVESTOR GROUP, Individually and on behalf of all others similarly situated,

       Plaintiffs,

   v.

MICHAEL D. WATFORD,
C. BRADLEY JOHNSON,
ULTRA PETROLEUM, INC.,
FIR TREE CAPITAL MANAGEMENT LP N/K/A FIR TREE PARTNERS, INC., and
EVAN LEDERMAN,

       Defendants.

---

## REPLY BRIEF SUPPORTING THE MOTION TO DISMISS OF DEFENDANTS MICHAEL D. WATFORD AND C. BRADLEY JOHNSON

---

David Holman
CRISHAM & HOLMAN LLC
2549 West Main Street, Suite 202
Littleton, CO 80120
(720) 739-2176

Joshua Z. Rabinovitz
Anne I. Salomon
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(312) 862-2284

*Counsel for Defendants Michael D. Watford and C. Bradley Johnson*

**Table of Contents**

Preliminary Statement ..........................................................................................................................1

Argument ...............................................................................................................................................2

I.    Plaintiffs Do Not Plead An Actionable Fraudulent Statement. .....................................2

      A.    Plaintiffs Do Not Plead Facts Establishing That Any Statement About
            Ultra's Plans For 2017 Vertical Drilling Is Actionable......................................................2

            1.    Plaintiffs Do Not Allege Any Statement Regarding 2017 Vertical
                  Drilling Was False Or Misleading.............................................................................2

            2.    Four Of The Statements Are Protected By The Safe Harbor For
                  Forward-Looking Statements....................................................................................4

            3.    Plaintiffs' Claim Regarding Statements About 2017 Vertical Drilling
                  Is Barred By The Statute Of Limitations.................................................................5

      B.    Plaintiffs Do Not Plead Facts Establishing That Any Statement About
            Horizontal Drilling Is Actionable.........................................................................................6

            1.    Plaintiffs Do Not Plead With Particularity That Any Statement Of
                  Fact Regarding Horizontal Drilling Was False Or Misleading.........................6

            2.    One Statement Regarding Horizontal Drilling Is Protected By The
                  Statutory Safe Harbor............................................................................................13

            3.    Plaintiffs Do Not Plead That Any Statement Of Opinion Regarding
                  Horizontal Drilling Was False Or Misleading. .....................................................14

      C.    Plaintiffs Do Not Plead Facts Establishing That Any Statement About
            Corporate Governance Is Actionable..................................................................................17

II.   Plaintiffs Do Not Plead With Particularity Facts Giving Rise To The Requisite "Strong
      Inference" That Any Defendant Acted With Scienter. .................................................19

III.  The Court Should Deny Plaintiffs' Request For Leave To Amend. ...........................24

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ........................................................................................16

*Anderson v. Spirit Aerosystems*,
827 F.3d 1229 (10th Cir. 2016) .................................................................2, 17, 20, 24

*Carroll v. Lawton Indep. Sch. Dist.*,
805 F.3d 1222 (10th Cir. 2015) ......................................................................................24

*City of Hialeah v. FEI*,
289 F. Supp. 3d 1162 (D. Or. 2018).............................................................................13

*Emps. Ret. Sys. v. The Williams Cos.*,
889 F.3d 1153 (10th Cir. 2018) ........................................................................................3

*GFF Corp. v. Assoc. Wholesale*,
130 F.3d 1381 (10th Cir. 1997) ........................................................................................3

*In re Gold Res. Sec. Litig.*,
957 F. Supp. 2d 1284 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir. 2015) ....................................5

*Golub v. Gigamon*,
372 F. Supp. 3d 1033 (N.D. Cal. 2019).........................................................................14

*KBC Asset Management v. DXC Technology Co.*,
19 F.4th 601 (4th Cir. 2021) ................................................................................... 15, 16

*In re Level 3 Commc'ns Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ......................................................................................23

*Lorusso v. Boulder Brands*,
2017 WL 4365180 (D. Colo. Mar. 1, 2017)..................................................................5

*Manasfi v. Malone*,
2007 WL 891871 (D. Colo. Mar. 22, 2007)..................................................................6

*Marsh Group v. Prime Retail*,
46 F. App'x 140 (4th Cir. 2002) .....................................................................................13

*McDonald v. Kinder-Morgan*,
287 F.3d 992 (10th Cir. 2002) (reaffirmed by *Emps. Ret. Sys.*, 889 F.3d at 1165) ..............................4

*Merck v. Reynolds*,
559 U.S. 633 (2010)..........................................................................................................................5, 6

*In re MGP Ingredients Sec. Litig.*,
2021 WL 3885655 (D. Kan. Aug. 31, 2021).................................................................. 22, 25

*MHC Mut. v. Sandler O'Neill & Partners*,
761 F.3d 1109 (10th Cir. 2014) ....................................................................................................2, 24

*In re Molycorp Sec. Litig.*,
157 F. Supp. 3d 987 (D. Colo. 2016) ........................................................................................16

*Nguyen v. Endologix*,
962 F.3d 405 (9th Cir. 2020)..............................................................................................................22

*Omnicare v. Laborers Dist. Council*,
575 U.S. 175 (2015)...........................................................................................................................17

*Smallen v. The Western Union Co.*,
950 F.3d 1297 (10th Cir. 2020) .................................................................................................2, 21

*Weinstein v. McClendon*,
757 F.3d 1110 (10th Cir. 2014) ..................................................................................................20

## Statutes

15 U.S.C. § 78u-5(i)..........................................................................................................................4

## Rules

Federal Rule of Civil Procedure Rule 9 .........................................................................................14

Federal Rule of Civil Procedure Rule 10b-5 ...................................................................................3

**Preliminary Statement**

Plaintiffs' opposition brief continues their strategy of incorrectly characterizing the statements they allege were fraudulent, and ignoring what the statements actually said.  Thus, Plaintiffs assert Ultra announced in April 2017 that it was "in position to drill new blockbuster wells."  Dkt. #91 ("Pl. Opp.") at 1.  But they identify no such statement; the alleged misstatements actually discussed specific metrics about vertical drilling that Plaintiffs do not allege were false or misleading.  Similarly, Plaintiffs assert that after Ultra drilled its three horizontal test wells, Defendants "claimed investors could expect similar wells in the future."  *Id.* at 2.  But, again, they identify no such statement; the alleged misstatements actually addressed horizontal drilling's *potential* to expand the field *generally*, which Plaintiffs do not allege was inaccurate.  At base, Plaintiffs are attempting to bootstrap a mismanagement claim into a claim for securities fraud.  They devote pages of their brief to their allegations that Defendants made poor business decisions in adopting a strategy to focus on horizontal drilling—disagreeing with technical experts; not planning sufficiently; moving too quickly.  But alleging it was a poor decision for Ultra to focus on horizontal drilling does not allege fraud; Plaintiffs fail to identify any statement rendered false or misleading by their allegations of poor decision-making.

