**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-02652-NYW-STV

SCOTT HEINER,
BALA SETTU,
GEOFFREY POLYCHRONIS,
MAHDI RIYAD ISSA,
YOAV GIVON,
MICHAEL ALTMAN, Individually and on behalf of all others similarly situated,

      Plaintiffs,

v.

MICHAEL D. WATFORD,
C. BRADLEY JOHNSON,
ULTRA PETROLUEM, INC.,
FIR TREE CAPITAL MANAGEMENT LP N/K/A FIR TREE PARTNERS INC., and
EVAN LEDERMAN

      Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

Magistrate Judge Scott T. Varholak

This matter comes before the Court on four Motions:  a Motion to Dismiss filed by Defendants C. Bradley Johnson and Michael D. Watford [#84]; a Motion to Dismiss filed by Defendant Evan Lederman [# 86]; a Motion to Dismiss filed by Defendant Fir Tree Capital Management LP ("Fir Tree") [# 87] (collectively, the "Motions to Dismiss"); and a Motion for Judicial Notice filed by Mr. Johnson and Mr. Watford [#85] (the "Motion for Judicial Notice").  These Motions have been referred to this Court.  [# 88]  This Court has carefully considered the Motions and related briefing, the entire case file and the applicable case law, and has determined that oral argument would not materially assist

1

in the disposition of the Motions. For the following reasons, the Court respectfully **RECOMMENDS** that the Motion for Judicial Notice [#85] be **GRANTED IN PART** and **DENIED IN PART**; the Motions to Dismiss [##84, 86, 87] be **GRANTED** to the extent that they seek dismissal of the Complaint; the Complaint be **DISMISSED WITHOUT PREJUDICE**; and that Plaintiffs be given fourteen (14) days from an order on this Recommendation to file a proposed amended complaint.

## I.    THE MOTION FOR JUDICIAL NOTICE

Before proceeding to the Motions to Dismiss, the Court must determine which factual sources it may consider in ruling on the Motions to Dismiss. "As a general rule, the only facts [a court] consider[s] in assessing the sufficiency of a complaint are those alleged in the complaint itself." *Emps.' Ret. Sys. v. Williams Cos., Inc.*, 889 F.3d 1153, 1158 (10th Cir. 2018) (citing *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010)). However, a court "may consider 'documents that the complaint incorporates by reference,' 'documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity,' and 'matters of which a court may take judicial notice.'" *Id.* (quoting *Gee*, 627 F.3d at 1186). "In securities cases it is not unusual to consider 'documents incorporated by reference into the complaint, public documents filed with the [Securities and Exchange Commission ("SEC")], and documents the plaintiffs relied upon in bringing suit.'" *Id.* (quoting *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013)). Thus, a court "may look to the contents of a referenced document itself rather than solely what the complaint alleges the contents to be. But such documents may properly be considered only for what

2

they contain, not to prove the truth of their contents." *Id.* (quotations and citations omitted).

The Motion for Judicial Notice requests that the Court consider twelve exhibits in ruling on the Motions to Dismiss. [#85] These exhibits may be divided into three categories: SEC Filings [##84-7, 84-8, 84-12], Earnings Call Transcripts [##84-3, 84-4, 84-5, 84-6, 84-9, 84-10], and PowerPoint Presentations [##84-2, 84-11, 84-13].

The Court finds that the contents of the SEC Filings and Earnings Call Transcripts may be properly considered in ruling on the Motions to Dismiss. The SEC Filings are each publicly available through the SEC's "EDGAR" filing system,[1] and are proper for judicial notice. *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1156 (D. Colo. 2012) ("In securities cases . . . a court may take judicial notice of the contents of SEC filings that are a matter of public record." (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 355 n.5 (2d Cir.2010)). And the Earnings Calls transcribed are repeatedly referred to and quoted in Plaintiffs' Second Amended Complaint [#75-2] (the "Complaint") and are central to Plaintiffs' claims. [*See id.* at ¶¶ 102-05 (Q1 2017 Earnings Call);[2] 106-11 and 191 (Q2 2017 Earnings Call); 114-16 and 195-99 (Q3 2017 Earnings Call); 204 (Q4 2017 Earnings Call); 221 (Q3 2018 Earnings Call)][3] Since Plaintiffs do not contest the authenticity of the Earnings Call

---

[1] [#84-7] is available at: https://www.sec.gov/Archives/edgar/data/1022646/000119312 518025059/d530599d424b3.htm; [#84-8] is available at: https://www.sec.gov/ Archives/edgar/data/1022646/000117184318005908/exh_991.htm; [#84-12] is available at: https://www.sec.gov/Archives/edgar/data/1022646/000119312517051805/d291465 d10k.htm.

[2] The Court will label quarter numbers in the following manner: "Q# YEAR." Thus, the first quarter of the 2017 fiscal year becomes "Q1 2017."

[3] Plaintiffs also quote from the Q1 2018 Earnings Call [#75-2 at ¶¶ 213-16], for which Defendants did not provide a transcript. In addition, Defendants provided a transcript for

Transcripts, or otherwise object to the Court considering them in ruling on the Motions to Dismiss, the Court may consider them. *See Emps.' Ret. Sys.*, 889 F.3d at 1158; *In re Gold Res. Corp. Sec. Litig.*, 957 F. Supp. 2d 1284, 1293 (D. Colo. 2013) (taking judicial notice of "transcript[s] of earnings conference calls"), *aff'd*, 776 F.3d 1103 (10th Cir. 2015).

However, the Court declines to consider the contents of the PowerPoint Presentations in ruling on the Motions to Dismiss. One presentation is dated February 28, 2018 [#84-2 (the "February 28 Presentation")], one is dated November 8, 2018 [#84-11 (the "November 8 Presentation")], and the other has no date [#84-13 (the "Undated Presentation")]. The Complaint appears to refer to one presentation released on March 14, 2018 that revealed Ultra's "finding and development costs." [#75-2, ¶¶ 9, 117] The Court is not satisfied that any of the three presentations submitted for judicial notice are the March 14, 2018 presentation referred to in the Complaint. Beyond the March 14, 2018 presentation, the Complaint's only references to a "slide" or a "presentation" come in the form of quotations from an Earnings Call wherein the speaker makes a passing reference to a slide or presentation. [#75-2, ¶¶ 68, 198, 199] Moreover, the Complaint does not allege that any presentation or slide was false or misleading. Thus, the Court finds that the Complaint does not rely on these presentations in bringing suit, nor are they "central" to Plaintiffs' claims.

The Court further finds that these presentations are not subject to judicial notice under Federal Rule of Evidence 201. The Motion states that the presentations "are

---

the Q2 2018 Earnings Call [#84-9], which Plaintiffs do not refer to. Because the Court does not rely on the Q2 2018 Earnings Call in this Recommendation, the Court need not consider whether judicial notice of that transcript is proper. *In re Level 3 Commc'ns, Inc. Sec. Litig.*, No. 09-CV-00200-PAB-CBS, 2010 WL 5129524, at *8 n.5 (D. Colo. Dec. 10, 2010), *aff'd,* 667 F.3d 1331 (10th Cir. 2012).

available on the internet," further representing that the Undated Presentation came from

a database called "FactSet CallStreet" and that the February 28 Presentation came from

a website called "Seeking Alpha."   [##84-1, ¶¶ 1, 12; 85 at 2; 98 at 6]   However,

Defendants only provided links for the February 28 Presentation and the November 8

Presentation.  [#84-1, ¶¶ 1, 10]  One link appears to be to the website "Seeking Alpha,"

and one to an archived version of Ultra's website.  [*Id.*]  Neither link, however, appears to

be operative such that it readily enables public access to the presentations.  Moreover,

Defendants have failed to establish that the accuracy of the website "Seeking Alpha"

"cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). And to the extent that the

other, nonoperative link was intended to portray Ultra's website, "[f]ederal courts . . . have

expressed skepticism as to whether it is appropriate to take judicial notice of information

or documents appearing on websites that are created and maintained by a party to the

litigation." *Gerritsen v. Warner Bros. Ent. Inc.*, 112 F. Supp. 3d 1011, 1030 (C.D. Cal.

2015).

As for the Undated Presentation, Defendants did not provide a link for public

access, but simply a statement that the presentation is "publicly available from FactSet

CallStreet."  [#84-1, ¶ 12]  Citing generally to an online database in order to find an

undated presentation that bears no marking of that database does not allow for an

"accurate[]" or "read[y] determin[ation]" of the authenticity of the presentation.  Fed. R.

Evid. 201(b)(2).  Defendants argue that the authenticity of the Undated Presentation may

be established by the fact that statements from the Q3 2017 Earnings Call Transcript

reference slides that appear in the Undated Presentation and appear to align with the

information provided.  [#98 at 3-6]  Putting aside the fact that such an analysis would

5

require analyzing the truth of the Q3 2017 Earnings Calls Transcript's contents (that is, that the information which was purported to be on each slide was, in fact, on each slide), the Court disagrees that references to information on slides suffices to allow the Court to "accurately and readily determine[]" the precise content of the entire Undated Presentation, as Defendants seek. Fed. R. Civ. P. 201(b)(2). Finally, the Court notes its finding that the Complaint fails to state a claim without consideration of the PowerPoint Presentations, "thus obviating the need to refer to the substance of the documents filed by [D]efendants." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, No. 09-CV-00200-PAB-CBS, 2010 WL 5129524, at *8 n.5 (D. Colo. Dec. 10, 2010), *aff'd,* 667 F.3d 1331 (10th Cir. 2012).

Accordingly, the Court RECOMMENDS that the Motion for Judicial Notice [#85] be GRANTED IN PART and DENIED IN PART.[4] Thus, in addition to the well-pleaded factual allegations in Plaintiffs' First Amended Complaint [#75-2]—which must be taken as true when considering a motion to dismiss, *Wilson v. Montano*, 715 F.3d 847, 850 n.1 (10th Cir. 2013) (citing *Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011))—the Court will also consider the contents of the SEC Filings and Earnings Call Transcripts of Earnings Calls referred to in the Complaint, indicating when it does so.

---

[4] The Court recognizes that the Motion for Judicial Notice is nondispositive, and therefore the Court could potentially issue an order as opposed to a recommendation. *See* 28 U.S.C. § 636(b)(1)(A); D.C.COLO.LCivR 72.1. However, because the Court's analysis of the Motion for Judicial Notice is in part intertwined with the Court's analysis of the Motions to Dismiss, and in the interest of judicial efficiency, the Court has determined that a recommendation on the Motion for Judicial Notice is appropriate.

