# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Nina Y. Wang

Civil Action No. 20-cv-02652-NYW-STV (consolidated for all purposes with Civil Action No. 20-cv-02820)

ULTRA PETROLEUM INVESTOR GROUP, Individually and on behalf of all others similarly situated,

       Plaintiffs,

   v.

MICHAEL D. WATFORD,
C. BRADLEY JOHNSON,
ULTRA PETROLEUM, INC.,
FIR TREE CAPITAL MANAGEMENT LP N/K/A FIR TREE PARTNERS, INC., and
EVAN LEDERMAN,

       Defendants.

## DEFENDANTS' RESPONSE TO PLAINTIFFS' OBJECTION TO RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

## Preliminary Statement

On November 21, 2022, Judge Varholak recommended dismissal of Plaintiffs' securities fraud complaint. Dkt. #102. The fifty-page Recommendation thoroughly analyzes each of the nineteen statements Plaintiffs allege were fraudulent and correctly concludes that each statement is not actionable. Plaintiffs argue Judge Varholak "erred because instead of evaluating Plaintiffs' claims in their own right to determine if they were plausible on their face, he considered them relative to a competing narrative that he ultimately saw as more likely to prevail." Dkt. #103 at 1-2. But Judge Varholak made no such comparison and drew no such conclusion. Rather, he considered Plaintiffs' allegations and other information that Plaintiffs *do not dispute* is properly considered on a motion to dismiss, and he carefully analyzed whether Plaintiffs had met the heightened pleading burden for a securities fraud claim. The Recommendation's comprehensive analysis of the complaint's deficiencies is correct, and the Court should adopt it. Plaintiffs object to Judge Varholak's analysis only as to seven of the nineteen alleged misstatements. Defendants address those seven statements below.

## Argument

**I.    The Court Should Adopt The Recommendation's Conclusion That The Alleged Misstatements Regarding Horizontal Drilling Are Not Actionable.**

The Recommendation concludes that each of the allegedly fraudulent statements regarding Ultra's horizontal drilling is not actionable. Dkt. #102 at 30-43. Of the ten alleged misstatements about horizontal drilling, Plaintiffs object to the Recommendation's conclusion for only five—Statements 10, 11, 13, 14, and 15.[1]

As explained more fully in Defendants' motion to dismiss briefs, Ultra announced in 2017 that

---

[1] References to "Statement __" refer to the statement numbers the Recommendation assigns to each of the alleged misstatements. Dkt. #102.

it would drill three horizontal test wells. Dkt. #84 at 4. Defendants announced the results of the test wells in late 2017 and early 2018. *Id.* at 4-5. Plaintiffs assert that "[e]ach statement furthered the misrepresentation that the initial horizontal well drilled by Ultra Petroleum would be representative of others to come in the field at large and that production output would be on par with the initial production reports previously provided." Dkt. #103 at 6. But, as the Recommendation correctly explains, Plaintiffs mischaracterize what Defendants actually said. Defendants disclosed from the start that the horizontal test wells were intended to test *the concept* of horizontal drilling. Plaintiffs themselves *admit* Defendants stated the test wells were a "'science experiment' meant to test the expansion's potential." Dkt. #75-2 ("Compl.") ¶ 11. Defendants stated the test results indicated the potential to expand the field, not that future results would match the test results.

Importantly, Plaintiffs also ignore the actual results disclosed for the test wells, pretending as though all three test wells were high performers. They were not. Rather, there was significant variation: While the first and third test wells had initial production of approximately 50 mmcfe/day, the second test well had initial production of only 17 mmcfe/day. Dkt. #84-7 at 2. Moreover, Plaintiffs do not dispute that Ultra's publicly disclosed results of the horizontal wells drilled after the test wells showed that some of those later wells performed better than the second test well. Dkt. #84-11 at 9. Thus, Plaintiffs do not (and could not) allege that the test wells produced uniformly outstanding results that later wells failed to replicate. As a result, their assertion that the test wells were some ruse designed to showcase results that would never recur is contradicted by their own allegations. The Court should adopt the Recommendation for the alleged misstatements about horizontal drilling.

