**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 20-cv-02652-NYW-STV (consolidated for all purposes with Civil Action No. 20-cv-02820)

SCOTT HEINER,
BALA SETTU,
GEOFFREY POLYCHRONIS,
MAHDI RIYAD ISSA,
YOAV GIVON, and
MICHAEL ALTMAN, Individually and on behalf of all others similarly situated,

       Plaintiffs,

v.

MICHAEL D. WATFORD,
C. BRADLEY JOHNSON,
ULTRA PETROLUEM, INC.,
FIR TREE CAPITAL MANAGEMENT LP N/K/A FIR TREE PARTNERS INC., and
EVAN LEDERMAN,

       Defendants.

---

**ORDER ADOPTING RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

---

This matter comes before the Court on the Recommendation of United States Magistrate Judge Scott T. Varholak. [Doc. 102]. Judge Varholak recommends that:

(1) the Motion to Dismiss of Defendants Michael D. Watford and C. Bradley Johnson, [Doc. 84], be granted;

(2) a Motion for Judicial Notice, [Doc. 85], be granted in part and denied in part;

(3) Defendant Evan Lederman's Motion to Dismiss the Second Amended Complaint for Failure to State a Claim, [Doc. 86], be granted;

(4) Defendant Fir Tree Capital Management's Motion to Dismiss the Second Class Action

Complaint, [Doc. 87], be granted;

> (5) the Second Amended Complaint, [Doc. 75-2], be dismissed without prejudice; and

> (6) Plaintiffs be given leave to file a proposed amended complaint.

[*Id.* at 50–51]. Plaintiffs and Defendants filed Objections on December 5, 2022 ("Plaintiffs' Objection" and "Defendants' Objection," respectively), [Doc. 103; Doc. 104], and the Parties filed their responses to the Objections on December 19, 2022, [Doc. 105; Doc. 106]. For the reasons below, the Court **ADOPTS** the Recommendation, which is incorporated into this Order by reference. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I.      LEGAL STANDARDS

### A.      Review of a Magistrate Judge's Recommendation

Pursuant to Fed. R. Civ. P. 72(b)(3), this Court reviews de novo any part of the magistrate judge's recommendation that is properly objected to. An objection is proper only if it is sufficiently specific "to focus the district court's attention on the factual and legal issues that are truly in dispute." *United States v. One Parcel of Real Prop.*, 73 F.3d 1057, 1060 (10th Cir. 1996). "In the absence of a timely objection, the district court may review a magistrate's report under any standard it deems appropriate." *Summers v. State of Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991).

### B.      Dismissal Under Federal Rule of Civil Procedure 12(b)(6)

In evaluating a motion to dismiss under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the plaintiff, and draw all reasonable inferences in the plaintiff's favor. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 757 F.3d 1125, 1136 (10th Cir. 2014); *Mink v. Knox*, 613 F.3d 995, 1000 (10th Cir. 2010). The complaint must allege a "plausible" right to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 n.14 (2007); *see also id.* at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). Conclusory allegations are insufficient,

*Cory v. Allstate Ins.*, 583 F.3d 1240, 1244 (10th Cir. 2009), and courts "are not bound to accept as true a legal conclusion couched as a factual allegation," *Twombly*, 550 U.S. at 555 (quotation omitted).

## II.    BACKGROUND

The factual allegations in the Second Amended Class Action Complaint for Violation of the Federal Securities Laws ("Second Amended Complaint"), [Doc. 75-2], are summarized in the Recommendation and accepted as true for present purposes.  The Court restates that summary below.

This federal securities fraud putative class action arises out of an alleged attempt to artificially boost an ailing natural gas production company's stock value through misinformation regarding the company's drilling prospects and leadership structure. *See generally* [*id.*]. Defendants are (1) Ultra Petroleum, Inc. ("Ultra"), a natural gas development and production company;[1] (2) Michael D. Watford, Ultra's CEO from September 1999 until March 2018; (3) C. Bradley Johnson, Ultra's CEO from March 2018 until October 2020; (4) Fir Tree Capital Management LP n/k/a Fir Tree Partners Inc. ("Fir Tree"), a private investment firm that held a substantial amount of Ultra's common stock during the Class Period; and (5) Evan Lederman, a partner at Fir Tree who served as the Chairman of the Board of Ultra from February 2018 until "at least June 4, 2020."  [*Id.* at ¶¶ 29–33, 154–57].[2]  Plaintiffs are individuals who purchased Ultra common stock between May 10, 2017 and March 7, 2019 (the "Class Period").  [*Id.* at ¶¶ 1, 28].

---

[1] Plaintiffs allege that "Ultra is sued to the extent of its available insurance."  [Doc. 75-2 at ¶ 29]. Ultra has not made an appearance in this action.

[2] The Second Amended Complaint generally makes allegations of "Defendants" as a whole group, *see, e.g.*, [*id.* at ¶¶ 105, 112, 192, 200], later specifying that the Section 10(b) claim is brought against the "Ultra Defendants"—Mr. Johnson, Mr. Watford, and Ultra—and that the Section 20(a) claim is brought against the "Controlling Defendants"—Mr. Johnson, Mr. Watford, Mr. Lederman, and Fir Tree. [*Id.* at ¶¶ 34–35, 240–55].  While this Order will specify the speaker of an allegedly

Beginning in the 1990s, Ultra developed extensive natural gas extraction operations in the Pinedale Anticline, a geological formation located in Wyoming (the "Pinedale Field"). [*Id.* at ¶¶ 50–51, 53–57]. The Pinedale Field was Ultra's primary asset, up to and through the Class Period. [*Id.* at ¶ 58].