Plaintiffs' brief also continues to argue for the implausible and nonsensical inference that Defendants redirected Ultra to horizontal drilling and falsely touted the benefits of that strategy to investors even though they "knew it would fail."  *Id.* at 2.  Plaintiffs cannot explain why individuals and entities who owned hundreds of millions of dollars of Ultra stock would knowingly choose to fail. Plaintiffs now argue that Defendants were chasing some small chance that horizontal drilling would accidentally succeed, but that does not make sense either, because it assumes Defendants would have chased a slight chance of making a larger profit despite the much greater chance of losing everything, which would have been irrational.  And they offer no plausible motive for Defendants to have misled

investors with public statements certain to be quickly disclosed as inaccurate.

Nothing in Plaintiffs' brief should distract from the fundamental nature of this case. Ultra embarked on a new strategy of horizontal drilling. Estimating the performance of a new venture is difficult. Ultimately, Ultra's results were disappointing, but there is a difference between being wrong and being a liar. The former does not suggest the latter. *See Smallen v. The Western Union Co.*, 950 F.3d 1297, 1309 (10th Cir. 2020); *MHC Mut. v. Sandler O'Neill & Partners*, 761 F.3d 1109, 1114 (10th Cir. 2014). Knowing deception in estimating future results "is possible, but it is more probable that the [] executives were overly optimistic." *Anderson v. Spirit Aerosystems*, 827 F.3d 1229, 1238 (10th Cir. 2016). That is the strongest inference from Plaintiffs' allegations, which is fatal to their claims.

**Argument**

**I.      Plaintiffs Do Not Plead An Actionable Fraudulent Statement.**

      **A.      Plaintiffs Do Not Plead Facts Establishing That Any Statement About Ultra's Plans For 2017 Vertical Drilling Is Actionable.**

            **1.      Plaintiffs Do Not Allege Any Statement Regarding 2017 Vertical Drilling Was False Or Misleading.**

Watford and Johnson's opening brief addressed, individually, each of the six supposedly fraudulent statements regarding Ultra's plans for 2017 vertical drilling. Dkt. #84 ("W&J Br.") at 7-9. Plaintiffs' primary response ignores what the statements actually said and argues generally that the statements "omitted to disclose that Ultra had not prepared the field for its 2017 drilling program." Pl. Opp. 22. But none of the statements said Ultra *had* "prepared the field" for 2017—or anything about preparation for 2017. Rather, each statement concerned specific facts or metrics about expectations for 2017 vertical drilling, and Plaintiffs do not allege that any of those facts or metrics was inaccurate. W&J Br. 7-9. Plaintiffs' brief does not contest Watford and Johnson's arguments on these points. They argue their allegations regarding Ultra's supposed lack of preparation are pled with sufficient

2

particularity (Pl. Opp. 21-22), but Watford and Johnson do not challenge the particularity of those allegations, they challenge whether the particular facts alleged establish that any of the six statements was false or misleading. Plaintiffs do not even argue that they do. This alone is dispositive of Plaintiffs' claim regarding the statements about 2017 vertical drilling.

Plaintiffs address only one of the statements specifically—Johnson's supposed "yes" response to a question whether "4 Bcf per well [is] still the right number." Compl. ¶ 104. The complaint alleges the answer "yes" was misleading because "Ultra could not maintain 4 Bcf wells through 2017." *Id.* ¶ 105. However, Plaintiffs' brief does not dispute that their complaint lacks any allegation that Ultra did not maintain 4 bcf wells through 2017. Indeed, Ultra's public statements about actual 2017 results, which Plaintiffs do not allege were false, disclosed Ultra *did* maintain 4 bcf through 2017. W&J Br. 3, 8. Consequently, Plaintiffs do not plead facts establishing the statement was false or misleading.[1]

Finally, Plaintiffs rely on non-controlling decisions to argue that, although accurate, the allegedly fraudulent statements left investors with some sort of general misimpression (which Plaintiffs fail to articulate). Pl. Opp. 22-23. Plaintiffs ignore that the Tenth Circuit has spoken definitively on this issue. First, it has rejected the contention "that 'once a disclosure is made, there is a duty to make it complete and accurate.'" *Emps. Ret. Sys.*, 889 F.3d at 1164. "This proposition," the court wrote, "has no support in the case law." *Id.* Rather, Rule 10b-5 "prohibit[s] *only* misleading and untrue statements, not statements that are incomplete." *Id.* (emphasis in original). The Tenth Circuit has also explained

---

[1] Because Plaintiffs fail to allege Ultra did not maintain 4 bcf wells through 2017, the Court need not address the secondary argument that Johnson did not actually express an expectation for 4 bcf wells, but rather said it was too early to report the results of Ultra's experiment with "frac stages." W&J Br. 8-9. Plaintiffs argue the Court must "credit" their interpretation of the statement, but the Court can read the statement for itself. Ex. 2 at 11. "[F]actual allegations that contradict [] a properly considered document are not well-pleaded facts that the court must accept as true." *GFF Corp. v. Assoc. Wholesale*, 130 F.3d 1381, 1385 (10th Cir. 1997); *Emps. Ret. Sys. v. The Williams Cos.*, 889 F.3d 1153, 1163 (10th Cir. 2018) (rejecting a plaintiff's unreasonable interpretation of an allegedly fraudulent statement).

when a statement is misleading: only if an omitted fact "alters the meaning of the statement" that was actually made. *McDonald v. Kinder-Morgan*, 287 F.3d 992, 998 (10th Cir. 2002) (reaffirmed by *Emps. Ret. Sys.*, 889 F.3d at 1165). In *McDonald*, the plaintiffs alleged that the defendant's revenue disclosures were misleading because the defendant failed to disclose that those revenues were at risk in the future because of undisclosed contractual issues. *Id.* at 994-95. The court rejected the argument that the statements were misleading, explaining that "the risks associated with the … contracts did not make the statements in the 10-Q … any less true than they would have been had [the defendant] decided to volunteer that information." *Id.* at 998. These controlling decisions foreclose Plaintiffs' unelaborated arguments that Watford or Johnson failed to disclose material information and that investors would have had some general misimpression regarding Ultra's plans for 2017 vertical drilling.

### 2. Four Of The Statements Are Protected By The Safe Harbor For Forward-Looking Statements.

The statutory safe harbor for forward-looking statements is an independent reason to dismiss four of the six allegedly fraudulent statements. W&J Br. Part I.A.2. Plaintiffs respond that the four statements were not forward-looking "because they concealed and/or obscured the fact that Defendants had failed to produce enough drilling pads to support an 8-rig drilling plan." Pl. Opp. 25. But Plaintiffs acknowledge that the meaning of "forward-looking" is defined by statute. *Id.* at 24. And that definition turns on what a statement includes, not what it omits. *See* 15 U.S.C. § 78u-5(i). Consequently, Plaintiffs' argument that something was omitted from the statements is irrelevant to whether they were forward-looking. Plaintiffs do not dispute that the four statements themselves were statements "of future economic performance," which the statute includes in the definition of forward-looking statement. *Id.* § 78u-5(i)(1); W&J Br. 9.