## II.   BACKGROUND

This federal securities fraud putative class action arises out of an alleged attempt to artificially boost an ailing natural gas production company's stock value through misinformation regarding the company's drilling prospects and leadership structure. *See generally* [#75-2]   Defendants are: Ultra Petroleum Corp. ("Ultra")—a natural gas development and production company [*id.* at ¶ 29];[5] Michael D. Watford—Ultra's CEO from September 1999 until March 2018 [*id.* at ¶ 30]; C. Bradley Johnson—Ultra's CEO from March 2018 until October 2020 [*id.* at ¶ 31]; Fir Tree—a private investment firm that held a substantial amount of Ultra's common stock during the Class Period [*id.* at ¶¶ 32, 154-57]; and Evan Lederman—a partner at Fir Tree who served as the Chairman of the Board of Ultra from February 2018 until "at least June 4, 2020" [*id.* at ¶ 33].[6]   Plaintiffs are individuals who purchased Ultra common stock between May 10, 2017 and March 7, 2019 (the "Class Period").  [*Id.* at ¶¶ 1, 28]

Beginning in the 1990s, Ultra developed extensive natural gas extraction operations in the Pinedale Anticline geological formation (the "Pinedale Field"), located in Wyoming.  [*Id.* at ¶¶ 50-51, 53-57]  The Pinedale Field was Ultra's primary asset, up to and through the Class Period.  [*Id.* at ¶ 58]

---

[5] Ultra is sued to the extent of its available insurance.  [*Id.*]   Ultra has not made an appearance in this action.

[6] The Complaint generally makes allegations of "Defendants" as a whole group [*see*, *e.g.*, *id.* at ¶¶ 105, 112, 192, 200], later specifying that the Section 10(b) claim is brought against the "Ultra Defendants"—Mr. Johnson, Mr. Watford, and Ultra—and that the Section 20(a) claim is brought against the "Controlling Defendants"—Mr. Johnson, Mr. Watford, Mr. Lederman, and Fir Tree.  [*Id.* at ¶¶ 34-35, 240-55]   While this Recommendation will specify the speaker of an allegedly false or misleading statement when possible, it largely adopts the Complaint's general practice of referring to all defendants as a single group ("Defendants").

By 2014, Ultra and its subsidiary held nearly $4 billion in outstanding debt.  [*Id.* at ¶ 59]  After a period of low gas prices, Ultra filed for bankruptcy in April 2016.  [*Id.*]  At the time of its bankruptcy filing, Ultra reported outstanding debts of $3.75 billion, including $1.34 billion in unsecured notes issued by the Ultra holding company (the "Notes").  Ultra exited the bankruptcy in April 2017 with a plan to pay off debt creditors in cash in full through debt and equity funding, with the exception of Note holders, who would be paid in shares.  [*Id.* at ¶¶ 60-61]  After securing refinancing and paying off its existing creditors, Ultra was left with $2 billion in debt and the following common-stock ownership profile:

- Former Shareholders: 41%
- Note Holders: 36%
- Purchasers in Rights Offering: 23%

[*Id.* at ¶¶ 61-63]  After acquiring a significant number of Notes and participating in the rights offering, Fir Tree owned 15.6% of Ultra's shares upon Ultra's exit from bankruptcy.  [*Id.* at ¶¶ 154-55]

### A.    Ultra's 2017 Vertical Drilling Operations

Ultra represented that it was exiting bankruptcy in "growth mode."  [*Id*. at ¶ 70]  While low gas prices in 2015 had forced Ultra to reduce its leased drilling rig[7] fleet to four, by May 2017 Ultra had informed investors that the fleet had been brought up to seven rigs, with negotiations for an eighth in the works.  [*Id.* at ¶ 76-77]

Due to the Pinedale Field's ecologically fragile environment, operators in the Pinedale Field must drill all wells from multi-well drilling pads to limit their impact.  [*Id.* at

---

[7] A "rig" used to drill wells consists of several independent buildings, which can cost $100,000 just to assemble and disassemble.  [*Id.* at ¶ 74]  The lease price on a rig generally exceeds $10,000 per day.  [*Id.* at 75]

¶ 78-79]  In order to construct a pad, an operator must secure a Master Drilling Permit, which takes about 12 months.  [*Id.* at ¶ 85]  And due to ecological and weather-related limitations, pad construction cannot be completed in the winter or spring.  [*Id.* at ¶ 84]  Thus, operators must plan ahead in constructing their drilling pads for the next season. [*Id.* at ¶ 85]

Relatedly, Ultra's senior management and board of directors would adopt a drilling/development plan each year that would set out drilling locations for the upcoming year.  [*Id.* at ¶¶ 90-92]  This approval would either come in the fourth quarter of the previous year, or the first quarter of the year being planned.  [*Id.* at ¶ 92]

Ultra built its 2017 drilling pads in the summer and fall of 2016, when it was involved in its bankruptcy proceeding.  [*Id.* at ¶¶ 86-87]  This divided attention, along with the anticipation of a small drilling season, resulted in the construction of few new pads.  [*Id.* at ¶ 88]  Thus, in order to accommodate its eight-rig drilling program, Ultra opted to place several rigs on "legacy" drilling pads[8] located in the eastern part of the Pinedale field.  [*Id.* at ¶¶ 89, 116]  The eastern portion of the Pinedale Field historically delivered less production than the field average.  [*Id.* at ¶¶ 89, 116]  This was all laid out in the 2017 drilling plan, approved by Ultra's senior management and board of directors by at least May 2017.  [*Id.* at ¶¶ 92-93, 100, 102]

In May 2017, Ultra disclosed the results from its first quarter of drilling in 2017.  [*Id.* at ¶¶ 100-03]  Mr. Johnson informed investors on the Q1 2017 Earnings Call that "[w]ell quality will improve as we progress into 2017."  [*Id.* at ¶ 103]  On this call, an investor

---

[8] A legacy pad is one that Ultra had built for drilling, but had decided against drilling.  [*Id.* at ¶ 95]

specifically asked about projected ultimate recoveries from the 2017 well and if "4 Bcf per well [was] still the right number[.]"[9]  [*Id.* at ¶ 104]  Mr. Johnson responded:

> Yeah, this [is] Brad. We were experimenting and continue to do so on our completions in Pinedale and really these recent experiments is more about diversion, and just looking for different ways to improve our diversion techniques for effective frac stages.  It's really too early to tell about those results. We'll continue to experiment with that throughout the year.
>
> And we'll be happy to share those results once we have some conclusions to draw.  It's just an ongoing tinkering effort, frankly, that we do in [the Pinedale Field].  We're never satisfied.  We're always looking for ways to improve.  And in the first quarter, diversion was sort of our area of experimentation.

[*Id.* at ¶ 104; 84-3 at 12]

On August 9, 2017, Ultra held its Q2 2017 Earnings Call to discuss its second-quarter production results.  [#75-2, ¶ 106]  During the call, Ultra announced that it was reducing its projected 2017 production growth rate by 3%, and reducing its projected 2018 production growth rate by 5%.  [*Id.*]  Ultra cited crew-delays and budget reallocation towards its horizontal drilling program as the causes of the decreases.  [*Id.* at ¶ 108]  As for the new wells drilled, Ultra informed investors that "[u]pon arrival of the additional rigs, operational performance has been strong. And these rigs have quickly approached the fleet average on several key operational metrics."  [*Id.* at ¶ 109]  Mr. Johnson told investors that he expected production to remain steady, stating that "[Ultra] expect[ed] the next 2 quarters to deliver similar results," and that  "looking forward, I think we're going to continue to see 4b[cf] wells and greater than 35% returns for the balance of this year." [*Id.* at ¶¶ 110-111]  Ultra's stock price fell 14.38% that day.  [*Id.* at ¶ 107]  An analyst

---

[9] "Bcf" stands for "billion cubic feet equivalent," and is a unit of energy measurement.  [*Id.* at ¶ 36]  The Complaint does not identify the source of the "4 Bcf per well" figure referenced by the investor.

report published after the call noted that "[i]mportantly, [the guidance reduction] does not

at all appear [to be] a well performance issue." [*Id.* at ¶ 113]

On November 7, 2017, Ultra held its Q3 2017 Earnings Call. [*Id.* at ¶ 114] During

that call, Mr. Watford informed investors that "[w]e expect production for the full year 2017

to be slightly below guidance," citing "issues caused by recent bankruptcy and third

parties" as the cause of this reduction. [*Id.* at ¶ 115] He elaborated that:

> In Wyoming, due to weather and regulation, we are limited to building our drilling pads during the summer and fall after receiving a requisite approval. During the summer of 2016, and with the company battling a contested bankruptcy proceeding, we were unable to properly prep enough pads to optimize our ramp up from 2 rigs to 8 rigs in 2017. That meant that our 2017 program led some rigs being placed on legacy pads that were located in sub-optimal yet still economic areas along the eastern flank of our field.

[*Id.* at ¶ 115] Mr. Johnson confirmed that:

> In 2017, the activity has been primarily on the east flank of the field. The activity in this area was not the result of high grading our inventory. Instead, we placed new rigs as part of our ramp up on pads that were available. Normally, we plan and construct pads up to a year before we drill them. However, due to the uncertainty surrounding our in-court restructuring, some of that predrill effort was on hold. We began our 4 to 8 rig ramp up earlier this year, rigs were deployed mostly to the east flank. [] [T]he east flank typically delivers lower IP's and lower EUR's than average[.]

[*Id.* at ¶ 116]

On March 14, 2018, Ultra published a PowerPoint presentation for an upcoming

conference, which disclosed unsustainably high finding and development costs[10] for its

2017 drilling. [*Id.* at ¶ 117] That same day, Ultra's stock price fell 12.3%. [*Id.*]

---

[10] "Finding and development costs" represent the costs of research and drilling divided by the total number of new reserves recognized. [*Id.* at ¶ 117] Thus, low-quality wells with few reserves can result in high finding and development costs. [*Id.*]

## B.    Ultra's Horizontal Drilling Program

Coming out of its bankruptcy, Ultra revealed to investors that it was "optimistic about . . . taking horizontal development on the edges and fringes of the field and expanding the resource" through the drilling of horizontal wells.  [*Id.* at ¶ 120 (statement of Mr. Johnson on May 3, 2017 call)]  A horizontal well allows an operator to drill perpendicularly once it reaches a productive region, potentially allowing the operator to access more natural gas than vertical drilling alone.  [*Id.* at ¶¶ 10 & n.3]  Ultra had previously drilled a horizontal well in the Pinedale Field in 2016, but this well was not productive enough to justify its cost.  [*Id.* at ¶ 121]

Ultra would drill three horizontal wells in 2017.  [*Id.* at ¶ 122]  Each was commercially successful.  [*Id.*]  According to a former Ultra employee, Ultra's technical team had spent six months analyzing the Pinedale Field for the best location to place its experimental wells, ultimately deciding on drilling its wells from the "Warbonnet Pads." [*Id.* at ¶ 130-31]  The Warbonnet Pads were located in the "core" of the Pinedale Field, as opposed to the "flank."[11]  [*Id.* at ¶¶ 133, 135]  Two were drilled on the "Warbonnet 9-23 Pad" (collectively, the "Warbonnet 9-23 Wells") and one on the "Warbonnet 9-24 Pad" (the "Warbonnet 9-24 Well") (collectively, the "Warbonnet Wells").  [*Id.* at ¶ 122]  The Warbonnet Wells were all located relatively close to each other, but targeted different drilling regions.  [*Id.*]