**Statement 10.** In November 2017, Defendant Watford announced the results of Ultra's first horizontal test well, and stated: "We believe this well is indicative of horizontal potential in the field, which could result in potentially 16 new horizontal wells, they are incremental to our vertical well

2

inventory." Compl. ¶ 197. Plaintiffs argue the statement was fraudulent because "Defendants spent vast resources identifying the single best location for wells anywhere in the Pinedale field" and "Defendants understood the horizontal wells they drilled would not be at all typical of the wells they would drill in a horizontal program." *Id.* ¶ 200; Dkt. #103 at 3-4.

As an initial matter, Watford's statement is expressly a "belief," subject to a higher pleading standard. *See Omnicare v. Laborers Dist. Council*, 575 U.S. 175, 188-89 (2015). To assert a claim based on an opinion, Plaintiffs must allege that either (1) the maker of the statement did not sincerely believe the opinion; or (2) the opinion did not "fairly align[] with the information in the issuer's possession at the time." *Id.* Plaintiffs do not allege Watford was not sincere about Ultra's belief in the potential for horizontal drilling. Instead, they allege the "'real facts' behind [the] statement did not support it" because "investors understood his statements to mean that the well's initial production was 'indicative' of the field at large." Dkt. #103 at 5-6 n.3. But Plaintiffs mischaracterize Watford's statement. The statement expressed a belief that the results of the horizontal test well indicated the *potential* that horizontal drilling had for the field, including potentially adding 16 horizontal wells. Watford did not say the results from this first test well would be typical of future horizontal wells; indeed, he expressly *declined* to provide quantitative guidance. Dkt. #84-6 at 3 ("we're not providing 2018 guidance at this time as we continue to refine our view on … the impact of horizontals."). Plaintiffs also mischaracterize Judge Varholak's conclusion on this issue, asserting that Judge Varholak concluded "investors would not have understood Mr. Watford's statement to 'communicate that [the well] would be 'typical.'" Dkt. #103 at 4. What Judge Varholak actually concluded, correctly, is that "Contrary to Plaintiffs' characterization of Mr. Watford's statement, Defendants did not communicate that Warbonnet 9-23 Well #1 would be 'typical.'" Dkt. #102 at 36. Thus, Judge Varholak properly analyzed what the alleged misstatement actually said, and correctly concluded that Watford did not state the test well's

3

results would be typical of future results.

Plaintiffs' allegation that Ultra dedicated "vast resources" to its horizontal test wells does not render what Watford actually said fraudulent. As the Recommendation correctly reasons, "spending resources to increase the likelihood of [the horizontal drilling] 'experiment's' success is not fraudulent or misleading." Dkt. #102 at 38. Moreover, Defendant Johnson expressly disclosed that "[o]ur teams have been busy evaluating resource expansion in Pinedale with an emphasis on horizontal drilling on the flanks of the field" (Dkt. #84-5 at 5), and that Ultra was "prioritizing targets based on quality" (Dkt. #84-6 at 11). No reasonable investor could have concluded that Ultra had not planned for the test wells or was not locating the test wells where they were most likely to succeed. For that same reason, Plaintiffs' reliance on Former Employee 1 ("FE 1") is misplaced. Plaintiffs allege that, according to FE 1, Ultra spent months identifying the best location for the horizontal test well. Dkt. #103 at 3. But Plaintiffs do not allege that FE 1 reported there were no other Pinedale locations where Ultra might be successful. Dkt. #102 at 41 ("Locating the 'single perfect location' in the Pinedale Field does not preclude the existence of other economic locations in the same area."). And, even if FE 1 held such a view, Plaintiffs do not allege FE 1 said as much to Watford before November 2017 or that Watford agreed with FE 1's opinion. *See Anderson v. Spirit Aerosystems*, 827 F.3d 1229, 1244-45 (10th Cir. 2016) (witness's allegation that cost projections were unreasonable was insufficient to establish the defendant's knowledge of falsity because the allegation "d[id] not suggest that [the defendant] believed his cost-control efforts were unrealistic"); *KBC Asset Mgmt. v. DXC Tech.*, 19 F.4th 601, 609 (4th Cir. 2021) (rejecting former employee's allegations because "the former employees, for the most part, do not allege that they passed their concerns on to [the defendants] or that the individual

Defendants were otherwise aware of the problems alleged").[2]

**Statement 11.** On Ultra's 3rd quarter 2017 earnings call, Watford stated that if Ultra had used the result of the first horizontal test well in a calculation addressing horizontal drilling's potential, it would have "come up with significantly better economics with much higher returns" than what Ultra actually disclosed. Compl. ¶ 198. Plaintiffs object to the recommended dismissal of this statement, arguing that "the initial production data from the well" was "not representative of the field at large and therefore not reliable." Dkt. #103 at 5 n.2. Plaintiffs' argument fails for two reasons. First, Watford did not say the first test well was representative of the field. Second, Watford's statement indicated that Ultra *did not* use the test well result in the calculation at issue—it was describing what would have happened *if* Ultra had done so. There is nothing false or misleading about describing how arithmetic works—that including a high producing well in a calculation would increase the total.