By 2014, Ultra and its subsidiary held nearly $4 billion in outstanding debt. [*Id.* at ¶ 59] Ultra filed for bankruptcy in April 2016 following a period of low gas prices. [*Id.*]. At the time of its bankruptcy filing, Ultra reported outstanding debts of $3.75 billion, including $1.34 billion in unsecured notes issued by the Ultra holding company (the "Notes"). [*Id.*]. Ultra exited the bankruptcy in April 2017 with a plan to pay off debt creditors in cash in full through debt and equity funding, with the exception of Note holders, who would be paid in shares. [*Id.* at ¶¶ 60–61]. After securing refinancing and paying off its existing creditors, Ultra was left with $2 billion in debt and the following common-stock ownership profile:

• Former Shareholders: 41%

• Note Holders: 36%

• Purchasers in Rights Offering: 23%

[*Id.* at ¶¶ 61–63]. After acquiring a significant number of Notes and participating in the rights offering, Fir Tree owned 15.6% of Ultra's shares upon Ultra's exit from the bankruptcy. [*Id.* at ¶¶ 154–55].

A.    **Ultra's 2017 Vertical Drilling Operations**

Ultra represented that it was exiting bankruptcy in "growth mode." [*Id*. at ¶ 70]. While

---

false or misleading statement when possible, the Court largely adopts the Second Amended Complaint's general practice of referring to all defendants as a single group ("Defendants").

low gas prices in 2015 had forced Ultra to reduce its leased drilling rig[3] fleet to four, by May 2017 Ultra had informed investors that the fleet had been brought up to seven rigs, with negotiations for an eighth in the works.  [*Id.* at ¶¶ 76–77].

Due to the Pinedale Field's ecologically fragile environment, operators in the Pinedale Field must drill all wells from multi-well drilling pads to limit their impact.  [*Id.* at ¶¶ 78–79].[4]  In order to construct a drilling pad, an operator must secure a Master Drilling Permit, which takes about 12 months.  [*Id.* at ¶ 85].  And due to ecological and weather-related limitations, pad construction cannot be completed in the winter or spring.  [*Id.* at ¶ 84].  Thus, operators must plan ahead in constructing their drilling pads for the next season.  [*Id.* at ¶ 85].

Relatedly, Ultra's senior management and board of directors would adopt a drilling/development plan each year that would set out drilling locations for the upcoming year.  [*Id.* at ¶¶ 90–92].  This approval would either come in the fourth quarter of the previous year, or the first quarter of the year being planned.  [*Id.* at ¶ 92].

Ultra built its 2017 drilling pads in the summer and fall of 2016, when it was involved in its bankruptcy proceeding.  [*Id.* at ¶¶ 86–87].  This divided attention, along with the anticipation of a small drilling season, resulted in the construction of few new pads.  [*Id.* at ¶ 88].  Thus, in order to accommodate its eight-rig drilling fleet target, Ultra opted to place several rigs on "legacy" drilling pads—i.e., "pads that Ultra had built for drilling, but decided against drilling"—located in the eastern part of the Pinedale field.  [*Id.* at ¶¶ 89, 95, 116].  The eastern portion of the Pinedale

---

[3] Plaintiffs describe "[t]he rigs operators use to drill wells [as] colossal marvels of technology" that consist of "several independent buildings," which can cost $100,000 to assemble and disassemble.  [*Id.* at ¶ 74].  The lease price on a rig generally exceeds $10,000 per day.  [*Id.* at ¶ 75].

[4] Plaintiffs explain that "[d]rilling pads are well drilling sites that support multiple wells" and the wells are "drilled laterally so they do not draw from the same small area."  [*Id.* at ¶ 79; *id.* at 19 n.5].

Field historically delivered less production than the field average.  [*Id.* at ¶¶ 89, 116].  These issues were all laid out in the 2017 drilling plan, approved by Ultra's senior management and board of directors by at least May 2017.  [*Id.* at ¶¶ 92–93, 100, 102].

In May 2017, Ultra disclosed the results from its first quarter of drilling in 2017.  [*Id.* at ¶¶ 100–03].  Mr. Johnson informed investors on the Q1 2017 Earnings Call that "[w]ell quality will improve as we progress into 2017."  [*Id.* at ¶ 103].  On this call, an investor specifically asked about projected ultimate recoveries from the 2017 well and if "4 Bcf per well [was] still the right number."[5]  [*Id.* at ¶ 104].  Mr. Johnson responded:

> Yeah, this [is] Brad.  We were experimenting and continue to do so on our completions in Pinedale and really these recent experiments is more about diversion, and just looking for different ways to improve our diversion techniques for effective frac stages.  It's really too early to tell about those results.  We'll continue to experiment with that throughout the year.
>
> And we'll be happy to share those results once we have some conclusions to draw.  It's just an ongoing tinkering effort, frankly, that we do in [the Pinedale Field].  We're never satisfied.  We're always looking for ways to improve.  And in the first quarter, diversion was sort of our area of experimentation.

[*Id.* at ¶ 104; Doc. 84-3 at 12].

On August 9, 2017, Ultra held its Q2 2017 Earnings Call to discuss its second-quarter production results.  [Doc. 75-2 at ¶ 106].  During the call, Ultra announced that it was reducing its projected 2017 production growth rate by 3%, and reducing its projected 2018 production growth rate by 5%.  [*Id.*].  Ultra cited crew delays and budget reallocation towards its horizontal drilling program as the causes of the decreases.  [*Id.* at ¶ 108].  As for the new wells drilled, Ultra informed investors that "[u]pon arrival of the additional rigs, operational performance has been strong. And

---

[5] Plaintiffs define "Bcf" as "billion cubic feet equivalent," and a unit of energy measurement.  [*Id.* at ¶ 36].  The Second Amended Complaint does not identify the source of the "4 Bcf per well" figure referenced by the investor.

these rigs have quickly approached the fleet average on several key operational metrics." [*Id.* at ¶ 109]. Mr. Johnson told investors that he expected production to remain steady, stating that "[Ultra] expect[ed] the next 2 quarters to deliver similar results," and that "looking forward, I think we're going to continue to see 4b[cf] wells and greater than 35% returns for the balance of this year." [*Id.* at ¶¶ 110–11]. Ultra's stock price fell 14.38% that day. [*Id.* at ¶ 107]. An analyst report published after the call noted that "[i]mportantly, [the guidance reduction] does not at all appear [to be] a well performance issue." [*Id.* at ¶ 113].