Plaintiffs also argue Ultra's cautionary language was not meaningful because "reasonable

4

minds" could disagree whether the forward-looking statements were "misleading." Pl. Opp. 25. But whether the forward-looking statements were misleading is not relevant to whether the cautionary language is meaningful—the two issues are independent of one another. Plaintiffs rely on non-controlling decisions to argue otherwise (*id.*), but ignore the Tenth Circuit's controlling decisions, which are directly on point and were discussed in Watford and Johnson's opening brief. W&J Br. 10-11.[2]

Finally, Plaintiffs argue the complaint alleges Johnson knew the forward-looking statements were false at the time he made them because he knew at the time that Ultra "was drilling on legacy pads and in sub-optimal locations." Pl. Opp. 26. But they offer no explanation how that allegation establishes Johnson knew any of the four forward-looking statements was false. W&J Br. 11.

### 3. Plaintiffs' Claim Regarding Statements About 2017 Vertical Drilling Is Barred By The Statute Of Limitations.

Plaintiffs' first response regarding the statute of limitations is that the supposed truth regarding the allegedly fraudulent statements about vertical drilling was fully revealed in March 2018. Pl. Opp. 26. "Full revelation" of the "truth" is not the standard for when the two-year limitations period begins to run (W&J Br. 12), but even so March 2018 is *more* than two years before Plaintiffs filed this suit. *Id.* So Plaintiffs' own argument is fatal to their claim.

Plaintiffs next argue that courts add, apparently automatically, in Plaintiffs' view, "six to twelve months" after inquiry notice before the limitations period begins to run. Pl. Opp. 27. The Supreme Court rejected this argument in *Merck v. Reynolds*, 559 U.S. 633 (2010), holding that the limitations period "begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have

---

[2] Ultra's cautions addressed the very types of forecasts expressed in the forward-looking statements. W&J Br. 10-11. Plaintiffs criticize the cautions as "general," but "[e]ven 'mere boilerplate' cautionary statements"—which Ultra's were not—"have been upheld as sufficient." *In re Gold Res. Sec. Litig.*, 957 F. Supp. 2d 1284, 1297 (D. Colo. 2013), *aff'd*, 776 F.3d 1103 (10th Cir. 2015); *see also Lorusso v. Boulder Brands*, 2017 WL 4365180, *11 (D. Colo. Mar. 1, 2017) (same).

discover[ed] the facts constituting the violation—whichever comes first." *Id.* at 653 (internal quotes omitted). None of the decisions Plaintiffs cite post-date *Merck*. And *Merck*'s application here is clear: Both the November 2017 statements that Plaintiffs' complaint alleges "admitted" the supposed fraud (W&J Br. 11-12), and the March 2018 statement that Plaintiffs now argue "fully revealed" it (Pl. Opp. 26), were public. Plaintiffs' own precedent holds that investors are charged with knowledge of public statements issued by the defendant corporation. Pl. Opp. 27 (*citing Manasfi v. Malone*, 2007 WL 891871, *1 (D. Colo. Mar. 22, 2007) (holding that the plaintiff was on notice no later than "when Defendants issued a press release about…")). Thus, under *Merck*, the limitations period began to run based on actual notice more than two years before Plaintiffs filed this suit.

Finally, Plaintiffs argue they "could not have 'discovered facts sufficient to form a complaint' until they were put on inquiry notice by interviewing the former employees cited in Plaintiffs' complaint." Pl. Opp. 27. But, again, inquiry notice is not relevant here. Moreover, the facts attributed to the former employee are at most peripheral to Plaintiffs' claim. The only allegation regarding vertical drilling that Plaintiffs attribute to a former employee is that Ultra's board "approved the 2017 drilling plan in Q1 2017 at the latest." *Id.* Plaintiffs argue that allegation is "invaluable" to showing that Johnson made the statements with scienter, but they fail to articulate how board approval of the drilling plan for 2017 establishes that Johnson knew the specific metrics in the alleged misstatements would be inaccurate (particularly because Plaintiffs do not allege they were inaccurate).

### B.    Plaintiffs Do Not Plead Facts Establishing That Any Statement About Horizontal Drilling Is Actionable.

#### 1.    Plaintiffs Do Not Plead With Particularity That Any Statement Of Fact Regarding Horizontal Drilling Was False Or Misleading.

Plaintiffs' discussion of horizontal drilling similarly ignores what the supposedly fraudulent statements actually said, beginning with the disclosures of the results of the three test wells. Although

6

Plaintiffs assert that Watford and Johnson had orchestrated the test well locations so that each pro-

duced exceptional results, they ignore that Ultra disclosed, at the time, that the test wells produced

*varied* results: initial production from two of the wells exceeded 50 mmcfe/day, but the other test well's

production was only 17 mmcfe/day.  W&J Br. 4-5; Ex. 6 at 2.  Thus, from the start Ultra's disclosures

demonstrated that horizontal drilling was *not* certain to achieve outstanding results in every instance,

and that Ultra, and Watford and Johnson, could not control those results, even on the test wells, when

they had every incentive to maximize their likelihood of success.[3]  Plaintiffs pretend that Watford and

Johnson told investors future horizontal drilling would achieve results like the two high-producing

test wells.  Pl. Opp. 2.  But they fail to identify any such statements, which would have been incon-

sistent with the varied test well results Ultra actually disclosed.

Regarding the specific alleged misstatements, Plaintiffs first address the August 2017 state-

ments that the horizontal test wells were an "experiment" (Compl. ¶¶ 190-91), arguing that the state-

ments "materially misrepresented the purpose and status of Ultra's horizontal drilling program and

omitted to disclose that they were cherry-picking results."  Pl. Opp. 28.  But Plaintiffs do not allege

any facts establishing that Defendants misrepresented the purpose of the horizontal test wells.  To the

contrary, Plaintiffs *acknowledge* that Defendants "told investors that they would 'test' *the concept* of using

horizontal wells to expand the Pinedale anticline."  *Id.* at 7 (emphasis added).  After all, Ultra's only

other attempt at horizontal drilling, in 2016, had not been profitable.  *Id.* at 10.  That proving the

concept of horizontal drilling might cause the stock price to increase does not render the statements

---

[3] The disclosures also demonstrate the inaccuracy of Plaintiffs' repeated assertion that Ultra's technical staff had selected "a single perfect location."  *E.g.*, Pl. Opp. 2.  Ultra never drilled in a single location, not even for the test wells.  Compl. ¶ 122.  In addition, the disclosures demonstrate the inaccuracy of Plaintiffs' assertion that the next two wells after the test wells "were vastly inferior to the test wells."  Pl. Opp. 17.  As Plaintiffs acknowledge, one of those next two wells had an initial production of 28.5 mmcfe/day—in other words, 67% *better* than the test well that produced 17 mmcfe/day.  *Id.*

false or misleading. Nor do Plaintiffs allege Ultra had other horizontal drilling results that it failed to disclose, such that it was "cherry-picking results." At base, what Plaintiffs seem to imply is that something is not an experiment where a company puts resources into planning it and tries hard to maximize the chances of the experiment succeeding. But Ultra disclosed contemporaneously with the allegedly fraudulent statements that it had devoted extensive time to planning the test wells. Ex. 4 at 5. It also disclosed it was "prioritizing targets based on quality." Ex. 5 at 11. For that reason, as well as the other reasons explained previously, Plaintiffs' argument is baseless. W&J Br. 14-15.