Ultra disclosed its general plan to drill the Warbonnet Wells in its Q2 2017 Press Release.  [*Id.* at ¶¶ 189]  Mr. Watford was quoted in the Q2 2017 Press Release explaining

---

[11] The Complaint does not define the terms "core" or "flank," so the Court adopts the commonly accepted meanings of these words, understanding the "core" to be located towards the center of the field and the "flank" to be located towards the edge of the field.

that Ultra would be shifting some of its resources from "development wells" to "three exploratory, horizontal wells." [*Id.* at ¶ 190]  On the Q2 2017 Earnings Call, Mr. Watford elaborated that: "[W]e're basically displacing the development vertical well drilling for the second half of [2017] so we can fund the horizontal experiment. And we're not proposing to see any production of any significance from the horizontal program. We're just—this is a science project.  We think it has lots of upside.  So we're displacing vertical wells." [*Id.* at ¶ 191]

In its Q3 2017 Press Release and Earnings Call, Ultra announced the positive initial results from its first Warbonnet 9-23 Well ("Warbonnet 9-23 Well #1"). [*Id.* at ¶ 193] The Press Release stated that Ultra had "[s]uccessfully drilled and completed a 2-mile horizontal well on the east flank of [the Pinedale Field]" and described Ultra's transition to "resource expansion." [*Id.* at ¶¶ 194-95]  On the Q3 2017 Earnings Call, Ultra gave more specific preliminary production numbers, and noted that it was "extremely pleased" with the results of Warbonnet 9-23 Well #1. [*Id.* at ¶ 193, 196]  Mr. Watford stated that: "We believe this well is indicative of horizontal potential in the field, which could result in potentially 16 new horizontal wells . . . ." [*Id.* at ¶ 197]  Mr. Johnson explained that Ultra was pursuing "the concept of drilling horizontal flank wells from preexisting pads used for vertical wells . . . .  We are doing this very operation on the Warbonnet 9-24 pad right now." [*Id.* at ¶ 199][12]  Noticing that Ultra's estimated initial production numbers appeared lower than the initial production of Warbonnet 9-23 Well #1, an investor asked: "Is there

---

[12] The Q3 2017 Earnings Call Transcript contains a correction to this statement, reading (without amendment):  "We're doing this very operation on the Warbonnet 9-24 (sic) [9-23] (19:23) pad right now . . . ."  [#84-6 at 8]

anything different with [Warbonnet 9-23 Well #1] or are you just trying to build in some conservativism?" [#75-2 at ¶ 198] Mr. Watford responded:

> Sure. To be frank, we built these economics last week prior to the [initial production data] of our well. So we [w]anted to anchor the economics here, based on actual data observed by other wells. So we used the [initial production] of 11 million a day from the Antelope well, certainly double the [initial production] rate of our well. We would recalculate and come up with significantly better economics with much higher returns.

[*Id.*]

The day of the Q3 2017 Earnings Call, Ultra's stock price rose by 2.36%. [*Id.* at ¶ 152] About a week after the Q3 2017 Earnings Call, Ultra issued a press release with more detailed results for Warbonnet 9-23 Well #1. [*Id.*] Ultra's stock price rose by 5%. [*Id.*]

On January 30, 2018, Ultra published a press release announcing that Ultra "has completed three horizontal[] [wells] on the east flank, each one targeting different intervals and each one verifying the significant resource potential beyond the previous commercial boundary of the Pinedale [Field]." [*Id.* at ¶ 202] Ultra's stock price fell by 2.35%. [*Id.* at ¶ 152]

On February 28, 2018, Ultra held a Q4 2017 and Fiscal Year 2017 Earnings Call. [*Id.* at ¶ 204] On that call, an investor noted that Ultra's next planned horizontal wells "are pretty close to your Warbonnet wells," and asked if Ultra would "stay pretty focused on the area that's been working for you[.]" [*Id.*] Mr. Johnson responded that Ultra was "going to stay in the same ZIP Code for a while. And we're definitely interested and want to learn more about the flanks. But right now, our focus is on delivering repeatable results." [*Id.*]

On or around May 10, 2018, Ultra delivered its Q1 2018 Press Release and held its Q1 2018 Earnings Call. [*Id.* at ¶ 211-213] The Q1 2018 Press Release disclosed the

14

initial production rates of Ultra's two newly completed horizontal wells ("Well #4" and "Well #5").  [*Id.* at ¶ 211]  Both Wells #4 and #5 had lower initial production rates than at least two of the Warbonnet Wells.  [*Id.* at ¶¶ 122, 211]  During the Q1 2018 Earnings Call, an investor asked about the poor performance of Wells #4 and #5 compared to the Warbonnet Wells.  [*Id.* at ¶ 213]  Mr. Johnson responded that "[t]he geological nature of [the Pinedale Field] does have variability and we certainly encountered that on these last two wells."  [*Id.*]  Mr. Johnson noted:

> [The wells were] certainly within an acceptable range [for] us to continue to ramp up [the horizontal drilling program] . . . .  [T]he well cost performance continues to be very [g]ood. The execution continues to be very good. And we're excited about the results so far. And we're excited about the upcoming wells and collectively, all that gives us the confidence to go faster."

[*Id.* at ¶ 215]  Finally, Mr. Johnson defended Ultra's decision to continue to ramp up its horizontal drilling program by stating that "the opportunity to shift capital through horizontal wells is just, for us, the obvious thing to do given the superior" returns.  [*Id.* at ¶ 216]  Around this time, Ultra's stock fell nearly 30%.  [*Id.* at ¶ 212]

On August 9, 2018, Ultra released its Q2 2018 Press Release.  [*Id.* at ¶ 218-220] The Q2 2018 Press Release revealed poor initial production rates of nine new horizontal wells ("Wells ##6-14"), which appear to have been the final horizontal wells that Ultra

15

would drill in the Pinedale Field during the Class Period.[13]  [*Id.* at ¶ 20-22, 218]  Mr.

Johnson was quoted as acknowledging the poor performance of these wells, but

highlighting Ultra's ongoing efforts to "expand[] our technical efforts to better leverage our

---

[13] The reported initial production rates for all of Ultra's reported horizontal wells drilled in the Pinedale Field during the Class Period are as follows:

| Well | Initial Production (mmcfe/day) |
| --- | --- |
| Warbonnet 9-23 Well #1 | 51 |
| Warbonnet 9-23 Well #2 | Not alleged |
| Warbonnet 9-24 Well | 50 |
| Well #4 | 11.7 |
| Well #5 | 28.5 |
| Well #6 | 20.0 |
| Well #7 | 11.7 |
| Well #8 | 11.3 |
| Well #9 | 8.4 |
| Well #10 | 7.6 |
| Well #11 | 7.1 |
| Well #12 | 6.9 |
| Well #13 | 4.5 |
| Well #14 | 4.1 |

[*Id.* at ¶¶ 122 (Warbonnet 9-23 Well #1, Warbonnet 9-24 Well), 211 (Wells ##4-5), 218 (Wells ##6-14)]

learnings in future horizontal wells." [*Id.* at ¶ 220] The next day, Ultra's stock price fell 29.3%. [*Id.* at ¶ 219]

During its Q3 2018 Earnings Call held on November 3, 2018, Ultra announced that it was pausing its horizontal drilling program, but Mr. Johnson informed investors that Ultra's leadership "remain[ed] confident that further well data analysis and optimization will allow [Ultra] to drill successful horizontal wells next year." [*Id.* at ¶ 21, 221] In its Q4 2018 and Fiscal Year 2018 Press Release, released on March 7, 2019, Ultra disclosed that its "2019 capital investment program does not include horizontal drilling." [*Id.* at ¶¶ 22, 222] Ultra's stock price fell by 11.8% that day. [*Id.* at ¶ 223] This would be the end of Ultra's horizontal drilling program in the Pinedale Field. [*Id.* at ¶ 22, 222] Ultra halted its drilling program entirely by the Fall of 2019, and filed for bankruptcy in May 2020. [*Id.* at ¶ 23]

### C.    Fir Tree's Involvement in Ultra's Corporate Governance

As discussed above, Fir Tree held a significant position in Ultra following Ultra's emergence from bankruptcy in 2017. [*Id.* at ¶¶ 154-55, 157] Immediately following Ultra's emergence from bankruptcy, Fir Tree used its position to exert influence over the selection of two of Ultra's directors. [*Id.* at ¶ 156] In September 2017, Fir Tree announced its intention to "Pursue Value-Maximizing Strategic Alternatives for Ultra Petroleum Corp." [*Id.* at ¶ 158] Ultra responded positively, "announc[ing] . . . its intention to work collaboratively with Fir Tree Partners . . . to pursue value-maximizing strategies." [*Id.* at ¶ 159]

On January 30, 2018, Ultra and Fir Tree announced that they had entered into a "Cooperation Agreement." [*Id.* at ¶ 160] The Cooperation Agreement entitled Fir Tree to

17

directly select one director for Ultra's seven-person board—Fir Tree selected Mr. Lederman. [*Id.* at ¶¶ 160-61] In addition, Fir Tree was entitled to propose three to five candidates for another seat, and Ultra would choose one. [*Id.* at ¶¶ 160-61] Two directors would resign to open space. [*Id.* at ¶ 160] In exchange, Fir Tree agreed to refrain from: acquiring more than 25% of Ultra's voting securities; soliciting proxies; facilitating any tender or exchange offer, or take-over bid; and seeking additional board candidates to Ultra's Board. [*Id.* at ¶ 161] Finally, Fir Tree agreed that it would not "take any public action in support of or make any public proposal or request that constitutes or relates to . . . advising, controlling, changing or knowingly influencing the Board or management of [Ultra] . . . ." [*Id.*] After the Fir-Tree selected directors took their seats on Ultra's board, Mr. Watford stated in a private call that Fir Tree was in control of Ultra. [*Id.* at ¶¶ 163-64]

Fir Tree's control extended specifically to Ultra's decision to switch to horizontal drilling. [*Id.* at ¶¶ 165] Historically, Ultra's directors were not involved in formulating drilling plans, but would instead give a "yes" or "no" to a drilling plan prepared by Ultra's management and technical professionals. [*Id.* at ¶ 167] In early 2018, however, Mr. Lederman held a meeting with Mr. Johnson and members of Ultra's technical team where he ordered them to focus on horizontal drilling for the remainder of the year. [*Id.* at ¶ 168] Mr. Johnson and the technical team suggested a gradual approach to the horizontal drilling program, which Mr. Lederman personally overrode. [*Id.* at ¶¶ 169-70] While the precise date of this meeting is unclear, it was unusual in that it occurred outside of the "the normal cycle" for adopting a drilling plan, and resulted in a late alteration of the budget in order to have additional horizontal testing. [*Id.* at ¶¶ 168, 171] Mr. Lederman also