**Statement 13.** On January 30, 2018, Defendant Johnson stated: "[T]he Company has completed three horizontals on the east flank, each one targeting different intervals and each one verifying the significant resource potential beyond the previous commercial boundary of the Pinedale Anticline." Compl. ¶ 202. Plaintiffs object to the recommended dismissal, arguing the statement (1) "furthered the misrepresentation that the initial horizontal well … would be representative of others to come" and (2) "concealed specifics about the initial well's location and output (e.g., its distance from neighboring vertical wells and access to untouched pockets of gas) that, in turn, prevented investors from being able to accurately evaluate or understand the above statements." Dkt. #103 at 6-7.

---

[2] Plaintiffs also assert that Defendant Johnson and former Ultra CFO Stratton both later admitted they "knew that [the initial test well] would produce better results than future wells." Dkt. #103 at 3. However, Plaintiffs' allegations (cited in their objection) do not support the assertion. Additionally, Plaintiffs' materiality argument (*id.* at 4) is irrelevant, as Defendants' argument is that Plaintiffs do not plead with particularity facts necessary to demonstrate a false or misleading statement of opinion, rather than any materiality challenge.

Plaintiffs' first argument fails because it again pretends that Johnson said the test wells were representative of future results. But he did not. Rather, he said the results verified "resource potential beyond the previous commercial boundary" of the field. Plaintiffs do not allege this was inaccurate. That Ultra was not ultimately able to drill horizontal wells economically beyond the commercial boundary at then-prevailing gas prices does not indicate a lack of significant resource potential that horizontal drilling could access and that was not previously accessible. Moreover, directly contradicting Plaintiffs' assertion that Defendants stated future wells would perform like the test wells, Johnson disclosed in February 2018 that Ultra used in its earnings guidance an estimate that horizontal wells would produce at 22 mmcfe/day and that Ultra's goal was to reach 30 mmcfe/day. Dkt. #84-4 at 6, 16. Both of these figures are well below the horizontal test wells' performance (*supra* at 2), meaning Johnson was clear Ultra *did not* believe future horizontal wells would perform like the test wells.

Plaintiffs' second argument—the purported concealment of the location of the wells relative to "neighboring vertical wells and untouched gas pockets"—fails because Defendants' statements did not say anything about proximity to other wells or gas pockets. Therefore, the statements could not have been inaccurate or misleading on that point. Controlling precedent rejects claims based solely on a failure to disclose, where the omission has no bearing on whether the statements actually made are misleading. *Emps. Ret. Sys. v. The Williams Cos.*, 889 F.3d 1153, 1164 (10th Cir. 2018) (the statute "prohibit[s] only misleading and untrue statements, not statements that are incomplete"). Regardless, Plaintiffs do not dispute that the Court can consider the transcript of Ultra's third-quarter earnings call, which contains a detailed nine-paragraph discussion of the location of the wells. Dkt. #84-6 at 7-8. Consequently, Plaintiffs' claim fails as a matter of law and for insufficient allegations of fact.

**Statement 14.** In February 2018, an analyst asked: "it looks like those next couple of horizontal wells are pretty close to your Warbonnet Wells. What are your plans to delineate the play

6

this year?  Or are you going to stay pretty focused on the area that's been working for you?"  Compl.

¶ 204.  Johnson responded: "We're going to stay in the same ZIP code for a while. And we're definitely

interested and want to learn more about the flanks.  But right now, our focus is delivering repeatable

results."  *Id.*

Plaintiffs first argue the statement was "materially misleading, given that the location of the

well made 'repeatable results' not possible."  Dkt. #103 at 6.   But the alleged misstatement did not

promise "repeatable" results; it stated Ultra *wanted* to achieve repeatable results *before* trying to drill in

new locations.  In other words, the statement articulated Ultra's plan to stay in the area it was currently

drilling because it was trying to achieve repeatable results before venturing elsewhere.  Plaintiffs do

not allege that was not Ultra's actual plan.  And as the Recommendation correctly notes, "[e]ven if

Defendants knew that the Warbonnet Wells were located in the 'single best location' of the Pinedale

Field as Plaintiffs allege … Ultra could nevertheless 'focus [on] delivering repeatable results' by drilling

near its successful wells."  Dkt. #102 at 41.