On November 7, 2017, Ultra held its Q3 2017 Earnings Call. [*Id.* at ¶ 114]. During that call, Mr. Watford informed investors that "[w]e expect production for the full year 2017 to be slightly below guidance," citing "issues caused by recent bankruptcy and third parties" as the cause of this reduction. [*Id.* at ¶ 115]. He elaborated that:

> In Wyoming, due to weather and regulation, we are limited to building our drilling pads during the summer and fall after receiving a requisite approval. During the summer of 2016, and with the company battling a contested bankruptcy proceeding, we were unable to properly prep enough pads to optimize our ramp up from 2 rigs to 8 rigs in 2017. That meant that our 2017 program led some rigs being placed on legacy pads that were located in sub-optimal yet still economic areas along the eastern flank of our field.

[*Id.*]. Mr. Johnson confirmed that:

> In 2017, the activity has been primarily on the east flank of the field. The activity in this area was not the result of high grading our inventory. Instead, we placed new rigs as part of our ramp up on pads that were available. Normally, we plan and construct pads up to a year before we drill them. However, due to the uncertainty surrounding our in-court restructuring, some of that predrill effort was on hold. We began our 4 to 8 rig ramp up earlier this year, rigs were deployed mostly to the east flank. [] [T]he east flank typically delivers lower IP's and lower EUR's than average[.]

[*Id.* at ¶ 116].

On March 14, 2018, Ultra published a PowerPoint presentation for an upcoming conference, which disclosed unsustainably high finding and development costs[6] for its 2017 drilling.  [*Id.* at ¶ 117].  That same day, Ultra's stock price fell 12.3%.  [*Id.*]

### B.     Ultra's Horizontal Drilling Program

Coming out of its bankruptcy, Ultra revealed to investors that it was "optimistic about . . . taking horizontal development on the edges and fringes of the field and expanding the resource" through the drilling of horizontal wells.[7]  [*Id.* at ¶ 120 (statement of Mr. Johnson on May 3, 2017 call)].  Ultra had previously drilled a horizontal well in the Pinedale Field in 2016, but this well was not productive enough to justify its cost.  [*Id.* at ¶ 121].

Ultra would drill three horizontal wells in 2017.  [*Id.* at ¶ 122].  Each was commercially successful.  [*Id.*].  According to a former Ultra employee, Ultra's technical team had spent six months analyzing the Pinedale Field for the best location to place its experimental wells, ultimately deciding on drilling its wells from the "Warbonnet Pads."  [*Id.* at ¶ 130–31].  The Warbonnet Pads were located in the "core" of the Pinedale Field, as opposed to the "flank."  [*Id.* at ¶¶ 131, 133, 135].  Two were drilled on the "Warbonnet 9-23 Pad" (collectively, the "Warbonnet 9-23 Wells") and one on the "Warbonnet 9-24 Pad" (the "Warbonnet 9-24 Well") (collectively, the "Warbonnet Wells").  [*Id.* at ¶ 122].  The Warbonnet Wells were all located relatively close to each other, but targeted different drilling regions.  [*Id.*].

---

[6] According to Plaintiffs, "[f]inding and development costs measures the costs of researching and drilling wells divided by the total number of new reserves recognized."  [*Id.* at ¶ 117].  Thus, low-quality wells with few reserves can result in high finding and development costs.  [*Id.*].

[7] A horizontal well allows an operator to drill perpendicularly once it reaches a productive region, potentially allowing the operator to access more natural gas than vertical drilling alone.  [*Id.* at ¶¶ 10 & n.3].

Ultra disclosed its general plan to drill the Warbonnet Wells in its Q2 2017 Press Release. [*Id.* at ¶ 189]. Mr. Watford was quoted in the Q2 2017 Press Release explaining that Ultra would be shifting some of its resources from "development wells" to "three exploratory, horizontal wells." [*Id.* at ¶ 190]. On the Q2 2017 Earnings Call, Mr. Watford elaborated that:

> We're basically displacing the development vertical well drilling for the second half of [2017] so we can fund the horizontal experiment. And we're not proposing to see any production of any significance from the horizontal program. We're just—this is a science project. We think it has lots of upside. So we're displacing vertical wells.

[*Id.* at ¶ 191].

In its Q3 2017 Press Release and Earnings Call, Ultra announced the positive initial results from its first Warbonnet 9-23 Well ("Warbonnet 9-23 Well #1"). [*Id.* at ¶ 193]. The Press Release stated that Ultra had "[s]uccessfully drilled and completed a 2-mile horizontal well on the east flank of [the Pinedale Field]" and described Ultra's transition to "resource expansion." [*Id.* at ¶¶ 194–95]. On the Q3 2017 Earnings Call, Ultra gave more specific preliminary production numbers, and noted that it was "extremely pleased" with the results of Warbonnet 9-23 Well #1. [*Id.* at ¶¶ 193, 196]. Mr. Watford stated, "[w]e believe this well is indicative of horizontal potential in the field, which could result in potentially 16 new horizontal wells[.]" [*Id.* at ¶ 197]. Mr. Johnson explained that Ultra was pursuing "the concept of drilling horizontal flank wells from preexisting pads used for vertical wells. . . . We are doing this very operation on the Warbonnet 9-24 pad right now." [*Id.* at ¶ 199]. Noticing that Ultra's estimated initial production numbers appeared lower than the initial production of Warbonnet 9-23 Well #1, an investor asked whether there was "anything different with the Warbonnet [9-23 Well #1] or are you just trying to build in some conservativism?" [*Id.* at ¶ 198]. Mr. Watford responded:

> Sure. To be frank, we built these economics last week prior to the [initial production data] of our well. So we [w]anted to anchor the economics here, based on actual data observed by other wells. So we used the [initial production] of 11 million a

9

day from the Antelope well, certainly double the [initial production] rate of our well. We would recalculate and come up with significantly better economics with much higher returns.

[*Id.*].