Next, Plaintiffs address the statement in Ultra's 3rd quarter 2017 press release that it had "successfully drilled and completed a 2-mile horizontal well on the east flank of Pinedale." Pl. Opp. 28 (discussing Compl. ¶ 195). Plaintiffs argue the statement was false because "[t]hese wells were located in the core, not the fringe, of the Pinedale field." *Id.* at 29. But Ultra expressly disclosed, at the time, that the horizontal wells were being drilled from the Warbonnet Pad. Compl. ¶ 199. Moreover, Plaintiffs do not dispute that a horizontal well's surface location does not indicate the area below the surface—up to two miles away—the well reaches. W&J Br. 14. Indeed, a central purpose of Ultra's horizontal drilling program was to access resources beyond the development boundary of Pinedale from surface locations and existing infrastructure located *inside* the development boundary. These arguments alone are sufficient to demonstrate Plaintiffs do not plead this statement was false or misleading.

But Ultra's disclosures went even further. As explained in Watford and Johnson's opening brief, on the same day it issued the press release, Ultra published a map showing the surface location and underground trajectory of the well in question. W&J Br. 14; Ex. 12 at 19. The map indicated that the well started in the core, drilled laterally through part of the core, and ended by accessing the eastern flank. *Id.* Plaintiffs respond to this by arguing the Court cannot accept the map "for the truth of its

8

contents." Pl. Opp. 31. But Watford and Johnson do not submit the map for its truth; they submit the map to show that—true or false—Ultra disclosed at the time of the supposed misstatement that the well began in the core, the precise information that is Plaintiffs' only basis for contending the supposed misstatement in the press release was inaccurate.

Plaintiffs cannot seriously dispute that the Court can consider that this information was disclosed at the time. Instead, Plaintiffs retreat to the argument that the map is unintelligible, that "it would take a clairvoyant expert to ferret out the information Defendants claim appears in it." Pl. Opp. 31. As an initial matter, this argument is simply not credible. Any reasonable person (and particularly a reasonable investor in a gas exploration company) could look at the map and within seconds see where the horizontal well in question was located (it is labeled with a big box that says "Warbonnet 9-23-A-1H"), where it traveled underground, and how those locations compare to previously drilled vertical wells. Ex. 12 at 19. But more than that, Plaintiffs ignore that Ultra did not just publish the map and rely on investors to analyze it on their own. Rather, Johnson discussed the map during Ultra's 3rd Quarter 2017 earnings call the same day—indeed, the presentation containing the map was a companion piece to the earnings call, not an independent publication. Ex. 5 at 7-8. Johnson devoted nine paragraphs of the earnings call transcript to detailing each of the horizontal wells identified on the map, including but not limited to information as to the wells' location and orientation on the map.[4] In doing so, Johnson publicly stated that one of the test wells "will be landed 2,600 feet

---

[4] Johnson's detailed explanation of this map also dispels Plaintiffs' farcical argument that "the map does not even include a legend identifying North, South, East, and West, without which investors cannot determine in which direction the lines go." Pl. Opp. 31. In describing each of the identified wells, Johnson explicitly oriented investors: "let's start with the southernmost well and we will work our way around the map in a clockwise fashion." Ex. 5 at 7; *id.* ("Moving up to the northmost well on this map…."); *id.* at 8 ("Now let's move southeast from this well which brings us to the set of three horizontal wells on" Warbonnet 9-23/24.).

9

to the north and drilled due east into the flank." *Id.* at 8.

At any event, regardless of the surface location of the test well at issue, Plaintiffs do not allege the well did not access Pinedale's flank. Without such an allegation of fact, they have no argument that the statement that the test well in question accessed the east flank of Pinedale was inaccurate. Plaintiffs argue that Ultra's Chief Operating Officer, Jay Stratton, "testified that the Warbonnet 9/23-24 wells were promising *because* they were located in the core." Pl. Opp. 31. But that is not what he said. Rather, in response to a question about differences between the two high-producing test wells and other horizontal wells, Stratton testified that "I think it was a core area for development in general in the field." Compl. ¶ 133. Thus, he did not testify that the two wells were in the core of Pinedale at all, much less that they did not access the field's flank. He testified that they were in *a* core area *for development*—in other words, an area that was targeted for development.

Plaintiffs also assert that Stratton testified during Ultra's bankruptcy proceedings "that the Warbonnet 9-23/24 actually went west." Pl. Opp. 12 (citing Compl. ¶ 134). However, the transcript of his testimony shows he did not say that. Contrary to Plaintiffs' assertion, Stratton actually testified: "Well, we're surrounded by different items or different circumstances that would prevent us from putting a pad in certain places. So, you know, the area is highly regulated in this particular location as a result of combining all those concerns into a location that would be approved by the BLM." Compl. ¶ 134. Plaintiffs' characterization of Stratton's testimony lacks any basis.

The next alleged misstatement is discussed in ¶ 198 of the complaint. Plaintiffs allege Watford said: "that *had* Defendants had the results of the first 2017 horizontal, they would have 'recalculate[d] on and come up with significantly better economics with much higher returns.'" Compl. ¶ 198 (emphasis added). This language plainly indicates that Ultra had not actually included those results, and was describing what would have happened *if it had done so.* There is nothing false or misleading about

describing how arithmetic works—that including a high producing well in a calculation would increase the total.  W&J Br. 14-15.  Plaintiffs argue that Watford's statement was false because he said "the well would force Defendants to '*re*calculate.'"  Pl. Opp. 32.  But that is not what he said, even as Plaintiffs allege it.  Compl. ¶ 198.  The Court can review the statement itself to confirm.  Ex. 5 at 15.

Next, Plaintiffs make two arguments why Johnson's January 30, 2018 statement that "the Company has completed three horizontals on the east flank, each one targeting different intervals and each one verifying the significant resource potential beyond the previous commercial boundary of the Pinedale Anticline" was fraudulent.  Pl. Opp. 29 (discussing Compl. ¶ 202).  First, Plaintiffs argue, again, that "[t]hese wells were located in the core, not the fringe."  *Id.* at 29.  This argument fails for the reasons discussed above.  *Supra* at 8-9.  Second, Plaintiffs argue the statement was false because, "rather than being representative of the field, the 'test' wells did not test anything; they were unrepresentative by design and intended to produce a manipulated unrepeatable result."  Pl. Opp. 29.  But, again, this pretends that Johnson said the test wells were representative of future results, rather than that they were intended to test the concept of horizontal drilling and to attempt to extend the boundary of what was accessible at Pinedale, thereby verifying the potential to access additional resources.  Plaintiffs do not allege the test wells did not do so.  That Ultra was not ultimately able to drill horizontal wells economically at then-prevailing gas prices does not indicate a lack of significant resource potential that horizontal drilling could access and that was not previously accessible.