18

made specific requests to various lower-level Ultra employees without going through company executives.  [*Id.* at ¶¶ 186-88]

In order to build internal support for rapidly expanding the horizontal drilling program, Mr. Lederman relied on modelling created by Andrew Teno—a Fir Tree director and employee who lacked graduate-level training or any type of technical degree.  [*Id.* at ¶¶ 177-78, 180]  Mr. Teno's model utilized inputs to an Excel spreadsheet, as opposed to relying on sophisticated industry-specific software used to minimize human error.  [*Id.* at ¶¶ 179-80]  Mr. Teno's model contained numerous errors that resulted in estimates that were unrealistically high.  [*Id.* at ¶ 180]  Similarly, Mr. Lederman pushed Ultra's board to rely on unrealistic assumptions with respect to production and cost estimates, consistently assuming the highest production estimates and the lowest cost estimates. [*Id.* at ¶¶ 181-184]

With these activities occurring internally, on April 27, 2018, Ultra made an amendment to its 2017 10-K form filed with the SEC.  [*Id.* at ¶ 206]  The amendment noted that Ultra's board had separate roles for the Chairman of the Board (Mr. Lederman) and the Chief Executive Officer (Mr. Johnson).  [*Id.*]  It stated Ultra's "belie[f] [that] the separation of the two roles allows the Chief Executive Officer to focus on the day-to-day business and operations while allowing the independent Chairman of the Board to lead the board in its fundamental role of providing guidance to and oversight of management." [*Id.*]  It also noted the board's job to "mitigate the chance that [Ultra's] named executive officers may have incentive to take undue risk by . . . engaging both the Board and management in our internal processes to identify circumstances that may create unnecessary risk."  [*Id.* at 209]

19

**D.    This Lawsuit**

Two groups of investors filed lawsuits against Ultra and members of its Board in September 2020.  [#1]; *Bussom v. Watford, et al.*, No. 20-cv-02820-KLM.  The suits were consolidated on April 29, 2021.  [#41]  Subsequently, Plaintiffs filed this second amended complaint, alleging violations of Sections 10(b) and 20(a) of the Exchange Act. [##75-2, ¶¶ 240-55; 77]  Mr. Watford and Mr. Johnson, together, filed a Motion to Dismiss arguing that: (1) Plaintiffs failed to meet the heightened pleading standards created by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and therefore failed to state a claim under Section 10(b) of the Exchange Act, and (2) with no underlying violation of Section 10(b), Plaintiff's Section 20(a) claims necessarily fail.  [#84]  Mr. Watford and Mr. Johnson also filed the Motion for Judicial Notice, discussed above.  [#85]  Mr. Lederman and Fir Tree both filed separate Motions to Dismiss, each arguing that Plaintiffs failed to state a claim under Section 20(a) of the Exchange Act because: (1) for the reasons set out in Mr. Watford and Mr. Johnson's Motion to Dismiss [#84], Plaintiffs failed to state a claim under Section 10(b) of the Exchange Act, therefore failing to state a claim under Section 20(a); and (2) Fir Tree and Mr. Lederman were not "control persons" under Section 20(a).  [##86, 87]  Plaintiffs filed a combined response to the three Motions to Dismiss, and filed a separate response to the Motion for Judicial Notice.  [##91, 93]  Defendants filed replies to the Motions to Dismiss [##97, 99, 100], and Mr. Johnson and Mr. Watford filed a reply regarding the Motion for Judicial Notice  [#98].

## III.    LEGAL STANDARDS

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion under Rule 12(b)(6), a court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff."  *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (alteration in original) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  Nonetheless, a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Generally, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).  "The burden is on the plaintiff to frame a 'complaint with enough factual matter (taken as true) to suggest' that he or she is entitled to relief."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  The court's ultimate duty is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed."  *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

21

Under Section 10(b) of the Securities Exchange Act of 1934, it is unlawful:

> To use or employ in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.

15 U.S.C. § 78j(b). SEC Rule 10b-5 prohibits "mak[ing] any untrue statement of material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in the light of circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

"A plaintiff suing under Section 10(b) . . . bears a heavy burden at the pleading stage." *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333 (10th Cir. 2012). To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege that:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*Id.*, 667 F.3d at 1333.

Under the PSLRA, "a heightened pleading standard applies to the first and third of these elements." *Id.*; *see also Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("Exacting pleading requirements are among the control measures Congress included in the PSLRA."). "In order to overcome a motion to dismiss, a complaint must 'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that

22

belief is formed.'" *Level 3 Commc'ns*, 667 F.3d at 1333 (quoting 15 U.S.C. § 78u-4(b)(1)).

As the Tenth Circuit has explained:

> In deciding whether the factual allegations support a reasonable belief that fraud occurred, courts should evaluate the facts alleged as a whole, evaluating the level of detail, number, and coherence and plausibility of the allegations; whether the allegations are specific enough to be verified or refuted by a defendant without requiring the complaint to disclose how the plaintiff learned of such facts or experts to prove such facts at trial; whether the sources of the facts are disclosed and the reliability of those sources; and any other facts that might affect how strongly the facts alleged support a reasonable belief that the defendant's statements were false or misleading.

*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1102-03 (10th Cir. 2003).

The identified statements must also be material, meaning that "a reasonable investor would consider [the statement or omission] important in determining whether to buy or sell stock." *Level 3 Commc'ns*, 667 F.3d at 1339 (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997)). Thus, courts "distinguish[] between statements that are material and those that are 'mere puffing . . . not capable of objective verification.'" *Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1248-49 (10th Cir. 2022) (quoting *Level 3 Commn'cs*, 667 F.3d at 1339). "Whether a statement constitutes mere puffery is a question of law that can be resolved on a motion to dismiss." *Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, No. 2:13-CV-00909-DN, 2014 WL 1320281, at *4 & n.61 (D. Utah Mar. 31, 2014) (collecting cases), *aff'd*, 638 F. App'x 778 (10th Cir. 2016).

Finally, "it is not enough for a plaintiff to allege generally that the defendant acted with scienter, as permitted under Fed. R. Civ. P. 9(b)." *Level 3 Commn'cs*, 667 F.3d at 1333. Instead, "[t]he plaintiff must, 'with respect to each act or omission alleged [to violate

Section 10(b)], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (quoting 15 U.S.C. § 78u-4(b)(2)(A)).

## IV.   ANALYSIS

### A.   Section 10(b) Claims

Plaintiffs allege that Defendants violated Section 10(b) and Rule 10b-5 through three categories of statements:  (1) statements misrepresenting Ultra's 2017 drilling plan and its capabilities [#75-2, ¶¶ 103-04, 109-11]; (2) statements misrepresenting Ultra's post-bankruptcy horizontal drilling program [*id.* at ¶¶ 120, 190-91, 194-99, 202, 204, 206, 213]; and (3) statements misrepresenting the nature of Ultra's relationship with Fir Tree and Mr. Lederman and their influence over Ultra's decision-making [*id.* at ¶¶ 206, 208-09, 215-16].   Consistent with the parties' briefing, the Court first determines whether the Complaint adequately pleads an actionable false or misleading statement.  Because the Court concludes that the Complaint fails to do so, the Court does not consider whether Defendants acted with scienter.

### 1.  Ultra's 2017 Vertical Drilling Plan; Statements 1-5

Plaintiffs generally allege that Defendants made material misleading statements regarding Ultra's 2017 drilling plan by promising an explosive year of high-quality wells with the knowledge that Ultra had not prepared enough pads to deliver strong results. [*See, e.g.*, *id.* at ¶ 2]  Specifically, Plaintiffs identify the following statements ("Statements 1-5") made by Ultra as misleading:

1. "Well quality will improve as we progress into 2017." [*Id.* at ¶ 103 (statement of Mr. Johnson, made on May 3, 2017)].

2. "[Q:] 'Or is 4 Bcf per well . . . still the right number?' [A:]  'Yeah, this [is] Brad.'"  [*Id.* at ¶ 104; #84-3 at 12 (statement of Mr. Johnson, made on May 3, 2017)].

24

3. "Upon arrival of the additional rigs, operational performance has been strong. And these rigs have quickly approached the fleet average on several key operational metrics." [##75-2, ¶ 109; 84-5 at 6 (statement of Mr. Johnson, made on August 9, 2017)].

4. "We expect the next 2 quarters to deliver similar results." [#75-2, ¶ 110 (statement of Mr. Johnson, made on August 9, 2017)].

5. "[Q:] '[I]s there a potential to see [the 4 Bcf EUR projection for vertical wells] sort of creep up over the next few quarters?' [A:] 'Sure, I think that's fair. . . . So looking forward, I think we're going to continue to see 4 b[cf EUR] wells and greater than 35% returns for the balance of this year.'" [*Id.* at ¶ 111 (statement of Mr. Johnson, made on August 9, 2017)].

The Court determines that Plaintiffs' claims regarding Statements 1-5 are barred by the statute of limitations.

"A private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than . . . 2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658 (b)(1). "[T]he limitations period in § 1658(b)(1) begins to run once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (quoting 28 U.S.C. § 1658(b)(1). "[A]lthough a statute of limitations bar is an affirmative defense, it may be resolved on a Rule 12(b)(6) motion to dismiss 'when the dates given in the complaint make clear that the right sued upon has been extinguished.'" *Radloff-Francis v. Wyo. Med. Ctr., Inc.*, 524 F. App'x 411, 413 (10th Cir. 2013) (quoting *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n. 4 (10th Cir.1980)).