Plaintiffs next argue the alleged misstatement supposedly concealed the location of the hori-

zontal wells.  This argument fails for the reason shown above.  *Supra* at 6.  Moreover, the Recommen-

dation is correct that the question to which Statement 14 responded expressly stated the location of

the horizontal wells—on the Warbonnet pad.  Thus, "Statement 14 supports the notion that Ultra

disclosed … the location of the Warbonnet Wells and the area that they accessed," undercutting Plain-

tiffs' conclusory assertion that the information was concealed.  Dkt. #102 at 41; Compl. ¶ 204.[3]

---

[3] Although the Recommendation based its decision on Plaintiffs' failure to plead falsity, Statement 14
is also not actionable because it is a forward-looking statement accompanied by adequate cautionary
statements.  *See* 15 U.S.C. § 78u-5(i)(1)(B);  Dkt. #84 at 16-17; Dkt. #97 at 13-14.

**Statements 15.**  Announcing its 1st quarter 2018 results, Ultra disclosed the performance of two new horizontal wells, which had "initial production rates of 11.7 mmcfe and 28.5 mmcfe per day."  Compl. ¶ 211.  Johnson stated that "[t]he geological nature of Pinedale does have variability and we certainly encountered that on these last two wells."  *Id.* ¶ 213.  Plaintiffs argue this statement was false because it "attributed the lower output to simply 'variability' within the field when, in reality, the lower output was a direct consequence of Ultra Petroleum's decision to drill the initial well in the single-most ideal location possible."  Dkt. #103 at 6.  But, even accepting Plaintiffs' characterization, Johnson's statement was not false.  "Variability" means "lack of consistency or fixed pattern."  *Oxford Languages Dictionary* (available by entering "variability" into Google.com).  Thus, the Recommendation correctly concluded: "All else being equal, if wells in one part of a field produce" different results than "wells in another part of the field," "it is obviously correct to say that the geological nature and resource availability of the field has variability."  Dkt. #102 at 42.  Indeed, one of the two new wells had *greater* production than the second of the three test wells, which had produced at 17 mmcfe/day.  *Supra* at 2.  These widely differing results across *all* the horizontal wells demonstrate that the geologic nature of Pinedale *is* variable.  As the Recommendation points out, given Plaintiffs' allegations, "[i]t would be difficult to attribute this discrepancy to anything other than the 'variability' of the Pinedale Field."  Dkt. #102 at 43.  Additionally, Plaintiffs' contention that Ultra "concealed … the initial well's location," fails for the reasons shown above.  *Supra* at 6.

## II.    The Court Should Adopt The Recommendation's Conclusion That The Alleged Misstatements About Corporate Governance Are Not Actionable.

Plaintiffs also object to the dismissal of their claim regarding two statements about corporate governance.  An April 27, 2018 SEC filing stated Ultra believed the separation of the CEO and Chairman positions "allows the Chief Executive Officer to focus on the day-to-day business and operations

8

while allowing the independent Chairman of the Board to lead the board in its fundamental role of providing guidance to and oversight of management." Compl. ¶ 206 (Statement 16). The filing also stated that one way Ultra mitigated risk was "by engaging both the Board and management in our internal processes to identify circumstances that may create unnecessary risk." *Id.* ¶ 209 (Statement 17). The Recommendation correctly concludes both statements are not actionable.