The day of the Q3 2017 Earnings Call, Ultra's stock price rose by 2.36%.  [*Id.* at ¶ 152]. About a week after the Q3 2017 Earnings Call, Ultra issued a press release with more detailed results for Warbonnet 9-23 Well #1.  [*Id.*].  Ultra's stock price rose by 5%.  [*Id.*].

On January 30, 2018, Ultra published a press release announcing that Ultra "has completed three horizontal[] [wells] on the east flank, each one targeting different intervals and each one verifying the significant resource potential beyond the previous commercial boundary of the Pinedale [Field]."  [*Id.* at ¶ 202].  Ultra's stock price fell by 2.35%.  [*Id.* at ¶ 152].

On February 28, 2018, Ultra held a Q4 2017 and Fiscal Year 2017 Earnings Call.  [*Id.* at ¶ 204].  On that call, an investor noted that Ultra's next planned horizontal wells "are pretty close to your Warbonnet wells," and asked if Ultra would "stay pretty focused on the area that's been working for you[.]"  [*Id.*].  Mr. Johnson responded that Ultra was "going to stay in the same ZIP Code for a while.  And we're definitely interested and want to learn more about the flanks.  But right now, our focus is on delivering repeatable results."  [*Id.*].

On or around May 10, 2018, Ultra delivered its Q1 2018 Press Release and held its Q1 2018 Earnings Call.  [*Id.* at ¶ 211–13].  The Q1 2018 Press Release disclosed the initial production rates of Ultra's two newly completed horizontal wells ("Well #4" and "Well #5").  [*Id.* at ¶ 211]. Both Wells #4 and #5 had lower initial production rates than at least two of the Warbonnet Wells. [*Id.* at ¶¶ 122, 211].  During the Q1 2018 Earnings Call, an investor asked about the poor performance of Wells #4 and #5 compared to the Warbonnet Wells.  [*Id.* at ¶ 213].  Mr. Johnson responded that "[t]he geological nature of [the Pinedale Field] does have variability and we certainly encountered that on these last two wells."  [*Id.*].  Mr. Johnson noted:

> [The wells were] certainly within an acceptable range [for] us to continue to ramp up [the horizontal drilling program]. . . . [T]he well cost performance continues to be very [g]ood.  The execution continues to be very good.  And we're excited about the results so far.  And we're excited about the upcoming wells and collectively, all that gives us the confidence to go faster.

[*Id.* at ¶ 215].  Mr. Johnson also defended Ultra's decision to continue to ramp up its horizontal drilling program by stating that "the opportunity to shift capital through horizontal wells is just, for us, the obvious thing to do given the superior returns."  [*Id.* at ¶ 216].  Around this time, Ultra's stock fell nearly 30%.  [*Id.* at ¶ 212].

On August 9, 2018, Ultra released its Q2 2018 Press Release.  [*Id.* at ¶ 218–20].  The Q2 2018 Press Release revealed poor initial production rates of nine new horizontal wells ("Wells ##6–14"), which appear to have been the final horizontal wells that Ultra would drill in the Pinedale Field during the Class Period.  [*Id.* at ¶ 20–22, 218].  Mr. Johnson was quoted as acknowledging the poor performance of these wells, but highlighting Ultra's ongoing efforts to "expand[] our technical efforts to better leverage our learnings in future horizontal wells."  [*Id.* at ¶ 220].  The next day, Ultra's stock price fell 29.3%.  [*Id.* at ¶ 219].

During its Q3 2018 Earnings Call held on November 3, 2018, Ultra announced that it was pausing its horizontal drilling program, but Mr. Johnson informed investors that Ultra's leadership "remain[ed] confident that further well data analysis and optimization will allow [Ultra] to drill successful horizontal wells next year."  [*Id.* at ¶¶ 21, 221].  In its Q4 2018 and Fiscal Year 2018 Press Release, released on March 7, 2019, Ultra disclosed that its "2019 capital investment program does not include horizontal drilling."  [*Id.* at ¶¶ 22, 222].  Ultra's stock price fell by 11.8% that day.  [*Id.* at ¶ 223].  This would be the end of Ultra's horizontal drilling program in the Pinedale Field.  [*Id.* at ¶ 22, 222].  Ultra halted its drilling program entirely by the Fall of 2019, and filed for its second bankruptcy in May 2020.  [*Id.* at ¶ 23].

### C.   Fir Tree's Involvement in Ultra's Corporate Governance

As previously mentioned, Fir Tree held a significant position in Ultra following Ultra's emergence from bankruptcy in 2017.  [*Id.* at ¶¶ 154–55, 157].  Plaintiffs allege that immediately following Ultra's emergence from bankruptcy, Fir Tree used its position to exert influence over the selection of two of Ultra's directors.  [*Id.* at ¶ 156].  In September 2017, Fir Tree announced its intention to "Pursue Value-Maximizing Strategic Alternatives for Ultra Petroleum Corp." [*Id.* at ¶ 158].  Ultra responded positively, "announc[ing] . . . its intention to work collaboratively with Fir Tree Partners . . . to pursue value-maximizing strategies." [*Id.* at ¶ 159].

On January 30, 2018, Ultra and Fir Tree announced that they had entered into a "Cooperation Agreement." [*Id.* at ¶ 160].  The Cooperation Agreement entitled Fir Tree to directly select one director for Ultra's seven-person board—Fir Tree selected Mr. Lederman.  [*Id.* at ¶¶ 160–61].  In addition, Fir Tree was entitled to propose three to five candidates for another seat, and Ultra would choose one.  [*Id.*].  Two directors would resign to open space.  [*Id.* at ¶ 160].  In exchange, Fir Tree agreed to refrain from (1) acquiring more than 25% of Ultra's voting securities; (2) soliciting proxies; (3) facilitating any tender or exchange offer, or take-over bid; and (4) seeking additional board candidates to Ultra's Board.  [*Id.* at ¶ 161].  Finally, Fir Tree agreed that it would not "take any public action in support of or make any public proposal or request that constitutes or relates to . . . advising, controlling, changing or knowingly influencing the Board or management of [Ultra]." [*Id.*].  After the Fir-Tree selected directors took their seats on Ultra's board, Mr. Watford stated in a private call that Fir Tree was in control of Ultra.  [*Id.* at ¶¶ 163–64].