Plaintiffs' argument that the statement was fraudulent because the test wells were known to be exceptional also fails because it ignores the results of the test wells as a whole, focusing instead on only two of the three test wells.  Pl. Opp. 29.  Plaintiffs do not dispute that Ultra's publicly disclosed results of the horizontal wells drilled after the test wells showed that some of those later wells performed *better* than one of the test wells.  W&J Br. 6 (citing Ex. 10 at 9).  No facts alleged in the

11

complaint support Plaintiffs' argument that the test wells produced uniformly outstanding results that later wells failed to replicate. *Supra* at 6-7.

Next, Plaintiffs address Johnson's statement that "[t]he geological nature of Pinedale does have variability and we certainly encountered that on these last two wells." Pl. Opp. 32-33 (discussing Compl. ¶ 213). Plaintiffs argue the results were not due to variability, but because the test wells were "showpieces." *Id.* However, this argument does nothing to dispute that Pinedale's geology was variable, leading to varied results—regardless of *why* it was variable. In other words, alleging the test wells were "showpieces" does not establish that Johnson's statement was inaccurate. Indeed, the widely differing results across *all* the horizontal wells—including the other test well—demonstrate that the geologic nature of Pinedale *is* variable. Plaintiffs offer no response to the opening brief's arguments. W&J Br. 16. Moreover, Plaintiffs' assertion that the test wells were "showpieces" is not supported by any allegation of fact in the complaint. Plaintiffs allege Ultra devoted time to identifying the locations where horizontal drilling was most likely to succeed and that Ultra drilled the test wells in those locations, but that does not establish Ultra or Defendants concluded there were not still other locations where horizontal drilling could succeed. Plaintiffs' argument pretends that Ultra or Watford or Johnson said that the future horizontal wells were likely to replicate the test wells' production. But they said no such thing. To the contrary, although the two high-performing test wells had initial production exceeding 50 mmcfe/day, Johnson explained in February 2018 that Ultra's "goal in 2018 is to drill horizontal wells that can each produce 30 million a day." Ex. 3 at 6. He also disclosed that the model Ultra used for its earnings guidance was 22 mmcfe/day. *Id.* at 16. Thus, Johnson was clear that he and Ultra *did not* expect future horizontal wells to perform like the two high-producing test wells. Indeed, even at 30 mmcfe/day—the higher of the two numbers Johnson disclosed—that would be less than 60% of the two high-producing test wells' production. Plaintiffs' insistence that Ultra or

12

anyone else communicated to investors an expectation that future horizontal wells would perform like two of the test wells is demonstrably inaccurate.

Finally, Plaintiffs' response regarding the alleged misstatement in ¶ 216 is wholly unsupported. Pl. Opp. 33. Plaintiffs do not dispute that the complaint alleges no facts indicating that Johnson opposed Ultra's strategy to shift capital to horizontal drilling. W&J Br. 16. Nor would it matter, for Johnson spoke on behalf of the corporation and the decision had been made by the board. Watford and Johnson rest on their opening brief's arguments. *Id.*

### 2.    One Statement Regarding Horizontal Drilling Is Protected By The Statutory Safe Harbor.

Plaintiffs' response to the argument that one alleged misstatement regarding horizontal drilling is protected by the statutory safe harbor for forward-looking statements is unavailing. W&J Br. 16-17 (discussing Compl. ¶ 204). First, Plaintiffs argue the statement was not forward-looking because it discussed Ultra's plans "right now" and because the statement that Ultra would "'stay' in the same zip code implies that they are currently in that zip code." Pl. Opp. 33-34. Plaintiffs' argument does not address the statutory definition of "forward-looking" and does not contest that the statement meets the definition. *Every* forward-looking statement is also a statement of current fact—that the statement is the speaker's current view of the future. *See, e.g.*, *Marsh Group v. Prime Retail*, 46 F. App'x 140, 146 (4th Cir. 2002) ("All projections can be characterized as presently held beliefs. The statements are forward-looking because they relate to 'future economic performance.'"). "To take the view that an expression of 'present belief' in a forward-looking statement is a 'present fact'—and therefore not itself a forward-looking statement—would work an end-run around the PSLRA's safe harbor provision." *City of Hialeah v. FEI*, 289 F. Supp. 3d 1162, 1173 (D. Or. 2018). After all, "[i]t strains logic to suggest that it is possible to make a forward looking statement that is not in at least some way based

13

on a belief about the present state of things." *Golub v. Gigamon*, 372 F. Supp. 3d 1033, 1048 (N.D. Cal. 2019). Plaintiffs' argument is inconsistent with the statute's definition and case law.

Second, Plaintiffs challenge the meaningfulness of Ultra's cautionary statements, arguing that the cautions "say absolutely nothing about horizontal wells, let alone 'repeatable' results." Pl. Opp. 34. But the cautionary language concerns the uncertainties of underground drilling, which *includes* horizontal drilling, and so is directly on-point. W&J Br. 17. And the alleged misstatement did not promise "repeatable" results; it stated Ultra *wanted* to achieve repeatable results *before* trying to drill in new locations. Plaintiffs offer no explanation why cautionary language would need to specifically address the word "repeatable" in order to be meaningful.

Finally, Plaintiffs offer only a footnote on the other way the alleged misstatement is protected by the safe harbor: that Plaintiffs fail to plead Johnson knew the statement was false. W&J Br. 17; Pl. Opp. 34 n.9. Plaintiffs' argument is not even responsive, much less persuasive.

### 3.    Plaintiffs Do Not Plead That Any Statement Of Opinion Regarding Horizontal Drilling Was False Or Misleading.

Plaintiffs do not deny that three of the allegedly fraudulent statements regarding horizontal drilling were opinions, subject to an even higher pleading burden than the already heightened pleading burden applicable under the PSLRA and Rule 9. W&J Br. 17-20 (discussing Compl. ¶¶ 120, 197, 215); Pl. Opp. 34-36. Plaintiffs first respond that one of the statements contained an "embedded statement of fact"—that Johnson saying he was "optimistic about" horizontal drilling on the flank indicates Ultra "is in fact drilling on the fringes." *Id.* at 34-35. As a starting point, Plaintiffs' argument is wrong: Expressing optimism about an activity does not indicate the activity has already begun. But, regardless, Plaintiffs do not allege Ultra was *not* drilling on the flank with its horizontal wells. *Supra* at 10.