Plaintiffs' theory is that Statements 1-5 constituted violations of Section 10(b) and Rule 10b-5 because Defendants "misleadingly omitted to disclose that Ultra had not prepared the field for its 2017 drilling program." [#91 at 30; *see also* #75-2, ¶¶ 115-16]

25

But, according to Plaintiffs' own allegations, Defendants "admitted" this fact as early as November 7, 2017 on the Q3 2017 Earnings Call. [*See* #75-2, ¶ 8 ("Announcing the Q3 2017 results [on November 7, 2017], Defendants admitted that Ultra was drilling poor wells. They admitted, too, that they had known as much all along. They even implied that their 'uneven' communications may have materially misled investors."); *id.* at ¶ 115 ("On the [Q3 2017 Earnings Call], Defendant Watford admitted that '[w]e expect production for the full year 2017 to be slightly below guidance.' . . . He explained that the chief culprit was that Ultra had not built enough drilling pads in the summer of 2016."). Plaintiffs further allege that on the Q3 2017 Earnings Call, "Defendant Johnson explained that not only did the 2017 wells underperform because they were placed on legacy pads, Ultra knew as much when it delivered its Q1 2017 Earnings Call [on May 3, 2017]." [*Id.* at ¶ 116] Plaintiffs also rely on a PowerPoint Presentation from March 14, 2018, alleging that this presentation revealed just how poorly Ultra's 2017 wells performed and alleging that Ultra's stock price fell 12.3% that same day. [*Id.* at ¶¶ 117-18] Thus, according to Plaintiffs' own allegations, by March 14, 2018—at the latest—a reasonable investor would have everything they needed to make the allegations that Plaintiffs make here: that Ultra's statements about the quality of its wells was misleading in light of its lack of preparation, that Ultra knew of its inadequate preparation, and that Ultra's misleading statements artificially inflated Ultra's stock and caused economic injury to Plaintiffs. Indeed, as Plaintiffs themselves argue in their brief, the March 14, 2018 presentation marked the point at which "the truth [regarding Ultra's 2017 drilling] was . . . fully revealed." [#91 at 26] Plaintiffs filed suit in September 2020, more than two years after March 14, 2018. [#1]

Plaintiffs argue that Defendants' cited admissions and "full[] reve[lation]" of the truth only sufficed to put Plaintiffs on inquiry notice of the alleged violation. [#91 at 26-27]  More specifically, Plaintiffs argue that they were not on inquiry notice regarding Defendants' scienter until interviewing one of Ultra's former employees, who provided information that Ultra's Board of Directors would normally approve the next year's drilling plan before the end of that year's first quarter. [#91 at 35; *see also* #75-2 at ¶92]  As the United States Supreme Court has explained, being placed on "inquiry notice" alone does not suffice to trigger Section 1658(b)(1)'s two-year limitations period.  *Merck & Co.*, 559 U.S. at 652.  "Inquiry notice" generally "refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further."  *Id.* at 651 (collecting cases).  It applies in cases where investors have received "storm warnings to alert a reasonable person to the *possibility* that there were . . . misleading statements." *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1196 (10th Cir. 1998) (quotation omitted); *see also Caprin v. Simon Transportation Servs., Inc.*, 99 F. App'x 150, 156 (10th Cir. 2004) (explaining that "even rumors of vague charges" may be sufficient "storm warnings" to create inquiry notice); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, 387 F. Supp. 2d 1130, 1141-42 (D. Colo. 2005) (holding that a negative analyst report and a related class action complaint against a company were potential "storm warnings" of the possibility of fraud at the company); *Lane v. Page*, 649 F. Supp. 2d 1256, 1302 (D.N.M. 2009) (holding that a *Wall Street Journal* article created a sufficient "storm warning" of a buyer's involvement in a sale and explaining that "[t]he nature of inquiry notice is that [] a reasonable person has been given sufficient hints of a claim").

This is hardly a case of "rumors" or "hints." Instead of having notice of a newspaper article or a negative analyst report, Plaintiffs allege that by March 14, 2018 Defendants had admitted to committing the course of conduct that Plaintiffs allege was fraudulent, and that Ultra's stock price had fallen. [#75-2, ¶¶ 8-9,115-18] Regarding evidence of Defendants' scienter, the Court finds that the former employee's testimony was not required, and that a reasonable investor would have discovered the facts relating to Defendants' scienter by the time of the March 2018 presentation. Again, Plaintiffs allege that in November 2017, Mr. Johnson admitted that "Ultra knew [that its 2017 wells would underperform] when it delivered its Q1 2017 Earnings Call" by informing investors that Ultra had not "high-grad[ed]" its inventory but had instead simply deployed its rigs on available pads, resulting in rigs being placed mostly on the historically less-productive east flank of the Pinedale Field. [*Id.* at ¶ 116; *see also id.* at ¶ 8 ("Announcing the Q3 2017 results [on November 7, 2017], Defendants admitted that Ultra was drilling poor wells. They *admitted, too, that they had known as much all along*." (emphasis added)). Indeed, Plaintiffs allege that in announcing the Q3 2017 results in November 2017, Defendants "even implied that their 'uneven' communications may have materially misled investors." [*Id.* at ¶ 8] No further evidence of scienter was required.

The Court is not persuaded by Plaintiffs' argument that these statements only showed that "someone at Ultra" knew of the poor placement, not that "someone whose scienter can be imputed to Ultra" knew. [#91 at 35] The admission regarding Ultra's knowledge was made by Mr. Johnson—who had been Senior Vice President of Operations until March 2018, when he was promoted to Ultra's CEO—and there is no indication that Mr. Johnson either denied personal knowledge of the misrepresentations

28

or implied that the misrepresentations were the result of actions taken by lower-level employees. [#75-2, ¶¶ 31, 116] Indeed, Ultra did not attempt to conceal the fact that the Board and senior management were involved in Ultra's planning process. According to the Complaint, Defendants had admitted as far back as September 3, 2015 that: "With respect to the development plans underlying our disclosed reserve estimates, each year, our senior management and our board of directors adopts a development plan based on the best information available at the time of adoption." [*Id.* at ¶ 91] And the Earnings Call Transcripts confirm that Ultra informed investors that it was working off of established plans. [## 84-3 at 5-6 (during the Q1 2017 Earnings Call, Mr. Johnson informing investors that Ultra's "ramp up to eight operated rigs in 2017 remain[ed] on track" and keeping investors apprised of Ultra's specific "expect[ations] and "forecast[s]" with regards to the productivity of Ultra's future wells); 84-5 at 6 (during the Q2 2017 Earnings Call, Mr. Johnson explicitly citing Ultra's "2017 development program" in reference to Ultra's plan "to bring on another 97 net wells in the second half of this year")] Accordingly, the Court rejects Plaintiffs' notion that they lacked sufficient knowledge of scienter prior to interviewing Ultra's former employee.[14]

---

[14] Moreover, even if the above-cited disclosures culminating in the March 2018 presentation were merely sufficient to trigger inquiry notice, a reasonable investor would not require very much time at all—and certainly not the five and one-half months Plaintiffs require to avoid the statute of limitations problems outlined herein—to discover facts relating to Defendants' scienter following this admission. *See Merck & Co.*, 559 U.S. at 652 (citing *Young v. Lepone*, 305 F.3d 1, 9 (1st Cir. 2002) for the proposition that "a reasonably diligent investigation . . . may consume as little as a few days or as much as a few years to get to the bottom of the matter"). Indeed, given Mr. Johnson's candid admissions, a reasonably diligent investigator could have simply asked Mr. Johnson who within Ultra knew about the material misrepresentations.

The Court concludes, from the face of the Complaint and materials properly before the Court, that a reasonable investor would have discovered the facts that constitute the alleged violations regarding the 2017 Vertical Drilling Statements before September 2018—two years before Plaintiffs filed suit. Accordingly, the Court RECOMMENDS that Plaintiffs' claims be DISMISSED in so far as they relate to Statements 1-5.

### 2. Ultra's Horizontal Drilling Program; Statements 6-15

Plaintiffs next allege that Defendants made materially misleading statements regarding Ultra's horizontal drilling program by touting the results of an extraordinary "test" well that was not representative of the remainder of Ultra's horizontal drilling prospects. [*See, e.g.*, #75-2, ¶ 2] The Court addresses each allegedly false or misleading statement in turn.

First, Plaintiffs allege that Defendants made the following two false statements ("Statements 6-7") in connection with its Q2 2017 Earnings Call and Press Release:

6. "We plan to drill 11% fewer development wells through year-end while we use those resources to drill three exploratory, horizontal wells." [*Id.* at ¶ 190 (statement of Mr. Watford)].

7. "[W]e're basically displacing . . . vertical well drilling for the second half of the year so we can fund the horizontal experiment. . . . We're just—this is a science project." [*Id.* at ¶ 191 (statement of Mr. Watford)].

Plaintiffs do not allege that Ultra did not displace resources from its vertical well drilling to fund its horizontal program. [*Id.* at ¶ 192] Instead, Plaintiffs take issue with the use of the words "exploratory," "experiment," and "science project." [#91 at 36] Since Defendants were simultaneously spending significant resources to find the best location for its first horizontal wells, Plaintiffs argue that the use of these words "misrepresented the purpose and status of Ultra's horizontal drilling program" and fraudulently failed to disclose that

Ultra was "cherry-picking results." [*Id.*] Plaintiffs appear to assert that Defendant's representation of its three planned horizontal wells created a false impression that the results of Ultra's "science project" would be representative of Ultra's future horizontal wells. [*Id.*; see also #75-2]

The Court fails to see the falsity of Statements 6 or 7. To begin, Ultra had no "results" to "cherry-pick" at this point—Defendants were detailing their plan to drill horizontal wells in the future. Moreover, the fact that Defendants were seeking to drill the best possible horizontal wells did not make them any less "exploratory" or "experiment[al]." In its nearly 30-year history drilling in the Pinedale Field, Ultra had only drilled one horizontal well there and it had failed. [#75-2, ¶¶ 53-54, 121] Ultra was communicating its plans to undertake a novel drilling strategy for the Pinedale Field. Reasonable investors would naturally expect Ultra to diligently prepare its next round of horizontal wells and place them where they would be most likely to succeed in order to avoid repetition of its past failure.

Plaintiffs next allege that the following statements ("Statements 8-12") made in connection with the Q3 2017 Earnings Call and Press Release were false or misleading:

8. "The third quarter was a solid one for us as we transition . . . to . . . resource expansion." [*Id.* at ¶ 194 (statement of Mr. Watford, quoted in the Press Release)]

9. "[Ultra has] [s]uccessfully drilled and completed a 2-mile horizontal well on the east flank of [the] Pinedale [Field]." [*Id.* at ¶ 195 (statement from the Press Release)]

10. "We believe this well is indicative of horizontal potential in the field . . . ." [*Id.* at ¶ 197 (statement of Mr. Watford during the Q3 2017 Earnings Call)]

11. "[Q:] 'Is there anything different with the Warbonnet well or are you just trying to build in some conservatism?' [A:] 'Sure. To be frank, we built these economics last week prior to [receiving the initial data] of our well. . . . We would

> recalculate and come up with significantly better economics with much higher returns.'" [*Id.* at ¶ 198 (statement of Mr. Watford during the Q3 2017 Earnings Call)]
>
> 12.  "On slide 17, we illustrate the concept of drilling horizontal flank wells from preexisting pads used for vertical wells. . . . We are doing this very operation on the Warbonnet 9-24 pad right now." [*Id.* at ¶ 199 (statement of Mr. Johnson during the Q3 2017 Earnings Call)]

Plaintiffs allege that Statements 8-12 were false or misleading for two related reasons: (1) The Warbonnet Pad was located in the core of the Pinedale Field, and not its flank, making it false to assert that these wells related to "resource expansion" or Pinedale's "flank;" and (2) Ultra had selected the single best location in the Pinedale Field for its horizontal test wells, making it misleading to state that these wells could be "indicative" of future wells or imply that Ultra's economics should be "recalculate[d]" based on the horizontal test wells. [*Id.* at ¶ 200]