First, the Recommendation is correct that both statements were immaterial as a matter of law, as they were not statements "a reasonable investor would consider … important in determining whether to buy or sell stock." Dkt. #102 at 44 (quoting *In re Level 3 Commc'ns Sec. Litig.*, 667 F.3d 1331, 1339 (10th Cir. 2012)). Plaintiffs argue for the first time in their objection that these statements were material because "Fir Tree Capital Management had just taken a significant stake in Ultra Petroleum" and "management over the company was of the utmost importance to investors" "in light of the 'Cooperation Agreement' and 'Standstill Provisions' entered into between Ultra Petroleum and Fir Tree." Dkt. #103 at 8-9; *see also* Dkt. #97 at 19 (noting Plaintiffs' failure to contest immateriality). Plaintiffs waived this argument by raising it for the first time in their Objection. *See Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."); *Goodwin v. Bruggeman-Hatch*, 2014 WL 4723916, *2 (D. Colo. Sept. 22, 2014) (similar). Regardless, Plaintiffs' vague reference to Fir Tree's relationship with Ultra is not sufficient to plead materiality. As the Recommendation correctly notes, "[t]he importance of [Fir Tree's relationship with Ultra] does not, however, mean that everything [D]efendants said on the topic was material." Dkt. #102 at 44-45 (quoting *Level 3 Commc'ns*, 667 F.3d at 1340).

Second, Plaintiffs fail to plead that either statement was false or misleading. Plaintiffs contend that "Mr. Lederman played an integral role in the day-to-day affairs" because of his role in developing and evaluating Ultra's horizontal drilling program. Dkt. #103 at 8. But, as the Recommendation

9

correctly recognizes, that is not a day-to-day business issue, but a strategic one.  Dkt. #102 at 45 (concluding that Plaintiffs' allegations show Fir Tree's role in horizontal drilling as "big-picture deci- sions").  Moreover, Plaintiffs' argument would "impose a strict judicial definition on such flexible phrases and concepts as … 'day-to-day business' that are frequently found in the corporate context." *Id.* (citing *Level 3 Commc'ns*, 667 F.3d at 1340 (holding as nonactionable "vague … management-speak upon which no reasonable investor would base a trading decision")).  Finally, as the Recommendation reasons, Ultra's statement was a description of its structural barriers to "*mitigate* the chance that [Ul- tra's] named executives *may* have incentive to take *undue* risk."  Dkt. #102 at 45-46 (quoting Compl. ¶ 209).  It was not a statement that Ultra did not take any risks.  Consequently, the Recommendation is correct that Statement 17 was a "tempered statement [that] is far from an actionable assurance that Ultra's Board would prevent Ultra from taking risks as a corporation.  Instead, it is a commonplace statement of commitment to risk management, which are generally unactionable." *Id.* (citing *Smallen v. W. Union Co.*, No. 17-cv-00474-KLM, 2019 WL 1382823, *7 (D. Colo. Mar. 27, 2019)).[4]

## III.    The Court Should Adopt The Recommendation Because Plaintiffs Do Not Plead Facts Giving Rise To The Requisite Inference Of Scienter.

Independent of their failure to plead a false or misleading statement, the Court should dismiss the complaint because Plaintiffs do not plead with particularity facts giving rise to a strong inference that any Defendant acted with intent to deceive investors.  Dkt. #84 at 22-25; Dkt. #97 at 19-24.  The Recommendation did not analyze this argument because it did not need to reach it.  Dkt. #102 at 24.  Nonetheless, the Court can consider it on *de novo* review.

---

[4] The Recommendation did not address Defendants' additional reasons for dismissal of Plaintiffs' claim against Statement 16.  As detailed in Defendants' motion to dismiss, Statement 16 is a statement of belief and Plaintiffs do not satisfy *Omnicare* because they do not plead facts demonstrating Ultra did not sincerely believe the opinion.  Dkt. #84 at 21.

Dated: December 19, 2022

Respectfully submitted,

/s/ David Holman

David Holman
CRISHAM & HOLMAN LLC
2549 West Main Street, Suite 202
Littleton, CO 80120
(720) 739-2176

Joshua Z. Rabinovitz
Anne I. Salomon
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(312) 862-2284

*Counsel for Defendants Michael D. Watford
and C. Bradley Johnson*

Edmund Polubinski III
Patrick W. Blakemore
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017 Telephone: (212)
450-4000
Facsimile: (212) 701-5800
Email: edmund.polubinski@davispolk.com

*Attorneys for Defendant Evan Lederman*

Sheila A. Sadighi
300 Executive Drive, Suite 275
West Orange, New Jersey 07052
Tel. 973-996-4991
ssadighi@rksllp.com

Matthew Peller
1251 Avenue of the Americas
New York, New York 10020
Tel. 212-597-2822
mpeller@rksllp.com

*Counsel for Defendant Fir Tree Capital
Management LP (f/k/a Fir Tree Inc.)*

11