Fir Tree's control extended specifically to Ultra's decision to switch to horizontal drilling. [*Id.* at ¶ 165].  Historically, Ultra's directors were not involved in formulating drilling plans, but would instead give a "yes" or "no" to a drilling plan prepared by Ultra's management and technical professionals.  [*Id.* at ¶ 167].  In early 2018, however, Mr. Lederman held a meeting with Mr.

Johnson and members of Ultra's technical team where he ordered them to focus on horizontal drilling for the remainder of the year. [*Id.* at ¶ 168]. Mr. Johnson and the technical team suggested a gradual approach to the horizontal drilling program, which Mr. Lederman personally overrode. [*Id.* at ¶¶ 169–70]. While the precise date of this meeting is unclear, it was unusual in that it occurred outside of "the normal cycle" for adopting a drilling plan, and resulted in a late alteration of the budget in order to have additional horizontal testing. [*Id.* at ¶¶ 168, 171]. Mr. Lederman also made specific requests to various lower-level Ultra employees without going through company executives. [*Id.* at ¶¶ 186–88].

To build internal support for rapidly expanding the horizontal drilling program, Mr. Lederman relied on modelling created by Andrew Teno—a Fir Tree director and employee who lacked graduate-level training or any type of technical degree. [*Id.* at ¶¶ 177–78, 180]. Mr. Teno's model utilized inputs to an Excel spreadsheet, as opposed to relying on sophisticated industry-specific software used to minimize human error. [*Id.* at ¶¶ 179–80]. Mr. Teno's model contained numerous errors that resulted in estimates that were unrealistically high. [*Id.* at ¶ 180]. Similarly, Mr. Lederman pushed Ultra's board to rely on unrealistic assumptions with respect to production and cost estimates, consistently assuming the highest production estimates and the lowest cost estimates. [*Id.* at ¶¶ 181–84].

With these activities occurring internally, on April 27, 2018, Ultra made an amendment to its 2017 10-K form filed with the SEC. [*Id.* at ¶ 206]. The amendment noted that Ultra's board had separate roles for the Chairman of the Board (Mr. Lederman) and the Chief Executive Officer (Mr. Johnson). [*Id.*]. It stated Ultra's "belie[f] [that] the separation of the two roles allows the Chief Executive Officer to focus on the day-to-day business and operations while allowing the independent Chairman of the Board to lead the board in its fundamental role of providing guidance

to and oversight of management."  [*Id.*].  It also noted the board's job to "mitigate the chance that [Ultra's] named executive officers may have incentive to take undue risk by . . . engaging both the Board and management in our internal processes to identify circumstances that may create unnecessary risk."  [*Id.* at ¶ 209].

### D.    Procedural History

In September 2020, two groups of investors filed lawsuits against Ultra and members of its Board.  *See* [Doc. 1]; *Bussom v. Watford, et al.*, No. 20-cv-02820-KLM.  The suits were consolidated on April 29, 2021.  [Doc. 41].  In May 2022, Plaintiffs filed the operative Second Amended Complaint, alleging violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("Exchange Act" or the "Act"), 15 U.S.C. §§ 78j(b) and 78t(a), as well as Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  [Doc. 75-2; Doc. 77].

On June 8, 2022, Mr. Watford and Mr. Johnson, together, filed a Motion to Dismiss (the "Watford and Johnson Motion"), arguing that: (1) Plaintiffs failed to meet the heightened pleading standards created by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and therefore failed to state a claim under Section 10(b) of the Exchange Act; and (2) with no underlying violation of Section 10(b), Plaintiff's Section 20(a) claims necessarily fail.  [Doc. 84].  Messrs. Watford and Johnson also filed the Motion for Judicial Notice, wherein they requested that the Court consider twelve exhibits in ruling on the Motions to Dismiss, [Doc. 85], which consisted of SEC Filings, Earnings Call Transcripts, and PowerPoint Presentations.  [Doc. 84-2 to Doc. 84-13].

The same day, Mr. Lederman and Fir Tree each filed separate Motions to Dismiss (the "Lederman Motion" and "Fir Tree Motion," respectively), both arguing that Plaintiffs failed to state a claim under Section 20(a) of the Exchange Act because: (1) for the reasons set out in the Watford and Johnson Motion, [Doc. 84], Plaintiffs failed to state a claim under Section 10(b) of

the Exchange Act, therefore failing to state a claim under Section 20(a); and (2) Fir Tree and Mr. Lederman were not "control persons" under Section 20(a).  [Doc. 86; Doc. 87].  Plaintiffs filed a combined response to the three Motions to Dismiss, and filed a separate response to the Motion for Judicial Notice.  [Doc. 91; Doc. 93].  Defendants subsequently replied to the Motions to Dismiss, [Doc. 97; Doc. 99; Doc. 100], and Messrs. Johnson and Watford replied to the Motion for Judicial Notice, [Doc. 98].

The Motions were referred to Judge Varholak for a Recommendation.  [Doc. 88].  After they were fully briefed, Judge Varholak recommended that the Motion for Judicial Notice be granted in part and denied in part, the Motions to Dismiss be granted, the Second Amended Complaint be dismissed without prejudice, and Plaintiffs be given leave to file a proposed amended complaint.  [Doc. 102 at 50].

## III.    ANALYSIS

### A.    Motion for Judicial Notice

The Parties do not object to Judge Varholak's recommendation that the Motion for Judicial Notice be granted in part and denied in part.  *See* [Doc. 103; Doc. 104].  In the absence of an objection, the district court may review a Magistrate Judge's recommendation under any standard it deems appropriate.  *See Summers v. Utah*, 927 F.2d 1165, 1167 (10th Cir. 1991); *see also Thomas v. Arn*, 474 U.S. 140, 150 (1985) ("It does not appear that Congress intended to require district court review of a [magistrate judge's] factual or legal conclusions, under a *de novo* or any other standard, when neither party objects to those findings.").