14

Second, Plaintiffs' argument that they have satisfied the heightened pleading standard for al-
leging the opinions were fraudulent (Pl. Opp. 34) does not address the argument in Watford and
Johnson's opening brief, which discussed the specific alleged misstatements at issue, the time at which
they were made, and Plaintiffs' actual allegations. W&J Br. 18-20. Instead, Plaintiffs argue that "the
facts FE 1 reports show that the Warbonnet 9-23/24 wells were drilled as showpieces." Pl. Opp. 35.
Yet, that is not what Plaintiffs' complaint alleges. Plaintiffs allege that, according to FE 1, Ultra had
identified a "single perfect location" for horizontal drilling. Compl. ¶ 131. Plaintiffs do not allege FE
1 said that he (or anyone) had concluded there were not other locations where Ultra could be *successful*
with horizontal drilling, even if they were not "perfect." W&J Br. 19. Nor do Plaintiffs allege FE 1
said the test wells were "showpieces." That is Plaintiffs' characterization, without support in the com-
plaint's allegations of fact. Plaintiffs then use their own characterization to imply that FE 1 said the
success of the test wells was a facade and that he knew future horizontal drilling would fail. But the
complaint contains no allegation supporting that assertion. (And, as explained below, any such asser-
tion would defeat Plaintiffs' attempt to meet their burden to plead scienter. *Infra* at 19.)

Equally importantly, Plaintiffs do not allege FE 1 had told his view to Watford by the time of
Watford's November 2017 statement of opinion or to Johnson by the time of his May 2018 statement
of opinion. W&J Br. 19-20 (citing authority). Nor do they allege that Watford or Johnson agreed
with FE 1's views about the "single perfect location," even if FE 1 held those views. *Id.* (citing au-
thority).

Recent authority further amplifies the point. In *KBC Asset Management v. DXC Technology Co.*,
19 F.4th 601 (4th Cir. 2021), the Fourth Circuit addressed a securities fraud case where the plaintiffs
alleged the defendant-corporation, DXC, made optimistic statements about future success that were

15

fraudulent because it had implemented a business strategy (cost-cutting) that would hinder future suc-

cess. *Id.* at 606. The plaintiffs attempted to plead the defendants' knowledge of the impending failure

by alleging that a former officer, Stephen Hilton, "claimed he warned [DXC's CEO] that cutting costs"

would harm future performance and that several unnamed former employees "believed DXC was

heading in the wrong direction before and during the class period." *Id.* at 608-09. The court rejected

both allegations. The court held that Hilton's allegation "show[ed] only that *Hilton* believed the cuts

he was being asked to make were misguided—not that [the defendants] *agreed* with that assessment."

*Id.* at 609 (emphasis in original). "These allegations suggest a mere business disagreement among the

executives, which does not amount to securities fraud." *Id.* Concerning the allegations from the other

former employees, the court concluded that "the former employees, for the most part, do not allege

that they passed their concerns on to [the defendants] or that the individual Defendants were other-

wise aware of the problems alleged." *Id.* "The far more plausible inference here is that there was a

disagreement within DXC over the proper course forward for the company and that Defendants made

a business decision to make cuts that their former employees found questionable." *Id.* at 610.

Thus, *KBC Asset Management* highlights the deficiencies in Plaintiffs' allegations in two respects:

(1) their failure to plead that FE 1 shared his concerns with Watford or Johnson before they made any

of the three statements of opinion; and (2) their failure to plead facts establishing that Watford or

Johnson agreed with FE 1's view. Each failure is independently fatal to Plaintiffs' claim regarding

these alleged misstatements.

Plaintiffs argue that whether FE 1 communicated his view to Watford or Johnson is beside

the point because "courts in the Tenth Circuit apply a 'common-sense' approach to determine whether

a witness's testimony is probative and reliable." Pl. Opp. 35. But they then cite only *Adams v. Kinder-*

*Morgan, Inc.*, 340 F.3d 1083, 1103 (10th Cir. 2003), and *In re Molycorp Sec. Litig.*, 157 F. Supp. 3d 987,

16

1008 (D. Colo. 2016), both of which discuss only how the Tenth Circuit analyzes whether an allegation is sufficiently particularized. Neither decision says anything to contradict the precedent in Watford and Johnson's opening brief holding that a former employee's statement about some fact does not undermine the sincerity or reasonableness of a speaker's opinion if the plaintiff does not allege the former employee ever told the speaker that fact. W&J Br. 19-20. Included in Watford and Johnson's authorities is a Tenth Circuit decision directly on point, holding that a witness's allegation that he believed cost projections were unreasonable was insufficient to establish the falsity of a statement made by someone else about the cost projections because the allegation "d[id] not suggest that [the speaker] believed his cost-control efforts were unrealistic." *Anderson*, 827 F.3d at 1244-45.[5] As explained in Watford and Johnson's opening brief, when an alleged misstatement is a statement of opinion, the plaintiff can only plead the statement was false by alleging with particularity facts indicating the opinion was not the speaker's sincere opinion or did not "fairly align[] with the information" the speaker had at the time. W&J Br. 17 (citing *Omnicare v. Laborers Dist. Council*, 575 U.S. 175, 188-89 (2015)). Alleging that FE 1 had information or an opinion, but not alleging he shared that information or opinion with Watford or Johnson, does not satisfy either prong of *Omnicare*.

Finally, Plaintiffs' response on materiality is baseless. W&J Br. 20; Pl. Opp. 36. Controlling precedent holds that investors do not rely on non-quantified statements of "optimism" or "excitement." W&J Br. 20 (citing Tenth Circuit precedent).

### C.    Plaintiffs Do Not Plead Facts Establishing That Any Statement About Corporate Governance Is Actionable.

Plaintiffs' argument regarding the two allegedly fraudulent corporate governance statements

---

[5] Plaintiffs offer a short footnote attempting to rebut Watford and Johnson's four authorities by identifying irrelevant differences between the decisions and this case. Pl. Opp. 36 n.10. The footnote provides no basis to distinguish the parts of the decisions on which Watford and Johnson rely.

mischaracterizes the statements.  Plaintiffs assert "Ultra stated that the independent Chairman of the Board would have the role of 'providing guidance to and oversight of management' while the CEO would be responsible for the 'day-to-day business and operations.'"  Pl. Opp. 36.  They also assert "Defendants indicated that Ultra had mitigated the incentive for management to take risks by 'engaging both the Board and management in our internal processes to identify circumstances that may create unnecessary risk.'"  *Id.* at 36-37.  Neither assertion is accurate.