The Court first examines Plaintiffs' allegations that the three horizontal test wells were not located in Pinedale's "flank" but its "core," and that the wells were drilled towards the west from the core, not the east. [*Id.* at ¶¶ 134-35, 200] Plaintiffs argue that, since the Warbonnet Pad was located in the core of the Pinedale Field, the Warbonnet Wells did not represent a "resource expansion" and could not be accurately characterized as flank wells. [#91 at 38-39] Defendants appear to concede that the pads from which the wells were drilled were located in the core of the Pinedale Field. [#84 at 20-21] However, Defendants argue that this is immaterial because the nature of a horizontal well is such that the well's surface location has no bearing on the sub-surface area that the well accesses. [*Id.* at 20] Since Plaintiffs do not plead any facts forming their belief that the Warbonnet Wells did not access the Pinedale Field's flank, Defendants argue that

Plaintiffs have failed to plead that the statements' descriptions of the Warbonnet Wells were false. [*Id.* at 20-21]

The Court agrees with Defendant that the Warbonnet Pad's location in the core of the Pinedale Field does not alone make Statements 8-12 misleading. Plaintiffs do not contest that a horizontal well drilled in the core of the Pinedale Field could nevertheless access the flank or fringe of the field, but instead acknowledge that a horizontal well is one where "the operator turns 90 degrees when it reaches a pre-selected highly productive strata. The operator then continues to drill perpendicularly for 1,000 to 10,000 feet, which gives horizontal wells their name." [#75-2, ¶ 10 n.3] Indeed, Plaintiffs further allege that the Pinedale Field is "a narrow formation only 4-5 miles wide," and do not contest that the Warbonnet Well referenced in Statements 8-12 was "a 2-mile horizontal well." [*Id.* at ¶¶ 119, 195] Such a well drilled from a pad located very much in the "core" of the Pinedale could quite easily access the flank of the Field and facilitate "resource expansion." Thus, the fact that "the Warbonnet Pad was a core area of the Pinedale [Field]" does not support Plaintiffs' allegation that Statements 8-12 were false or misleading. [*Id.* at ¶ 200] The surface pad location of the Warbonnet Wells does not disqualify them from expanding the resource or otherwise being flank wells.

Plaintiffs appear to argue in their brief that the Complaint properly alleges that the Warbonnet Wells did not terminate in the fringe of the Pinedale Field based on a statement by Ultra's CFO, Mr. Stratton. [*See* #91 at 39 ("Ultra's CFO, [Mr.] Stratton[,] testified that the [Warbonnet Wells] were promising *because* they were located in the core.")] However, Plaintiffs only rely on a misstatement of testimony that is fully quoted in the Complaint. [*Id.*] Instead of testifying that the Warbonnet Wells were located in the

33

geographic core of the Pinedale Field, Mr. Stratton testified that the area in which the Warbonnet Wells were drilled "was a core area for development in general in the [Pinedale Field]," and then proceeded to explain the factors that made the area suitable for horizontal drilling. [#75-2 at ¶ 133] As cited in the Complaint, Mr. Stratton said nothing about the geographic location of the Warbonnet Wells, let alone where those horizontal wells ultimately accessed.

Plaintiffs further allege that Mr. Stratton's testimony "confirmed" that the Warbonnet Wells "actually went west," and not east. [*Id.* at ¶ 134-35] The full testimony excerpt from the Complaint is given below:

> Q: Sure. But as you move east to west on this pad—on these [Warbonnet Wells], are there mountains or wildlife preserves, or a lake or lakes here, that—which would make it—lend itself more to horizontal drilling than vertical?
>
> A: Well, we're surrounded by different items or different circumstances that would prevent us from putting a pad in certain places. So, you know, the area is highly regulated in this particular location as a result of combining all those concerns into a location that would be approved by the BLM.

[*Id.* at ¶ 134] The Complaint continues, alleging that:

> [Mr.] Stratton's testimony emphasizes that the Warbonnet [W]ells' path veered West, further into the Pinedale's core, rather than East, to its flanks. Mr. Talarico continued his line of question[ing] by focusing [Mr.] Stratton's attention on Section 19 [of the Pinedale Field]. In response, [Mr.] Stratton admitted that there were no vertical wells in Section 19. The Warbonnet [Wells] are located in Sections 23 and 24 of Range 9; Section 19 is directly West, not East.

[*Id.* at ¶ 135] It is unclear to the Court how this testimony by Mr. Stratton says anything about the direction that the Warbonnet Wells were drilled. In the first exchange, although Mr. Stratton was asked about movement from east to west on the Warbonnet Pad, he responded with a general statement about the "surround[ing]" circumstances that reveals nothing about the direction that the Warbonnet Wells travelled. [*Id.* at ¶ 134] And in the

second exchange, as alleged, Mr. Stratton simply gave information regarding a section of the Pinedale Field located west of the Warbonnet Pad after being asked specifically about that section.  [*Id.* at ¶ 135]  Again, this reveals nothing about the direction that the Warbonnet Wells were drilled.[15]  Since Mr. Stratton's testimony contradicts Plaintiffs' allegations that Mr. Stratton testified that the Warbonnet Wells were drilled towards the west, Plaintiffs' allegations characterizing Mr. Stratton's testimony need not be taken as true.  *Cf. GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) ("[F]actual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true.").  Thus, Plaintiffs have stated insufficient facts to support a reasonable belief that it was false or misleading for Ultra to state that its Warbonnet Wells were flank wells or otherwise contributed to resource expansion.  *See Adams*, 340 F.3d at 1102-02, 1104.

Next, the Court considers whether Statements 10, or 11[16] were false or misleading statements of material fact based on Defendants' knowledge that the Warbonnet Wells were "not . . . at all typical of the wells [Ultra] would drill in the horizontal program."  [#75-2 at ¶ 200]  Defendants broadly argue that none of their statements, including Statements 10 and 11, were false or misleading in this respect because Defendants never "represent[ed] that the entire field would be as productive" as the Warbonnet Wells or

---

[15] The fact that there were no vertical wells west of the Warbonnet Wells says nothing about the direction the horizontal Warbonnet Wells were drilled.

[16] Statements 8, 9, and 12 make no conceivable representation of Ultra's future horizontal wells, and could not be reasonably interpreted to extrapolate the success of the Warbonnet Wells to any of Ultra's future drilling activities.  Accordingly, to the extent that Plaintiffs' allege that Statements 8, 9, and 12 were false or misleading due to Defendants' knowledge that the Warbonnet Wells were not representative of future wells that Ultra would drill, those allegations fail.

"told investors [that] future horizontal drilling would achieve results like the . . . test wells."
[##84 at 18; 97 at 11]

Statement 10 is a statement from Mr. Watford that "[w]e believe [Warbonnet 9-23 Well #1] is indicative of horizontal potential in the [Pinedale] [F]ield," made during the Q3 2017 Earnings Call.  [#75-2, ¶ 197]  With respect to this statement, Defendants argue that Plaintiffs fail to meet the heightened pleading standard for statements of opinion.  [#84 at 24-26]   As the Tenth Circuit has explained, "pure statements of opinion . . . are *not* material misstatements *unless* they inaccurately represent the speakers' beliefs concerning then-present factual conditions."  *Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018) (citations and quotations omitted).  However, "a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view. And if the real facts are otherwise, but not provided, the opinion statement will mislead the audience."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015).  Thus, "statements of opinion or belief must rest on a factual basis that justifies them as accurate, the absence of which renders them misleading."  *Hampton*, 897 F.3d at 1299 (quotations omitted).

Plaintiffs fail to adequately allege that Mr. Watford's statement misrepresented his, or Ultra's, belief based on the underlying facts.  Contrary to Plaintiffs' characterization of Mr. Watford's statement, Defendants did not communicate that Warbonnet 9-23 Well #1 would be "typical" of the rest of Ultra's horizontal wells in the Pinedale Field.  This is clear from the full context of the statement.  On the same Q3 2017 Earnings Call, Mr. Watford expressly discouraged extrapolating Warbonnet 9-23 Well #1's initial success to the rest

of the Pinedale Field. When asked for details regarding how this success could impact

Ultra's 2018 horizontal drilling program, Mr. Watford replied:

> You have to remember that we just had one well on for less than a week
> more or less. . . . So we need to get the second well on. We need the third
> well on. So I don't think we'll be in a position to want to push on the
> accelerator very hard till we get into the February, March of next year to
> where you have these wells produced for a handful of months and see what
> that production curve looks like."

[#84-6 at 12-13]  Mr. Johnson further told investors on the call that "for the moment we

are prioritizing [horizontal drilling] targets based on quality."  [*Id.* at 12]  Thus, investors

were given explicit notice that Ultra did not yet have enough information to base its future

decisions off of, and was moving forward by focusing its efforts on the most productive

locations of the Pinedale Field.

When read in the context of these more fulsome disclosures, a reasonable investor

would not understand Mr. Watford's statement that Ultra was "extremely excited about

[the positive initial results of Warbonnet 9-23 Well #1]," and "believe[d] that [Warbonnet

9-23 Well #1 was] indicative of the horizontal potential in the field" as a representation of

the conditions throughout the Pinedale Field.  [#75-2 at ¶ 197; 84-6 at 4]; *see Omnicare,*

*Inc.*, 575 U.S. at 186-90 (2015) (explaining that "whether a statement is 'misleading'

depends on the perspective of a reasonable investor" and that courts must examine the

"circumstances" surrounding allegedly misleading opinion statements).  As the Tenth

Circuit has explained, "positive generalizations about a company's performance will

typically not give rise to liability under [S]ection 10(b); rather, to be actionable, the

statements must be grounded in concrete metrics or other objectively verifiable data."

*Ind. Pub. Ret. Sys.*, 45 F.4th at 1249 (10th Cir. 2022); *see also Level 3 Commc'ns*, 667

F.3d at 1340.  Mr. Watford's statement of excitement regarding a newly-drilled well

37

contains no objectively verifiable metrics, data, or other information upon which a reasonable investor could rely.  It is instead the type of "rosy affirmation" of corporate optimism that the Tenth Circuit has consistently held is unactionable because a reasonable investor understands that they are "not capable of objective verification."  *Ind. Pub. Ret. Sys.*, 45 F.4th at 1249; *Level 3 Commc'ns*, 667 F.3d at 1340.