The Court has reviewed the portion of the Recommendation relating to the Motion for Judicial Notice, *see* [Doc. 102 at 2–6], to satisfy itself that there is "no clear error on the face of

the record."[8] Fed. R. Civ. P. 72(b), advisory committee's note to 1983 amendment.  Based on this review, the Court has concluded that the Recommendation is thorough, well-reasoned, and a correct application of the facts and the law.   Accordingly, it is **ORDERED** that the Recommendation is **ADOPTED** with respect to the Motion for Judicial Notice, [Doc. 85], and the Motion for Judicial Notice is **GRANTED IN PART AND DENIED IN PART**.  Thus, in addition to the well-pleaded factual allegations in the Second Amended Complaint, [Doc. 75-2], the Court finds it appropriate to consider the contents of the SEC Filings and Earnings Call Transcripts in resolving the instant Motions to Dismiss.  *See* [Doc. 84-3 to Doc. 84-10, Doc. 84-12].

### B.     Motions to Dismiss

Plaintiffs assert Count I against Mr. Johnson, Mr. Watford, and Ultra (the "Ultra Defendants") for violation of Section 10(b) of the Exchange Act and Rule 10b-5, alleging that the Ultra Defendants knowingly made false and misleading statements for the purpose of defrauding Plaintiffs in connection with the purchase of Ultra's securities, which impacted the price of Ultra's common stock.  [Doc. 75-2 at ¶¶ 240–49].  Plaintiffs assert Count II against Mr. Johnson, Mr. Watford, Mr. Lederman, and Fir Tree (the "Controlling Defendants") for aiding and abetting the Ultra Defendant's conduct, in violation of Section 20(a) of the Act.  [*Id.* at ¶¶ 250–55].

*The Recommendation.*  With respect to Plaintiffs' claims under Count I, Judge Varholak reviewed the three categories of statements that Plaintiffs allege Defendants made in violation of Section 10(b) and Rule 10b-5: (1) statements misrepresenting Ultra's 2017 drilling plan and its capabilities ("Statements 1–5"), [Doc. 75-2 at ¶¶ 103–04, 109–11]; (2) statements misrepresenting Ultra's post-bankruptcy horizontal drilling program ("Statements 6–15"), [*id.* at ¶¶ 120, 190–91,

---

[8] This standard of review is something less than a "clearly erroneous or contrary to law" standard of review, Fed. R. Civ. P. 72(a), which in turn is less than a *de novo* review.  Fed. R. Civ. P. 72(b).

194–99, 202, 204, 206, 213]; and (3) statements misrepresenting the nature of Ultra's relationship with Fir Tree and Mr. Lederman and their influence over Ultra's decision-making ("Statements 16–19"), [*id.* at ¶¶ 206, 208–09, 215–16]. [Doc. 102 at 24–48]. First, Judge Varholak found that the alleged violations regarding the 2017 Vertical Drilling Statements before September 2018 were barred by the statute of limitations, and accordingly, recommended their dismissal. [*Id.* at 30]. As to statements made with respect to Ultra's post-bankruptcy drilling program and statements made with respect to Ultra's relationship with Fir Tree and Mr. Lederman, Judge Varholak found that Plaintiffs failed to adequately plead an actionable false or misleading statement in the Second Amended Complaint, and therefore did not reach the issue of whether Defendants acted with scienter. [*Id.* at 30-48]. And because Plaintiffs failed to plead a primary violation of the securities laws under Count I, Judge Varholak found that Plaintiffs' claim under Count II for violation of Section 20(a) necessarily failed. [*Id.* at 48–49]. Finally, Judge Varholak recommended that Plaintiffs be granted leave to amend. [*Id.* at 49–50].

***Plaintiffs' Objection.*** Plaintiffs argue that Judge Varholak erred in the Recommendation "because instead of evaluating Plaintiffs' claims in their own right to determine if they were plausible on their face, he considered them relative to a competing narrative that he ultimately saw as more likely to prevail," which was "inappropriate under the law." [Doc. 103 at 1–2]. Defendants disagree with Plaintiffs, countering that Judge Varholak properly "considered Plaintiffs' allegations and other information that Plaintiffs *do not dispute*" and "carefully analyzed whether Plaintiffs had met the heightened pleading burden for a securities fraud claim." [Doc. 106 at 2]. Defendants also point out that "Plaintiffs object to Judge Varholak's analysis only as to seven of the [19] alleged misstatements" that Plaintiffs claim support their claims under Count I. [*Id.*].

***Defendants' Objection.***   Defendants object to the Recommendation insofar as Judge Varholak recommended that Plaintiffs be granted leave to amend.  [Doc. 104 at 1–2].  Defendants argue that "Plaintiffs already had the full benefit of reviewing the arguments that the Recommendation credited in deciding in Defendants' favor" because Defendants made the same arguments in prior motions to dismiss, which were fully briefed.  [*Id.* at 2].  Defendants also state that Plaintiffs' request for leave to amend "is insufficient and the Court should dismiss the case with prejudice, rather than giving Plaintiffs yet another opportunity to replead." [*Id.*].  In response, Plaintiffs argue that the Court should grant leave to amend if it adopts Judge Varholak's recommendation to grant the Motions to Dismiss.  [Doc. 105].

### 1.    2017 Vertical Drilling Statements (Statements 1–5)

Plaintiffs do not object to the Recommendation that any violations based on the 2017 Vertical Drilling Statements made before September 2018 are barred by the statute of limitations.  *See* [Doc. 103].  Accordingly, this Court may review Judge Varholak's Recommendation that violations based on such be dismissed under any standard it deems appropriate.  *Summers*, 927 F.2d at 1167.  This Court finds that Judge Varholak's Recommendation as to the 2017 Vertical Drilling Statements is well-reasoned and there is no clear error.