First, Ultra actually stated it believed the separation of the CEO and Chairman positions would "allow[] the Chief Executive Officer to *focus* on the day-to-day business and operations while allowing the independent Chairman of the Board to lead the board in its fundamental role of providing guidance to and oversight of management."  Compl. ¶ 206 (emphasis added).  The statement did not say day-to-day issues would be the sole province of the CEO, nor did it say the board had no additional roles other than the fundamental one the statement referenced.  Thus, Plaintiffs' argument that "Fir Tree did not limit itself to 'guidance' and 'oversight' of management" does not plead the statement was false.  Pl. Opp. 37.  Moreover, Plaintiffs' allegation is that Fir Tree or Lederman took an active role specifically in determining Ultra's adoption of the horizontal drilling strategy.  That is not a day-to-day business issue, but a strategic one.  As a result, board involvement in adopting it is not inconsistent with the alleged misstatement even as Plaintiffs (inaccurately) characterize it.  Finally, under Yukon law, the board is the ultimate decision-maker for the corporation, so no reasonable investor could have understood Ultra's statement to indicate the board would refrain from deciding any issue it saw fit to decide, including overruling management when it wanted to.  W&J Br. 21.  Plaintiffs argue Fir Tree had signed a "Cooperation Agreement" agreeing to "refrain from advising, controlling, or influencing the management of the company."  Pl. Opp. 37.  But they omit that this section of the contract concerned only "public action"—and so did not apply to internal decisions.  Compl. ¶ 161.

18

Second, Ultra did not say it had "mitigated the incentive for management to take risks," as Plaintiffs assert.  Pl. Opp. 36-37.  Taking risks is how corporations attempt to make a profit (and why investments in companies are a risk, instead of a sure thing).  Rather, Ultra stated it had mitigated management's incentive to take "*undue* risk."  Compl. ¶ 209 (emphasis added).  Plaintiffs do not allege any facts indicating Ultra's board believed it was taking undue risks.  Nor do they allege Ultra did not attempt to mitigate undue risk by involving the board in internal processes, precisely as stated.  Plaintiffs argue the complaint alleges that "Fir Tree caused Defendants to ignore internal reports and bet the company on a single plan that was unsubstantiated by internal data and opposed by management and Ultra's technical team."  Pl. Opp. 38.  But the three paragraphs of the complaint they cite (¶¶ 180-81, 210) identify no such reports and do not support any part of that assertion.

Finally, Plaintiffs do not contest the argument that these two statements are not the type of statement on which investors rely.  W&J Br. 21.  This argument, supported by controlling precedent, is dispositive of Plaintiffs' claim about these statements.

## II.    Plaintiffs Do Not Plead With Particularity Facts Giving Rise To The Requisite "Strong Inference" That Any Defendant Acted With Scienter.

Independent of Plaintiffs' failure to plead falsity, their allegations also fail to meet the heightened standard for pleading scienter.  W&J Br. 22-25.  Plaintiffs' lead argument in response is that they have alleged, with particularity, that Watford and Johnson knew their statements were false.  Pl. Opp. Part I.B.1 & 2. But, as explained above, their argument fails because the facts they argue Watford and Johnson knew do not conflict with the allegedly fraudulent statements.  *Supra* at 15.  "[A]llegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in

19

order to deceive, manipulate, or defraud." *Weinstein v. McClendon*, 757 F.3d 1110, 1114 (10th Cir. 2014).

Plaintiffs also argue the Court should infer that Watford and Johnson knew Ultra's horizontal drilling program would fail because "horizontal drilling operations were critical to Ultra's operations." Pl. Opp. 40. But controlling authority rejects the argument that scienter can be inferred from the importance of a project to a company. In *Anderson v. Spirit Aerosystems*, 827 F.3d 1229 (10th Cir. 2016), the Tenth Circuit held that "[w]e cannot infer scienter based only on a defendant's position in a company or involvement with a particular project." *Id.* at 1245. Rather, to plead knowledge of particular information regarding an important project, the court held, the plaintiff must plead facts showing the defendants "actually reviewed" the information that supposedly indicated their statements were inaccurate. *Id.* at 1246. Yet, here, the only allegations Plaintiffs identify are that Lederman made aggressive assumptions and that Ultra changed its plans mid-way through a year. Pl. Opp. 41-42. These allegations do not establish any defendant knew horizontal drilling would not succeed—nor do any other allegations in the complaint.

Plaintiffs also argue they have pled with particularity that Johnson knew all along that Ultra's horizontal drilling program would fail because they allege Johnson "admitted that he had known beforehand that the Warbonnet 9-23/24 would be atypically strong performers" at a December 9, 2019 private meeting with an Ultra investor, Louis Talarico. Pl. Opp. 42. Yet, even accepting for purposes of this motion the accuracy of Plaintiffs' allegation, knowing that the horizontal test wells "would be atypically strong performers" does not establish that Johnson knew other horizontal wells would not perform strongly. Again Plaintiffs' position relies on the implicit assumption that Ultra or Johnson or Watford stated that future horizontal wells would perform as well as the two high-producing test wells. But Plaintiffs do not identify any statement saying any such thing. And, as explained above, Johnson disclosed publicly Ultra's expectations that future horizontal wells would, on average, produce *far less*

20

than the two high-producing test wells.  Thus, Plaintiffs' scienter story depends on a fiction.

Ultimately, the Court must consider whether Plaintiffs' allegations give rise to a cogent and compelling inference that Defendants knew they were making false statements.  W&J Br. 22.  Plaintiffs do not dispute that, to do so, the Court "must consider plausible, nonculpable explanations for the defendant's conduct" and weigh those potential explanations against the possible inference of scienter. *Smallen*, 950 F.3d at 1305.  Yet Plaintiffs' brief ignores any such explanations.  They ignore that their allegation is not just that Defendants knowingly made false statements about Ultra's prospects for horizontal drilling, but that Defendants chose an operational strategy for Ultra—switching from nearly all vertical drilling to nearly all horizontal drilling—that they supposedly *knew*, in advance, would fail. It is implausible that Defendants would make such a choice, and certainly less likely than Defendants simply making a choice that ended up being unsuccessful.  Switching to an operational strategy they knew would fail is implausible because, as Plaintiffs themselves allege, Defendants owned hundreds of millions of dollars of Ultra stock.  W&J Br. 23.  Thus, Plaintiffs' proposed inference is that De-fendants chose a "bet the company" strategy they knew would lose them a fortune.  Pl. Opp. 38.  That makes no sense.  Plaintiffs also ignore that, if Defendants knew there was a "single perfect location" for horizontal drilling and wanted to deceive investors, it would have made no sense to drill in any location other than the perfect one, the results of which could only have the effect of *dissuading* inves-tors from believing the supposed fraud.  But that is just what Defendants did, drilling one of the three test wells in a location Plaintiffs allege Defendants *knew* would not—and did not—produce excep-tional results.  *Supra* at 7.  Plaintiffs' failure to address these issues coherently renders their proposed inference implausible.

The same holds true even just considering the allegedly fraudulent statements divorced from the operational decision to pursue horizontal drilling.  On Plaintiffs' telling, Defendants made public

21

statements they knew would shortly be revealed as inaccurate, publicly, when Ultra's horizontal drilling did not succeed. It is implausible that corporate officers would do such a thing, as *Nguyen v. Endologix*, 962 F.3d 405 (9th Cir. 2020), persuasively explains. W&J Br. 22-23; *see also In re MGP Ingredients Sec. Litig.*, 2021 WL 3885655, *16 (D. Kan. Aug. 31, 2021) (rejecting similar scienter allegations, reasoning: "Why would defendants promise something to the market when they supposedly knew all along that the plan would fall short? And on top of that, why would defendants undertake this fraudulent scheme if they knew already that investors soon would uncover their deceit?") (internal citation omitted).