Based on the testimony of an unidentified former employee ("FE1"), Plaintiffs allege that Ultra had spent a significant amount of time finding a suitable location for its "science project" wells and had identified the Warbonnet Pads as the "single perfect location to drill a horizontal well."  [#75-2 at ¶ 130-131]  These allegations do not impact the Court's analysis of Mr. Watford's statement.  As discussed, spending resources to increase the likelihood of an "experiment's" success is not fraudulent or misleading.  Similarly, locating and prioritizing the best location in the Pinedale Field for its first three wells does not mean that all of Ultra's future horizontal drilling endeavors were doomed to fail, or that results from those exemplary wells were incapable of forming the basis for any type of optimistic "indicati[on]" of the "potential" for future horizontal drilling in the same field.  Finally, Ultra communicated to investors that the test wells would all be drilled from one pad, which had been "prioritiz[ed] . . . based on quality."  [#84-6 at 11-12]  Thus, Defendants did not conceal the "true facts" underlying Mr. Watford's optimistic expression of opinion, and Plaintiffs have failed to allege the materiality or the falsity of Statement 10.

Nor do Plaintiffs allege the falsity of Statement 11.  Statement 11, in context, is:

[Q:] "From what it looks like you estimate an [initial production] in your potential go-forward economics of roughly 11 million cubic feet a day versus [Warbonnet 9-23 Well #1] that came on at closer to 22 [million]. Is there anything different with [Warbonnet 9-23 Well #1] or are you just trying to build in some conservatism?"

> [A by Mr. Watford:] "Sure. To be frank, we buil[t] these economics last week prior to [receiving the initial data] of our well. So we [w]anted to anchor the economics here, based on actual data observed by other wells. So we used the [initial production] of 11 million a day from [an existing well], certainly double the [initial production] of our well. We would recalculate and come up with significantly better economics with much higher returns."

[#75-2, ¶ 198] Plaintiffs allege that "because the [Warbonnet Wells] were not representative, they could not be considered in estimating the production of a typical well in the Pinedale [Field]," therefore making the statement false or misleading. [*Id.* at ¶ 200] But in Statement 11, Mr. Watford told investors that Ultra did not follow this alleged course of action. That is, Statement 11 explicitly explains that Ultra did *not* use the promising initial results of Warbonnet 9-23 Well #1 in its economic projections, because it wanted to keep its projections "anchor[ed]" to "actual data." [*Id.* at ¶ 198]

The final sentence in Statement 11 is not to the contrary. There, Mr. Watford acknowledges that recalculating the economics using Warbonnet 9-23 Well #1's positive preliminary data would result in a boost of the company's economic projections. This is quite obviously true. But Plaintiffs do not allege that Ultra ever made this calculation. And, as discussed above, Ultra did not hold out Warbonnet 9-23 Well #1 as "typical" or "representative" of the rest of its horizontal operations in the Pinedale Field. So, to the extent that investors made the economic calculation referenced by Mr. Watford that Ultra explicitly avoided, they did so with knowledge of the incompleteness of the data and at their own risk.

The next allegedly false statement ("Statement 13") relating to Ultra's horizontal well program came on January 30, 2018 when Ultra issued a press release discussing the results of a newly drilled horizontal well. [*Id.* at ¶ 202] The press release quoted Mr. Johnson as saying:

> The initial results of this well confirm the horizontal potential of the Mesaverde interval. We were expecting higher pressures and higher porosities in the Mesaverde and that is exactly what we encountered . . . . To date, [Ultra] has completed three horizontals on the east flank, each one targeting different intervals and each one verifying the significant resource potential beyond the previous commercial boundary of the Pinedale [Field]. We look forward to drilling more horizontal wells in 2018 and beyond.

[*Id.*] For similar reasons as explained regarding Statements 8-12, Plaintiffs have failed to allege the falsity of Statement 13. As discussed above, Plaintiffs have failed to allege facts supporting their allegation that it was false or misleading to describe the Warbonnet Wells as being "on the east flank," or as otherwise expanding the "previous commercial boundary of the Pinedale [Field]." As Plaintiffs allege, a horizontal well can laterally access distant areas [*id.* at ¶ 10 n.3], meaning that the well that is drilled in the core of a field can still access resources in the field's flank. Thus, a horizonal well that begins in the core can still access resources "beyond the previous commercial boundary" of a field. Plaintiffs plead no facts supporting their allegation that the Warbonnet Wells did not do so. To the contrary, Plaintiffs allege that the Warbonnet Wells were specifically drilled to access resources that traditional vertical drilling could not recover—thereby expanding the commercial boundary of the field. [*See, e.g.*, *id.* at ¶¶ 13, 131] And again, Defendants did not hold out the Warbonnet Wells as representative of future horizontal wells, but instead acknowledged the success that the Warbonnet Wells had achieved on their own terms. Accordingly, Plaintiffs do not allege how the Warbonnet Wells—which Plaintiffs allege were successful [*See, e.g.*, *id.* at ¶ 11]—failed to "verify[]" the resource potential of the areas that they accessed.

The next allegedly misleading statement ("Statement 14") came during the Q4 2017 Earnings Call held on February 28, 2018. [*Id.* at ¶ 204] Statement 14, in context, is:

40

> [Q:] Then it looks like those next couple of horizontal wells are pretty close to your Warbonnet Wells. What are your plans to delineate the play this year? Or are you going to stay pretty focused on that area that's been working for you?
>
> [A:] Yes. We're going to stay in this same ZIP Code for a while. And we're definitely interested and want the learn more about the flanks. But right now, our focus is delivering repeatable results.

[*Id.* at ¶ 204] The parties dispute whether all or part of Statement 14 is "forward looking" such that it receives protection under the PSLRA's safe harbor provision.[17] [##84 at 22-23; 91 at 41-42; 97 at 17-28] Even assuming the safe harbor provision does not apply, Plaintiffs have failed to plead the falsity of Statement 14. If anything, Statement 14 supports the notion that Ultra disclosed: (1) the location of the Warbonnet Wells and the area that they accessed; and (2) the notion that the Warbonnet Wells were not necessarily representative or typical of the rest of the Pinedale Field. Plaintiffs allege that Statement 14 is false because "the [Warbonnet Wells] were not repeatable." [#75-2, ¶ 205] But Statement 14 did not promise repeatable results to investors. It stated that Ultra was going to focus its future drilling on the area in which it had achieved success in hopes of achieving repeatable results before expanding its horizontal drilling program to other areas of the Pinedale Field. Even if Defendants knew that the Warbonnet Wells were located in the "single best location" of the Pinedale Field as Plaintiffs allege [*Id.* at ¶ 205], Ultra could nevertheless "focus [on] delivering repeatable results" by drilling near its successful wells. Locating the "single perfect location" in the Pinedale Field does not preclude the existence of other economic locations in the same area. Statement 14

---

[17] The PLSRA creates a statutory safe harbor for certain "forward looking statement[s]" when those statements are "accompanied by meaningful cautionary statements . . .; or immaterial" or the plaintiffs fails to prove that the statement "was made with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(A)-(B).

informed investors of the strategy that Ultra had selected for seeking out those productive areas.  Plaintiffs do not successfully allege that this was not, in fact, Defendants' plan moving forward.

The next allegedly misleading statement related to Ultra's horizontal drilling program ("Statement 15") came during the Q1 2018 Earnings Call held on or around May 10, 2018.  [*Id.* at ¶ 211-13]  Before the Q1 2018 Earnings Call, Ultra reported the initial production rates of Wells #4 and #5 [*id.* at ¶ 211]—both of which were lower than at least two of the Warbonnet Wells.  S*ee supra* note 13.  On the call, an investor asked about the lower production from Wells #4 and #5. [*Id.* at ¶ 213]  Mr. Johnson responded by ensuring that these two wells did not miss their intended targets, but that "[t]he geological nature of [the] Pinedale [Field] does have variability and we certainly encountered that on these last two wells."  [*Id.* at ¶ 211-13]

Plaintiffs have failed to allege the falsity of Statement 15.  Plaintiffs allege that Statement 15 is false because "it was not the Pinedale [F]ield's variability but the Warbonnet[] [Wells'] exceptionalism that accounted for the disparity between the Warbonnet [Wells] and [the] new wells.  [*Id.* at ¶ 214]  The Court fails to see the distinction between the Plaintiffs' competing explanations.  All else being equal, if wells in one part of a field produce exceptional results, and wells in another part of the field produce poor results, then it is obviously correct to say that the geological nature and resource availability of the field has variability.  Plaintiffs do not allege that Wells #4 and #5 produced worse results than at least two of the Warbonnet Wells due to differences in drilling equipment, staffing, weather, or any other factor besides where the wells were located.  [*See Id.* at ¶ 214 ("[Statement 15 was] false because . . . the Warbonnet [Wells]

42

had been selected as the best conceivable location in the Pinedale [F]ield, and the new wells were not.")]  It would be difficult to attribute this discrepancy to anything other than the "variability" of the Pinedale Field.

For the reasons discussed above, the Court RECOMMMENDS that Plaintiffs' claims be DISMISSED as they relate to Statements 6-15.

### 3. Fir Tree's Involvement in Ultra's Corporate Structure; Statements 16-19

The final category of allegedly false or misleading statements relate to Fir Tree's involvement in Ultra's corporate structure.  According to Plaintiffs, Fir Tree's strategy as a private equity firm was to make a short-term gain by selling its shares after drilling a few highly productive wells, which conflicted with the interests of long-term shareholders who sought a steady and sustainable growth path.  [*Id.* at ¶¶ 146-53]  Plaintiffs broadly allege that Ultra misled investors by misrepresenting the amount of control that Fir Tree was exercising over Ultra's drilling decisions, thereby allowing Fir Tree to guide Ultra's decision-making in a way that conflicted with long-term growth.  [*See Id.* at ¶¶ 208, 210, 217]  The Court examines each allegedly false or misleading statement in turn.

The first two allegedly false or misleading statements relating to Fir Tree's relationship with Ultra came in an amendment to Ultra's 2017 10-K filing, made on April 27, 2018.  [*Id.* at ¶¶ 206-10]   The amendment explained:

> The Board of Directors currently has separate roles for the non-executive Chairman of the Board and the Chief Executive Officer. [Ultra] believes the separation of the two roles allows the Chief Executive Officer to focus on the day-to-day business and operations while allowing the independent Chairman of the Board to lead the board in its fundamental role of providing guidance to and oversight of management.

[*Id.* at ¶ 206 ("Statement 16")]   The amendment further listed one of the Board's responsibilities as "[m]itigat[ing] incentives to take undue risk," explaining:

43

> We mitigate the chance that our named executive officers may have incentive to take undue risk by using multiple performance measures and targets, different performance measures in our short and long-term incentive programs, and by engaging both the Board and management in our internal processes to identify circumstances that may create unnecessary risk.