### 2.    Ultra's Post-Bankruptcy Horizontal Drilling Program (Statements 6–15)

Next, this Court considers the Recommendation and Plaintiffs' Objection as to Ultra's post-bankruptcy statements regarding its horizontal drilling program.  Defendants contend that Plaintiff's object to the Recommendation's conclusion only regarding five statements, i.e., Statements 10, 11, 13, 14, and 15.  [Doc. 106 at 2].  Those statements are as follows:

(10)[9]   "We believe this well is indicative of horizontal potential in the field …." [Doc. 102 at 31 (citing [Doc. 75-2 at ¶ 175 (statement of Mr. Watford during Q3 2017 Earnings Call)])];

(11)   "[Q:] 'Is there anything different with the Warbonnet well or are you just trying to build in some conservatism?' [A:] 'Sure. To be frank, we built these economics last week prior to [receiving the initial data] of our well. . . . We would recalculate and come up with significantly better economics with much higher returns.'" [*Id.* at 32 (citing [Doc. 72-5 at ¶ 198 (statement of Mr. Watford during the Q3 2017 Earnings Call)])];

(13)   The initial results of this well confirm the horizontal potential of the Mesaverde interval. We were expecting higher pressures and higher porosities in the Mesaverde and that is exactly what we encountered . . . . To date, [Ultra] has completed three horizontals on the east flank, each one targeting different intervals and each one verifying the significant resource potential beyond the previous commercial boundary of the Pinedale [Field]. We look forward to drilling more horizontal wells in 2018 and beyond. [*Id.* at 40 (citing [Doc. 75-2 at ¶ 202])];

(14)   [Q:] Then it looks like those next couple of horizontal wells are pretty close to your Warbonnet Wells. What are your plans to delineate the play this year? Or are you going to stay pretty focused on that area that's been working for you? [A:] Yes. We're going to stay in this same ZIP Code for a while. And we're definitely interested and want the learn more about the flanks. But right now, our focus is delivering repeatable results. [*Id.* at 41 citing Doc. 75-2 at ¶ 204]; and

(15)   In response to an investor question regarding a lower production from Wells #4 and #5, Mr. Johnson responded by referring to "[t]he geological nature of [the] Pinedale [Field] does have variability and we certainly encountered that on these last two wells." [*Id.* at 42 citing Doc. 75-2 at ¶¶ 211-13.

In reviewing Plaintiffs' Objection, this Court agrees that their Objection is limited to these statements and the theory that Defendants made false and misleading statements by informing investors that the Warbonnet wells were indicative of the horizontal potential in the Pinedale Field, while knowing that those wells were drilled at the most optimal placement and that subsequent

---

[9] For ease of reference, the Court follows the numbering of the statements as set forth in the Recommendation.

wells would necessarily be less productive. [Doc. 103 at 2–7]. Therefore, this Court limits its *de novo* review of Judge Varholak's statements accordingly.[10]

Turning to Statements 10, 11, 13, 14, and 15, Plaintiffs object to Judge Varholak's finding that Defendants' post-bankruptcy horizontal drilling statements were not material, arguing that Judge Varholak accepted Defendants' narrative and ignored Plaintiffs' allegations of materiality, including an excerpt from an analyst report written by NatAlliance Securities, stating that Ultra Petroleum is most likely going to be able to reduce costs and achieve better results based on the new horizontal well at Pinedale. [Doc. 103 at 3–4]. In doing so, however, Plaintiffs first address a more fundamental issue, i.e., whether they have sufficiently averred that these statements were false or misleading. *Compare* [Doc. 103 at 2–7] *with* [Doc. 102 at 35–42]. Statement 10 lies at the core of Plaintiffs' theory: "We believe this well is indicative of horizontal potential in the field . . ." With respect to Statement 10 (and the related Statement 11), Plaintiffs fail to meaningfully point to any factual allegations in their Amended Complaint that would permit a factfinder to conclude that the statement was not an opinion, or that it misrepresented Mr. Watford's, or Ultra's, belief based on the underlying facts. *See* [Doc. 103 at 2–7]. Indeed, Plaintiffs seem to implicitly concede that the statements were "literally accurate." [Doc. 103 at 6–7]. Instead, Plaintiffs contend that Defendants' statements about the horizontal well on January 30, February 28, and May 10, 2018 (Statements 13–15) further a misrepresentation that the initial well was representative of those to come. [Doc. 103 at 6]. But, for these statements to be viable as false or misleading, Plaintiffs must first allege sufficient facts to allow a factfinder to conclude that

---

[10] The Court may review Judge Varholak's Recommendation as to Statements 6–9, and 12 under any standard, and upon review, finds it well-reasoned and without clear error.

Statement 10 misrepresented Mr. Watford's belief at that time, and this Court's review of the Amended Complaint reveals no such factual allegations.

 3. **Statements Made Regarding the Nature of Ultra's Relationship with Fir Tree and Mr. Lederman and their Influence over Ultra's Decision-Making (Statements 16–19)**

This Court next turns to the Recommendation and Plaintiffs' Objection as to statements made regarding the relationship between Fir Tree and Mr. Lederman, on one hand, and Ultra, on the other. The Court limits its *de novo* review on Plaintiffs' Objection to Judge Varholak's finding that two statements[11] made in Ultra's April 17, 2018 amendment to its 2017 annual report were not actionable:

 (16)   The amendment noted that Ultra's board had separate roles for the Chairman of the Board (Mr. Lederman) and the Chief Executive Officer (Mr. Johnson). [Doc. 75-2 at ¶ 206]. Specifically, it stated Ultra's "belie[f] [that] the separation of the two roles allows the Chief Executive Officer to focus on the day-to-day business and operations while allowing the independent Chairman of the Board to lead the board in its fundamental role of providing guidance to and oversight of management." [*Id.*]; and

 (17)   It also noted the board's job to "mitigate the chance that [Ultra's] named executive officers may have incentive to take undue risk by . . . engaging both the Board and management in our internal processes to identify circumstances that may create unnecessary risk." [*Id.* at ¶ 209].