Plaintiffs respond by mischaracterizing their own allegations. They argue *Nguyen*'s reasoning does not apply "where the Defendants allegedly concealed *risks* that could make their scheme unsuccessful." Pl. Opp. 45. They argue that Defendants thought "[p]erhaps Ultra would get lucky and the next wells would be exceptional, too." *Id.* at 44. But that is not what Plaintiffs allege. What Plaintiffs allege is that Defendants *knew* horizontal drilling would be unsuccessful because they *knew* there was a "single perfect location" for horizontal drilling. Compl. ¶ 2 (the test wells "were showpieces whose results Defendants *knew* would not be repeated with later wells") (emphasis added); *id.* ¶ 192 ("Defendants *understood* the horizontal [test] wells they drilled would not be typical of the wells they would drill in a horizontal program") (emphasis added); Pl. Opp. 2 ("Watford and Johnson *knew* it would fail and misled investors anyway.") (emphasis added); *id.* at 3 ("Defendants *knew* that the test wells were, by design, not repeatable and were an anomaly.") (emphasis added). These are not allegations of Defendants believing there was a possibility that things might turn out well; they are allegations that Defendants knew horizontal drilling would fail, fail quickly, and fail publicly.

As *Nguyen* explains, such a theory could make sense if the defendants attempted to sell their stock while the stock price was fraudulently inflated. W&J Br. 24. But Plaintiffs do not allege any

22

defendant sold stock. *Id.* Nor does Plaintiffs' assertion that Fir Tree was hoping the alleged misstatements would fraudulently inflate the stock price provide an explanation. Pl. Opp. 46. First, Fir Tree had no designee on the board until February 2018 (Compl. ¶ 33), *after* the horizontal test wells had been drilled and their results disclosed. Second, Plaintiffs' allegation is based solely on Fir Tree being a "private equity" firm. Pl. Opp. 44. If that general allegation were sufficient to plead scienter, then the scienter requirement would be automatically satisfied any time a private equity firm has a substantial stake in a publicly traded corporation. Precedent rejects such generally applicable arguments. *E.g.*, *In re Level 3 Commc'ns Sec. Litig.*, 667 F.3d 1331, 1346 (10th Cir. 2012) (allegations of incentives that are "common among executives at publicly traded companies" do "not ordinarily indicate scienter"). Third, and most fundamentally, Plaintiffs' theory is that Defendants *knew* bad news was coming that would negatively impact Ultra's stock price. Thus, even if Defendants had hoped for a significant bump in Ultra's stock price when they made the supposedly fraudulent statements, once that did not happen they would have known they had to sell quickly to avoid a significant loss. But they did not sell, even with hundreds of millions of dollars at stake. This strongly suggests Defendants did *not* know failure was likely.[6] Finally, if the alleged misstatements about the horizontal test wells "failed to boost Ultra's stock price" (Pl. Opp. 3), then there was no fraudulent inflation of Ultra's stock price and Plaintiffs have no claim. There is no in-between: Either the supposedly fraudulent statements fraudulently inflated the stock price—and Defendants should have sold (either to make a profit or

---

[6] Plaintiffs also assert that Watford and Johnson were willing to make public statements they knew were false to try to "deliver short-term appreciation" so Fir Tree "would sell their stake." Pl. Opp. 44. The complaint contains no allegations of fact supporting any such intent. Plaintiffs repeatedly assert that Fir Tree admitted in a Wall Street Journal article that the market's failure to respond to the alleged misstatements about horizontal drilling "has been really unbelievable to us." Pl. Opp. 14, 44. But, as the complaint establishes, the statement was not even about Ultra specifically, let alone about horizontal drilling or Ultra's public statements about it. Compl. ¶ 152.

23

avoid a loss)—or the statements did not inflate the stock price, and Plaintiffs were not damaged be-cause "Defendants' ploy failed." *Id.* at 30.

The implausibility of Plaintiffs' scienter theory is also underscored by Defendants' frequent disclosures of negative news throughout the Class Period. W&J Br. 24-25. Plaintiffs' brief ignores these disclosures entirely, but they are critical. If Defendants were intending to mislead investors to try to fraudulently inflate the stock price, they would have had no reason to lower guidance in August 2017 and then to warn in November 2017 that Ultra was likely to miss even that lowered guidance. *Id.* at 24. They would have had no reason to slow horizontal drilling after only one full quarter and then to *stop* horizontal drilling entirely shortly thereafter, if what they were doing was holding off telling the supposed truth hoping to "get lucky and the next wells would be exceptional." Pl. Opp. 44. That Defendants did not act consistently with the fraud Plaintiffs assert they were engaged in makes the more plausible inference that Defendants were not engaged in that fraud.

Weighing the allegations in their totality, which Plaintiffs acknowledge the Court must do (Pl. Opp. 43-44), the most compelling inference is straightforward: Defendants sincerely believed hori-zontal drilling would benefit Ultra, but ultimately it did not. As the Tenth Circuit held in response to an assertion that corporate officers willfully misestimated their company's performance, "[t]hat is pos-sible, but it is more probable that the [] executives were overly optimistic and failed to give adequate weight to financial red flags, for the plaintiffs supply little reason to suspect malevolence rather than benign optimism." *Anderson*, 827 F.3d at 1238; *MHC Mut.*, 761 F.3d at 1114.

## III. The Court Should Deny Plaintiffs' Request For Leave To Amend.

The Court should deny Plaintiffs' request for leave to amend. Pl. Opp. 50 n.13. Plaintiffs' brief fails to identify any new allegations they would make to try to cure the complaint's deficiencies. Accordingly, dismissal with prejudice is proper. *Carroll v. Lawton Indep. Sch. Dist.*, 805 F.3d 1222, 1231

(10th Cir. 2015) (affirming denial of request for leave to amend because the plaintiffs "failed to identify

the specific factual allegations they would allege in an amended complaint"); *MGP Ingredients*, 2021 WL

3885655 at *17-19 (rejecting unsupported request for leave to amend).

Dated: July 13, 2022                        Respectfully submitted,

                                            */s/ David Holman*
                                            David Holman
                                            CRISHAM & HOLMAN LLC
                                            2549 West Main Street, Suite 202
                                            Littleton, CO 80120
                                            (720) 739-2176

                                            Joshua Z. Rabinovitz
                                            Anne I. Salomon
                                            KIRKLAND & ELLIS LLP
                                            1301 Pennsylvania Avenue, N.W.
                                            Washington, D.C. 20004
                                            (312) 862-2284

                                            *Counsel for Defendants Michael D. Watford*
                                            *and C. Bradley Johnson*