[*Id.* at ¶ 209 ("Statement 17")]

Plaintiffs allege that Statement 16 was false because Fir Tree (presumably through the Chairman of the Board, Mr. Lederman) went beyond "guidance" and "oversight" of management by overruling management in ordering a horizontal-focused drilling plan, bypassing management to communicate directly with Ultra employees, and designing its own drilling plan. [*Id.* at ¶ 208] Moreover, Plaintiffs allege that Fir Tree interfered in certain "day-to-day affairs," such as preparing its own reserves and production estimates. [*Id.* at ¶ 208] Plaintiffs similarly allege that Statement 17 was misleading because the Board, directed by Mr. Lederman, was forcing Ultra to undergo an unnecessarily risky horizontal drilling program as opposed to mitigating risks. [*Id.* at ¶ 210]

Statements 16 and 17 are immaterial and therefore unactionable. "A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock." *Level 3 Commc'ns*, 667 F.3d at 1339 (quoting *Grossman*, 120 F.3d at 1119 (10th Cir. 1997)). Reasonable investors do not rely on vague statements incapable of objective verification. *See id.* at 1339-40; *Grossman*, 120 F.3d at 1119. To be sure, a reasonable investor would want to know of Fir Tree's involvement in the direction and management of Ultra. To this end, Ultra kept investors apprised of its relationship with Fir Tree through, at least, press releases and the release of information regarding a cooperation agreement between Ultra and Fir Tree. [##75-2, ¶¶ 158-62, 225, 227, 228; 84-7 at 1-2] "The importance of [Fir Tree's relationship with

Ultra] does not, however, mean that everything [D]efendants said on the topic was material." *Level 3 Commc'ns*, 667 F.3d at 1340.

Plaintiffs allege that Mr. Lederman overstepped his "guidance" and "oversight" "limit[s]" by "overrul[ing] management" on certain drilling decisions. [#75-2, ¶ 208] First, it is far from clear that Statement 16 was intended to communicate a set of limitations on each position's role, as opposed to simply delineating each position's "focus" or "fundamental role." [*Id.* at ¶ 206] Moreover, "oversight" authority is such a broad term that it could easily encapsulate "overruling" when it comes to big-picture plans, such as a company's drilling focus moving forward. Personal approaches to "oversight" and "guidance" styles differ widely between individuals and entities, such that a reasonable investor could not expect for such general phrases to provide the meaningful limitation of the Chairman's authority that Plaintiffs suggest. Similarly, Plaintiffs allege that Fir Tree (again, presumably through Mr. Lederman) "interfered in day-to-day affairs" by "creating [its] own reserves and production estimates." [*Id.* at ¶ 208] But the modelling and estimate process that the Complaint describes plainly involves big-picture decisions relating to what assumptions and inputs the company would rely on moving forward. [*Id.* at ¶¶ 178-84] The Court declines Plaintiffs' invitation to impose a strict judicial definition on such flexible phrases and concepts as "guidance," "oversight," and "day-to-day business" that are frequently found in the corporate context. *C.f. Level 3 Commc'ns*, 667 F.3d at 1340 (holding as nonactionable "vague . . . management-speak upon which no reasonable investor would base a trading decision").

Statement 17, in turn, provided a general description of Ultra's structural barriers in place to "*mitigate* the chance that [Ultra's] named executive officers *may* have incentive

45

to take *undue* risk." [#75-2 at ¶ 209 (emphases added)] This tempered statement is far from an actionable assurance that Ultra's Board would prevent Ultra from taking risks as a corporation. Instead, it is a commonplace statement of commitment to risk management, which are generally unactionable. *See Smallen v. W. Union Co.*, No. 17-CV-00474-KLM, 2019 WL 1382823, at *7 (D. Colo. Mar. 27, 2019) (noting that "courts have found that general language regarding a company's commitment to risk management is inactionable," collecting cases, and making the same finding), *aff'd sub nom. Smallen v. The W. Union Co.*, 950 F.3d 1297 (10th Cir. 2020). Indeed, the precise risk-mitigation measure that Plaintiffs take issue with was Ultra's statement that it would mitigate risk "by engaging both the Board and management in our internal processes to identify circumstances that may create unnecessary risk." [#75-2 at ¶ 209] This added detail to Ultra's risk-mitigation commitment that the Board was "engag[ed]" with Ultra's "internal [risk-identification] processes" does not make Statement 17 actionable. *C.f. Smallen*, 2019 WL 1382823 at *7 (holding that a statement that a company was "fully engaged in the fight against . . . fraud" was inactionable); *In re Sturm, Ruger & Co., Inc. Sec. Litig.*, No. 3:09-cv-1293, 2011 WL 494753, at *5 (D. Conn. Feb. 7, 2011) (holding that the statement "[e]mployees are fully engaged and we see nothing but opportunities ahead of us" was inactionable).

Moreover, even if it were actionable, Plaintiffs have failed to allege the falsity of Statement 17. Plaintiffs allege that "far from tempering management's incentives to take undue risk, the Board itself was requiring that management undertake a reckless horizontal drilling plan." [#75-2 at ¶ 210] But this simply alleges that Ultra's selected method of mitigating risk—engaging the Board in internal risk-mitigation processes—was

46

ineffective.  Plaintiffs therefore allege mismanagement, but not fraud.  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("Congress by [Section] 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." (quoting *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12 (1971)).

The final allegedly fraudulent statements came on the Q1 2018 Earnings Call, held on May 10, 2018.  [#75-2, ¶¶ 215-17]  On that call, Mr. Johnson was asked about the preliminary results of some newly drilled horizontal wells.  Mr. Johnson responded that the results were "certainly within an acceptable range to us to continue to ramp up [the horizontal program]. . . . And we're excited about the results so far.  And we're excited about the upcoming wells and collectively, all that gives us the confidence to go faster." [*Id.* at ¶ 215 ("Statement 18")]  Mr. Johnson was then asked to explain why Ultra was substituting horizontal wells for vertical wells, as opposed to increasing the budget and pursing both.  [*Id.* at ¶ 216]  After explaining Ultra's general strategy of spending within cash flow as opposed to increasing the budget, Mr. Johnson stated:  "And in doing so, the opportunity to shift capital through horizontal wells is just, for us, the obvious thing to do given the superior returns."  [*Id.* ("Statement 19")]

Statements 18 and 19 are nonactionable statements of corporate optimism that no reasonable investor would rely upon.  Plaintiffs allege that the statements were false because Ultra's management opposed the switch to horizontal drilling but was overruled by Fir Tree, meaning that "the decision to [focus on horizontal drilling] did not arise from 'excitement' at the returns."  [*Id.* at ¶ 217]  But statements of corporate excitement about past results and upcoming plans are a classic example of inactionable puffery.  *See In re Advance Auto Parts, Inc.*, No. CV 18-212-RGA, 2020 WL 599543, at \*5 (D. Del. Feb. 7,

47

2020) (noting that "[c]ourts have routinely found that statements using words like 'excited' and 'pleased' constituted inactionable puffery," and holding the same); *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 366 (S.D.N.Y. 2019) (holding that the statement "[p]ersonally, I have never been more confident and excited about the future of Sketchers" was inactionable puffery), *aff'd sub nom. Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020); *In re Cybershop.com Sec. Litig.*, 189 F. Supp. 2d 214, 232 (D.N.J. 2002) (holding that the statements "[w]e are very excited about this deal" and "we are expecting an enormous fourth quarter and it is very exciting" were inactionable puffery, even if they were misleading).   Similarly, a statement that a corporation supports its selected course of action is not something that a reasonable investor would rely upon in valuing the company.

Thus, Plaintiffs have failed to plead that Defendants made a material false statement regarding Ultra's relationship with Fir Tree during the Class Period. Accordingly, the Court RECOMMENDS that Plaintiffs' claims be DISMISSED as they relate to Statements 16-19.

### 4. Conclusion

Because Plaintiffs have failed to allege that Defendants made a false or misleading statement of material fact, the Court RECOMMENDS that Plaintiffs' claim alleging violations of Section 10(a) be DISMISSED.

### B.      Plaintiffs' Claims under Section 20(a)

Section 20(a) of the PSLRA provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly

48

and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a).

"Control-person claims under Section 20(a) are predicated on some underlying primary

violation of the securities laws." *Smallen*, 950 F.3d at 1315 (citing *Adams*, 340 F.3d at

1107). Because Plaintiffs have failed to allege "a primary violation of the securities laws"

as asserted under Section 10(b), the Court determines that their Section 20(a) claims

necessarily fail. *See id*. Accordingly, the Court RECOMMENDS that Plaintiffs' claim

alleging violations of Section 20(a) of the PSLRA be DISMISSED.

### C.     Amendment of Plaintiffs' Complaint

Plaintiffs seek leave to amend their Complaint should the Court conclude that it is

deficient. [#91 at 58 n.13] The entirety of Plaintiffs' argument is a one sentence request,

with two case citations. [*Id.*] The Tenth Circuit has held that a district court does not abuse

its discretion when it dismisses a complaint with prejudice where the request to amend is

made in such a perfunctory manner. *See Gold Res. Corp.*, 776 F.3d at 1118-19 ("The

district court did not abuse its discretion in dismissing the complaint with prejudice where

plaintiff's memorandum contained only one sentence at the very end of his brief

alternatively requesting leave to amend in the event the district court should decide to

dismiss his complaint."); *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180,

1186-87 (10th Cir. 1999) ("[A] request for leave to amend must give adequate notice to

the district court and to the opposing party of the basis of the proposed amendment before

the court is required to recognize that a motion for leave to amend is before it."). However,

the Court is also cognizant that "[l]eave to amend is to be granted with extreme liberality

in securities fraud cases, because the heightened pleading requirements imposed by the

PSLRA are so difficult to meet." *Osher v. JNI Corp.*, 183 F. App'x 604, 605 (9th Cir. 2006)

49

(citing *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir.2003)); *see also In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1209 (D. Colo. 2004) (granting leave to amend a fourth amended complaint "[b]ecause it does not clearly appear that an attempt to amend necessarily would be futile"). Accordingly, the Court RECOMMENDS Plaintiffs' complaint be DISMISSED WITHOUT PREJUDICE, and that Plaintiffs be given fourteen (14) days from an order on this Recommendation to file a proposed amended complaint.

## V.    CONCLUSION

For the reasons set forth above, the Court **RECOMMENDS** that:

1. the Motion for Judicial Notice [#85] be **GRANTED IN PART** and **DENIED IN PART**;

2.  the Motions to Dismiss [##84, 86, 87] be **GRANTED** to the extent that they seek dismissal of the Complaint;

3. the Complaint be **DISMISSED WITHOUT PREJUDICE;** and

4. Plaintiffs be given fourteen (14) days from an order on this Recommendation to file a proposed amended complaint.[18]

---

[18] Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review." *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the Magistrate Judge. *See Vega v. Suthers*, 195 F.3d 573, 579-

DATED:  November 19, 2022                    BY THE COURT:

                                             s/Scott T. Varholak
                                             United States Magistrate Judge

---

80 (10th Cir. 1999) (holding that the district court's decision to review Magistrate Judge's recommendation *de novo* despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (finding that cross-claimant waived right to appeal certain portions of Magistrate Judge's order by failing to object to those portions); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (finding that plaintiffs waived their right to appeal the Magistrate Judge's ruling by failing to file objections). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).