Upon *de novo* review, this Court concludes that Judge Varholak correctly determined that these statements were not actionable. Specifically, courts around the country have determined that statements regarding good corporate governance are too general to cause a reasonable investor to rely upon them. *See, e.g.*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d

---

[11] The Objection does not challenge Judge Varholak's finding that Statements 18–19 are "statements of corporate excitement about past results and upcoming plans are a classic example of inactionable puffery." *Compare* [Doc. 103 at 8–10] *with* [Doc. 102 at 47–48]. Thus, this Court has reviewed Judge Varholak's Recommendation as to Statements 8–19 and has found no clear error. *Summers,* 927 F.2d 1165.

173, 185 (2d Cir. 2014) (explaining "[i]t is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them" (internal quotations omitted)).

### 4.    Section 20(a) Claims

Because this Court concurs with the Recommendation insofar as it finds that "a primary violation of the securities laws" as asserted under Section 10(b) has not been adequately pleaded, the Court further determines that Plaintiffs' Section 20(a) claims necessarily fail.  [Doc. 102 at 49 (citing *Smallen v. The W. Union Co.*, 950 F.3d 1297, 1315 (10th Cir. 2020))].

### 5.    Leave to Amend

Finally, this Court considers Defendants' Objection to Judge Varholak's Recommendation that Plaintiffs be given leave to amend the operative pleading within 14 days.  [Doc. 102 at 49]. Defendants object, arguing that Plaintiffs should not be given a fourth opportunity to amend when Plaintiffs' request to amend was reflected in a single sentence in a footnote.  [Doc. 104 at 2]. Instead, Defendants argue that this action should be dismissed with prejudice.  [*Id.* at 2, 5]. Plaintiffs argue in response that Defendants must demonstrate that Judge Varholak abused his discretion before this Court can properly deny leave to amend.  [Doc. 105].

This Court respectfully disagrees with Plaintiffs as to the applicable standard.  As an initial matter, Judge Varholak's Recommendation is not directed at a fully briefed motion to amend, which are considered by courts in this District as non-dispositive when granted.  *See Franke v. ARUP Labs., Inc.,* 390 F. App'x 822, 828 (10th Cir. 2010) ("motion to amend was a nondispositive pretrial matter that the magistrate judge was authorized to decide pursuant to 28 U.S.C. § 636(b)(1)(A)"); *Murphy Creek Ests., LLC v. Murphy Creek Ests. Funding, LLC*, No. 22-cv-00304-

DDD-NRN, 2022 WL 18674573, at *2 (D. Colo. Nov. 23, 2022) ("The weight of authority indicates that motions for leave to amend pleadings are considered nondispositive, at least when, as here, leave to amend is granted rather than denied.").   Rather, Judge Varholak considered whether leave to amend should be permitted within the context of a Recommendation on a Motion to Dismiss, without the benefit of any substantive discussion as to what amendments are proposed, and recommended that Plaintiffs be permitted to file an amended pleading within fourteen days of this Court's ruling.  [Doc. 102 at 49-50].  Thus, this Court reviews this portion of Judge Varholak's Recommendation *de novo*, as Defendants have filed a timely Objection.

This Court also disagrees with Defendants' contention—without citation of any legal authority—that the entirety of this action should be dismissed with prejudice.  [Doc. 104].  While this Court agrees that Claims I and II, insofar as they are based on the 2017 Vertical Drilling Statements made before September 2018 (Statements 1–5), are time-barred and appropriately dismissed with prejudice, it cannot conclude that the remainder of Claim I is necessarily futile.  *Cf. In re Qwest Commc'ns Int'l, Inc.,* 396 F. Supp. 2d 1178, 1209 (D. Colo. 2004).  Judge Varholak correctly notes that "[l]eave to amend is to be granted with extreme liberality in securities fraud cases, because the heightened pleading requirements imposed by the PSLRA are so difficult to meet." [Doc. 102 at 49 (quoting *Osher v. JNI Corp.*, 183 F. App'x 604, 605 (9th Cir. 2006))].

Nevertheless, this Court is mindful that Plaintiffs have already availed themselves of the opportunity to amend and that the request for amendment is limited.  Accordingly, instead of simply allowing Plaintiffs to file a Second Amended Complaint within 14 days, this Court will permit Plaintiffs to file a Motion to Amend after the required conferral with Defendants, and in compliance with all applicable rules, including but not limited to D.C.COLO.LCivR 15.1 and Civ. Practice Standard 10.1(c).

## CONCLUSION

For the reasons set forth herein, it is hereby **ORDERED** that:

(1)     Plaintiffs' Objection to the Recommendation of United States Magistrate Judge Scott T. Varholak to Grant Defendants' Motions to Dismiss the Complaint [Doc. 103] is **OVERRULED**;

(2)     Defendants' Objection to the Recommendation of United States Magistrate Judge [Doc. 104] is **OVERRULED**;

(3)     The Recommendation [Doc. 102] is **ADOPTED in its entirety**;

(4)     The Motion to Dismiss of Defendants Michael D. Watford and C. Bradley Johnson [Doc. 84] is **GRANTED**;

(5)     The Motion for Judicial Notice [Doc. 85] is **GRANTED IN PART AND DENIED IN PART**;

(6)     Defendant Evan Lederman's Motion to Dismiss the Second Amended Complaint for Failure to State a Claim [Doc. 86] is **GRANTED**;

(7)     Defendant Fir Tree Capital Management's Motion to Dismiss the Second Class Action Complaint [Doc. 87] is **GRANTED**;

(8)     The Second Amended Complaint [Doc. 75-2] is **DISMISSED with prejudice, insofar as the claims are based on the 2017 Vertical Drilling Statements made before September 2018 (Statements 1–5)**, and **DISMISSED without prejudice as to the remainder of the claims**; and

(9)     No later than **April 10, 2023**, Plaintiffs may file a Motion to Amend after the required conferral with Defendants, and in compliance with all applicable Federal Rules of Civil Procedure, Local Rules of Civil Practice, including but not limited

to D.C.COLO.LCivR 15.1, and the Uniform Practice Standards, to be briefed in the ordinary course.

DATED: March 27, 2023                    BY THE COURT:

                                         Nina Y. Wang
                                         United States District Judge